STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THOMAS C. RAMSEUR, DEFENDANT-APPELLANT.

Argued February 4, 1985—Decided March 5, 1987.

126

 

130

138

140

146

148

152

*James K. Smith, Jr.*, Deputy Public Defender, *Lois A. DeJulio*, First Assistant Deputy Public Defender, and *Matthew Astore*, Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith, Jr.*, Former Acting Public Defender, attorney; *James K. Smith, Jr.*, of counsel; *Lois A. DeJulio, Matthew Astore, Judith L. Borman, Jane Ellen Haburay, Claudia Van Wyk*, and *Patricia Kern*, Assistant Deputy Public Defenders, on the briefs).

*George L. Schneider*, Former Essex County Prosecutor, and *Hilary L. Brunell*, Former Assistant County Prosecutor, ar-

gued the cause for respondent (*George L. Schneider*, attorney; *Hilary L. Brunell, Elizabeth A. Duelly,* and *Marc J. Friedman,* Assistant County Prosecutors, on the briefs).

*Marc Feldman,* a member of the Virginia and Maryland bars, argued the cause for *amici curiae* American Civil Liberties Union of New Jersey and NAACP Legal Defense and Education Fund, Inc. (*Jeffrey E. Fogel,* attorney; *Marc Feldman* and *Robert F. Williams,* of counsel and on the brief).

*Irwin I. Kimmelman,* Former Attorney General of New Jersey, and *Debra L. Stone,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General (*Irwin I. Kimmelman,* attorney; *Debra L. Stone* and *Anne C. Paskow,* Deputy Attorney General, of counsel).

*Daniel Crystal, Joseph A. Fortunato, Morton Stavis,* and *William J. Volonte* submitted a brief on behalf of *amicus curiae* The National Lawyers Guild, New Jersey Chapter.

*Stephen M. Latimer* submitted a brief on behalf of *amicus curiae* Rutgers University School of Law—Prison Law Clinic.

Leave to rely on the brief submitted on behalf of The National Lawyers Guild was granted to *amicus curiae* American Friends Service Committee, New Jersey Justice Program (*Norgaard and Scher,* attorneys), and *amicus curiae* New Jersey Council of Churches, Inc. (*Donald L. Drakeman,* attorney).

Table of Contents

Introduction ................................................................... 154
I. The Act .................................................................... 156
II. Facts ...................................................................... 160
III. Constitutionality .......................................................... 166
 A. Constitutionality of Death Penalty Per Se .................................. 168
 B. Constitutionality of *N.J.S.A.* 2C:11–3 .................................... 182
 C. Constitutionality of *N.J.S.A.* 2C:11–3c(4)(c) .............................. 197
IV. Pretrial Issues ............................................................ 212
 A. Selection of Essex County Juries ......................................... 212
 B. Struck Jury .............................................................. 239
 C. *Voir Dire* .............................................................. 243
 D. Death Qualification ...................................................... 248

Table of Contents—Continued

V. Trial Issues ................................................................... 261
 A. Psychiatric Defense ...................................................... 261
 B. Admissibility of Prior Acts ............................................. 264
 C. Diminished Capacity Instructions ....................................... 267
VI. Sentencing Issues ............................................................ 271
 A. Use of *Non Vult* Plea .................................................. 271
 B. Trial Court Comments on Evidence ....................................... 279
 C. Flight Charge ........................................................... 282
 D. Constitutionality of *N.J.S.A.* 2C:11–3c(4)(c) as Applied to Defendant........... 286
 E. Instructions Concerning Mitigation ..................................... 292
 F. Instructions Concerning Jury Deliberations ............................. 299
 1. Jury Deadlock ....................................................... 300
 2. Jury Coercion ....................................................... 304
 3. Other Errors at Sentencing .......................................... 315
 G. Prosecutorial Misconduct ............................................... 319
 H. Proportionality Review ................................................. 324
 Conclusion ................................................................. 331

The opinion of the Court was delivered by

WILENTZ, C.J.

In this matter and in *State v. Biegenwald,* 106 *N.J.* 13 (1987), also decided today, the defendant has been convicted of murder and sentenced to death. In their appeals, both defendants attack the constitutionality of this state's capital punishment act (*L.*1982, *c.* 111) under the federal and New Jersey Constitutions. They also contend that various trial errors warrant reversal of their convictions and their sentences.

We hold that the capital punishment act is in all respects constitutional. We sustain the verdict of guilty in each case. We conclude, however, that critical portions of the trial courts' instructions in the sentencing proceedings were erroneous. *See infra* at 299–300; *State v. Biegenwald, supra,* 106 *N.J.* at 190. We therefore reverse the death sentence in each of these cases and remand them to the respective trial courts. The murder conviction in each case is affirmed.

In *State v. Biegenwald,* the trial court on remand shall conduct a new sentencing proceeding; in the *Ramseur* matter, because we have ruled that the death penalty cannot be imposed on remand, the trial court shall sentence the defendant,

in accordance with the act, to imprisonment for a specific term of years with no parole eligibility for thirty years.

We will first describe the death penalty act and the facts of this case. We will then treat the constitutional questions and follow that with a discussion of Ramseur's allegations of trial and sentencing errors.[1]

Before doing so, we note that this case and *State v. Biegenwald* were among the first capital punishment cases tried under the reimposition of the death penalty in this state. Both the difficulty and responsibility involved in being among the first trial judges to preside over a capital cause were great, as were the talents of the two trial judges who met that challenge. Our disagreement with some of their rulings should not in any way detract from the credit to which they are entitled for the quality of their performance.[2]

---

[1]These two cases, decided today, were argued together. We have elected to treat most major issues common to both in this opinion, limiting our decision in *State v. Biegenwald* largely to questions affecting that case only.

Various issues in this case and in *Biegenwald,* critical to both but unsettled when these appeals were filed, have been resolved by the Legislature and the United States Supreme Court. The Legislature in 1985 (*L.*1985, *c.* 178) made it clear that the State had the burden of proving beyond a reasonable doubt that the statutory aggravating factors outweighed the mitigating factors (as explained herein). The instructions in both cases did not conform with this requirement. The Legislature also clarified its intention concerning jury deadlock, requiring the trial court to inform the jury explicitly that its failure to reach a unanimous death verdict would result in a sentence of imprisonment of thirty years without parole (*L.*1985, *c.* 178); this clarification strongly supported the conclusion that another part of the instructions in this case was improper. *See infra* at 311. Another important issue was settled by the United States Supreme Court's decision in *Lockhart v. McCree,* 476 *U.S.* ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986), in which the Court upheld the constitutionality of a jury death qualification system substantially the same as that used in New Jersey.

[2]We note also the excellent work done by the Trial Judges' Committee on Capital Causes, consisting of experienced judges and chaired by Judge John Marzulli, which was established shortly after the legislation took effect. That committee's work, necessarily advisory, leading to the production of a Bench Manual for Capital Cases, anticipated many of the difficult questions that

# I.

## The Act

New Jersey's death penalty act (hereafter referred to as "the Act") was passed in 1982 as an amendment to the murder provisions of our Code of Criminal Justice. *N.J.S.A.* 2C:11–3. Inasmuch as this is the first case to come before this Court challenging the validity of a sentence imposed pursuant to the Act, we will set forth the provisions of the legislation in some detail.

The Act calls for a bifurcated trial in which punishment is determined in a separate proceeding following the establishment of guilt. Sec. c(1).[3] In the guilt phase, the central question is whether the defendant committed murder, *i.e.,* whether he purposely or knowingly caused death or participated in one of a number of crimes during the commission of which death resulted (similar to the former common-law crime of "felony murder"). Sec. a(1), (2), and (3). A defendant is subject to a separate sentencing proceeding, *i.e.,* is "death-eligible," only if he has been found guilty of purposeful and knowing murder and committed the murder by his own hand or paid someone else to do so. Sec. c. "Death-eligible" defendants face either death or at least a thirty-year term of imprisonment without parole, depending on the outcome of the sentencing proceeding. Sec. c(1). Defendants convicted of murder but not "death-eligible" are sentenced to a prison term of at least thirty years without parole. Sec. b.

---

might arise in such cases, analyzed them, and provided most helpful recommendations. It has been used widely not only by the bench but by counsel for the prosecution and for the defense.

[3]*N.J.S.A.* 2C:11–3, containing the Code's murder provisions, consisted of five subsections, (a) to (e), at the time of these crimes and their trials. The death penalty provisions are found in subsections (c) to (e). For convenience, in referring to these provisions we shall, for instance, use Sec. c(1) to designate *N.J.S.A.* 2C:11–3c(1).

In the sentencing proceeding, ordinarily conducted before the same jury that determined guilt, the State is required to prove, beyond a reasonable doubt, the existence of one or more "aggravating factors" specifically set forth in Section c(4)(a)–(h). The aggravating factors are:

(a) The defendant has previously been convicted of murder;

(b) In the commission of the murder, the defendant purposely or knowingly created a grave risk of death to another person in addition to the victim;

(c) The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery[4] to the victim;

(d) The defendant committed the murder as consideration for the receipt, or in expectation of the receipt of any thing of pecuniary value;

(e) The defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value;

(f) The murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another;

(g) The offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary or kidnapping; or

(h) The defendant murdered a public servant, as defined in [N.J.S.A.] 2C:27–1, while the victim was engaged in the performance of his official duties, or because of the victim's status as a public servant.

Thereafter the defendant may produce evidence of any "mitigating factors" set forth in Section c(5)(a)–(h). The mitigating factors are:

(a) The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution;

(b) The victim solicited, participated in or consented to the conduct which resulted in his death;

(c) The age of the defendant at the time of the murder;

(d) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution;

(e) The defendant was under unusual and substantial duress insufficient to constitute a defense to prosecution;

(f) The defendant has no significant history of prior criminal activity;

---

4 A 1985 amendment changed "aggravated battery" to "aggravated assault." L.1985, c. 178. For discussion of this change, see *infra* at 206 note 33.

(g) The defendant rendered substantial assistance to the State in the prosecution of another person for the crime of murder; or

(h) Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.

The State is required to notify the defendant of the aggravating factors that it intends to prove, the notice to be given during discovery in the guilt phase. *R.* 3:13–4(a); *see* Sec. c(2)(e). Both the State and the defendant are permitted to rebut the proofs of the other in the sentencing proceeding. Sec. c(2)(d). An amendment to the Act not applicable to these cases requires the State to prove aggravating factors in accordance with the Rules of Evidence while allowing the defendant to establish the existence of mitigating factors by "reliable" relevant evidence, without regard to those Rules. *L.*1985, *c.* 178. The "catch-all" provision of the mitigating factors, Sec. c(5)(h) ("[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense"), has no counterpart in the aggravating factors. This provision is designed to meet the constitutional requirement that the defendant must be allowed to present any relevant evidence in mitigation. *See Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L.Ed.*2d 973, 990 (1978) (plurality opinion).

If the jury (or the court when there is no jury) finds that the State has proven one or more of the aggravating factors beyond a reasonable doubt and that—as the statute read at the time of the Ramseur and Biegenwald trials—any aggravating factor or factors are "not outweighed by one or more of the mitigating factors," the court is required to sentence the defendant to death. Sec. c(2)(a), (3)(a). If the jury does not so find, or if it is unable to reach a unanimous verdict, the court shall sentence the defendant to at least a thirty-year prison term without parole. Sec. c(3)(b), (c).

The Legislature twice amended the Act in 1985. *L.*1985, *c.* 178, 478.[5] Two of its changes are of substantial importance in these cases. One revision concerns the jury's weighing of the aggravating and mitigating factors; as just discussed, at the time of these trials the statute provided that if the jury found that the aggravating factor or factors were "not outweighed" by the mitigating factors, the defendant would be sentenced to death. Sec. c(3)(a). That section now reads that "if the jury ... finds that any aggravating factors exist and that all of the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors, the court shall sentence the defendant to death." For the reasons given in *State v. Biegenwald, supra,* 106 *N.J.* at 64–67, our interpretation of this portion of the statute as it read at the time of these trials conforms with this later legislative amendment. That is to say, we read the statute under which Ramseur and Biegenwald were sentenced as requiring, as a condition for the imposition of the death penalty, a jury finding that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. Even without the amendment, we believe the history of the Act strongly supports that reading; with the amendment, we think simple justice compels it.

The other important revision for the purpose of these cases was the addition of a new subsection, Section f, that requires

---

[5]Most of the changes referred to in this opinion were effected by *L.*1985, *c.* 178. The later amendment, *L.*1985, *c.* 478, effected but two changes: requiring an appeal where the death sentence is imposed, and prohibiting imposition of the death sentence on juveniles. Unfortunately, in form the second amendment (*c.* 478) takes as existing law *N.J.S.A.* 2C:11–3 *unamended,* as if it had not previously been amended by *c.* 178. No problems of substance result, for the Legislature's intention in both is clear—there is no inconsistency between the two amendments. There is, however, some potential confusion in referring to the statutory section designations. For example, in *L.*1985, *c.* 178, *N.J.S.A.* 2C:11–3f contains provisions requiring the court to inform the jury of the effect of deadlock; but the very same section in *L.*1985, *c.* 478 says nothing whatsoever about advising the jury of the consequences of deadlock and instead prohibits the imposition of the death penalty on a juvenile. Resolution of the designation problem is found, pursuant to *N.J.S.A.* 1:3–1, in *N.J. Session Laws* 1986, No. 3, at A–2 to A–6.

the trial court to inform the jury that its failure to reach a unanimous death verdict will result in sentencing pursuant to Section b, *i.e.*, at least a thirty-year term without parole. *L.* 1985, *c.* 178. That amendment strongly supports our conclusion that the trial court in this case committed prejudicial error when it repeatedly attempted to persuade the deadlocked jury to achieve unanimity in the sentencing proceeding.

Finally, the Act provides for appeals from death sentences to this Court as a matter of right, pursuant to our Rules. Sec. e. We have implemented that provision by allowing a direct appeal from the trial court. *R.* 2:2–1(a)(3). Formerly the Act merely permitted such an appeal; as amended, the Act now requires an appeal to be taken, by the public defender if necessary. *L.*1985, *c.* 478. This amendment codifies our holding in *State v. Koedatich*, 98 *N.J.* 553 (1984) (allowing public defender to file appeal on behalf of defendant who did not wish to appeal his death sentence). The Act also formerly required that in an appeal to this Court we determine "whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Sec. e. By virtue of the 1985 amendment (*L.*1985, *c.* 178), however, we now must do so only "[u]pon the request of the defendant." [6]

## II.

### Facts

Asaline Stokes, the victim in this case, lived with her grandchild across the street from defendant's aunt's house. She and defendant "used to go together," the relationship having apparently existed for several years. On occasion, Ramseur would threaten her, as he did during an argument about a year or year and a half before the killing. On the day following those

---

[6]This part of the amendment was presumably triggered by the decision in *Pulley v. Harris*, 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29 (1984), holding that such proportionality determinations are not constitutionally required.

threats, after learning a man had been in her house, Ramseur told her, according to one of Ms. Stokes' granddaughters, that "what he say yesterday was about to come true," namely, "that she was going to regret it." That granddaughter also overheard a loud noise during an argument between them that day and upon entering the room, after Ramseur left, she saw her grandmother, Ms. Stokes, lying on the floor with blood coming out of her mouth, blood on the wall, and "like a hole all the way through her cheek." The police were called, and Ms. Stokes was taken to the hospital.

On another occasion, three to four months before the murder, someone rang the doorbell at the Stokes' residence, and as one of her granddaughters tells it, "my grandmother went on the porch and asked who was it and [Ramseur] was—he backed back down onto the sidewalk so my grandmother could see him and he told my grandmother that he would kill her and the kids or just her by herself...." Ms. Stokes' granddaughter was standing right behind her when that occurred.

The night before the killing, again during an argument, Ms. Stokes told Ramseur that "she's tired of his drinking and tired of him coming up there with her grandkids because if she can't raise them who else was going to raise them?," as recounted by a neighbor who lived next door and heard the exchange. He told her "You'll be sorry." That same evening he took a knife from her kitchen, secretly, he thought, but in fact one of Ms. Stokes' grandchildren saw him. It was the knife he used the next day to kill Ms. Stokes.

On August 25, the day of the killing, Ms. Stokes, one of her grandchildren, some friends of her grandchildren, and a neighbor were on the porch of the neighboring home; another grandchild was on Ms. Stokes' sunporch. Her neighbor was braiding the hair of a young child, and several of the children were teasing each other and generally having fun. At one point, Ms. Stokes left the porch to talk to a mechanic who was standing by the front of a truck near the house. As they

spoke, her neighbor noticed Ramseur "peeping" through the window from his aunt's house across the street. He "had the curtains back, and he [was] looking"; he was "just peeping out, just like this, staring across the street." He did this for a couple of minutes, maybe more.

Ramseur then emerged from the house, walked down the porch steps, and crossed the street to the place near the truck where Ms. Stokes and the mechanic were talking. He patted Ms. Stokes on the shoulder. As one witness recounted:

He walked up to her and just like this, stabbed her.... When he stabbed her, she went down and she throwed her hands up and he got on her like this and was stabbing her like this and fell down by the truck and she was laying there and her tongue was coming out and she stretched her leg out like this so he walked [he walked away from her].... Then he came back, then leaned over and stabbed her.... He was stabbing her I don't know how many times ... I know at least four times, all over, and then that's when she went to throw up her arms. It was so many. It were fast. I don't know how many.

Other witnesses also testified that the defendant, after having stabbed Ms. Stokes, began to walk away, but then returned to inflict additional wounds. He told his victim as she lay there, in a voice loud enough to be heard by others, "If I see your kids again I'm going to kill them too."

A Newark police officer who was driving through the area arrived at the scene. He left his patrol car, ran after Ramseur, and ordered him to stop three times before the defendant complied.

When the ambulance arrived Ms. Stokes was lying in the mud bleeding from the chest and face. The two ambulance team members, the emergency room nurse at University Hospital, and the assistant medical examiner of Essex County gave testimony concerning the number of stab wounds received by Ms. Stokes. She had major stab wounds in the face and chest, including two chest wounds about eight and one-half inches deep that pierced the lung. She also received a number of stab wounds on both arms—called "defense" wounds because they were inflicted when Ms. Stokes "trie[d] to defend herself by either grabbing the knife or protecting herself from the knife."

The wounds were such that Ms. Stokes did not die immediately. As witnesses testified, she kept saying "I'm going to die, I'm going to die," and asked that "somebody hold my hand." She told a grandchild that "she couldn't breathe." When the ambulance arrived she was screaming and saying "I am going to die." As one of the ambulance personnel said, "[a]s I was picking her up to put her on the stretcher, she reached up. She grabbed me by the collar and she told me she was going to die." Her exact words were: "Please help me. I am going to die." "She was moving all over.... While we were trying to check her out and lay her on the stretcher, you know, she was kicking, moving, you know, trying to fight with us, you know."

They put her in the ambulance and started fixing her wounds with bandages. When they drove away, according to the ambulance attendant who accompanied her, "she kept on fighting me and saying 'I am going to die. I am going to die.'" She repeated this all the way to the hospital, a ride of four to five minutes. Only upon her arrival at the hospital did she become unconscious. She died at the hospital after an unsuccessful attempt to revive her through direct cardiac massage.

On September 17, 1982, an Essex County grand jury indicted Thomas Ramseur on three counts: (1) murdering Asaline Stokes (*N.J.S.A.* 2C:11-3); (2) knowingly and unlawfully possessing and carrying a knife under circumstances not manifestly appropriate for lawful use (*N.J.S.A.* 2C:39-5d); and (3) knowingly and unlawfully possessing a knife with the purpose to use it unlawfully against the person of another (*N.J.S.A.* 2C:39-4d).

Defendant filed a pretrial motion to dismiss the indictment because of alleged underrepresentation of certain groups on Essex County jury panels. The jury challenge motion, which was heard after the trial, was denied.

The *voir dire* of jurors was conducted from April 4, 1983, to April 22, 1983. The trial court placed limits on the types of questions counsel could pose, including restricting questions about race to the single inquiry of whether race would influ-

ence the jurors in reaching a fair and impartial verdict. Initially, the court permitted defense counsel to ask broad questions concerning how prospective jurors felt about the law. After two days, however, he disallowed these questions because he concluded that the proper question was whether the jurors could comport with the law. Six jurors were dismissed for cause on the ground that they could not comport with the law. Neither side used all its peremptory challenges.

At trial, the State presented a number of witnesses who testified about the events of August 25, 1982, and the threats that Ramseur had made. There was also testimony concerning the medical treatment received by Ms. Stokes.

A number of witnesses testified for the defendant. It was conceded that he committed the killing. Friends and relatives of Ramseur testified that his behavior had substantially changed after June 1982, when he apparently was the victim of a mugging. They testified that this incident precipitated a change in his personality.

Dr. Mark Mishkin, a neuroradiologist, testified that Ramseur had atrophy (a shrinkage or wasting) of the brain in the frontal and temporal lobes. He labelled the atrophy progressive based on CAT scans performed on Ramseur. Dr. Mishkin, on cross-examination, stated that such a pathology would not preclude normal conduct.

Dr. Dorothy Lewis, a psychiatrist who had examined Ramseur, testified that he suffered from psychomotor seizures, a type of epilepsy. During a seizure an individual may lose control over his or her behavior. Violence is possible if the person is also paranoid and provoking circumstances exist. Dr. Lewis further testified that Ramseur was paranoid. Dr. Lewis stated that the stabbing occurred during such a psychomotor seizure.

The trial court ruled that evidence of Ramseur's 1966 killing of his first wife was admissible because it formed a significant basis for the experts' opinions, and because its prejudicial

potential was minimal given that the defense admitted that Ramseur killed Ms. Stokes. Its purpose was to rebut the defense of diminished capacity.

Various other experts, for the State on rebuttal and for the defendant on surrebuttal, testified concerning Ramseur's mental condition.

The trial court instructed the jury that insanity or diminished capacity was a complete defense to the murder charge. Defense counsel wanted to waive the insanity instruction. Defense counsel also objected to the court's instruction that if the jury found that Ramseur suffered from diminished capacity it must acquit him, and argued that if the jury made such a finding, Ramseur could be found guilty of manslaughter. The court overruled the objections. The jury found Ramseur guilty of murder.[7]

During the sentencing proceedings, after three and one-half hours of deliberations the jury sent a note to the trial court stating "Jury unable to reach a unanimous decision. Suggestions please." Over defense counsel's objections, the court charged the jurors to continue deliberating, sequestered them for the night, and required them to recommence deliberations the next morning. The court also issued supplemental instructions to the jury that repeatedly emphasized the importance of the jury's reaching a unanimous verdict.

Eventually, the jury found that two aggravating factors were present: that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim, Sec. c(4)(c), and that Ramseur had previously been convicted of murder, Sec. c(4)(a). Two mitigating factors were also found: that defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, Sec. c(5)(a), and that defendant's capacity to appreciate the

---

[7]Defendant was also found guilty of the two weapon offenses.

wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution. Sec. c(5)(d). The jury found that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Ramseur was sentenced to death.

## III.

### Constitutionality

The Act is attacked, on both federal and state constitutional grounds,[8] as violating the prohibition against cruel and unusual punishment. *U.S. Const.* amends. VIII, XIV; *N.J. Const. of 1947* art. I, para. 12. One prong of that attack contends that every death penalty statute, regardless of its provisions, is unconstitutional; capital punishment, defendant contends, conflicts with contemporary standards of decency, constitutes disproportionate punishment, serves no penological purpose, is inevitably discriminatory, and in all those respects constitutes cruel and unusual punishment. Implicit in the contention of lack of penological justification is a claim of denial of substantive due process, and implicit in the contention that the death penalty is inevitably discriminatory is a claim of denial of equal protection.

The second prong of the attack contends that this statute does not sufficiently guide jury discretion in imposing the death penalty, that it allows death to strike arbitrarily, discriminatorily, and unpredictably, and that it is therefore cruel and unusual "in the same way that being struck by lightning is cruel and unusual," *Furman v. Georgia,* 408 *U.S.* 238, 309, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). Defendant also attacks a specific aggravating factor of

---

[8]The constitutional contentions addressed herein include those asserted both in this case and in *State v. Biegenwald, supra,* 106 *N.J.* 13.

the Act, Section c(4)(c) ("The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"), as being so vague that its application in any case, and in this case, violates due process, *i.e.*, deprives him of his life without due process of law. No limiting construction, it is said, can save this provision.

Before treating these contentions, we note our agreement that the testing of a death penalty law by both federal and state constitutional standards is appropriate. That capital punishment is a matter of particular state interest or local concern and does not require a uniform national policy (*see State v. Hunt*, 91 *N.J.* 338, 366 (1982) (Handler, J., concurring)) is evident, not just to this Court but to the Supreme Court of the United States. *See California v. Ramos*, 463 *U.S.* 992, 1013–14, 103 *S.Ct.* 3446, 3459–60, 77 *L.Ed.*2d 1171, 1188–89 (1983) (noting in capital case that "[i]t is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires"). Indeed, two states have declared their death penalty laws violative of their own state constitutions. *People v. Anderson*, 6 *Cal.*3d 628, 493 *P.*2d 880, 100 *Cal.Rptr.* 152, *cert.* den., 406 *U.S.* 958, 92 *S.Ct.* 2060, 32 *L.Ed.*2d 344 (1972); *District Attorney v. Watson*, 381 *Mass.* 648, 411 *N.E.*2d 1274 (1980). Application of state constitutional provisions to these questions is particularly appropriate in view of the "[c]onsiderations of federalism" that have constrained the United States Supreme Court in this area. *See Gregg v. Georgia*, 428 *U.S.* 153, 186, 96 *S.Ct.* 2909, 2931, 49 *L.Ed.*2d 859, 882 (1976) (plurality opinion) (upholding states' right to impose death penalty under federal Constitution).

Ultimately, however, we conclude that both Constitutions produce the same results when applied to these issues. *Cf. Greenberg v. Kimmelman*, 99 *N.J.* 552, 569 (1985) ("In some cases our analysis of article I, paragraph 1 of the New Jersey Constitution may lead to a different result from that required

by the fourteenth amendment to the United States Constitution. In this case, however, the two constitutions point toward the same result."). Quite frequently we rely here on the reasoning of the United States Supreme Court's plurality opinion in *Gregg v. Georgia, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, in support of our conclusions. We do so fully aware that in determining the validity of a state action challenged under our own Constitution, we are not obliged to adhere to the reasoning or the results of the Supreme Court's federal constitutional decisions. That we are not required to follow the Supreme Court's analysis does not, however, mean that we are precluded from following that analysis where we find it persuasive, as we often do in this case.[9] *See State v. Hunt, supra,* 91 *N.J.* at 363 (Handler, J., concurring) ("The opinions of the Supreme Court, while not controlling on state courts construing their own constitutions, are nevertheless important guides on the subjects which they squarely address.").

## A. Constitutionality of Death Penalty *Per Se*

Defendant claims that no matter how written, a statute providing for capital punishment inflicts cruel and unusual

---

[9]We note that this approach is in accord with the holdings of most state courts that have considered *per se* challenges to the death penalty based on state constitutional analogues to the eighth amendment. *See, e.g., State ex rel. Westfall v. Mason,* 594 *S.W.*2d 908, 916 (Mo.1980) (en banc); *State ex rel. Serna v. Hodges,* 89 *N.M.* 351, 552 *P.*2d 787, 792–93 (1976); *Commonwealth v. Zettlemoyer,* 500 *Pa.* 16, 454 *A.*2d 937, 967 (1982), *cert.* den., 461 *U.S.* 970, 103 *S.Ct.* 2444, 77 *L.Ed.*2d 1327 (1983); *Cozzolino v. State,* 584 *S.W.*2d 765, 767 (Tenn.1979); *State v. Rupe,* 101 *Wash.*2d 664, 683 *P.*2d 571, 592 (1984) (en banc). The decisions to the contrary by the California and Massachusetts courts were each later overturned in public referenda amending the state constitutions. To the extent these decisions rested on the judgment that the death penalty was offensive to contemporary standards of decency, *see People v. Anderson, supra,* 6 *Cal.*3d at 650–51, 493 *P.*2d at 895, 100 *Cal.Rptr.* at 167; *District Attorney v. Watson, supra,* 381 *Mass.* 648, 411 *N.E.*2d at 1283, they can hardly be regarded as authoritative. The net result is that with thirty-seven states having adopted death penalty acts, in none of them has the state constitutional *per se* challenge ultimately been successful.

punishment, since the death penalty violates contemporary standards of decency, is disproportionate, has no penological justification, and is inevitably discriminatory.

To the extent that defendant relies on the eighth amendment as made applicable to the states through the fourteenth amendment, *see Robinson v. California,* 370 *U.S.* 660, 666, 82 *S.Ct.* 1417, 1420, 8 *L.Ed.*2d 758, 763 (1962), his contention may be summarily dismissed. *Gregg v. Georgia, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859. As noted above, however, this Court recognizes its freedom—indeed its duty—to undertake a separate analysis under the cruel and unusual punishment clause of the New Jersey Constitution.

█ The test to determine whether a punishment is cruel and unusual under Article I, paragraph 12, of our Constitution is generally the same as that applied under the federal Constitution. Three inquiries are required. First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective? *Gregg v. Georgia, supra,* 428 *U.S.* at 173, 96 *S.Ct.* at 2925, 49 *L.Ed.*2d at 874–75; *State v. Des Marets,* 92 *N.J.* 62, 82 (1983); *State v. Hampton,* 61 *N.J.* 250, 273–74 (1972).

In determining whether the death penalty conforms with contemporary standards of decency, we first observe that there is nothing in New Jersey's legislative, judicial, or cultural history and traditions to suggest there is a significantly different attitude toward capital punishment in this state from that prevailing nationwide. Death has been regarded as an appropriate punishment for murder throughout this state's history. *See L.*1898, *c.* 235, sec. 108; *L.*1796, *c.* DC, sec. 3; *N.J. Revision* 1709–1877, Crimes, sec. 68, at 239 (death penalty was mandatory for all first-degree murders from 1709 to 1877). It would be very difficult to sustain the argument that the framers of our 1947 Constitution viewed capital punishment beyond the pale of

a civilized society. Indeed, the very same constitutional documents that prohibit the infliction of cruel and unusual punishment contain provisions implicitly recognizing the appropriateness of capital punishment. *N.J. Const. of 1947* art. I, para. 11 (referring to power to deny bail to persons accused of "capital offenses"); *N.J. Const. of 1947* art. VI, sec. 5, para. 1(c) (authorizing direct appeal to this Court in "capital causes"); *N.J. Const. of 1844* art. I, para. 10 (referring to power to deny bail to persons accused of "capital offenses"). In his monograph to the Constitutional Convention, Dean Heckel specifically wrote that the cruel and unusual punishment clause of the proposed Constitution would not *per se* prohibit capital punishment. Heckel, "The Bill of Rights," in 2 *Proceedings of the State of New Jersey Constitutional Convention of 1947* at 1336, 1354 (S. Goldmann & H. Crystal ed. 1951).

New Jersey courts have upheld the constitutionality of the death penalty. In *State v. Tomassi,* 75 *N.J.L.* 739 (1907), the Court of Errors and Appeals rejected the claim that electrocution, preceded by solitary confinement, constituted cruel and unusual punishment under our Constitution. *Id.* at 746–47. More recently, this Court rejected an attack based on the eighth amendment, finding that "the judiciary cannot say that the death penalty is now beyond 'the limits of civilized standards.' " *State v. Forcella,* 52 *N.J.* 263, 293 (1968) (quoting *Trop v. Dulles,* 356 *U.S.* 86, 98, 78 *S.Ct.* 590, 596, 2 *L.Ed.*2d 630, 641 (1958) (plurality opinion)), rev'd on other grounds *sub nom. Funicello v. New Jersey,* 403 *U.S.* 948, 91 *S.Ct.* 2278, 29 *L.Ed.* 2d 859 (1971).

This historical background, while relevant, is not in and of itself dispositive of our resolution of the legal issue. Constitutional provisions drafted in different times and intended to embody general principles need not be limited to the specifics then in the minds of the framers. *See generally* Brennan, "Constitutional Adjudication and the Death Penalty: A View From the Court," 100 *Harv.L.Rev.* 313, 325–28 (1986);

Munzer & Nickel, "Does the Constitution Mean What It Always Meant?," 77 *Colum.L.Rev.* 1029, 1042–45, 1050 (1977) (discussing new meanings given to Constitution generally, and to eighth amendment in particular). Thus even the fact that the very same Constitution that contains the prohibition also clearly contemplates death as a permissible punishment is not dispositive. Obviously what was thought not cruel then may be viewed differently now. *See Weems v. United States*, 217 *U.S.* 349, 378, 30 *S.Ct.* 544, 553, 54 *L.Ed.* 793, 803 (1910) (cruel and unusual punishment clause "may acquire meaning as public opinion becomes enlightened by a humane justice"); *Trop v. Dulles, supra*, 356 *U.S.* at 101, 78 *S.Ct.* at 598, 2 *L.Ed.*2d at 642 (amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society"). Our search must be for *contemporary* standards of decency.

■ The view that the death penalty does not accord with contemporary standards of decency draws much of its support from those convinced, for many reasons, of the death penalty's futility, indecency and inhumanity. They include some of the best-informed students of the subject, many of whom believe that society would share their views if it were better informed. *See, e.g., Furman v. Georgia, supra*, 408 *U.S.* at 362, 92 *S.Ct.* at 2789, 33 *L.Ed.*2d at 420 (Marshall, J., concurring); *cf.* Bedau, "Thinking of the Death Penalty as a Cruel and Unusual Punishment," 18 *U.C.D.L.Rev.* 873, 923 (1985) (referring to the "handful of literate friends of the death penalty"). The "contemporary standard of decency" against which the death penalty must be tested, however, is that of the community, not that of its scientists, penologists, or jurists.

■ We therefore will not detail the arguments on both sides of this issue—including the horrors of the punishment inflicted on the murderer by society, or those inflicted on the victim by the murderer—for we do not regard this question as requiring or even permitting *our* resolution of the many conflicting

values. Nor does the question relate to the citizen's possible response in an academic discussion of the death penalty, of good and evil, of the aims of punishment, and of the ultimate nature and fate of humanity. Rather, the question is one of fact: do the contemporary standards of morality in our society deem capital punishment to be an appropriate penalty for murder? We have no doubt of the answer: although the view is not unanimous, it is a widely held belief, and a strongly held one in our society, that the appropriate penalty for murder may be death.

One of the strongest indicators of this contemporary standard is the fact that the Legislature passed the Act in 1982. Obviously, passage of that law cannot be dispositive. Such an interpretation would render the constitutional ban on cruel and unusual punishments a mere tautology, eliminating its function as a limitation on legislative power. Nevertheless, since contemporary community standards are the test, such recent legislation, enacted by those who represent the community, must be given great deference. *See Gregg v. Georgia, supra,* 428 *U.S.* at 175, 96 *S.Ct.* at 2926, 49 *L.Ed.*2d at 876.

We are confident that the presumptive evidence provided by the Legislature's enactment of a death penalty statute is not rebutted by other evidence of community standards. The absence in New Jersey of any executions since 1963 is sometimes relied on as an objective indicator of contemporary standards, the position being that what society does is more important than what it says. The facts when understood, however, support rather than undermine the conclusion that the death penalty does not conflict with contemporary moral standards. As Chief Justice Weintraub said in his concurring opinion in *State v. Funicello,* 60 *N.J.* 60, *cert.* den. *sub nom. New Jersey v. Presha,* 408 *U.S.* 942, 92 S.Ct. 2849, 33 *L.Ed.*2d 766 (1972):

There has been a suspension of capital punishment in this country for a number of years—since 1963 in our State. The reason is that the Federal Supreme Court has not reached for and resolved known issues as to the constitutionality of capital punishment. The failure to do so has effectively ended capital

punishment with respect to every defendant sentenced to death before the Federal Supreme Court lays the issues to rest. [*Id.* at 82.]

During that period, moreover, as indicated from our own review of the history of individual death sentences, defendants successfully avoided execution by innumerable proceedings and applications before our state courts, federal courts, and back and forth. In other words, the lack of executions may have had more to do with judicial standards than with community standards.

If the actions of jurors are to be taken as a true reflection of society's morality, the most recent evidence strongly supports the view that the death penalty does not violate contemporary standards of decency. Since the restoration of capital punishment in 1982, juries in this state have imposed twenty-six sentences of death. Letter from Office of the Public Defender, Feb. 17, 1987. And while our inquiry is necessarily limited to New Jersey, the passage since 1972 of death penalty statutes in thirty-seven states, *see* "Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency," 69 *Cornell L.Rev.* 1129, 1217 (1984), is strong evidence of community standards here. Despite our diversity, we are a nation of shared values. When, in the course of a decade, thirty-seven states call for the death penalty, the probability that the legislature of each state accurately reflects its community's standards approaches certainty.

If there was some decrease in support for the death penalty during the 1960s, if there were more people then than there are now who found the infliction of death indecent and immoral, the evidence does not suggest that the change was significant or of long duration. When the meaning of a constitutional provision depends, as does the cruel and unusual punishment clause, on community standards, and when the consequent validity of the most important laws—laws affecting life and death—depends, therefore, also on those standards, the judiciary must measure this critical factor with a scale that registers only changes of significance, significant not only in the extent of change, but

also in the duration of change in light of our history. As far as we can see, nothing even approaching that kind of change occurred in the 1960s or has ever occurred in this country or in this state on this issue.[10]

We hold that New Jersey's death penalty does not conflict with contemporary standards of decency in this state. The claim that it is in violation of our state constitutional prohibition against cruel and unusual punishment on this basis must therefore be denied.

It is further claimed that the death penalty is grossly disproportionate punishment, and that any death penalty statute therefore violates the cruel and unusual punishment clause.

█ A function of the constitutional ban on cruel and unusual punishments is to guard against punishments that are grossly disproportionate in relation to the crime. *State v. Des Marets, supra,* 92 *N.J.* at 82. Under the eighth amendment, the United States Supreme Court has invalidated the death penalty as an excessive and disproportionate punishment when imposed for the rape of an adult, *Coker v. Georgia,* 433 *U.S.* 584, 97 *S.Ct.* 2861, 53 *L.Ed.*2d 982 (1977), or for participation in a felony as the driver of a getaway car where the homicide was committed by others and the defendant had no intent to kill, *Enmund v. Florida,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982).

When the crime is murder, however, the claim that punishment by death is by its very nature "disproportionate" loses

---

[10]Those who contend that the Legislature's enactment of a capital punishment statute does not accurately reflect community standards must also deal with the evidence provided by public opinion polls. Surveys conducted in 1981 and 1977 by the Eagleton Institute of Politics of Rutgers University indicate that approximately 72% of New Jersey residents support the imposition of the death penalty for murder. While we do not regard public opinion polls as decisive of issues of constitutional law, we cannot ignore their relevance to the largely empirical determination of the content of community standards.

meaning. Neither of the objective grounds relied on as indicators of the death penalty's excessiveness in the circumstances presented in *Coker* and *Enmund,* the attitudes of legislatures nationwide and the practices of juries, supports the claim that the death penalty is an excessive punishment for murder. All thirty-seven states that have enacted post-*Furman* death penalty statutes include murder as an eligible offense, and, as previously noted, twenty-six juries have imposed the death penalty for murder since the revival of capital punishment in this state in 1982. Nor can we say that "our own judgment," *Coker v. Georgia, supra,* 433 *U.S.* at 597, 97 *S.Ct.* at 2868, 53 *L.Ed.*2d at 992, leads us to a different conclusion. "Murder is the most heinous and vile offense proscribed by our criminal laws." *State v. Serrone,* 95 *N.J.* 23, 27 (1983). Measuring the punishment, death, against the crime, causing death, it is most difficult to appreciate the death penalty's excessiveness.

■ We believe that the claim of "disproportionality," in the death penalty context, is a short-hand method of expressing either the contention that the legitimate penological goals of society could be, and therefore must be, served by a lesser punishment, or the contention that the death penalty violates contemporary standards of morality. These contentions are better dealt with on their own merits. We therefore agree with the plurality in *Gregg v. Georgia, supra,* 428 *U.S.* at 187, 96 *S.Ct.* at 2931, 49 *L.Ed.*2d at 882, that although the death penalty is severe and irrevocable, it is not an excessive or disproportionate penalty for the crime of murder.

Defendant claims that the Act, indeed every death penalty act, has no justifiable penological purpose and therefore violates the cruel and unusual punishment provision of our Constitution. *Amicus* American Civil Liberties Union advances the related argument that the cruel and unusual punishment clause, in conjunction with Article I, paragraph 1, of our Consti-

tution,[11] requires the State to demonstrate a compelling governmental interest and the unavailability of less restrictive measures before it may intentionally deprive someone of the fundamental right to life.

We believe that these contentions misconceive the constitutional guarantees upon which they rely.[12] Our function

---

[11]Article I, paragraph 1, provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

[12]*Amicus'* argument is based on the theory that the constitutional status of a right to life as fundamental requires the State to demonstrate a greater justification before imposing death as punishment than it must show in other decisions concerning punishment. *Amicus* argues that none of the penological justifications advanced to support the death penalty can satisfy the State's burden if the Constitution demands a compelling state interest: deterrence is not proven to be significantly more advanced by the imposition of death than by imprisonment, and revenge alone is not a sufficiently compelling justification.

With one exception this claim has been rejected by all other state courts. In 1975 the Massachusetts Supreme Judicial Court invalidated that state's pre-*Gregg* death penalty statute, holding that the state had not proven that the death penalty served a compelling state interest in the least restrictive manner. *Commonwealth v. O'Neal,* 369 *Mass.* 242, 339 *N.E.*2d 676 (1975). All other courts presented with it since *Gregg,* however, have rejected this claim. *See Smith v. State,* 465 *N.E.*2d 1105, 1113 (Ind.1984); *Burrows v. State,* 640 *P.*2d 533 (Okla.Crim.App.1982), *cert.* den., 460 *U.S.* 1011, 103 *S.Ct.* 1250, 75 *L.Ed.*2d 480 (1983); *State v. Pierre,* 572 *P.*2d 1338, 1346 (Utah 1977), *cert.* den., 439 *U.S.* 882, 99 *S.Ct.* 219, 58 *L.Ed.*2d 194 (1978) (all concluding that the argument that was accepted in *O'Neal* was rejected by the United States Supreme Court in *Gregg* where that Court concluded that it would presume the validity of legislative choice to impose the death penalty); *see also State ex rel. Serna v. Hodges,* 89 *N.M.* 351, 552 *P.*2d 787, 796 (1976) (pre-*Gregg* case rejecting *O'Neal*).

The decisions of this Court advanced by *amicus* ACLU to support its theory of strict scrutiny of capital punishment apply Article I, paragraph 1, to establish a right to privacy and bodily autonomy that the state may not invade without demonstrating a compelling justification. *In re Grady,* 85 *N.J.* 235 (1981); *In re Quinlan,* 70 *N.J.* 10, *cert.* den. *sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976); *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N.J.* 576 (1971). These cases do not support a claim that the state bears the same burden when it seeks to impose punishment on the convicted

is not to determine whether, in our opinion, any penological ends served by the death penalty are compelling or legitimate. Nor is it thought to be appropriate for the judiciary to invalidate a particular statutory punishment on the ground that something less might accomplish the same penological goal. *See, e.g., Gregg v. Georgia, supra,* 428 *U.S.* at 175, 96 *S.Ct.* at 2926, 49 *L.Ed.*2d at 876. Our ban on cruel and unusual punishments is not a vehicle for enforcing judicial notions of penological "reasonableness." *Cf.* Heckel, *supra,* at 1355 (proposed amendment to substitute "excessive and unreasonable punishments" for "cruel and unusual punishments" was defeated). " 'Legislatures, not courts, prescribe the scope of punishments.' " *State v. Des Marets, supra,* 92 *N.J.* at 66 n. 2 (quoting *Missouri v. Hunter,* 459 *U.S.* 359, 368, 103 *S.Ct.* 673, 679, 74 *L.Ed.*2d 535, 544 (1983)). Especially when dealing with the "particularly egregious offense" of murder, "great defer-

---

murderer. *See State v. Jerrett,* 309 *N.C.* 239, 307 *S.E.*2d 339, 354 (1983) (death penalty does not violate right to privacy under federal Constitution). There is nothing within the text of the provision or in our state constitutional traditions to suggest that Article I, paragraph 1, was intended to limit the state's ability to impose death as a punishment where that punishment is consistent with the constitutional protections of the cruel and unusual and equal protection clauses.

*Amicus* characterizes the claim that the convicted murderer has forfeited his right to life protected under Article I, paragraph 1, as "patently frivolous." We do not agree. Just as the prisoner's right to liberty is subject to the state's criminal process, so is his undeniable right to life. We of course have never held that a prisoner has no constitutional rights. *New Jersey State Parole Bd. v. Byrne,* 93 *N.J.* 192 (1983); *see State v. Holmes,* 109 *N.J.Super.* 180, 184 (Law Div.1970) ("a citizen's status as prisoner does not deprive him of his due process rights"). Yet we have never relied on Article I, paragraph 1, as a source of limitation of the Legislature's power to punish. The state is never required to demonstrate a compelling justification in order to impose an otherwise permissible sentence, yet this is the result to which *amicus'* analysis, if accepted, would inexorably lead. Death is, of course, profoundly different from any other punishment in its severity, finality and deprivation of humanity. However, as our holding today makes clear, we must ultimately view the choice of death as a means of punishment within the domain of the Legislature.

ence must be given to the legislative intent governing sentencing." *State v. Serrone, supra,* 95 *N.J.* at 27.

The question before us is the far more narrow one of whether the enactment of the Act was a legitimate exercise of the Legislature's power, and we must conclude that this power was legitimately exercised unless the punishment "is so clearly arbitrary and without rational relation to the offense" as to require this Court to find that the Legislature has exceeded its "very wide discretion" in this area. *See State v. Smith,* 58 *N.J.* 202, 211 (1971).

The legislative history of the Act provides no persuasive evidence of the Legislature's purpose. We will therefore assume that the Legislature intended one or more of the well-recognized penological purposes underlying all criminal sanctions: deterrence (both general and specific), retribution, and rehabilitation. *See, e.g., State v. Ivan,* 33 *N.J.* 197, 199 (1960). Quite clearly rehabilitation is not intended, so we will deal only with deterrence and retribution.

There is apparently a school of thought that contends that retribution (punishment) without more is not a justifiable penological goal. *See, e.g., People v. Anderson, supra,* 6 *Cal.*3d at 651, 493 *P.*2d at 896, 100 *Cal.Rptr.* at 168. While this Court on occasion seems to have expressed some sympathy with that view, *see State v. Ivan, supra,* 33 *N.J.* at 199 ("retribution is not a favored thesis"); *State v. Leggeadrini,* 75 *N.J.* 150, 162 (1977), more recently that position, if such it be, has changed. *See State v. Yarbough,* 100 *N.J.* 627, 635 (1985) (noting that contemporary model for sentencing in New Jersey is "based on notions of proportionality and desert"), *cert. den.,* —— *U.S.* ——, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986); *State v. Roth,* 95 *N.J.* 334, 345–51 (1984) (describing the demise of the rehabilitation and prediction-of-future-dangerousness theories of punishment in the 1970s and the reemergence of "just deserts" principle as a primary penological aim); *In re Trantino Parole Application,* 89 *N.J.* 347, 373 (1982) (requiring parole determi-

nations to include consideration of whether the "punitive aspects" of sentence have been satisfied). In defendant's view, to inflict the death penalty for retributive reasons is "to devalue life" and "to abandon respect for the individual." Society, however, apparently regards the *nonimposition* of the death penalty in certain instances as a failure to uphold the value of human life, namely, the life extinguished by the murderer. The Constitution does not require society to share defendant's view. Justice and the perception that justice is done are indispensable to the survival of an ordered society. The Legislature, speaking for its citizens, has determined that the demands of justice are met by executing those who murder. Society's views here must be given primacy.

We thus agree with the United States Supreme Court that retribution constitutes a valid penological objective for the death penalty. *Gregg v. Georgia, supra,* 428 *U.S.* at 183–84, 96 *S.Ct.* at 2929–30, 49 *L.Ed.*2d at 880–81. As the Court in *Gregg* said:

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self help to vindicate their wrongs. [*Id.* at 183, 96 *S.Ct.* at 2929, 49 *L.Ed.*2d at 880.]

These authorities, and many others,[13] demonstrate sufficient respectable support for the proposition that retribution is a legitimate penological goal to allow a Legislature to fix punishment with that goal in mind.

The argument about deterrence is different. All accept its legitimacy as a penological goal; the division, and it is a sharp one, concerns an empirical question. Does the death

---

[13]*See, e.g.,* W. Berns, *For Capital Punishment: Crime and Morality of the Death Penalty* (1979); S. Jacoby, *Wild Justice: The Evolution of Revenge* (1983) (providing an argument on behalf of retribution generally although opposing the death penalty in part on the curious ground that execution is an insufficient punishment for mass murderers); Model Sentencing and Corrections Act, Art. 3, Prefatory Note (1978).

penalty deter murder? The answers, the reasons, and the statistics conflict and proliferate,[14] but add up to only one conclusion: the Legislature could reasonably find that the death penalty deters murder, just as it could find that it does not. Given the plethora of scientific analysis, "common-sense" explanations of the penalty's deterrent effect based on logic, *see, e.g., id.* at 186, 96 *S.Ct.* at 2931, 49 *L.Ed.*2d at 881–82 (assuming that death penalty may deter "carefully contemplated murders"), are neither persuasive nor important. Given the conflicting and inconclusive evidence, we cannot say that a legislative conclusion that the death penalty acts as a deterrent is so clearly arbitrary and irrational as to constitute an illegitimate exercise of power.[15]

We respect the arguments of those who believe that a more enlightened view is that the death penalty serves no legitimate penological purpose. In this area of crime and punishment, however, it is not our function to weigh competing arguments and determine which is more enlightened. *State v. Des Marets, supra,* 92 *N.J.* at 66. The wisdom of the death penalty is not for this Court to decide.

Ordinarily the kind of claim here asserted would be summarily dismissed. We would never spend more than a sentence responding to a defendant's claim that, for instance, a particular prison term serves no penological purpose for the crime involved, and indeed such a contention is so clearly lacking in legal substance that it is almost never made. The penalty of

---

[14]*See* Ehrlich, "The Deterrent Effect of Capital Punishment: A Question of Life and Death," 65 *Am.Econ.Rev.* 397 (1975) (purporting to establish a deterrent impact) and its progeny of critics, *e.g.,* Baldus & Cole, "A Comparison of the Work of Thorsten Sellin and Isaac Ehrlich on the Deterrent Effect of Capital Punishment," 85 *Yale L.J.* 170 (1975); Bowers & Pierce, "The Illusion of Deterrence in Isaac Ehrlich's Research on Capital Punishment," 85 *Yale L.J.* 187 (1975); McGahey, "Dr. Ehrlich's Magic Bullet: Economic Theory, Econometrics, and the Death Penalty," 26 *Crime & Delinquency* 485 (1980).

[15]In this respect we refer only to "general deterrence," and ignore the "specific deterrence" of the individual.

death rather than imprisonment is involved here, however. The difference requires this more extended treatment. Ultimately, however, even when it comes to the death penalty, we agree with Chief Justice Weintraub that "[a]s to the question whether the death penalty serves a useful end, and its morality and fairness, these are matters which rest *solely* with the legislative branch of government." *State v. Forcella, supra,* 52 *N.J.* at 293 (emphasis added).

Finally, defendant contends that the death penalty inherently discriminates on the basis of race and hence is unconstitutional.[16]

We are well aware of the history of discrimination against blacks in this country and of the role that discrimination played in the decision in *Furman* to strike down all then-existing death penalty statutes. *See Furman v. Georgia, supra,* 408 *U.S.* at 249–57, 92 *S.Ct.* at 2731–35, 33 *L.Ed.*2d at 355–60 (Douglas, J., concurring); *id.* at 364–65, 92 *S.Ct.* at 2790, 33 *L.Ed.*2d at 421 (Marshall, J., concurring). While the requirement that a capital jury's discretion be rationally guided protects the rights of all persons accused of a capital crime, it can appropriately be regarded as a special protection for black defendants. We are not convinced that this requirement has failed in other states, and inevitably will fail in this state, to perform this function. No court has found constitutionally significant evidence of racial discrimination in the application of a post-*Furman* death penalty statute,[17] and no such evidence has been presented to us in this case.

---

[16]Defendant also contends that the death penalty discriminates against certain other groups, such as the poor and men, but has failed to supply any empirical evidence of a constitutional violation in this regard.

[17]We note that the Supreme Court is currently considering the contention, rejected by the Eleventh Circuit, that the Georgia death penalty statute has been applied in a racially discriminatory fashion insofar as those who kill blacks are less likely to receive the death penalty than are those who kill

Suffice it to say that this Court will receive any evidence on this issue and that we will, in addition, attempt to monitor the racial aspects of the application of the Act. We refuse, however, preemptively to invalidate the Act on the theory that it will inevitably be applied in a racially discriminatory fashion.

■ We hold that capital punishment is not *per se* a violation of our state constitutional ban against cruel and unusual punishments.

B. Constitutionality of *N.J.S.A.* 2C:11–3

Defendant contends that even if capital punishment is not *per se* unconstitutional, the particular capital punishment statute adopted by the Legislature violates the prohibition against cruel and unusual punishments by failing to narrow sufficiently the jury's discretion in determining who will receive the death sentence. We will examine this contention first under the eighth amendment to the federal Constitution and then under our own state Constitution, independent state constitutional analysis being, as we have noted, appropriate in this area.

To assess defendant's federal constitutional argument, we must review the United States Supreme Court's difficult struggle to ensure that any system of capital punishment is "at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings v. Oklahoma*, 455 *U.S.* 104, 110, 102 *S.Ct.* 869, 874, 71 *L.Ed.*2d 1, 8 (1982). At one time, the Supreme Court ridiculed the futility of any requirement designed to limit jury discretion in capital cases:

> To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability. [*McGautha v. California*, 402 *U.S.* 183, 204, 91 *S.Ct.* 1454, 1465, 28 *L.Ed.*2d 711, 724 (1971).]

.

---

whites. *See McCleskey v. Kemp*, —— *U.S.* ——, 106 *S.Ct.* 3331, 92 *L.Ed.*2d 737 (1986), *granting cert. to* 753 *F.*2d 877 (11th Cir.1985).

One year later, in *Furman v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346, the Court invalidated every death penalty statute in the nation essentially for failing to do that which *McGautha* said could not be done. At the heart of *Furman* was the concern that, by placing uncontrolled discretion in the hands of jurors, our legal system had failed to provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not," *id.* at 313, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 392 (White, J., concurring), thus permitting this uniquely severe punishment to be "wantonly and ... freakishly imposed." *Id.* at 310, 92 *S.Ct.* at 2762, 33 *L.Ed.*2d at 390 (Stewart, J., concurring).

*Furman* suggested that to pass constitutional muster, a capital punishment statute must achieve two objectives: limit imposition of the penalty to what is assumed to be the small group for which is it appropriate, *see id.* at 310, 92 *S.Ct.* at 2762, 33 *L.Ed.*2d at 390 (White, J., concurring), and ensure that the limited class selected for the penalty is chosen with rationality and consistency, *see id.* at 310, 92 *S.Ct.* at 2762, 33 *L.Ed.*2d at 390 (Stewart, J., concurring). Both requirements are aimed primarily at eliminating the arbitrary nature of capital proceedings in the past and their high risk of discrimination. Death penalty statutes enacted after *Furman,* modeled on the American Law Institute's Model Penal Code § 210.6 (Proposed Official Draft 1962), attempted to adhere to these principles. A key feature was bifurcation. In the first proceeding of the bifurcated system, those murderers potentially subject to the death penalty are identified by the defining provisions of each statute. This proceeding narrows the class to "death eligibles." In the second proceeding, the sentencing proceeding, the narrow class is further limited by the jury's application of statutory identifying factors.

In *Gregg v. Georgia, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, the Supreme Court declared the Georgia post-*Furman* death penalty statute constitutional. The bifurcated

proceeding, the use in the sentencing proceeding of aggravating and mitigating factors, the instruction that the jury must find at least one aggravating factor beyond a reasonable doubt, and the provisions for appellate review were deemed to constitute sufficient guidance of the jury's discretion. *Id.* at 206–07, 96 *S.Ct.* at 2940–41, 49 *L.Ed.*2d at 893. The Court apparently found no constitutional infirmity in the absence of any guidance in the Georgia statute as to how the jury should weigh aggravating and mitigating factors; as the Court later explained, *Gregg*'s validation of the Georgia act makes it apparent that the initial narrowing process itself will satisfy *Furman* even though, at the end of the process, there is significant *un*guided discretion left to the jury. *See Zant v. Stephens*, 462 *U.S.* 862, 875, 103 *S.Ct.* 2733, 2741, 77 *L.Ed.*2d 235, 248–49 (1983). Based largely on the reasoning in *Gregg*, the Court also sustained the revised Florida and Texas death penalty statutes. *See Proffitt v. Florida*, 428 *U.S.* 242, 96 *S.Ct.* 2960, 49 *L.Ed.*2d 929 (1976); *Jurek v. Texas*, 428 *U.S.* 262, 96 *S.Ct.* 2950, 49 *L.Ed.*2d 949 (1976).

At the same time, however, the Court made clear that there are also constitutional constraints on the degree to which a capital jury's discretion may be controlled. The Court invalidated the death penalty statutes of North Carolina and Louisiana because they provided for a mandatory death sentence in certain circumstances upon the jury's return of a guilty verdict. *Woodson v. North Carolina*, 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944 (1976); *Roberts v. Louisiana*, 428 *U.S.* 325, 96 *S.Ct.* 3001, 49 *L.Ed.*2d 974 (1976). By preventing the "particularized consideration" of a convicted defendant's character and record, the mandatory death penalty failed to meet the special constitutional "need for reliability" in meting out the sentence of death. *Woodson v. North Carolina, supra,* 428 *U.S.* at 303, 305, 96 *S.Ct.* at 2990, 2991, 49 *L.Ed.*2d at 960–61. In addition, the purported advantage of the mandatory death sentence, an assurance of consistency, was thought to be more apparent than real, because it is outweighed by the disadvantage that

history has taught us inheres in such schemes: juries will simply not convict, they will act on factors not set forth by statute (in effect they will nullify the law), and the outcome will actually be significantly more unpredictable and less consistent than that under a statute providing for some measure of jury discretion. *Id.* at 302–03, 96 *S.Ct.* at 2990, 49 *L.Ed.*2d at 959–60.

Later cases expanded on the reliability principle. The Court in *Lockett v. Ohio, supra,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.* 2d 973, ruled that a death penalty law may not provide for the exclusion of any mitigating evidence concerning the defendant's character or record or the circumstances of the offense. The breadth of this ruling was enlarged in *Green v. Georgia,* 442 *U.S.* 95, 99 *S.Ct.* 2150, 60 *L.Ed.*2d 738 (1979), which required the admission of a statement, offered as mitigating evidence, that would have been excluded under Georgia's hearsay rule.

Two principles emerge from the Court's decisions in and since *Furman* requiring a capital jury's discretion to be channeled: that decisions to impose the death sentence be consistent (in the sense of consistency with other decisions to impose or not to impose death) and that they be reliable (in the sense that the individual defendant is deserving of the punishment). Sometimes conflicting, the two principles of consistency and reliability reflect the increased demands of accuracy and fairness, rising to constitutional dimension, in the implementation of this unique criminal sanction.

We believe that the Act fully conforms with the constitutional requirements set forth by the United States Supreme Court. Our statute is substantially patterned on the Georgia statute upheld in *Gregg* and later in *Zant v. Stephens, supra,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235. As the Court in *Gregg* noted, the fact that a death penalty statute is constructed along the general lines of the Georgia act is not in and of itself a guarantee of constitutional validity; constitutional review of each statutory system remains a necessity. *Gregg*

*v. Georgia, supra,* 428 *U.S.* at 195 & n. 46, 96 *S.Ct.* at 2935 & n. 46, 49 *L.Ed.*2d at 887 & n. 46. Nevertheless, the Act contains all of the essential features: a narrowing of the class of death eligibles, a bifurcated trial, a requirement that the jury find at least one aggravating factor and then weigh the aggravating factors against the mitigating factors, a "catch-all" mitigating factor that will allow the introduction of any mitigating evidence relevant to the defendant's character or record or to the circumstances of the offense, no mandatory sentence of death for any offense, and a provision for appellate review by this Court.[18]

The statute additionally provides several procedural protections for the defendant that are not required under the constitutional analysis of the Supreme Court. The jury must find that aggravating factors exist beyond a reasonable doubt, and that they outweigh mitigating factors beyond a reasonable doubt. This Court not only has mandatory appellate review, but also the authorization to conduct proportionality review upon the defendant's request. And Section c(3)(c), providing that in the event of deadlock at the penalty proceeding the court must impose a sentence of imprisonment, assures to some extent that doubtful cases (as indicated by the deadlock) will not result in death, lending further support to the consistency and reliability of the statutory scheme.

Defendant claims, however, that our statute is constitutionally infirm in its initial failure to exempt any murderers from potential subjection to the death penalty (with the exception of those who did not cause death by their own conduct or pay someone to do so). He notes that under New Jersey's prior

---

[18]Defendant contends that the Act must fail for not specifying this Court's standard of review and therefore not ensuring that our review will be "meaningful." We disagree. We believe that the Legislature, despite its lack of specificity, fully intended this Court to exercise its power of review in accordance with applicable constitutional standards, and we shall not hesitate to do so.

death penalty law, only those defendants convicted of deliberate premeditated murder or felony murder were subject to a death sentence. We will assume that the class of murderers who have caused death purposely or knowingly [19] by their own hand, or have paid someone else to do so, is larger than those formerly encompassed within first-degree murder in this state. The comparison, however, is irrelevant: there is no constitutional requirement that, at the first stage of narrowing (at the guilt phase), the class covered must be smaller than the class ultimately subject to the death penalty under a state's prior statute. Furthermore, there is absolutely nothing in any United States Supreme Court case to suggest that the death eligible class may not be defined precisely as New Jersey has defined it.[20]

---

[19]Under *N.J.S.A.* 2C:2-2(b), the Code defines these levels of culpability:

(1) *Purposely.* A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. "With purpose," "designed," "with design" or equivalent terms have the same meaning.

(2) *Knowingly.* A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.

[20]Defendant claims that "[b]ecause most [murder] defendants fall within at least one aggravating factor, the statute fails in its duty to limit the number of defendants eligible for the death penalty." We find no authority for the proposition that there is a "duty to limit" the *number* of individuals who are eligible for the death penalty. The only "duty to limit" established by the United States Supreme Court concerns the class of offenders that could be subjected to the death penalty: a state must "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia,* 446 *U.S.* 420, 428, 100 *S.Ct.* 1759, 1764, 64 *L.Ed.*2d 398, 406 (1980).

Moreover, defendant confuses the statutory aggravating factors enumerated by the legislature with notions of "death eligibility." He stresses that the eight

 Nor is the further narrowing subject to constitutional objection. It is true that any aggravating factor may alone lead to death, and that one aggravating factor—that the murder was committed in conjunction with a robbery, rape, burglary, arson, or kidnapping (Sec. c(4)(g))—includes a very substantial portion of all murders. But ultimately the question remains, is the jury's discretion sufficiently guided? Our conclusion is that it is. There is nothing in any of the cases that suggests such a classification is invalid. It is capable of fairly exact definition, thereby assuring consistency, and will ultimately be tested by the almost limitless introduction of mitigating factors, thereby tending to assure reliability.

 There is one class of murder in which a factor defines both death eligibility as well as selection for the penalty itself. The defendant who pays another to commit knowing or purposeful murder and is therefore death eligible (Sec. c) will, without proof of any further aggravating factor (since such payment itself is an aggravating factor, Sec. c(4)(e)), be subject to the death penalty if that aggravating factor outweighs any mitigating factors. But there is nothing whatsoever unconstitutional about that. The definition of the circumstance is precise, and the penalty therefor consistent.[21]

---

aggravating factors "fail to define a narrow class of persons eligible for death." This argument is undermined by the unambiguous language of the statute. Death eligibility is defined by Section a(1)–(2) and Section c. *See State v. Price,* 195 *N.J.Super.* 285, 294 (Law Div.1984). The aggravating factors outlined in Section c(4)(a)–(h) are considered only after the death eligibility determination has been made. Once an aggravating factor (or factors) has been proven beyond a reasonable doubt, the death penalty will be imposed if, and only if, the aggravating factor (or factors) outweighs any mitigating factor or factors beyond a reasonable doubt.

[21]Defendant also argues that the Act's aggravating factors are vague and overbroad, in that they fail to rationally define a class of murder for which the death penalty could be sought. We note that only two aggravating factors, that "[t]he defendant has previously been convicted of murder," Sec. c(4)(a), and that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the

victim," Sec. c(4)(c), have been found with respect to the murder Ramseur committed. Because defendant asserts that "taken as a whole, the statute fails to establish a rational process for determining who will die," and because defendant's claim is that the statute is unconstitutional on its face, *see State v. Saunders*, 75 *N.J.* 200, 208–10 (1977), we shall review defendant's contentions concerning all the aggravating factors. (We treat Section c(4)(c) separately.) We conclude that the aggravating factors established by the Legislature strongly adhere to the principle that an aggravating circumstance "must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens, supra,* 462 *U.S.* at 877, 103 *S.Ct.* at 2742, 77 *L.Ed.*2d at 249–50.

The language discovered in all the aggravating factors is (with the exception of c(4)(c)) precise and sufficiently narrow, and reflects a policy determination clearly within the legislative power. Aggravating factors containing similar if not identical language have been applied by other courts: Section c(4)(a), *see Godfrey v. Georgia, supra,* 446 *U.S.* at 423 n. 2, 100 *S.Ct.* at 1762 n. 2, 64 *L.Ed.*2d at 403 n. 2; *Preston v. State,* 444 *So.*2d 939, 945 (Fla.1984); Section c(4)(b), *State v. Moose,* 310 *N.C.* 482, 313 *S.E.*2d 507, 516–18 (1984); Section c(4)(d), *State v. Hensley,* 142 *Ariz.* 598, 691 *P.*2d 689, 691–92 (1984); *State v. Oliver,* 309 *N.C.* 326, 307 *S.E.*2d 304, 321 (1983); *Hopkinson v. State,* 664 *P.*2d 43, 74 (Wyo.), *cert.* den., 464 *U.S.* 908, 104 *S.Ct.* 262, 78 *L.Ed.*2d 246 (1983); Section c(4)(e), *see Hopkinson v. State, supra,* 664 *P.*2d at 74; *see also State v. Harding,* 137 *Ariz.* 278, 670 *P.*2d 383, 401 (1983) (Gordon, V.C.J., specially concurring) (an aggravating factor is satisfied where defendant "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value"); Section c(4)(f), *see State v. Oliver, supra,* 309 *N.C.* 326, 304 *S.E.*2d at 320; *Routly v. State,* 440 *So.*2d 1257, 1262–63 (Fla.1983), *cert.* den., 468 *U.S.* 1220, 104 *S.Ct.* 3591, 82 *L.Ed.*2d 888 (1984); Section c(4)(h), *Moore v. State,* 479 *N.E.*2d 1264, 1275–76 (Ind.), *cert.* den., —— *U.S.* ——, 106 *S.Ct.* 583, 88 *L.Ed.*2d 565 (1985); *State v. Compton,* 104 *N.M.* 683, 726 *P.*2d 837, 847, *cert.* den., —— *U.S.* ——, 107 *S.Ct.* 291, 93 *L.Ed.*2d 265 (1986); *Commonwealth v. Beasley,* 504 *Pa.* 485, 475 *A.*2d 730, 738 (1984).

Defendant specifically claims that Section c(4)(g) is irrational, because under the death penalty provisions "a felony murder done by one's own act can be either an aggravating factor, 2C:11–3c(4)(g), or a lesser offense, 2C:11–3a(3), punishable by a term of from 30 years to life imprisonment." We disagree. Both the language of the statute and its legislative history clearly indicate that those convicted under the common law doctrine of "felony-murder" will not be subjected to capital punishment. Indeed, the federal Constitution forbids the imposition of the death penalty when a person does not do the killing, or intend that the killing occur. *Enmund v. Florida, supra,* 458 *U.S.* at 801, 102 *S.Ct.* at 3378, 73 *L.Ed.*2d at 1154. That constitutional proscription is not violated by making the fact that the murder was committed during a felony an aggravating factor, so long as defendant committed the murder *"purposely" or "knowingly,"* as the statute requires. *See* Sec. a(1)–(2). The aggravating factor described in Section c(4)(g) is unquestionably constitutional. *See Calhoun v. State,* 297 *Md.* 563, 468 *A.*2d 45, 75 (1983) (upholding constitutionality of

 We hold that the Act is constitutional under the eighth amendment to the federal Constitution.

 We conclude, furthermore, that the Act is valid under the New Jersey Constitution. We read Article I, paragraph 12 of our Constitution as also mandating the goals of consistency and reliability in the administration of capital punishment. The state Constitution thus provides an additional and, where appropriate, more expansive source of protections against the arbitrary and nonindividualized imposition of the death penalty. As our dissenting colleague has demonstrated, see *post* at 351–369, in recent years the United States Supreme Court has departed from the vigorous enforcement of these constitutional principles, particularly the principle of consistency. We are not obliged to follow the reasoning of all these United States Supreme Court decisions in interpreting our own state constitutional protections, nor do we intend to.

But the fact that the Supreme Court has faltered in its pursuit of consistency and reliability does not, as the dissent suggests, mean that the goals themselves are "fundamentally contradictory—perhaps unattainable." *Post* at 347. The concept of "guided discretion" is no stranger to our jurisprudence. Indeed, our criminal justice system's sentencing policies generally—apart from the death penalty—are based on it. *See State v. Roth, supra,* 95 *N.J.* at 358. In the context of the death penalty, where the demands for fairness and accuracy are heightened, the principles of consistency and reliability rise to constitutional dimension. While there is an undeniable measure of "doctrinal tension" between these principles (see *post* at 339–340), we cannot agree that "doctrinal tension" is a basis for depriving society of the ability to ordain what it believes to be the appropriate sanction for murder. Here as in numerous other contexts, this Court must strike the best balance we can

similar provision), *cert.* den. *sub nom. Tichnell v. State,* 466 *U.S.* 993, 104 *S.Ct.* 2374, 80 *L.Ed.*2d 846 (1984).

between competing values. Hard cases there will be, but we have always believed that the judiciary's role in such cases is to find the right answer, not to shrink from our responsibility to apply the law.[22]

We must therefore arrive at an independent determination under our Constitution that the Act contains sufficient safeguards to prevent both arbitrary and nonindividualized infliction of the death penalty, whether or not the United States Supreme Court would require those safeguards under the federal Constitution. In this connection we note that, with one exception, none of the United States Supreme Court cases criticized by the dissent concerned the facial validity of a death penalty statute. Rather, those cases involved claims of error specific to the death sentence imposed on the defendant involved. Even assuming that we would not follow these cases as a matter of state constitutional law, they have no bearing on a facial attack on the Act itself. The one exception is *Zant v. Stephens, supra,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235, in which the Court held that Georgia's death penalty statute was not defective for failing to guide further the jury's discretion after the point at which the jury found aggravating factors to exist. But whether or not this Court would follow *Zant* is irrelevant, for the New Jersey death penalty statute does

___

[22]In fact, the dissenting opinion itself seems to recognize the necessity and legitimacy of guided discretion in capital sentencing determinations. It also reads our state Constitution as "serv[ing] at a minimum to affirm the principles [of consistency and individualization] originally voiced in *Furman* and *Gregg*" (*post* at 370)—a puzzling interpretation if those principles are, as the dissent suggests, impossible to reconcile (*post* at 351). Moreover, the dissent disclaims any reliance on the view that the death penalty is *per se* unconstitutional (*post* at 383–384). But there are only three ways to structure a capital punishment system: the jury may be given (1) total discretion, (2) no discretion, or (3) guided discretion. The United States Supreme Court has declared that the first two options are unconstitutional, a determination binding on all state courts. Yet the dissent simultaneously attempts both to acknowledge that the death penalty does not *per se* violate the state Constitution and to argue that a system providing for guided discretion—the only permissible option under the federal Constitution—*does* violate the state Constitution.

substantially guide the jury's discretion at this stage by requiring a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt.

The dissent, however, would require more than a bifurcated trial, a narrowing of the death-eligible class, a requirement that the jury find at least one aggravating factor, a further requirement that the jury find the aggravating factors to outweigh the mitigating factors beyond a reasonable doubt, a "catch-all" mitigating factor, and a provision for appellate review, all of which are found in the Act. The dissent would require that "[w]here a life is at stake, the procedures used to take that life must maximize both consistency and individual consideration in sentencing, and thus minimize arbitrariness and irrationality." *Post* at 370.

We are not quite sure what is meant by this suggested directive to "maximize" procedural protections in capital sentencing. If the suggestion is that capital defendants are entitled to perfection, to totally consistent, accurate and reliable procedures, obviously not only this Act but any death penalty act would be unconstitutional. Society has never been required to conform to such an impossible standard. While the dissent explicitly declines to say that the death penalty is unconstitutional *per se* under the New Jersey Constitution, it apparently would accomplish the same result indirectly by establishing requirements that, though unspecified, could never be met.

If, on the other hand, the suggestion is the more narrow one that the Act must contain certain additional measures that it does not currently contain in order to assure the consistent and reliable imposition of the death penalty, we do not believe that our dissenting colleague has identified any such measures. The dissent advances five criticisms of the Act: that the definition of murder is too broad, that the aggravating factors are too vague, that jury determinations of "death-eligibility" and "death-selection" are made simultaneously, that no procedure for review of prosecutorial discretion is included, and that

proportionality review is required only where the defendant requests it. *Post* at 384. These last two criticisms are simply premature. We share many of the dissent's concerns with respect to the need for controlling prosecutorial discretion and the importance of proportionality review even in the absence of a request by the defendant. Suffice it to say that in this case we have not been presented with a claim or showing of prosecutorial abuse in this early stage of the administration of the Act or with a defendant unwilling to request proportionality review, that we will consider these issues if and when they arise, and that we decline to invalidate the Act on its face on these grounds.

The dissent finds great significance and constitutional unfairness in the fact that the Act, like the death penalty statutes of several other states,[23] narrows the death-eligible class at the sentencing phase rather than at the guilt phase. We note first that the dissent is not entirely accurate in stating that the Act "[i]n effect ... encompasses all murders." *Post* at 387. There is a very large class of murderers, namely, those who are accomplices to persons who cause death during the commission of a felony, who are *not* subject to the death penalty. Section c of the Act permits the death penalty to be imposed only on those who commit murder "by [their] own conduct" or who pay another to do so. Thus the Act does provide for a certain degree of narrowing at the guilt phase.

This is just one of many facts that significantly undercuts the dissent's argument that the Act expands the class of murderers subject to the death penalty as compared to this state's prior capital punishment law. That law subjected only first-degree murderers to the death penalty, but it defined felony-murder as first-degree murder; and under it felony-murderers who did not participate, indeed, who had no intent to participate nor any

---

[23]*See* Ga.Code Ann. § 16–5–1 (1982); Ill.Ann.Stat. ch. 38, § 9–1 (Smith-Hurd Supp.1984); Mont.Code Ann. § 45–5–102 (1985); S.C.Code Ann. § 16–3–10, –20 (1962 & Law. Co-op. Supp.1986).

reason to participate, in the homicidal act nevertheless could be and were sentenced to death. *See, e.g., State v. Bunk,* 4 *N.J.* 461, *cert.* den., 340 *U.S.* 839, 71 *S.Ct.* 25, 95 *L.Ed.* 615 (1950); *State v. Mule,* 114 *N.J.L.* 384 (E. & A.1935). The current Act excludes such felony-murders.

The dissent also mistakenly assumes a clearcut distinction between the categories of first-degree murder and second-degree murder under our prior law. Such a clearcut distinction did not in fact exist. The dissent has called the element of "deliberation" the "crucial difference" between the two degrees of murder. Yet our cases consistently held that for deliberation to be found, no particular period of time need have elapsed between the formation of the defendant's homicidal plan and the execution of that plan. *See, e.g., State v. Coleman,* 46 *N.J.* 16, 45 (1965), *cert.* den., 383 *U.S.* 950, 86 *S.Ct.* 1210, 16 *L.Ed.*2d 212 (1966); *State v. Walker,* 37 *N.J.* 208, 218, *cert.* den., 371 *U.S.* 850, 83 *S.Ct.* 89, 9 *L.Ed.*2d 86 (1962). Under this standard, it was undoubtedly the rare murder whose facts could not support a finding of either first-degree or second-degree murder, and in fact our cases indicate that in many if not most murder prosecutions the jury was instructed on both theories. *See, e.g., State v. Reyes,* 50 *N.J.* 454, 458, 464 (1967); *State v. Bindhammer,* 44 *N.J.* 372, 389 (1965) ("Though the testimony relied on by the defendant might have justified a lesser degree, the testimony relied on by the State clearly justified the finding of first degree, for under settled law it is not necessary that any particular period of time elapse between the formation of the purpose to kill and its execution."); *State v. Wynn,* 21 *N.J.* 264, 270 (1956).

Moreover, while intent to do only serious bodily harm could not formerly support a first-degree murder charge, it may similarly be insufficient to support a capital sentence today because of the constitutionally required culpability standards regarding a capital defendant's intent to kill. *See Enmund v. Florida, supra,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140.

Of course, in one respect the class of murderers subject to the death penalty is significantly greater today than under prior law. The Act prevents potential capital defendants from avoiding a capital sentencing proceeding by pleading guilty to the murder charge. Sec. c(1); *see State v. Wright,* 196 *N.J.Super.* 516 (Law Div.1984). Such *non vult* pleas with that effect were permissible under the prior statute. In 1972, however, this Court invalidated the death penalty law precisely because it allowed (and thereby tended to compel) defendants to forgo a trial on guilt and plead *non vult* in order to avoid death. *State v. Funicello, supra,* 60 *N.J.* 60. The dissent's reliance on the pre-*Funicello* function of the *non vult* plea in "narrowing" the class of death-eligibles under prior law is ironic given the dissent's overall purpose of demonstrating that the current Act will be arbitrarily applied. For while the pre-*Funicello* availability of the *non vult* plea undoubtedly decreased the number of murderers subject to the death penalty, it did so in a wholly illegitimate fashion, and perhaps as much as anything else contributed to the arbitrary infliction of the death penalty condemned in *Furman v. Georgia.*

In short, the dissent's preference for the definition of capital murder contained in our prior statute is inexplicable. Although empirical evidence is lacking, we may confidently assume that the class of murderers subject to the death penalty today is not substantially greater than it was under prior law (excluding, as we think we must, the role of the *non vult* plea). More importantly, we think it undeniable that the current law's definition of murder, in conjunction with its provisions relating to pleas, helps make this statute far more fair than the prior law, and far less likely to result in the arbitrary application of the death penalty. A further narrowing of the death-eligible class before sentencing as proposed by the dissent would not, in our opinion, make the Act in any significant degree more fundamentally fair. All it would do is deprive society of its right and power to punish and deter murder.

The dissent is on no firmer ground in suggesting that the "use of aggravating factors in a single proceeding both to define the murder as a capital offense and to determine the imposition of the death sentence is [not] a fair way to administer the ultimate sanction of death." *Post* at 391. As the dissent points out, the fact that the New Jersey statute requires juries to weigh aggravating factors against mitigating factors is an important distinction between it and the Georgia statute. The Georgia statute does not contain such a requirement; it gives juries complete discretion over the life-or-death decision once the jury has determined that at least one aggravating factor exists. In *Zant v. Stephens, supra,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235, the Supreme Court held that the failure of the Georgia statute to allow aggravating factors to play any role in guiding the jury's discretion, apart from its function of narrowing the class of death-eligibles, did not violate the Constitution.

Our dissenting colleague would hold the New Jersey Act *un*-constitutional because it provides the *additional* restraint on jury discretion that the petitioner in *Zant* argued was constitutionally *necessary.* That is to say, the dissent argues that one of the Act's most important provisions for assuring that the death penalty is consistently applied is in fact *un* fair. The reason given is that "from the defendant's perspective, the sentence is imposed as and when the offense is defined." *Post* at 393. The dissent sets forth this proposition as if the element of unfairness is self-evident. It is not, at least to us. In our view, the statutorily mandated weighing process does not promote the arbitrary application of the death penalty; on the contrary, it protects against it.

The dissent's final contention—that the aggravating factors are vague and overbroad—really reduces to a claim that one of the aggravating factors, Section c(4)(c), is vague and overbroad. The dissent's position is that in construing this factor we in New Jersey will make the same mistakes other courts have made, no matter how aware of those errors or how determined

not to make them. We deal with this contention in the following section. We note here only that, assuming that this aggravating factor can be freed of its vagueness and can be consistently applied, we find no constitutional infirmity in the mere fact that its inclusion in the Act will increase the class of murderers subject to the death penalty. That is society's choice to make, not the judiciary's.

 We conclude under the state and federal Constitutions that New Jersey's death penalty act sufficiently guides juries' discretion so as to achieve a capital punishment system that narrows the class, and that it defines and selects those who will be subject to the sentencing proceeding and ultimately to the death penalty with consistency and reliability. The attack on its constitutionality in this respect must fail.

C. Constitutionality of *N.J.S.A.* 2C:11–3c(4)(c)

Section c(4)(c) lists as one of the aggravating factors that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Defendant challenges this factor as being facially unconstitutional, and argues that no limiting construction can render it constitutional. This claim is based both on the eighth and fourteenth amendments of the United States Constitution. The eighth amendment challenge is that this aggravating factor is imprecise because it permits juries to find the existence of the aggravating factor in an arbitrary and capricious manner, and therefore fails to assure the "channeling" of the jury's discretion required by *Furman v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346; the fourteenth amendment challenge is that Section c(4)(c) is so imprecise as to amount to an impermissibly vague criminal law,

which will allow for standardless and arbitrary application of the law by prosecutors and juries.[24]

Section c(4)(c) of the Act is its most troublesome portion and one of its most important. The provision is troublesome because of its obvious vagueness. Merely quoting it is the best proof of that fact. The provision is important because this vagueness probably accurately expresses society's wish to limit the death penalty to only certain murderers and yet reflects society's inability to define precisely that limit.[25] The trouble,

---

[24]While defendant asserts similar violations of the New Jersey Constitution (Article I, paragraphs 1 and 13), we believe that the analysis under, and the effect of, both the federal and state Constitutions in this connection are identical.

[25]Of the thirty-seven states that provide for the death penalty for murder, twenty-four of them have provisions similar to Section c(4)(c). The provisions attempt to make it more likely that the defendant receive the death penalty when the murder is set "off from the usual, the ordinary, the normal sort of homicide in the typical murder case." *Hopkinson v. State, supra,* 664 *P.*2d at 73. These provisions use different terms to describe this class of murderers deserving of death with many of them stating that the murder was "especially heinous, atrocious or cruel," was "outrageously vile, wanton or inhuman," or involved "depravity of mind." *See* Rosen, "The 'Especially Heinous' Aggravating Circumstance in Capital Cases—The Standardless Standard," 64 *N.C.L.Rev.* 941, 943 n. 7 (1986).

In most of the states, the provision is copied or adapted from Model Penal Code § 210.6(c)(3)(h) (Proposed Official Draft 1962). The language there is that the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity." After the Supreme Court, in *Proffitt v. Florida, supra,* 428 *U.S.* 242, 96 *S.Ct.* 2960, 49 *L.Ed.*2d 913, seemingly approved the Florida Supreme Court's limiting construction of the Code's provision to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," *State v. Dixon,* 283 *So.*2d 1, 9 (Fla.1973), *cert.* den. *sub nom. Hunter v. Florida,* 416 *U.S.* 943, 94 S.Ct. 1950, 40 *L.Ed.*2d 295 (1974), other states adopted a modified version of the Code explicitly including Florida's definition in their statutes. *See, e.g.,* Cal.Penal Code Sec. 190.2(a)(14) (West Supp.1986). Despite the differences in language, cases under New Jersey's form of this aggravating factor and under the Model Penal Code's form share common problems of definition and application as well as common goals. As is apparent from the discussion that follows, attempts by the judiciary to clarify and make these provisions constitutionally definite significantly displace the actual language of

therefore, originates not with the Legislature's language, but with the requirement that we provide each sentencing jury in advance with specific guidance as to the nature of the crimes that will satisfy the statute without allowing the provision to encompass every act of murder. That our construction of this provision may result in some murders falling outside the death penalty when society may have intended otherwise is a consequence of the constitutional command that criminal laws conform to a certain standard of precision, a command based on fundamental notions of fairness.

Quite clearly the introductory language of the provision ("[t]he murder was outrageously or wantonly vile, horrible or inhuman") is indefinite beyond anyone's ability to remedy, and presumably was so recognized by the Legislature, which attached to that part of the section the explicitly limiting portion *"in that it involved* torture, depravity of mind, or an aggravated battery to the victim ..." (Emphasis added). Interpretations by various courts throughout the nation give effect to this limitation, ultimately by construing the entire provision in a manner that results in the second portion being the essential finding. *See Hance v. State,* 245 *Ga.* 856, 268 *S.E.*2d 339, *cert.* den., 449 *U.S.* 1067, 101 *S.Ct.* 796, 66 *L.Ed.*2d 611 (1980); *Turner v. Commonwealth,* 221 *Va.* 513, 273 *S.E.*2d 36, 44–45 (1980), *cert.* den., 451 *U.S.* 1011, 101 *S.Ct.* 2347, 68 *L.Ed.*2d 863 (1981). In effect, although these courts do require two independent findings (that the offense (1) is "outrageously or wantonly vile, horrible or inhuman," and (2) involves torture, depravity or aggravated battery), in applying the construction, the first part of the provision is rendered nugatory. The resultant construction is that the aggravating factor exists when the murder "involved torture, depravity of mind, or an aggravated battery to the victim." Some courts, such as the trial court in *State v. Biegenwald, supra,* 106 *N.J.* at 49–50, however, have read

the statutes. The similarity of those clarifications makes cases decided under one form of the statute persuasive in cases decided under another form.

the introductory language as modifying the second part of the provision and have required that the torture, battery or depravity must warrant a characterization of being "wantonly vile, horrible or inhuman." We believe that the language of the provision itself, its clear intent, and constitutional considerations all support a construction that does not treat the first part of the provision ("was outrageously or wantonly vile, horrible or inhuman") as either an independent requirement or a qualitative modification of what follows.

While not quite so obvious, it is fairly clear that the second portion of Section c(4)(c) will also not pass constitutional muster unless a narrowing construction is supplied. The United States Supreme Court's approval of the Georgia court's narrowing construction of both sections of the provision in *Gregg v. Georgia, supra,* 428 *U.S.* at 201–02, 96 *S.Ct.* at 2938, 49 *L.Ed.* 2d at 890–91, and *Godfrey v. Georgia,* 446 *U.S.* 420, 430–32, 100 *S.Ct.* 1759, 1765–66, 64 *L.Ed.*2d 398, 408–09 (1980), indicates that a limiting construction of both parts of the provision may be required.[26]

This Court's power and obligation to narrow imprecise statutory language in order to render it constitutional is beyond question. *See, e.g., Town Tobacconist v. Kimmelman,* 94 *N.J.* 85 (1983); *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57 (1980); *Borough of Collingswood v. Ringgold,* 66 *N.J.* 350 (1975), app. dism., 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976); *State v. Profaci,* 56 *N.J.* 346 (1970). As indicated above, the narrowing is essential to satisfy the requirement of *Gregg* that the discretion of the jury be adequately controlled and the require-

---

[26]Despite the United States Supreme Court's declaration that at least under the federal Constitution, this aggravating factor could be applied in a valid manner, two state supreme courts have ruled it facially unconstitutional pursuant to both the federal and their own state constitutions. *People v. Superior Court,* 31 *Cal.*3d 797, 647 *P.*2d 76, 183 *Cal.Rptr.* 800 (1982); *In re Petition of State,* 433 *A.*2d 325 (Del.1981).

ment of the fourteenth amendment that criminal laws not be vague.[27]

What, then, did the Legislature intend? The question is not meant to suggest that a particular constitutionally permissible construction was part of that intent. We search only for those general indications that will enable us to adopt a construction

---

[27]We note in this connection the difference between "vagueness" that renders a statute invalid as a citizen's guide to lawful action, *see State v. Lee*, 96 *N.J.* 156 (1984); *State v. Lashinsky*, 81 *N.J.* 1 (1979), and "vagueness" that allows arbitrary and discriminatory enforcement of the laws by police, judges and juries, *see Kolender v. Lawson*, 461 *U.S.* 352, 357–58, 103 *S.Ct.* 1855, 1858, 75 *L.Ed.*2d 903, 909 (1983); *see also Town Tobacconist v. Kimmelman, supra*, 94 *N.J.* at 118; *State v. Sharkey*, 204 *N.J.Super.* 192, 199 (App.Div.1985). We are concerned here with the latter, specifically, with vagueness that makes the jury's functioning unpredictable. In this context, a vague sentencing guideline, by rendering the determination more inscrutable to judicial review, increases the chance for concealed prejudice in sentencing. No contention has been made in this case, or indeed in others, that the constitutional mandate of definiteness has as its purpose advising murderers of the difference between conduct that will bring on the death penalty and conduct that will result in a thirty-year prison term. We note also the conclusion of some cases that vagueness in matters pertaining to the sentencing proceeding may not result in fourteenth amendment violations as readily as vagueness in the definition of the elements of a crime. *State v. Payton*, 361 *So.*2d 866, 871 (La.1978). It is clear to us, however, that functionally, the aggravating factors in the Act are indistinguishable, for this purpose, from the elements of a crime. For example, no more or less than premeditation under our prior law, proof of an aggravating factor could mark the difference between imprisonment and death. There is no reason for requiring definiteness in the former but not in the latter. *See Bullington v. Missouri*, 451 *U.S.* 430, 438, 101 *S.Ct.* 1852, 1857, 68 *L.Ed.*2d 270, 278 (1981) (holding double jeopardy clause applicable to capital sentencing proceeding because of procedural similarities to trial of guilt). *But see Spaziano v. Florida*, 468 *U.S.* 447, 464, 104 *S.Ct.* 3154, 3164, 82 *L.Ed.*2d 340, 354 (1984) (sixth amendment right to jury trial does not extend to capital sentencing). Several state supreme courts have expressly equated aggravating factors with elements of an offense. *See Arnold v. State*, 236 *Ga.* 534, 224 *S.E.*2d 386, 391 (1976) (holding unconstitutionally vague aggravating condition that "murder [is] committed by a person who has a substantial history of serious assaultive criminal convictions"); *State v. Silhan*, 302 *N.C.* 223, 275 *S.E.*2d 450, 482 (1981) ("in terms of a jury's function, [aggravating factors] are like the elements of a given criminal offense").

of this provision with reasonable confidence that it fairly reflects the legislative purpose.[28]

In *State v. Bass*, 189 *N.J.Super.* 445, 451–52 (Law Div.1983), the trial court concluded that our death penalty provision, which is identical to that of Georgia's statute, must be interpreted in accordance with the construction adopted by the Georgia Supreme Court. Its reasoning in support of this proposition is compelling: unquestionably, as demonstrated by the comments of the bill's chief sponsor [29] and the Director of the Division of Criminal Justice,[30] the drafters of the Act sought to design a statute that would pass constitutional muster and were keenly aware of the United States Supreme

[28]Whether our narrowing construction should attempt to be final is a difficult issue. If finality is intended, there is the obvious risk that the definition will exclude cases that we may later conclude, after further reflection, were clearly intended to be included. A narrowing, however, that is explicitly subject to modification as "unforeseen" cases arise has a tendency not too dissimilar from the arbitrary infliction of the death penalty by the jury. One would not know, until a case reached this Court, whether its circumstances properly triggered this factor, and our determination might be accurately viewed as an exercise of relatively uncontrolled discretion to decide who shall live and who shall die. We believe that the need for predictability and consistency and the demands of fairness require that we define the factor now, once and for all. If, as a result, we miss a case, or more, because we could not foresee it, the Legislature can correct that error for future cases. That a defendant will be in prison at least thirty years, and perhaps more, when he should have been executed is preferable to executing a defendant under circumstances that suggest that the sentence was determined with less than clear guidance as to its appropriateness.

[29]Senator Russo, sponsor of the 1982 legislation, said in the Judiciary Committee Hearings on S. 112 that the bill was "drafted in accordance with the United States Supreme Court guidelines that render capital punishment constitutional in the Supreme Court case that so declared." Capital Punishment Act: Hearings on S. 112 Before the N.J. Senate Judiciary Comm., 200th Leg., 2nd Sess. (1982). Although not identified by name, the Supreme Court case referred to is *Gregg v. Georgia, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859.

[30]At public hearings before the Senate Judiciary Committee, Director Edwin Stier stated, referring to Section c(4)(c): "We tried to make that conform to the most recent case law on the subject." Capital Punishment Act: Hearings on S.112 Before the N.J. Senate Judiciary Comm., 200th Leg., 2nd Sess. (1982).

Court's decisions approving Georgia's construction of its provision. *See Gregg v. Georgia, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859; *Godfrey v. Georgia, supra,* 446 *U.S.* 420, 100 *S.Ct.* 1759, 64 *L.Ed.*2d 398.

We do not, however, agree that in copying Georgia's statute, including the particular provision at issue, the Legislature intended to adopt Georgia's construction of this provision. We say this for several reasons. First, and foremost, we believe the New Jersey Legislature wanted assurance that the Act was constitutional. Since Georgia's statute was constitutionally approved, the Legislature copied it for that reason and that reason alone. It is true that the holding by the United States Supreme Court depended on a narrowing of the aggravating factor at issue here, but it was quite clear that any narrowing that provided the requisite degree of definiteness would pass constitutional scrutiny. The *particular* narrowing effected at that point by the Georgia Supreme Court [31] (and "approved" by

---

[31]The particular narrowing construction "approved" by the United States Supreme Court in *Gregg* and *Godfrey, supra,* 446 *U.S.* at 430–31, 100 *S.Ct.* at 1765–66, 64 *L.Ed.*2d at 407–08, was in fact abandoned by the Georgia Supreme Court prior to the adoption of Section c(4)(c) here. The former approved construction had been set forth in *Harris v. State,* 237 *Ga.* 718, 230 *S.E.*2d 1 (1976), *cert.* den., 431 *U.S.* 933, 97 *S.Ct.* 2642, 53 *L.Ed.*2d 251 (1977), and *Blake v. State,* 239 *Ga.* 292, 236 *S.E.*2d 637, *cert.* den., 434 *U.S.* 960, 98 *S.Ct.* 492, 54 *L.Ed.*2d 320 (1977). Read together these decisions resulted in a narrow definition of the provision which required that torture be read *in pari materia* with aggravated battery to require evidence of serious physical injury to the victim before death, and defined depravity of mind as that mental state leading to torture or aggravated battery. The first part of the provision ("outrageously or wantonly vile, horrible or inhuman") was construed as simply a requirement that the state must demonstrate that the murder involved either torture, aggravated battery or depravity of mind. This construction was expanded by the Georgia court's 1980 decision in *Hance v. State, supra,* 245 *Ga.* 856, 268 *S.E.* 2d 339. *Hance* held that the provision would be supported when the evidence showed that the act had been "outrageously or wantonly vile, horrible or inhuman" and that, in addition, it involved either aggravated battery, torture or depravity of mind. A finding of either torture or depravity of mind could be supported without evidence that serious physical injury occurred before death because torture was construed to include abuse less severe than aggravated

the United States Supreme Court in *Godfrey*) was not essential. Our position is debatable, for there is sound authority that the "copying" state adopts not only the statute but the construction of the originating state. *See Todd Shipyards Corp. v. Weehawken,* 45 *N.J.* 336, 343 (1965); 2A C. Sands, *Sutherland Statutory Construction* § 52.02 (4th ed. 1973). That authority, however, is much more persuasive when dealing with statutes covering complex matters, whose adoption is preceded by careful study, often by commissions appointed for that purpose, and especially statutes that have had a fairly long history of interpretation in the originating state. For example, New Jersey statutes relating to tort claims, *N.J.S.A.* 59:1–1 et seq., and comparative negligence, *N.J.S.A.* 2A:15–5.1, were copied from California and Wisconsin statutes respectively. In both of these instances, our courts have fairly consistently adopted the construction of the statute by those states. *See, e.g., S.E.W. Friel Co. v. New Jersey Turnpike Auth.,* 73 *N.J.* 107, 122 (1977) (Tort Claims Act); *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 161 (1979) (Comparative Negligence Act). The statute at issue here, however, is relatively new, had been subjected to relatively little construction at the time of its adoption in New Jersey, and was certainly, at least insofar as the construction of the statute was concerned, not at all the subject of any long-term study by any commission in these states or by anyone else.

▮ Furthermore, we cannot believe that the Legislature of New Jersey intended a construction of this provision that would limit it to only murders preceded by the infliction of physical pain. The language of the provision undeniably calls for a

---

battery, as well as sexual and psychological abuse and depravity to be manifested by brutality after death. 268 *S.E.*2d at 345–46. Although Georgia in *Hance* moved away from the serious physical injury standard, there is no indication that this Legislature intended to adopt the specific formula favored by the Georgia court at the time the provision was passed here any more than the Legislature intended to adopt the specific *Harris/Blake* construction expressly approved by the United States Supreme Court.

broader interpretation, and that interpretation can easily be accommodated to constitutional requirements. It is not tenable, for instance, to attribute to the Legislature a willingness to shield from the death penalty murderers who inflict psychological torture on their victims before death while condemning those whose brutality is limited to the infliction of physical pain. Where the policies of the copying state are not reflected in the construction of the statute in the original jurisdiction, the adopting state is not bound by such constructions. *See Engberg v. State,* 686 *P.*2d 541, 552 (Wyo.) (although copying Florida's death penalty statute, Wyoming need not follow Florida's application of the statute where state policies diverge), *cert.* den., 469 *U.S.* 1077, 105 *S.Ct.* 577, 83 *L.Ed.*2d 516 (1984).

We therefore conclude that while the Legislature intended to obtain the benefits of the constitutional validation of the substantially identical Georgia provision, it did not intend to assume the burdens of what, to us, appears to be an unduly restrictive construction.

It is instructive to refer to the various constructions of this provision in other states. The results of these endeavors, however, often provide examples better not followed. We list some of the constructions that other courts have developed in their attempt to apply similar statutory factors constitutionally. In defining an "aggravated battery" for this purpose, courts have defined it as a battery which occurs in addition to or independently of the force that caused death, *see, e.g., Smith v. Commonwealth,* 219 *Va.* 455, 248 *S.E.*2d 135, 149 (1978) (aggravated battery is one "which qualitatively and quantitatively is more culpable than the minimum necessary to accomplish an act of murder"), *cert.* den., 441 *U.S.* 967, 99 *S.Ct.* 2419, 60 *L.Ed.* 2d 1074 (1979) [no reason is given why, despite the fact that severe and long-lasting pain is *intentionally* inflicted by the murderer, it is considered less horrible if the blows that were intended to cause that pain also were intended to, and did,

result in death]; [32] in other states an "aggravated battery" occurs where the act caused "unnecessary pain," presumably meaning pain in excess of what was "necessary" to accomplish the murder, see *State v. Sonnier,* 402 *So.*2d 650, 658–60 (La. 1981), *cert.* den., 463 *U.S.* 1229, 103 *S.Ct.* 3571, 77 *L.Ed.*2d 1412 (1983) [but death should not be imposed as a result of what may be an extremely close determination of how much pain is considered "necessary"]. Some states seem to require that death be preceded by serious abuse, see *State v. Sonnier, supra,* 402 *So.*2d at 658–60; *but see State v. Moore,* 414 *So.*2d 340, 348 (La.1982) (awareness of imminent death sufficient to satisfy provision), *cert.* den., 463 *U.S.* 1214, 103 *S.Ct.* 3553, 77 *L.Ed.*2d 1399 (1983); *see also State v. Wood,* 648 *P.*2d 71, 86 (Utah) (murder must involve aggravated battery or torture), *cert.* den., 459 *U.S.* 988, 103 *S.Ct.* 341, 74 *L.Ed.*2d 383 (1982) [the limitation to physical pain is insufficient because it excludes the infliction of psychological pain]; or where death was preceded by "foreseeable" suffering, *State v. Adamson,* 136 *Ariz.* 250, 665 *P.*2d 972, 988, *cert.* den., 464 *U.S.* 865, 104 *S.Ct.* 865, 78 *L.Ed.*2d 178 (1983) [this formulation, if literally accepted, would inflict the death penalty based on negligence, ordinarily thought to be the lowest degree of culpability, one that rarely sustains a finding of even *any* crime]. Finally, many states limit the factor to include only acts committed by the defendant before death, *see Simmons v. State,* 419 *So.*2d 316, 319 (Fla.1982); *State v. Steward,* 197 *Neb.* 497, 250 *N.W.*2d 849, 864 (1977) [this assumes that society is interested only in the victim's suffering as compared to the murderer's depravity].[33]

---

[32]Material in brackets in this section refers to this Court's views of the conclusion of another court.

[33]In 1985 the Legislature amended Section c(4)(c) to substitute "aggravated assault" for "aggravated battery." *L.*1985, *c.*178. Prior to that, our trial courts had held that the Legislature, intending to copy Georgia's similar provision, also intended to adopt that state's construction of the statute to require the infliction of serious physical pain prior to death. *State v. Bass, supra,* 189

We are convinced that the essence of the legislative concern is the defendant's state of mind. We do not believe that the Legislature intended to distinguish between two murderers each of whom intended to inflict immediate death upon the victim without any additional suffering whatsoever, when one victim dies immediately and the other lives for a long period of time and experiences excruciating pain. That capricious event alone would be perceived as an insufficient basis on which to inflict death on that defendant while imposing imprisonment on the other. Our system of criminal laws is predicated usually on the imposition of punishment based on the defend-

---

*N.J.Super.* at 451. The legislative change in 1985 signals a rejection of this narrow construction. We believe that the legislative amendment, while affecting only future cases, by rejecting the definition put forward in *Bass* also signals a legislative confirmation of our more inclusive reading here of the 1982 statute.

In 1982, when the Act was first adopted here, even those states which professed to adhere to a requirement of serious physical injury had not actually applied the provision to conform to this limit. Georgia, two years prior to our adoption of the statute in 1982, in *Hance v. State, supra,* 245 *Ga.* 856, 268 *S.E.*2d at 345–46, had retreated from its earlier construction of the provision which had required serious physical injury to satisfy the provision. Thus even the initial use of the term "aggravated battery" if intended to copy the application of the statute by other states did not signal an intention to limit its application to serious physical injury.

Because of our more inclusive reading of Section c(4)(c) than that of our trial courts, we find that our construction here of Section c(4)(c) conforms to that which the Legislature intended to introduce with the words "aggravated assault." In other words, while the use of the word "assault" may have signalled disapproval of the prior narrow construction of the provision, the change in statutory language should not affect the definition which we give today to the statute. The word "assault" includes acts not limited to the infliction of serious physical pain, and is therefore consistent with our interpretation of the original statute. However, it is important to note that despite the broad statutory definition of "assault," the use of the word "assault" in our statute does not expand our definition of the provision set forth here. The statutory definition of aggravated assault, if applied literally to every murder case, is unconstitutionally overinclusive. Every murder could be said to involve an "attempt to cause serious bodily injury to another," thus meeting the statutory definition of aggravated assault in *N.J.S.A.* 2C:12–1(b). We therefore

ant's intent. Indeed, our Code's ranking of crimes by degree places those crimes committed with intentional conduct as the highest degree of crime, for which the defendant is most severely punished. Society's concern, the community's concern, the Legislature's concern, is to punish most harshly those who *intend* to inflict pain, harm, and suffering—in addition to intending death.

We would not, however, include within the coverage of Section c(4)(c) the murder in which the victim suffered no pain in fact despite the murderer's intention to inflict pain, *i.e.*, in which the victim unexpectedly died instantaneously. While both defendants (the ones intending pain in these two examples) are, concededly, equally culpable, we conclude as a practical matter that absent this particular limit on the application of Section c(4)(c) (*i.e.*, no death penalty where no pain was suffered despite the murderer's intent to inflict it), there would be too many possible presentations by the prosecution, each conceivably turning on theoretical reconstructions of intent. Because proof that will support a Section c(4)(c) finding, as we shall construe it here, is already largely circumstantial, to permit the added speculation as to proof of intent to inflict pain when no pain was inflicted might allow impermissibly discretionary findings and death sentences based on the slimmest of evidence.

We therefore start by including within Section c(4)(c) the class of murders in which defendant intended to, and did in fact, cause extreme physical or mental suffering—in addition to death.[34] The state of mind that we require corresponds to our Code's "purposeful" definition. Thus, the extreme physical or mental suffering must be precisely what defendant *wanted* to

---

conclude that the amended statutory provision does no more than conform to our construction of Section c(4)(c).

[34]This includes cases where defendant intended to cause a third party who is not the victim to suffer. *See Strickland v. State,* 247 *Ga.* 219, 275 *S.E.*2d 41, *cert.* den., 454 *U.S.* 882, 102 *S.Ct.* 365, 70 *L.Ed.*2d 192 (1981).

occur in addition to death.[35] "Torture" and "aggravated bat-
tery" take on adequate definiteness when the circumstances are
described in terms of defendant's intention, and the require-
ment that defendant intentionally inflicted extreme physical or
emotional pain eliminates the need for a distinction between the
two statutory terms.

We conclude that "depravity of mind," however, identi-
fies a concern distinct from that discussed above. These words
mark society's concern to punish severely those who murder
without purpose or meaning as distinguished from those who
murder for a purpose (albeit a completely unjustified purpose).
This term isolates conduct that causes the greatest abhorrence
and terror within an ordered society, because citizens cannot
either in fact or in perception protect themselves from these
random acts of violence. The killer who does it because he
likes it, perhaps even because it makes him feel better, who
kills bystanders without reason, who kills children and others
whose helplessness[36] would indicate that there was no reason
to murder, evinces what we define as depravity of mind.[37]

---

[35]We note, however, that this aggravating factor does not exist when defend-
ant's state of mind was "knowing" but not "purposeful," i.e., when defendant,
although "practically certain" that extreme physical or mental suffering would
occur, did not in fact have that result as his "conscious object." See N.J.S.A.
2C:2–2b(1) and (2), defining "purposely" and "knowingly." This limitation
provides further assurance that this aggravating factor will apply only to the
most culpable murderer.

[36]The helplessness of the victim is not the factor that, by itself, allows a
finding of depravity; rather, it usually demonstrates the senselessness of the
killing.

[37]Mutilation of a body after death may be indicative of "depravity of mind."
See, e.g., Hance v. State, supra, 245 Ga. 856, 268 S.E.2d at 346. The dissent
points to this approval of after death mutilation as evidence of depravity and
concludes that this construction is sufficiently manipulable in a multiple
wound case so as to defeat any limiting definition of murder accompanied by
aggravated battery or torture. The claim made by the dissent is that where
intent to do serious bodily harm before death cannot be proved, if the moment
of death is sufficiently indefinite, the wounds will be considered "mutilation"

Troublesome issues of justification may arise. They will be answered as are other troubling moral and policy judgments that sometimes find their way to the courts. What society is concerned with here, however, is the complete absence—from society's point of view—of any of the recognizable motivations or emotions that ordinarily explain murder. The definition of this kind of murder is *not* vague. There is not a danger here that it will be difficult to distinguish between those who fall under our definition of depraved and those who do not.

To clarify further the limits of this classification we refer to an objection made by the dissent to this construction of depravity. The dissent here mischaracterizes our definition of depravity. The apparent purpose is to prove the construction we adopt is vulnerable to manipulation that would undo our effort to narrow it. Were depravity merely a killing *without* warning as is contended, we would agree that the definition fails. However, nothing in our definition suggests that a killing committed without a warning would by itself constitute depravity. A murder committed without a warning is not at all the same as one lacking a recognizable motive, because warning has little to do with the reason or lack thereof for killing. In addition, the second part of the dissent's argument—that a murder *preceded* by a warning to the victim would render it one accompanied by aggravated battery or torture—ignores our requirement that the killing be accompanied by extreme physical or mental suffering, and that such suffering be intentionally inflicted, purposely inflicted, the specific purpose being to cause the victim to suffer prior to death. By itself, the victim's

---

and thus indicative of depravity. Our determination that after death mutilation may be a depraved act, however, requires that the murderer intend to do physical damage to a corpse and that when that harm is done the murderer have intended that it be done specifically upon a corpse. Depravity is not distinguished from aggravated battery and torture by that finely drawn line that is the moment of death. Instead, it is distinguished by the distinct mental state that causes a murderer intentionally to damage a body that he *believes* is no longer a live human being.

awareness of imminent death is not sufficient to satisfy Section c(4)(c). The mere fact that a murder is preceded by a warning to the victim would not fulfill our requirement that the murderer intends to, or has as his explicit purpose to, inflict severe psychological (or physical) pain prior to death; to constitute torture or a battery under our test, the murderer must *want* the victim to suffer that pain.

Therefore, depending on the facts, the jury should be charged—without quoting the statute—that this aggravating factor exists if the murder involved torture, depravity of mind, or an aggravated battery to the victim. Torture or aggravated battery to the victim shall be found if the defendant intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death,[38] "severity" measured either by the intensity of the pain, or the duration of the pain, or a combination of both.[39] Where the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing, the court shall instruct the jury on the meaning of depravity in this specific context. For the defendant who killed for the enjoyment of it, because the victim just happened to be in the area, or for no reason at all, just to kill, society must be able to reserve its most extreme sanction.

---

[38]In most of these cases proof will be totally circumstantial, because the defendant is unlikely to get on the stand and testify to his intention to cause pain prior to death. The trial court will therefore be most careful to instruct the jury on the distinction between a finding that pain was foreseeable and the need to establish beyond a reasonable doubt that defendant *intended* to inflict pain prior to death.

[39]Execution-style murders may definitely be included in this provision: if the victim is aware as a practical certainty that he is about to be executed, his psychological suffering obviously is extreme. In making the victim aware of such imminent execution, the defendant must have as his purpose for doing so that this knowledge will cause the victim to endure great psychological suffering.

## IV.

### Pretrial Issues

Having determined that the Act withstands constitutional scrutiny, we turn now to defendant's allegations that numerous errors infecting his trial mandate reversal of both his conviction and his death sentence. In accordance with the presentation in defendant's brief, we have grouped these allegations into three chronological categories into which they generally fall. In this section and in section V, we treat defendant's claims that errors that occurred at the pretrial stage and at the trial in the guilt phase, respectively, require reversal of his murder conviction. In section VI, we address defendant's claim that errors that took place in his sentencing proceeding warrant reversal of the sentence of death.

### A. Selection of Essex County Juries

Defendant poses a broad challenge to the Essex County jury selection system. He contends that: (1) the grand and petit juries that indicted and tried him were drawn from lists that are unconstitutionally underrepresentative of blacks; (2) the grand jury procedures used by assignment judges in the county violate New Jersey selection statutes; (3) the selection procedure for grand jury forepersons excludes blacks and women. The Law Division rejected all three of defendant's claims. *State v. Ramseur*, 197 *N.J.Super.* 565 (1984). We consider them in turn.

#### 1(a).

Since 1979 in Essex County, both petit and grand juries have been chosen from a "source" list consisting of every person whose name is found on either the Department of Motor Vehicle (DMV) licensed driver list or the voter registration list. *N.J.S.A.* 2A:70-4, *amended by* L.1979, *c.* 271, § 1. The source list is arranged by municipality. From it is derived the "master" list, which consists of the names of all persons to whom qualifying questionnaires will be sent. Jury managers determine how

many questionnaires should be sent based on their anticipated needs and their experience as to what rate of return they can expect from the mailing. They then create the master list by randomly selecting the required number of names from the source list. The actual design of the method insures that prospective jurors are chosen from each street in each municipality without selecting more than one person from any one household. *State v. Ramseur, supra,* 197 *N.J.Super.* at 571–72.

The 20 to 28% of the questionnaires that are completed and returned are screened for eligibility. Persons who have served on a jury within the last seven years or who have received a questionnaire in the last four years are deemed ineligible. On the basis of information returned with the questionnaire, the extreme hardship cases are excused. The remaining names are placed on the "qualified" list. Once the qualified list is constituted, jury managers randomly select grand jurors from it; those not selected as grand jurors are designated petit jurors. The lists are divided into panels and placed in alphabetical order. The jurors then receive summonses to report for jury duty.

Defendant presented evidence showing that blacks [40] are underrepresented on the jury source and qualified list. According to the 1980 census figures, the percentage of black adults between the ages of 18 and 74 in Essex County is 35.9. Defendant's experts conducted three separate surveys between 1981 and 1982 to determine the percentage of blacks on the jury lists. Averaging the results of two telephone surveys (one conducted in May 1981 and another in May 1982) and a "geo-

---

[40]At trial, defendant raised the underrepresentation of students, low-income people, residents of Newark, young people, and women as well as of blacks as part of his constitutional challenge. These claims were rejected. *State v. Ramseur, supra,* 197 *N.J.Super.* at 576–82. He has since chosen to focus his argument on his claims with respect to the exclusion of blacks. Accordingly, we will confine our discussion to the alleged underrepresentation of blacks only, and do not reach the claims with respect to other groups.

graphical inference" study [41] (corresponding to the May 1982 telephone survey), defendant's experts concluded that blacks represented about 21.3% of the individuals on the source list and about 21.8% of the individuals on the qualified list.

The State sought to discredit defendant's expert testimony on several grounds. In addition, the prosecution conducted its own informal "headcount" to determine the actual number of blacks appearing for jury duty. The parties stipulated that this study was intended only to prove the race of those persons who actually appeared for service, not to prove the racial composition of the source or qualified lists. This "observation" concluded that 32.2% of the 4451 petit jurors who appeared for duty in the period studied were black, a figure closely approximating the 35.9% of eligible blacks in the county population. A similar "headcount" of the grand jurors concluded that 24.6% were black. The trial court did not make a factual finding as to whether the prosecution's data were scientifically reliable. Because it found defendant's figures to be constitutionally insignificant, the court also declined to evaluate the credibility of his expert witnesses. 197 *N.J.Super.* at 574 n. 4.

### 1(b).

We must analyze the evidence presented for possible violations of defendant's federal and state constitutional rights to an impartial jury and to equal protection of the laws. *U.S. Const.* amends. VI, XIV; *N.J. Const. of 1947* art. I, paras.

---

[41]As the Law Division explained:

The geographic inference method is a procedure in which the race of a particular juror is inferred from the area of Essex County in which he [or] she lives. The county was broken up into tracts. The racial makeup of the tract is determined from census data. Each name on the racially neutral source list is identified with a particular tract in the county. If the tract in which the juror resides is classified as 90–100% black, the race of the juror is inferred to be black. If the tract in which the juror resides is classified as 0–10% black, the juror is inferred to be white. Jurors living in tracts classified as 11–89% black were not counted. [197 *N.J.Super.* at 573.]

5, 9.[42] Under the equal protection clause, selection of both grand and petit jurors must be free from any taint of discriminatory purpose. *Strauder v. West Virginia,* 100 *U.S.* (10 *Otto* ) 303, 25 *L.Ed.* 664 (1880). Under the sixth amendment, petit jurors must be drawn from pools that represent a "fair cross-section" of the community, *Duren v. Missouri,* 439 *U.S.* 357, 368 n. 26, 99 *S.Ct.* 664, 670 n. 26, 58 *L.Ed.*2d 579, 589 n. 26 (1979); there is also authority suggesting a similar cross-section right with regard to grand jury selection in this state, where the right to indictment by a grand jury is constitutionally protected, *State v. Porro,* 152 *N.J.Super.* 259, 265 (Law Div. 1977), aff'd, 158 *N.J.Super.* 269 (App.Div.), *cert.* den., 439 *U.S.* 1047, 99 *S.Ct.* 724, 58 *L.Ed.*2d 706 (1978); *see N.J. Const. of 1947* art. I, para. 8.

To prove either an equal protection or fair cross-section claim, a defendant must first identify a constitutionally cognizable group, *i.e.,* a group capable of being singled out for discriminatory treatment. *Castaneda v. Partida,* 430 *U.S.* 482, 494, 97 *S.Ct.* 1272, 1280, 51 *L.Ed.*2d 498, 510 (1977); *Duren v. Missouri, supra,* 439 *U.S.* at 364, 99 *S.Ct.* at 668, 58 *L.Ed.*2d at 587.

Second, under the equal protection test, the defendant must prove "substantial underrepresentation" over a significant period of time, *Castaneda v. Partida, supra,* 430 *U.S.* at 494, 97 *S.Ct.* at 1280, 51 *L.Ed.*2d at 510, whereas under the sixth amendment the defendant must show that the representation of the particular group is not "fair and reasonable" over a period of time, *Duren v. Missouri, supra,* 439 *U.S.* at 364, 99 *S.Ct.* at 668, 58 *L.Ed.*2d at 587. Finally, under equal protection analysis, the defendant must show discriminatory purpose, either by the strength of his statistical showing or by demonstrating the

---

[42]We are unaware of any authority discerning a more broadly defined right in this area under the state Constitution, and thus rely on the federal standards to assess defendant's constitutional challenge.

use of racially non-neutral selection procedures to support the inference of discrimination raised by substantial underrepresentation. *Castaneda v. Partida, supra,* 430 *U.S.* at 494, 97 *S.Ct.* at 1280, 51 *L.Ed.*2d at 510-11. Under the sixth amendment's fair cross-section test, the defendant need not show purposeful discrimination but must show merely that the underrepresentation was due to systematic exclusion. *Duren v. Missouri, supra,* 439 *U.S.* at 364, 99 *S.Ct.* at 668, 58 *L.Ed.*2d at 587.

It is not necessary for the defendant to show that the *particular* juries that indicted and tried him were underrepresentative. Indeed, a defendant has no right to a jury that includes members of his own race. *See Taylor v. Louisiana,* 419 *U.S.* 522, 538, 95 *S.Ct.* 692, 701, 42 *L.Ed.*2d 690, 703 (1975); *Alexander v. Louisiana,* 405 *U.S.* 625, 628, 92 *S.Ct.* 1221, 1224, 31 *L.Ed.*2d 536, 540–41 (1972). He does, however, have the right to assert the failure of the jury system to provide generally for adequate representation of cognizable groups, and such a showing entitles him to reversal of his conviction whether or not he has suffered prejudice. *See Vasquez v. Hillery,* 474 *U.S.* 254, ———— ———, 106 *S.Ct.* 617, 622–24, 88 *L.Ed.*2d 598, 607–09 (1986). Thus, for example, the fact that Ramseur's juries more than represented the percentage of blacks in Essex County—nine of the twenty-three grand jurors, *see infra* note 46, and seven of the twelve petit jurors, *see State v. Ramseur, supra,* 197 *N.J.Super.* at 582 n. 6, were black—is not relevant to the constitutional inquiry.

Having proved the three prongs, under either the equal protection or fair cross-section tests, the defendant has made out a *prima facie* case and the State must establish a rebuttal case, which also varies under the two tests. Under equal protection analysis, the State must dispel the inference of intentional discrimination by, for example, showing that permissible racially neutral selection criteria and procedures have produced the disproportionate result. *See Castaneda v. Partida, supra,* 430 *U.S.* at 497–98, 97 *S.Ct.* at 1281–82, 51 *L.Ed.*2d

at 512. Under the fair cross-section test, the *prima facie* case is overcome by a showing that a significant state interest is manifestly and primarily advanced by those aspects of the jury selection process that result in disproportionate exclusion of the distinctive group. *Duren v. Missouri, supra*, 439 *U.S.* at 367–68, 99 *S.Ct.* at 670, 58 *L.Ed.*2d at 589.

Reducing both tests to their constitutional essence, whether analyzing a grand or petit jury challenge, we would primarily focus on the cognizability of the group in question, the substantiality of the underrepresentation, and the possible causes of it. We recognize that the separate prongs of each test are interrelated, seeming like converging streams of analysis rather than rigid compartments. Our application of the test must be practical rather than mechanical, remembering that the ultimate judgment demanded is whether there has been unconstitutional exclusion in the Essex County jury-selection process. We do not here seek to "turn matters that are inherently incommensurable into mere matters of arithmetic." *Cassell v. Texas*, 339 *U.S.* 282, 291, 70 *S.Ct.* 629, 633, 94 *L.Ed.* 839, 849 (1949) (Frankfurter, J., concurring).

1(c).

Blacks unquestionably being a constitutionally cognizable group, defendant has met the first prong of both the equal protection and fair cross-section tests. *See, e.g., Rose v. Mitchell*, 443 *U.S.* 545, 565, 99 *S.Ct.* 2993, 3005, 61 *L.Ed.*2d 739, 756 (1979).

No court has yet provided a specific mathematical test for determining when underrepresentation becomes "substantial" and therefore constitutionally suspect. Rather, impermissible ranges of underrepresentation have been identified on a case-by-case basis. *See, e.g., Duren v. Missouri, supra*, 439 *U.S.* 357, 99 *S.Ct.* 664, 58 *L.Ed.*2d 579 (group represented 54% of community population but 15% of jury pool); *Castaneda v. Partida, supra*, 430 *U.S.* 482, 97 *S.Ct.* 1272, 51 *L.Ed.*2d 493 (79% of community, 39% of jury pool); *Alexander v. Louisiana*,

*supra*, 405 *U.S.* 625, 92 *S.Ct.* 1221, 31 *L.Ed.*2d 536 (21% of community, 14% of jury pool, but only 7% of panel from which jury was drawn); *Turner v. Fouche*, 396 *U.S.* 346, 90 *S.Ct.* 532, 24 *L.Ed.*2d 532 (1970) (60% of community, 37% of jury pool); *Jones v. Georgia*, 389 *U.S.* 24, 88 *S.Ct.* 4, 19 *L.Ed.*2d 25 (1967) (per curiam) (30.7% of community, 5% of jury pool); *Sims v. Georgia*, 389 *U.S.* 404, 88 *S.Ct.* 523, 19 *L.Ed.*2d 634 (1967) (24% of community, 5% of jury pool); *Whitus v. Georgia*, 385 *U.S.* 545, 87 *S.Ct.* 643, 17 *L.Ed.*2d 599 (1967) (42.6% of community, 9.1% of grand jury pool and 7.8% of petit jury pool).

The meaning of the statistical evidence presented in such cases is obscured not only by the absence of rigid rules but also by the different methods used to analyze the data. Three methods are most commonly used. We will briefly describe the three procedures, the phenomena they purport to measure, and the flaws the courts have discovered in attempting to apply them.[43]

---

[43] A fourth approach to analyzing the statistical data not advocated by either side in these proceedings attempts to measure the numerical rather than the percentage effect of underrepresentation upon the composition of the jury panel. This method projects the number of minorities expected on each jury panel based on the population percentage and then measures the difference between this figure and the number that actually serve.

Thus, in any array of 120 jurors from which 10 juries of 12 jurors each were selected, with a minority population of 50%, one would expect approximately 6 minority jurors per panel. If there were only 4 or 5 minority jurors, the difference would be 1–2. Often courts using this method have held that a 1–2 person average difference in a jury of 12 is insignificant. *See, e.g., United States v. Kleifgen*, 557 *F.*2d 1293, 1297 (9th Cir.1977); *United States v. Goff*, 509 *F.*2d 825, 826–27 (5th Cir.), *cert.* den., 423 *U.S.* 857, 96 *S.Ct.* 109, 46 *L.Ed.*2d 83 (1975); *United States v. Jenkins*, 496 *F.*2d 57, 65 (2d Cir.1974), *cert.* den., 420 *U.S.* 925, 95 *S.Ct.* 1119, 43 *L.Ed.*2d 394 (1975). We note, however, that even a difference of one person may have a significant impact on jury decisionmaking. Two jurors are much better able to influence the other ten than a lone juror who is easily isolated. Where the minority population is smaller, say 8%, this method is not useful. At 8%, a minority group would be expected to have less than one juror (.96) on any panel, and the significance of underrepresentation will never be measurable.

The simplest method, enunciated in *Swain v. Alabama,* 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759 (1965), overruled on other grounds, *Batson v. Kentucky,* 476 *U.S.* ——, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986), and relied upon by the State and the Law Division in this case, is absolute disparity. It measures the absolute difference between the proportion of the subject group in the general population and its proportion to the jury pool, *i.e.,* the qualified list. In *Swain,* while the absolute disparities ranged from 11 to 16%, the Court held that purposeful discrimination based on race alone could not be "satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." *Id.* at 208–09, 85 *S.Ct.* at 829, 13 *L.Ed.*2d at 766.

Absolute disparity is largely a descriptive measure that states in mathematical terms the existence of a disparity that may or may not be the result of unconstitutional discrimination. It is more likely to reveal underrepresentation where the subject population is large because the smaller the population, the less striking the numerical differences appear. *See Foster v. Sparks,* 506 *F.*2d 805, 818–19, 834–35 (5th Cir.1975) (appendix by Gewin, J.); Kairys, Kadane & Lehoczky, "Jury Representativeness: A Mandate for Multiple Source Lists," 65 *Calif.L.Rev.* 776, 793–94 (1977) (hereafter "Jury Representativeness"). Thus a 4% absolute disparity probably does not demonstrate impermissible underrepresentation where a group comprises 50% of the population (*i.e.,* 50% of population, 46% of jury pool). However, where the cognizable group constitutes only 8% of the population, a 4% disparity may be significant (8% of popula-

---

In short, the problem with this test, which focuses on the actual number of jurors, is that rather than testing for intent it seems to be better designed for testing for harm to the defendant. It is designed to show how much difference the underrepresentation will make to the particular complaining defendant rather than to demonstrate and test the intent of the state. However, as *Rose v. Mitchell, supra,* 443 *U.S.* at 551–59, 99 *S.Ct.* at 2997–3001, 61 *L.Ed.*2d at 746–51, makes clear, harm to the particular criminal defendant is not the relevant consideration.

tion, 4% of jury pool). Under the *Swain* test, this second group would receive no protection against possible underrepresentation.

The second method, comparative disparity, uses the absolute disparity figure and constructs a ratio to measure the magnitude of the disparity given the difference in population size. It is calculated by dividing the absolute disparity by the population figure. In the above example, the 4% disparity in a 50% population represents an 8% relative disparity whereas that same 4% absolute disparity in a population of 8% is a 50% relative disparity. Comparative disparity measures the diminished likelihood that members of the underrepresented group, when compared to the population as a whole, will be called for jury service. Again using the above example, in the first population, members of the underrepresented group are 8% less likely to serve as jurors than members of the majority group. In the second, those members are 50% less likely. This method is also largely descriptive, but because it takes the size of the subject population into account, it is more likely to register underrepresentation of smaller groups. The United States Supreme Court has acknowledged, though it never explicitly adopted, this formula in *Alexander v. Louisiana, supra,* 405 *U.S.* at 629, 92 *S.Ct.* at 1224, 31 *L.Ed.*2d at 541. It has been followed in several lower courts. *See, e.g., United States v. Goff,* 509 *F.*2d 825 (5th Cir.), *cert.* den., 423 *U.S.* 857, 96 *S.Ct.* 109, 46 *L.Ed.*2d 83 (1975); *People v. Harris,* 36 *Cal.*3d 36, 679 *P.*2d 433, 201 *Cal.Rptr.* 782, *cert.* den., 469 *U.S.* 965, 105 *S.Ct.* 365, 83 *L.Ed.*2d 301 (1984).

In none of these cases has a maximum permissible level been specified. However, one court has observed that

[i]f these cases have a common thread, it is that a comparative disparity well over 50% is strong evidence of underrepresentation cognizable under the sixth and fourteenth amendments. A comparative disparity of about 50% may or may not be adequate to show such underrepresentation, depending in part upon the size of the group in question. Finally, a comparative disparity well below 50% is unlikely to be sufficient, especially where the absolute disparity also is small. [*State v. Lopez,* 107 *Idaho* 726, 692 *P.*2d 370, 377 (Ct.App.1984).]

The third approach, recognized by the Supreme Court in *Castaneda v. Partida, supra,* 430 *U.S.* at 496 n. 17, 97 *S.Ct.* at 1281 n. 17, 51 *L.Ed.*2d at 512 n. 17, the Statistical Decision Theory (SDT) or statistical significance test, is not purely descriptive. It attempts to measure the likelihood that aspects of the selection process do not operate randomly. Thus it indicates the possible existence of discrimination within the system. Specifically, SDT provides a measure of the extent to which the actual percentage of minority jurors can be expected to differ from the percentage of the minority proportion in the general population if the selection process is completely random. SDT further indicates whether this figure is so at variance with the expected outcome that the hypothesis of random selection ought to be rejected.

For the purpose of illustration, the jury selection process in which two groups are being compared can be likened to filling a box with a population of 1,000 slips of paper of which 600 are pink and 400 gray, and having someone randomly select a sample of 100 slips. The expected number of pink slips would be 60 and the expected number of gray slips would be 40. That is, in any drawing there would be a 60% probability of drawing a pink slip and a 40% probability of selecting a gray one. However, a statistician would not be surprised if the number of pink slips "deviated" from the expected. Statisticians measure this deviation by a formula that enables them to tell whether the result is so far from the expected as to demonstrate that the result was not random. Using our illustration above and applying the formula of SDT described in *Castaneda,* we would expect that the standard deviation from the expected in our drawing would be plus or minus 4.8 slips.[44] If the result of our

---

[44]As calculated in *Castaneda,* the standard deviation equals the square root of the product of the observed number of jurors times the probability of drawing a member of the allegedly underrepresented group times the probability of drawing a nonmember. 430 *U.S.* at 496 n. 17, 97 *S.Ct.* at 1281 n. 17, 51 *L.Ed.*2d at 512 n. 17; *see United States v. LaChance,* 788 *F.*2d 856, 866 (2d Cir.),

drawing were to yield only 30 pink slips, that would be approximately six standard deviations away from the expected. A statistician would assume that a result more than 2 or 3 standard deviations from the expected would be suspect.[45]

We do not purport to describe fully the significance of the three tests used to measure underrepresentation in jury pools or to demonstrate any certainty about our mathematical understanding. We will not, in this case, choose one test over the others as the best method for assessing the significance of statistical evidence. Nor will we attempt to establish, for any of the tests, a fixed numerical line separating substantial from insubstantial showings of underrepresentation. Instead, we will use all three standards and the traditional common-law method of reasoning by example to other cases to arrive at a judgment of the significance of the evidence presented with respect to the Essex County jury system at issue in this case.

As previously noted, the percentage of blacks in the Essex County population eligible for jury service is 35.9, and defendant's surveys showed that the percentage of blacks on the qualified juror list for the periods surveyed was only 21.8. Thus the absolute disparity was 14.1% (35.9 minus 21.8). The comparative disparity was 39.3% (14.1 divided by 35.9)—that is, any white had roughly a 40% greater chance than any black of being selected. Finally, defendant calculated the standard deviations to be 28.9 from the expected deviation.

---

cert. den., —— U.S. ——, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986). In the example in text, the standard deviation is the square root of 24, i.e., the square root of $(100 \times .6 \times .4)$, or 4.8.

[45]This illustration is drawn from United States v. LaChance, 788 F.2d 856, 866–67 (2d Cir.), cert. den., —— U.S. ——, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986). For further discussion of standard deviation analysis, see Moultrie v. Martin, 690 F.2d 1078, 1082–85 (4th Cir.1982); Finkelstein, "The Application of Statistical Decision Theory to the Jury Discrimination Cases," 80 Harv.L.Rev. 338 (1966).

The 14.1% absolute disparity in the representation of blacks in the Essex County jury lists is roughly equivalent to the absolute disparities held impermissible in *Preston v. Mandeville,* 428 *F.*2d 1392 (5th Cir.1970) (13.3%), and *Stephens v. Cox,* 449 *F.*2d 657 (4th Cir.1971) (15%), yet it is also close to the disparities found permissible in *United States ex rel. Barksdale v. Blackburn,* 639 *F.*2d 1115 (5th Cir.) (11.5%), *cert.* den., 454 *U.S.* 1056, 102 *S.Ct.* 603, 70 *L.Ed.*2d 593 (1981), and *Thompson v. Sheppard,* 490 *F.*2d 830 (5th Cir.1974) (11%), *cert.* den., 420 *U.S.* 984, 95 *S.Ct.* 1415, 43 *L.Ed.*2d 666 (1975), and falls within the 11% to 16% range of disparity found in *Swain v. Alabama, supra,* 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759.

The comparative disparity here shows that black people have about 40% less chance of being selected than population figures would otherwise indicate. This is not much lower than the 45.4% condemned in *Preston v. Mandeville, supra,* 428 *F.*2d 1392, or the 50.0% condemned in *Stephens v. Cox, supra,* 449 *F.* 2d 657. Yet it is within the 36% to 42% range found permissible in *Swain* (42%), *United States ex rel. Barksdale v. Blackburn, supra,* 639 *F.*2d 1115 (40.8%), and *Thompson v. Sheppard, supra,* 490 *F.*2d 830 (36.4%), and below 50%. *Cf. State v. Lopez, supra,* 107 *Idaho* 726, 692 *P.*2d at 377 (disparity well below 50% is "unlikely to be sufficient" to support a constitutional claim).

Finally, the difference between the expected and observed number of blacks, 28.9 standard deviations, as calculated by defendant, is almost identical to the 29 standard deviations held in *Castaneda v. Partida, supra,* to be constitutionally significant. We thus may be confident that the demonstrated under-representation of blacks in the Essex County jury pools is not the result of random selection. The fact that the underrepresentation is not random does not, however, mean it is intentional, nor does it mean that it is substantial; the determination of substantiality requires an exercise of judgment, not the application of a formula.

We conclude that the statistical evidence, in light of prior case law, is not so alarming as to compel a conclusion of substantial underrepresentation. We believe the evidence is, however, significant enough to alert us to a possible constitutional violation. Because the numbers themselves appear to straddle the borderline of substantial underrepesentation, we must look to the circumstances surrounding the statistical showing to determine its full constitutional import.

We look first to the nature of the source lists. The federal courts have recognized that the constitutional importance of the statistical showing depends in part on the degree of subjectivity involved in the selection mechanism. A higher disparity is tolerable "[i]f the disparity proceeds from objective criteria, *i.e.*, age, educational attainment, registration to vote, etc.," than "if the disparity proceeds from the application of subjective tests, under which there is wide opportunity for intentional racial discrimination." *Blackwell v. Thomas*, 476 *F.*2d 443, 447 n. 7 (4th Cir.1973); *see Barber v. Ponte*, 772 *F.*2d 982, 994 (1st Cir.1985), *cert.* den., — *U.S.* ——, 106 *S.Ct.* 1272, 89 *L.Ed.*2d 581 (1986); *Thompson v. Sheppard, supra*, 490 *F.*2d at 832; Stone, "Grand Jury Discrimination Challenges: Defeat by Default," 4 *W.New Eng.L.Rev.* 665, 681–82 (1981). The use of DMV and voter registration lists is a facially neutral procedure. The source lists are drawn "objectively, mechanically, and at random,". *Thompson v. Sheppard, supra*, 490 *F.*2d at 833, allowing no opportunity for subjective or racially-motivated judgments.

We have found no case holding a jury selection system unconstitutionally underrepresentative where the statistical showing was similar to that presented here and where objective selection criteria such as voting registration and drivers' licenses were used. In the cases mentioned above involving similar absolute and comparative disparities, subjective judgments by state officials entered into the process of constituting the juror rolls. *See Preston v. Mandeville, supra*, 428 *F.*2d at 1394 ("[d]efendants maintained the master roll partially at least on

subjective judgment as distinguished from objective criteria or on a random selection system"); *Stephens v. Cox, supra,* 449 *F.*2d at 660 (jury commissioners, who were allowed to rely on personal knowledge in choosing jurors, had "opportunity to discriminate"). In contrast, in *Thompson v. Sheppard, supra,* 490 *F.*2d 830, where the statistical showing—an 11% absolute disparity and a 36.4% comparative disparity—was comparable to those in *Preston* and *Stephens* and very similar to that here, but where the jury lists were chosen randomly from voter lists, the court held that defendant failed to carry his burden of demonstrating a violation of the fair cross-section standard. *Id.* at 833.

In general, courts have consistently upheld against constitutional challenge the random drawing of jurors from lists of registered voters. *United States v. Blair,* 493 *F.Supp.* 398, 407 (D.Md.1980), aff'd, 665 *F.*2d 500 (4th Cir.1981); *State v. Porro, supra,* 152 *N.J.Super.* at 266. *See generally* Annot., "Validity of Requirement or Practice of Selecting Prospective Jurors Exclusively from List of Registered Voters," 80 *A.L.R.* 3d (1977) (collecting cases). A few courts have found unconstitutional underrepresentation even where voting lists were used, but in those cases the statistical showing was substantially more dramatic than that made here. *See People v. Harris, supra,* 36 *Cal.*3d at 48, 679 *P.*2d at 438–39, 201 *Cal.Rptr.* at 788 (56% comparative disparity for blacks, 87% comparative disparity for Hispanics); *State v. Lopez, supra,* 107 *Idaho* 726, 692 *P.* 2d at 376 (61% comparative disparity for Hispanics).

Second, we look to the time period over which violations are alleged. This inquiry goes to the existence of a history of exclusion. In this case, we have evidence based on only two telephone surveys, one in May 1981 and another in May 1982, and one geographic study corresponding to the 1982 telephone survey. Particularly given the borderline nature of the disparities shown, we are most reluctant to strike down the entire Essex County jury system on the basis of studies covering these time periods. *See Ford v. Commonwealth,* 665 *S.W.*2d

304 (Ky.) (statistical data based on random sampling of jury panels for two years does not constitute a showing of underrepresentation over a significant period of time), *cert.* den., 469 *U.S.* 984, 105 *S.Ct.* 392, 83 *L.Ed.*2d 325 (1984).

Finally, we look to the State's efforts at reform. We are not dealing here with a system in which there has been long-standing abuse with no attempts at reform. New Jersey has been conscious of its obligation to achieve greater neutrality and representativeness in its jury selection system. The addition of the DMV lists in 1979—at a time when very few jurisdictions, state or federal, required the use of multiple lists in addition to voter lists, *see* "Jury Representativeness," *supra,* 65 *Calif.L. Rev.* at 778—was obviously intended to broaden the representativeness of the pool. In addition, a 1981 Task Force chaired by Justice Clifford to study the current jury system has made numerous recommendations that may serve to increase the representativeness of juries. We are certain that those currently working on improvements in jury procedures will continue to seek to improve the yield of jurors from the source lists.

We agree, however, that the results are still far from optimal. Greater representativeness on the jury panels is obviously desirable. Jury officials should undertake the improvements suggested by this record, if practical and fair, *e.g.,* eliminating duplicates on the master list (who apparently tend to be white), and pursuing follow-up measures that will increase juror yields.

Moreover, we cannot concur in the suggestion, frequently made, that jury selection systems based on voter lists are effectively insulated from constitutional attack since random selection from a properly compiled voter list can never amount to a "systematic exclusion" as required under the third prong of the *Duren* test. *See, e.g., United States v. Clifford,* 640 *F.* 2d 150, 156 (8th Cir.1981); *State v. Bernal,* 137 *Ariz.* 421, 671 *P.*2d 399, 404 (1983); *State v. Sheppard,* 350 *So.*2d 615, 651 (La.1977) (system involved both voter registration and driver license lists); *State v. Ferguson,* 651 *S.W.*2d 521, 524–25 (Mo.

Ct.App.1983). These courts reason that the fair cross-section requirement is satisfied so long as each qualified citizen is provided "an equal opportunity to be selected in random drawing to serve on a petit jury." *United States v. Clifford, supra,* 640 *F.*2d at 156. The fair cross-section principle, however, is designed to achieve results, not just assure opportunities; thus " 'compilers of jury lists may drift into discrimination by not taking affirmative action to prevent it.' " *People v. Harris, supra,* 36 *Cal.*3d at 58, 679 *P.*2d at 446, 201 *Cal.Rptr.* at 795 (quoting *People v. Superior Court,* 38 *Cal.App.*3d 966, 972, 113 *Cal.Rptr.* 732, 736 (1974)).

We may assume, although defendant did not attempt to prove, that a major reason for the apparent underrepresentation of blacks in Essex County jury pools is the likelihood that proportionally more blacks than whites do not register to vote and do not have driver's licenses. Knowing this, jury officials may not sit by idly in the belief that no constitutional complaint may be lodged against a random selection mechanism that relies upon facially "neutral" voter and DMV lists. That belief would be mistaken, for such inaction in the face of knowledge of the system's underrepresentativeness would indicate that the underrepresentation has a systematic and partly subjective cause, has continued over a significant period of time, and is not being counteracted by efforts at reform. Thus, even though the numbers shown here are arguably within acceptable limits, if they were to continue over a significant period of time, the continued exclusive reliance by jury officials on the voter and DMV lists could become constitutionally suspect.

At this time, however, and on the showing made by defendant in this case, we cannot say that the inadequacies in the present system rise to constitutional dimensions. Given the marginal strength of the statistical showing in comparison to other cases, the fact that the mechanism by which jury lists are now constituted is facially neutral and objective, the failure to demonstrate underrepresentativeness over a sufficient period of time, and the State's efforts at reform, we hold that defend-

ant has failed to make a *prima facie* showing that the Essex County grand and petit jury selection procedures violate either the sixth or fourteenth amendments.[46]

## 2.

In addition to his challenge to the method of composing the jury pools, defendant asserts that the procedures used by the county assignment judges to assemble the grand jury panels from those pools impermissibly selected grand jurors on the basis of race.

The trial court heard testimony to the effect that upon receipt of the summons and realization that grand jury duty means six

---

[46]Our confidence in the correctness of our conclusion is bolstered by indications that defendant's surveys may overstate the degree of underrepresentation of blacks in the jury pools. Photographs of each grand jury that sits in Essex County are taken by the county sheriff officer. We have obtained copies of these photographs for the years 1979 through 1982. (Included was the photograph of the grand jury that indicted defendant in September 1982, which indicates that nine of the twenty-three jury members were black.) Our review of these photographs indicates that in each of the four years, black grand jurors constituted at least 24% of the members of the grand juries empanelled and that the average was 25.3%. (A number of jurors—6.7% over the four years—were absent when the photographs were taken. We counted all these absent jurors as non-black.) In its suggestion that black representation on the grand juries is significantly higher than the 21.8% figure arrived at by defendant's experts, this determination is consistent with the evidence provided by the State's informal headcount, which found that 24.6% of the grand jurors appearing for service during the survey period were black. That informal study concluded, in addition, that 32.2% of the petit jurors who appeared for duty were black. Both of these percentages, approximately 25% of grand and 32% of petit jurors, are within constitutional boundaries.

For the reasons given above, we are satisfied that, even accepting defendant's evidence on its face, no constitutional case has been made out. We thus feel no need to, and do not, hinge our holding in any way on these observations calling into question the accuracy of defendant's statistical presentation. Nor do these observations unsettle our conviction that the system should move toward greater representativeness. In the interest of assuring all concerned that our jury selection system is being administered in a constitutional manner, however, we would be remiss if we did not point out that the factual assertions underlying defendant's claim may well be inaccurate.

weeks of service, almost every juror submits a written request for excusal from service. These letters are screened by the clerk's office and the obviously meritorious requests are granted. The two assignment judges for Essex County during the periods relevant to this appeal would then review the letters and questionnaires before the panel was called. The grand jury selection process produces seventy-five names. After the early excuses, about fifty grand jurors actually appear for service.

At the actual selection, both assignment judges would question each juror and reconsider (but generally deny) excuses. One judge's method for selecting grand juries differed slightly from panel to panel. However, he always briefly interviewed each juror with respect to an excuse, then if the juror was not excused, he asked him or her either to take the next seat in the jury box or to wait in the courtroom. He exercised discretion in selecting jurors to get a "cross section of the community, so that all interests, all walks of life, all backgrounds are properly represented...." This included excluding from the grand jury that indicted defendant two black jurors who were willing to serve because he was "deliberately trying to get an even mix of people from background and races, and things like that...." In choosing another grand jury, the judge tried to "get some white males if I can," because he had "too many white women on the jury right now...." On another occasion the judge interviewed the entire panel of fifty or so and then selected from among the panel twenty-three people to sit as the grand jury, again stating that he wanted to obtain a cross-section. The other judge also followed this select-after-interview procedure. According to the first judge, in the exercise of discretion, he sometimes chose individuals of one race over another simply to obtain a racial balance. The judge was not, however, familiar with the census figures for Essex County, or the actual percentage of blacks, although the other judge testified that blacks constituted about 40% of the population, and that he always attempted to "get a good balance between black and white."

Defendant contends that the assignment judges' practices disregarded statutory and constitutional commands and mandate dismissal of his indictment. We take up the statutory issue first.

Grand jury selection procedures are governed in New Jersey by *N.J.S.A.* 2A:71–1 to –7. Specifically, *N.J.S.A.* 2A:71–2 provides that grand jurors shall be drawn randomly and seated for service on the panel as they are selected. *N.J.S.A.* 2A:78–1 allows the assignment judge to excuse a juror "whenever it appears that any member ... should be excused." *N.J.S.A.* 2A:73–1 *mandates* that prospective grand jurors remaining after excuses have been granted *be seated in the order they were drawn.* Finally, *N.J.S.A.* 2A:72–7 prohibits disqualification of otherwise qualified grand or petit jurors on account of race, color, creed, national origin, ancestry, marital status, or gender. At a minimum, the statutes evidence a clear legislative intent to maximize the randomness and objectivity of the grand juror selection process despite the exercise of discretion inherent in the granting of excuses.

The State argues that the discretion allowed by *N.J.S.A.* 2A:78–1 permits assignment judges to grant excuses in pursuit of a fair cross-section in the grand jury. It further asserts that even if the procedures used were improper, the defendant's failure to show prejudice defeats his claim.

We recognize that both judges, in the exercise of their discretion, attempted to advance the salutary purpose of obtaining a fair cross-section of jurors. For this it is difficult to criticize them. However, jury selection is an integral part of the fair process to which every criminal defendant is entitled. *State v. Singletary,* 80 *N.J.* 55, 62 (1979). It is vital that juries be selected in a manner free from taint and suspicion. To that end the pertinent practice safeguards in the statute must be carefully observed. *State v. Wagner,* 180 *N.J.Super.* 564, 567 (App.Div.1981). In capital cases this responsibility is of the deepest concern. *State v. Kociolek,* 23 *N.J.* 400 (1957) (statutes

providing for twenty peremptory challenges for criminal defendant and pre-trial delivery of jury list to defendant charged with murder are mandatory).

▮ Both judges testified that on occasion they excused prospective grand jurors of a particular race to obtain a racial balance. As noted, although they stated that they attempted, when excusing grand jurors, to obtain a representative cross-section, they both indicated that they did not know the actual black population of Essex County. Thus, they exercised their discretion to realize their individual conceptions of fair representation, conceptions that were not informed by the facts. It is clear, however, that modern jury selection statutes were designed especially to avoid such subjective evaluations of grand jury composition. While we do not dispute the necessity of allowing the judge to exercise discretion to excuse those prospective grand jurors who may be eligible for excusal, judges are not permitted by the statute to exercise their discretion to implement personal notions of cross-sectionality.

▮ The requirement of a random process to insure representativeness of grand jury panels demands that each person have an equal chance of serving. *See State v. Long,* 204 *N.J.Super.* 469, 483–84 (Law Div.1985). A particular grand jury is not required to be a mirror image of the community. *State v. Porro, supra,* 152 *N.J.Super.* at 267. We do not believe that *N.J.S.A.* 2A:78–1 was contemplated by the Legislature as the mechanism by which fair representation on grand jury panels would be achieved. Rather, the legislators intended that the randomness requirements of *N.J.S.A.* 2A:71–2 would accomplish this result. Finally, it is quite clear that *N.J.S.A.* 2A:78–1 cannot be read to contravene the clear mandate of 2A:72–7 that jurors not be disqualified solely on the basis of race. The procedures followed here did just that.

▮ We now turn to the question whether these statutory violations are of such dimension as to require dismissal of defendant's indictment. We do not construe our state's statute

as requiring dismissal of the indictment whenever the statutory commands are breached, regardless of the nature or effect of the violations or the intent of those who committed them. It is well-settled that judicial power to dismiss an indictment is not to be exercised except on the clearest and plainest grounds and that an indictment should stand unless manifestly deficient or palpably defective. *State v. Wein*, 80 *N.J.* 491, 501 (1979); *State v. Weleck*, 10 *N.J.* 355, 364 (1952). In formulating remedies for violations of the Federal Jury Selection and Service Act, 28 *U.S.C.* §§ 1861–1869 (1982), federal courts have noted that Congress "left room for harmless error by providing that dismissal should lie only when there was a *substantial* failure to comply with the [Federal Jury Selection and Service] Act." *Unted States v. Evans*, 526 *F.*2d 701, 705 (5th Cir.), *cert.* den., 429 *U.S.* 818, 97 *S.Ct.* 62, 50 *L.Ed.*2d 78 (1976). We believe that our statute is infused with a similar purpose, and that violations of it should warrant dismissal of an indictment only where they substantially undermine the randomness and objectivity of the selection mechanism or cause harm to the defendant.[47]

With these principles in mind, we decline to dismiss defendant's indictment because of the statutory violations. We acknowledge that the assignment judges' procedures were improper and that they may have even created the potential for abuse. However, no one suggests that the independence of the grand jury itself was compromised, *cf. State v. Hart*, 139 *N.J.Super.* 565, 568 (App.Div.1976), or that the panel was in any way biased or prejudiced, or that "the grand jury had before it no substantial or rationally persuasive evidence upon which to base its indictment," *Costello v. United States*, 350

---

[47]In this regard, irregularities in the selection of grand juries are to be distinguished from those in the selection of petit juries. It has been recognized that the special, fundamental role played by the petit jury in our system of criminal justice may call for reversal of a conviction because of improper selection procedures even in the absence of a showing of prejudice. *State v. Kociolek, supra,* 23 *N.J.* 400; *State v. Wagner, supra,* 180 *N.J.Super.* at 567.

*U.S.* 359, 364, 76 *S.Ct.* 406, 409, 100 *L.Ed.* 397, 403 (1956) (Burton, J., concurring). Were we to sense any such fundamental injustice, we would not hesitate to call for further proceedings. Although the procedures used obviously implicated the randomness of the selection process, there is no showing that they substantially undermined the randomness principle, and when, as here, the purpose of the judges' actions was to achieve greater racial balance and not impermissibly to exclude members of a cognizable group, the statute does not call for a dismissal.

Nor can we agree with defendant's contention that the judges' procedures give rise to a claim that Essex County grand juries were constituted in a manner violative of the sixth or fourteenth amendments. As previously discussed, one of the essential elements of a *prima facie* claim is that the procedures used result in substantial underrepresentation of a cognizable group. Defendant produced no evidence, however, concerning the actual representation of blacks on Essex County grand juries; his evidence went solely to the percentage of blacks in the pools from which the juries were selected. It is thus impossible for this Court to say that the assignment judges' procedures, which came into play after the qualified list was constituted, caused any underrepresentation of blacks, much less a substantial underrepresentation. Plainly, defendant's constitutional challenge to the system must fail on this prong of the *prima facie* test.

The assignment judge's dismissal of two blacks from the specific grand jury that indicted defendant requires separate constitutional analysis. In recent decisions limiting prosecutors' use of peremptory challenges, both this Court and the United States Supreme Court have made clear that unconstitutional exclusion of blacks and other cognizable groups during jury selection may occur in an individual case as well as systematically over a period of time. *See Batson v. Kentucky,* — *U.S.* ——, ——, 106 *S.Ct.* 1712, 1722, 90 *L.Ed.*2d 69, 87

(1986); *State v. Gilmore,* 103 *N.J.* 508, 527 (1986). Applying the principles set forth in *Batson* and *Gilmore,* however, we hold that the dismissal of two blacks from defendant's grand jury was not an error of constitutional magnitude.[48]

In *Batson,* the prosecutor used his peremptory challenges to strike all four blacks from the petit jury venire, leaving the defendant, a black, to be tried by an all-white jury. —— *U.S.* at ——, 106 *S.Ct.* at 1715, 90 *L.Ed.*2d at 78. Overruling its prior determination in *Swain v. Alabama, supra,* 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759, the Court held that the prosecutor's conduct may have violated the equal protection clause. *"Exclusion* of black citizens from service as jurors," the Court said, "constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." —— *U.S.* at ——, 106 *S.Ct.* at 1716, 90 *L.Ed.*2d at 80 (emphasis added). To "establish a prima facie case of purposeful discrimination in selection of the petit jury" under *Batson,* the defendant must show that "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at ——, 106 *S.Ct.* at 1722, 90 *L.Ed.*2d at 87. The facts in the present case belie any contention that the assignment judge exercised his powers in order "to remove from the venire

---

[48]Defendant's brief does not attack the constitutionality of the dismissal of the two prospective black jurors for failure to comply with *Batson* and *Gilmore* for the obvious reason that his brief was written before those cases were decided. Defendant does, however, claim that the dismissal of these jurors from the grand jury which indicted him was unconstitutional because it "resulted in a greater underrepresentation of members of his own race than would have occured randomly." The critical flaw in this claim is that the Supreme Court has not defined underrepresentation by comparing the representation of the group that "would have occurred randomly" with the actual representation of the group on the jury. Rather, "underrepresentation must be proved ... by comparing the proportion of the group *in the total population* to the proportion called to serve as grand jurors." *Castaneda v. Partida, supra,* 430 *U.S.* at 494, 97 *S.Ct.* at 1280, 51 *L.Ed.*2d at 510 (emphasis added). Because the number of blacks that actually served on defendant's grand jury was greater than that in the total population, no "underrepresentation" can be said to have occurred in the *Castaneda* sense.

members of the defendant's race": the actual grand jury empanelled contained nine blacks, and the assignment judge testified that in dismissing the two jurors he sought to achieve a more truly representative grand jury. While the assignment judge's actions were improper under statutory law, and certainly would have been unconstitutional had they been intended to exclude all or virtually all blacks from the grand jury, we cannot find in these circumstances that they constituted the type of "purposeful discrimination" interdicted by *Batson* and the fourteenth amendment.

In *State v. Gilmore, supra,* 103 *N.J.* 508, we held that in addition to raising the equal protection concerns identified in *Batson,* a prosecutor's use of peremptory challenges to exclude all blacks from a petit jury violated the defendant's state constitutional right to an impartial jury drawn from a representative cross-section of the community. We do not believe that this right [49] was violated by the assignment judge's actions in this case. In *Gilmore,* defendant was tried by an all-white jury; here, nine blacks remained on the grand jury. Of course, "one need not eliminate 100% of minority jurors to achieve an impermissible purpose. If the minority's representation is reduced to 'impotence,' as, for example, by the challenge of a disproportionate number of group members," the representative cross-section requirement may not be fulfilled. *Commonwealth v. Soares,* 377 *Mass.* 461, 387 *N.E.*2d 499, 516 n. 32, *cert.* den., 444 *U.S.* 881, 100 *S.Ct.* 170, 62 *L.Ed.*2d 110 (1979). But it is clear that the assignment judge's practices here did not reduce the minority's representation to "impotence" or "restrict unreasonably the possibility that the petit jury will comprise a representative cross-section of the community," *State v. Gilmore, supra,* 103 *N.J.* at 529. The grand jury that indicted defendant was more than representative of the Essex County

---

[49]We assume, without deciding, that this right is applicable at the grand jury stage as well as at the petit jury stage. *See State v. Porro, supra,* 152 *N.J.Super.* at 265.

black population, and we therefore hold that the dismissal of the two additional black jurors, while erroneous, was not unconstitutional.

### 3.

Lastly, defendant seeks dismissal of his indictment on the ground that the procedure for selecting grand jury forepersons in Essex County contravenes the sixth and fourteenth amendments, as well as Article I, paragraphs 5, 8, and 9 of the New Jersey Constitution, "and New Jersey statutes." [50]

Once each grand jury was selected, the assignment judges used discretion to choose the foreperson and his or her deputy. To locate potential forepersons, the judges would review all the questionnaires and excuse letters of the grand jurors prior to their being empaneled. Once the grand jury was empaneled, both judges would have a short conversation with the grand jury manager, to determine who would be the best foreperson and deputy. Both judges testified that they tried to ensure that a "balance" of people became forepersons. One judge took into account leadership and administrative skills and educational or employment background. The other judge testified that although he did not look for a "leader," he expected the foreperson to be articulate, have an average ability to read and write, and not be timid. The defendant adduced evidence that for blacks in the grand jury foreperson position, there was an absolute disparity of 29.8% and a comparative disparity of 83%, with standard deviations of 7.2.

The sixth amendment's fair cross-section requirement does not extend to the post of grand jury foreperson. *See*

---

[50]Defendant does not specify which statutes he believes were infringed, making analysis of his statutory claim difficult. *N.J.S.A.* 2A:72–7 outlaws discrimination in the selection of grand or petit jurors, but makes no specific reference to selection of the foreperson. We believe the statute addresses only selection of the jury as a body and not the selection of a member of that body to perform administrative tasks.

*United States v. Holman,* 680 *F.*2d 1340, 1356 (11th Cir.1982); *United States v. Perez-Hernandez,* 672 *F.*2d 1380, 1385 (11th Cir.1982). Only the equal protection clause has been invoked to prohibit discrimination in that post and then only when the foreperson's functions are deemed constitutionally significant. *See Hobby v. United States,* 468 *U.S.* 339, 104 *S.Ct.* 3093, 82 *L.Ed.*2d 260 (1984). Moreover, we see no reason why this Court should interpret the state Constitution to create such a fair cross-section right. In *Perez-Hernandez, supra,* the Eleventh Circuit, in explaining why the fair cross-section right does not apply to the grand jury foreperson, said:

> [T]he Sixth Amendment right to an "impartial jury" is given full effect by insuring that distinct groups of the community are represented, but are not given the opportunity to dominate, or, in the alternative, denied the opportunity to participate, in a democratic system of justice. Accordingly, the fair cross section analysis is only applicable to groups, such as a grand or petit jury, which can represent society as a whole. One person alone cannot represent the divergent views, experience, and ideas of the distinct groups which form a community. Thus, a grand jury foreman is a member of the group which represents a cross section of his or her community, but he or she cannot be a fair cross section of that community. [672 *F.*2d at 1385.]

Ramseur's equal protection claim is still outstanding, however. The tripartite test is the same for the underrepresentation in the post of grand jury foreperson as for the underrepresentation of blacks in the source and qualified lists.

The question here is whether the grand jury foreperson in this state performs duties that are so significant that the equal protection clause may be said to be violated. In *Hobby v. United States, supra,* the Supreme Court found that the post of federal grand jury foreperson was "essentially clerical in nature: administering oaths, maintaining records, and signing indictments." 468 *U.S.* at 344–45, 104 *S.Ct.* at 3096, 82 *L.Ed.*2d at 266. The Court found that "the ministerial trappings of the post carry with them no special powers or duties that meaningfully affect the rights of [the accused] beyond those posessed by every member of that body." *Id.* at 345, 104 *S.Ct.* at 3096, 82 *L.Ed.*2d at 266. According to the Court, the foreperson has "no authority apart from that of the grand jury as a whole to

act in a manner that determines or influences whether an individual is to be prosecuted." *Id.*

Ramseur places primary reliance on the plurality opinion in *Rose v. Mitchell, supra*, 443 *U.S.* 545, 99 *S.Ct.* 2993, 61 *L.Ed.*2d 739. In that case, the Court "assume[d] without deciding that discrimination with regard to the selection of only the foreman" required that a conviction be set aside. *Id.* at 551–52 n. 4, 99 *S.Ct.* at 2998 n. 4, 61 *L.Ed.*2d at 747 n. 4. The defendant in *Rose*, however, had been convicted in Tennessee state court. Under Tennessee law, the trial court chose a foreperson from the general population to serve as the thirteenth juror in a body otherwise composed of persons selected by a random process. A foreperson served for two years and could be, and often was, reappointed. He was expected to assist the district attorney in investigating crimes, could conduct the questioning of witnesses, and had to sign an indictment for it to be valid. *See id.* at 548 n. 2, 99 *S.Ct.* at 2996 n. 2, 61 *L.Ed.*2d at 744 n. 2.

It is clear that the Tennessee grand jury foreperson was in a position to guide the decisionmaking process of the grand jury and had substantially greater power than his federal counterpart. In the instant case, the trial court found, based on the evidence adduced at the motion hearings, that the duties of the grand jury foreperson in this state are closer to those of federal forepersons than to those of Tennessee forepersons, and hence are not constitutionally significant. We agree with the conclusion of the court below and therefore leave it undisturbed.[51]

---

[51]We find no merit to defendant's claim that his jury challenge motion must be remanded for a hearing before a judge from outside Essex County. In the lower court, defendant initially requested that the assignment judge recuse himself and all other Essex County judges from hearing the grand jury challenge. The assignment judge properly recused himself from the matter because of the possibility that he would be called as a witness, but ruled that motions to disqualify other judges must be made before the judge sought to be disqualified. *See R.*1:12–2 (providing that "[a]ny party ... may apply to a judge for *his* disqualification") (emphasis added). He thus denied the motion

## B. Struck Jury

Defendant moved before trial for implementation of the so-called "Arizona" or "struck" jury system. The trial court had determined to empanel eighteen jurors and to leave until the conclusion of the case the selection of the twelve who would ultimately deliberate. Under the form of "struck" jury system proposed by defendant, it would have been necessary to death-qualify a total of sixty prospective jurors before any peremptory challenges could be asserted—the eighteen to be sworn, plus twenty-six to account for the number of peremptory challenges allowed defendant, plus sixteen to accommodate the State's peremptories.[52]

---

to recuse the other judges "with the understanding, of course, that defendant has the right to seek to recuse any individual judge as the rules and the cases permit." Defendant apparently never exercised that right, however. He is not in a position now to attack the propriety of the fact that his challenge was heard by an Essex County judge. *See Bonnet v. Stewart,* 155 *N.J.Super.* 326, 330 (App.Div.) (holding that party who had sought disqualification of the judge who heard his cause only from the assignment judge and not the judge himself could not appropriately raise recusal issue on appeal), certif. den., 77 *N.J.* 468 (1978). Reaching the merits nevertheless, we reject defendant's argument that the jury challenge required the Essex County judge who heard it "to evaluate his 'boss' " and hence that defendant's right to a fair and impartial hearing was violated. While assignment judges are responsible for the administration of the judicial system in their vicinage pursuant to this Court's rules, they are neither in theory nor in fact other judges' "bosses." Each member of the New Jersey judiciary is accountable to no person but only to the law and to his or her oath. The responsibility lodged in assignment judges over court administration matters is hardly of such a nature as to render other judges in the county incompetent to rule on the propriety of their actions or to constitute a "reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." *R.*1:12–1(f).

[52]The number of peremptory challenges that the parties could have exercised is controlled by *Rule* 1:8–3(d) (1983), which provides:

If the offense charged is ... murder ... the defendant shall be entitled to 20 peremptory challenges if tried alone and to 10 such challenges is tried jointly; and the State shall have 12 peremptory challenges if the defendant is tried alone and 6 peremptory challenges for each 10 afforded defendants when tried jointly....

The trial court rejected defendant's proposal for a struck jury system, but recognized that if the parties were required to exercise their peremptory challenges after each juror was qualified, "neither counsel [would] have any good idea as to the composition of ... eighteen members that [would] ultimately be selected." The court therefore qualified eighteen jurors before the parties were called on to exercise peremptories; as each peremptory was exercised, a new panel member was examined on *voir dire* until a replacement juror was qualified, at which point the other party was permitted to challenge peremptorily. The process continued in that fashion until a jury of eighteen, satisfactory to both sides, was obtained. As it turned out, neither the State nor the defense exhausted its allotted number of peremptory challenges.

Defendant acknowledges that the method of jury selection is a matter reposed in the sound discretion of the trial court, but he contends that the denial of his motion for a struck jury amounted to an abuse of that discretion, warranting a new trial before a jury chosen in accordance with his proposal. The struck jury system, says defendant, is the best suited for insuring that capital defendants receive a fair and impartial trial.

To the extent that defendant claims a constitutional right to a struck jury, the claim is without merit. The right to peremptory challenges springs not from any constitutional basis but rather from statutory provisions designed to insure an impartial jury. *State v. Singletary, supra,* 80 *N.J.* at 62; *see N.J.S.A.* 2A:78–7(c). States may fix reasonable limitations on peremptory challenge procedures, "so long as the right of challenge is not taken away and reasonable opportunity is given to challenge." *Veach v. McDowell,* 133 *Ind.App.* 628, 184 *N.E.* 2d 149, 151 (1962). Thus, the manner in which the peremptory

challenges are exercised, if not directed by statute, is within the discretion of the court, limited by defendant's right to a fair and impartial jury. *St. Clair v. United States*, 154 *U.S.* 134, 148, 14 *S.Ct.* 1002, 1008, 38 *L.Ed.* 936, 941 (1894); *United States v. Turner*, 558 *F*.2d 535, 538 (9th Cir.1977); *State v. Brunson*, 101 *N.J.* 132, 140 (1985); *cf. Batson v. Kentucky, supra*, —— *U.S.* ——, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69; *State v. Gilmore, supra*, 103 *N.J.* 508.

In *Foraker v. State*, 394 *A.*2d 208 (Del.1978), the Delaware Supreme Court upheld the constitutionality of a rule requiring the exercise of peremptory challenges in capital cases immediately after examination of individual jurors and not after the entire jury has been impaneled.

> We find no constitutional defect in this procedure as it rationally requires the defendant and the State to focus upon possible prejudices of the individual jurors, as opposed to allowing evaluation of the composition of the jury as an entire body. In the context of a murder trial, such a procedure is legitimate. [*Id.* at 215 (citation omitted).]

*See St. Clair v. United States, supra*, 154 *U.S.* at 147–48, 44 *S.Ct.* at 1007–08, 38 *L.Ed.* at 941–42 (defendant in capital case does not have right to examine all jury members for cause before exercising peremptory challenges).

Defendant's contention that the struck jury system is the only valid method of selecting a capital jury fails not only as a constitutional argument but also as a suggested statement of desirable state policy. We understand the attraction of the struck jury procedure: under it, the parties are confronted with all of the jurors who might hear the case, enabling the parties to make a comparative assessment before exercising a peremptory challenge. *See Swain v. Alabama, supra*, 380 *U.S.* at 217–18, 85 *S.Ct.* at 834, 13 *L.Ed.*2d at 771; *United States v. Sams*, 470 *F*.2d 751, 754 (5th Cir.1972). In no case, however, has such a system been mandated. Indeed, in *United States v. Blouin*, 666 *F*.2d 796 (2d Cir.1981), the court held explicitly that the " 'struck jury system' . . . is not required," nor, on balance, even "necessarily preferable to the 'jury box' system; it is merely different." *Id.* at 799. Certainly, the struck jury

system is not necessarily more fair for defendants; its benefits accrue also to the prosecutor, who will likewise use the opportunity to make a comparative assessment of potential jurors.

Moreover, the struck jury system poses certain obvious problems, notably, in our view, in its requirement that ·a larger group of jurors must be questioned and qualified. 3 *ABA Standards for Criminal Justice* Standard 15–2.6, commentary at 15.70 (2d ed. 1980). In capital cases, the process is particularly lengthy because individual *voir dire* may be required under *Rule* 1:8–3(a) and (d) for many potential jurors, here sixty. Often neither party will use all of the allotted peremptory challenges, in which case jurors will have been questioned unnecessarily.

The concerns over judicial economy raised by the proposed system were addressed by this Court in an analogous context in *State v. Rios*, 17 *N.J.* 572 (1955). In *Rios*, also a capital case, the trial court denied defendant's application to exercise a peremptory challenge after the juror had been found acceptable to defense counsel and had been sworn. In rejecting defendant's contention that the denial constituted error, Justice Wachenfeld, writing for a unanimous Court, observed:

> Were we to sanction peremptory challenges after the swearing of the jurors, it would soon become standard practice for counsel to withhold their peremptory challenges until a full panel had been sworn, doubtlessly hoping thereby to gain the advantage of an observation made after the entire panel had been seated. Such a procedure would lead to but further and needless delay in the selection of a jury and would not serve to advance the ends of justice. [*Id.* at 594.]

This is not to say that we disapprove the use of a "struck" jury system *per se;* it is to say, however, that trial courts·do not err in seeking to balance the exigencies of the judicial system with the interests of the parties in exercising informed peremptory challenges.

 We thus cannot say that the trial court's analysis here was erroneous. In essence, defendant's argument confuses his right to an impartial jury with his interest in acquittal. Defendant is not entitled, however, to a jury he considers most

favorably disposed to him; he is entitled to an impartial jury. The right of challenge is one of exclusion, not selection. *E.g.,* *State v. Marchese,* 14 *N.J.* 16, 21 (1953). Here, defendant has made no showing that the system used produced anything other than an impartial jury. The method of jury selection provided defendant a fair and reasonable opportunity to exercise his peremptory challenges to exclude any juror defendant believed would not be impartial. We therefore hold that defendant was not entitled to the qualification of sixty jurors prior to the exercise of his peremptory challenges. The struck jury issue in future cases is left to the sound discretion of the trial courts.

## C. Voir Dire

Defense counsel in this case sought permission to ask potential jurors several questions regarding racial attitudes and prejudices.[53] The trial court, however, forbade all questioning on the subject except for a single general question. This limitation, according to defendant, made intelligent challenges for cause and peremptory challenges impossible, violating de-

---

[53] 1. Have you had a negative experience with someone of a different race than your own? If yes, please tell us about it.
2. FOR WHITE JURORS ONLY: Would you please describe your experiences with black people?
IF JOB, NEIGHBORHOOD, OR CHILDREN'S SCHOOL NOT MENTIONED, ASK:
a. Are there any black people working at (place where juror works)? If yes, What contact do you have with them?
b. Are there any black people living in your neighborhood? If yes, What contact do you have with them? If no, Why do you think that is?
c. If juror has school age children: What is the racial composition of the student body at your children's school? Does your child have any black friends?
3. FOR NON–NEWARK RESIDENTS: Do you ever have occasion to go to Newark?
4. What are your impressions of Newark's black neighborhoods?
5. How long have you lived in Essex County?
a. IF FIFTEEN YEARS OR MORE: What are your impressions about how Newark has changed over the last 15 years? What do you think are some of the reasons for these changes?

fendant's right to an impartial jury under the federal and state Constitutions. *See U.S. Const.* amends. VI, XIV; *N.J. Const. of 1947* art. I, paras. 1, 10.

At a conference before jury selection began, the trial court stated that "race is not, at all, a factor in the case," and that any questions on the issue were therefore unnecessary. It saw "no reason at all" to ask the questions relating to race proposed by the defendant because the case did not involve an interracial crime. Nevertheless, not wishing to foreclose all such inquiry, the court ruled as follows:

> I'll permit you to ask the question as to whether race would have any influence in the ability of the [juror] to reach a fair and impartial verdict. If there is an answer that requires further elucidation, of course, I will permit additional inquiry.

This judgment was consonant with the Supreme Court's view of the law in this area. In *Ristaino v. Ross*, 424 *U.S.* 589, 96 *S.Ct.* 1017, 47 *L.Ed.*2d 258 (1976), the Supreme Court held that due process does not compel questions about racial bias except in cases in which "[r]acial issues ... were inextricably bound up with the conduct of the trial." *Id.* at 596–97, 96 *S.Ct.* at 1021, 47 *L.Ed.*2d at 264. However, under the circumstances presented in *Ristaino*, with the defendant accused of violent interracial crimes, the Court would have required questioning about racial bias "under [its] supervisory power" over federal courts. *Id.* at 597 n. 9, 96 *S.Ct.* at 1022 n. 9, 47 *L.Ed.*2d at 265 n. 9. Further, the states were "free to allow or require questions not demanded by the Constitution." *Id.* In *Rosales-Lopez v. United States*, 451 *U.S.* 182, 191, 101 *S.Ct.* 1629, 1635, 68 *L.Ed.*2d 22, 30 (1981), the Supreme Court held that in federal courts, denial of requested inquiry into racial prejudice would constitute reversible error "where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury."

A plurality of the *Rosales-Lopez* Court explained the result in *Aldridge v. United States*, 283 *U.S.* 308, 51 *S.Ct.* 470, 75 *L.Ed.* 1054 (1931), and *Ristaino, supra:*

> *Aldridge* and *Ristaino* together fairly imply that federal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and victim are members of different racial or ethnic groups. This supervisory rule is based upon and consistent with the "reasonable possibility standard" articulated above. It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise such a possibility. [451 *U.S.* at 192, 101 *S.Ct.* at 1636, 68 *L.Ed.*2d at 31.]

The Court held that because the petitioner had been tried for immigration law violations rather than crimes of violence, and because no other special circumstances existed, neither the Constitution nor supervisory powers required inquiry into racial prejudice. *Id.* at 192–94, 101 *S.Ct.* at 1636–37, 68 *L.Ed.*2d at 31–32.

Most recently, in *Turner v. Murray*, 476 *U.S.* ——, 106 *S.Ct.* 1683, 90 *L.Ed.*2d 27 (1986), the Court held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.* at ——, 106 *S.Ct.* at 1688, 90 *L.Ed.*2d at 37 (footnote omitted). The Court adhered to the principle that "[t]he fact of interracial violence alone is not a 'special circumstance' entitling the defendant to have prospective jurors questioned about racial prejudice," *id.* at —— n. 7, 106 *S.Ct.* at 1687 n. 7, 90 *L.Ed.*2d at 36 n. 7, but distinguished *Ristaino* on the ground that "the crime charged [in *Turner*] was a capital offense." *Id.* at ——, 106 *S.Ct.* at 1687, 90 *L.Ed.*2d at 35. In *Turner,* the trial court had rejected the question, to be asked of jurors during the *voir dire* preceding an interracial murder trial, whether the fact the defendant was black and the victim white would affect the juror's "ability to render a fair and impartial verdict based solely on the evidence." *Id.* at ——, 106 *S.Ct.* at 1685, 90 *L.Ed.*2d at 33.

In the instant case, by contrast, not only was there no interracial crime involved, but the trial court *did* allow a question on race analogous to the one refused by the trial court in *Turner.* The trial court thus exceeded both the federal constitutional and supervisory standards. As in *Ristaino,* moreover,

and in further contrast to *Turner*, racial issues in the present case were not "inextricably bound up with the conduct of the trial." *Ristaino v. Ross, supra*, 424 *U.S.* at 597, 96 *S.Ct.* at 1021, 47 *L.Ed.*2d at 264. Not only were the defendant, victim, and State's fact witnesses all of the same race, but the defendant did not interpose a racially implicated defense and racial issues formed no part of the State's case. Defendant's argument fails, therefore, as a matter of federal constitutional law.

The present case provides no convincing justification, moreover, for requiring a more specific *voir dire* dealing with racial bias under state law. In *State v. Long*, 137 *N.J.Super.* 124, 130–31 (App.Div.1975), certif. den., 70 *N.J.* 143 (1976), where the defendant stood trial on drug charges, the Appellate Division held that absent "racial overtones," *see Ham v. South Carolina*, 409 *U.S.* 524, 93 *S.Ct.* 848, 35 *L.Ed.*2d 46 (1973), racial-prejudice inquiries were not constitutionally imperative. Nevertheless,

> [w]here a defendant does request a *voir dire* inquiry as to potential prejudice because of color or other physical characteristics, it is the better practice for a judge to accede to the request and pose simple and direct questions pointed to the specific element of prejudice involved. [137 *N.J.Super.* at 131.]

Whether the failure to ask the question constitutes an abuse of discretion, the court held, depends on the facts of the case. *Id.* In *Long* itself, nothing in the nature of the crime, "milieu" of the community, or pretrial publicity made the court's failure reversible error. *Id.* at 132. In this case, as in *Long*, the absence of racial overtones among either the defendant and victim, or the defendant and witnesses, or in the legal issues raised by either side supports the trial court's judgment.

In contrast to the defendant in *Long*, the three black male defendants in *State v. Sims*, 140 *N.J.Super.* 164 (App.Div.1976), stood trial for the attempted murder of two white police officers. The Appellate Division held that those facts made questions concerning racial prejudice appropriate, and ordered the trial court to ask such questions if requested on a retrial granted in part on other grounds. *Id.* at 173. *Sims* is distin-

guishable from the instant case, however, because Ramseur's crime was not interracial.

We are sensitive to the reality of racial prejudice, and to the possibility that jurors may prejudge a defendant because of his or her race, even in the absence of an interracial crime. Racial prejudice may operate, for instance, when the defendant is black simply because the defendant is black and regardless of the victim's color. We must be particularly sensitive to this possibility in a capital case. As the Supreme Court has recognized, "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." *Turner v. Murray, supra,* 476 *U.S.* at ——, 106 *S.Ct.* at 1687, 90 *L.Ed.* 2d at 35. This Court too has recognized the crucial role of extensive *voir dire* in weeding out unfit jurors in capital cases:

> Another important, indeed critical, means for dealing with potential and latent bias is the voir dire. The court should consider the efficacy of more exhaustive and searching voir dire examinations. The court in conducting the voir dire should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias. The court should consider whether there should be a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause. Particularly in capital cases, trial judges should exercise extraordinary care in the voir dire of potential jurors.... [*State v. Williams,* 93 *N.J.* 39, 68–69 (1983) (footnotes omitted).]

We are satisfied, however, that where the case itself carries no racial overtones, racial concerns are met by the approach followed by the trial court in the instant case although, where defendant so requests, we would prefer a broader range of inquiry. We reject the defendant's characterization of the allowed question as a "sledgehammer" inquiry. By allowing a general inquiry into whether racial views would affect impartiality, and by leaving open the possibility of further questioning if the initial answer warranted it, the trial court responded to the general problem of racially prejudiced jurors. Because the case itself carried no racial overtones, there was no abuse of discretion in so limiting the questioning; nor would there have been abuse in allowing more extensive

questioning. Under the circumstances in this case, the trial court's approach cannot be said to have deprived defendant of his right to an impartial jury, even if a more searching inquiry is usually advisable when requested.

## D. Death Qualification

Defendant contends that New Jersey's process of "death qualification" deprives capital defendants of the right to an impartial jury as provided by the federal and state Constitutions. He also contends that the trial court's dismissal of two jurors in his case on the ground that they were unqualified to sit in a capital cause was erroneous and deprived him of his right to an impartial jury.

### 1.

At the time of the argument of these appeals, there was an open question of whether the federal Constitution forbade

removal for cause, prior to the guilt phase of a bifurcated trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the tria[l]. [*Lockhart v. McCree*, 476 *U.S.* ——, ——, 106 *S.Ct.* 1758, 1760, 90 *L.Ed.*2d 137, 142 (1986).]

The Supreme Court has since held in *Lockhart v. McCree*, *supra*, that it does not. Thus defendant's constitutional objection must be rejected as a matter of federal law. Because defendant has based his attack on Article I, paragraph 10 of our state Constitution as well as the federal Constitution, however, our inquiry cannot begin and end with *Lockhart*. We must review the evolution of the death qualification doctrine and arrive at our own judgment on this matter.

In *Witherspoon v. Illinois*, 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1968), the Supreme Court held that exclusion of all jurors who express "conscientious scruples" against the death penalty violates a capital defendant's right to an impartial jury. "A man who opposes the death penalty, no less than one who favors it," the Court said, "can make the discretionary judgment entrusted to him by the State and can thus obey the oath

he takes as a juror." *Id.* at 519, 88 *S.Ct.* at 1775, 20 *L.Ed.*2d at 783. The Court stated that jurors who made their opposition to the death penalty "unambiguous" or "unmistakably clear," however, could be excluded. *Id.* at 515 n. 9, 522 n. 21, 88 *S.Ct.* at 1777 n. 21, 20 *L.Ed.*2d at 781 n. 9, 785 n. 21. In *Adams v. Texas,* 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980), the Court restated the exclusion test in terms of whether the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

Such jurors are referred to as *"Witherspoon* excludables." *Lockhart v. McCree, supra,* 476 *U.S.* at ——, 106 *S.Ct.* at 1761, 90 *L.Ed.*2d at 143. The process of jury selection that eliminates *"Witherspoon* excludables" from the panel is referred to as "death qualification." *Id.* The question that *Lockhart* had to resolve was whether the process of death qualification that is necessary to select a jury capable of following the judge's instructions in the capital sentencing phase of the trial results in the seating of a jury that is uncommonly prone to convict in the guilt phase. The issue arose because Arkansas, by legislative enactment and judicial decision, had provided for the use in capital cases of a unitary jury, *i.e.,* a jury that sits during both the guilt and penalty phases. The reliability and validity of the studies that support the conclusion that "death qualified" juries are more likely to convict were extensively reviewed by the Supreme Court in *Lockhart.* The Court accepted, "for purposes of [the] opinion[,] that the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries." *Id.* at ——, 106 *S.Ct.* at 1764, 90 *L.Ed.*2d at 147.

The Court nonetheless held that the Constitution does not prohibit states from death-qualifying juries in capital cases. The Court first concluded that death-qualification did not violate the fair cross-section requirement for a jury because the process did not involve the systematic exclusion of a distinctive

group in the community. *Id.* at ——, 106 *S.Ct.* at 1764–66, 90 *L.Ed.*2d at 147–50. The group of *"Witherspoon* excludables" differs significantly from the groups previously recognized as distinctive, such as women and racial minorities, because the *"Witherspoon* excludable" group is identified as the result of an activity "designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *Id.* at ——, 106 *S.Ct.* at 1765, 90 *L.Ed.*2d at 149. The Court emphasized, and the defendant agreed, that the state had not instituted its death qualification procedures for the purpose of arbitrarily skewing the composition of capital-case juries. *Id.*

The Court also rejected the argument that death qualification deprives capital defendants of their right to an impartial jury. *Id.* at ——, 106 *S.Ct.* at 1766–70, 90 *L.Ed.*2d at 150–54. In its view, if the Constitution required a certain mix of individual viewpoints, *i.e.,* those less or more prone to convict on a particular jury, then courts would be required to undertake the difficult task of balancing each jury. *Id.* at ——, 106 *S.Ct.* at 1767, 90 *L.Ed.*2d at 151. The Court also emphasized the state's "entirely proper interest in obtaining a single jury that could impartially decide all of the issues in [the defendant's] case." *Id.* at ——, 106 *S.Ct.* at 1768, 90 *L.Ed.*2d at 152.

The Court distinguished *Witherspoon* because in that case Illinois had "deliberately slanted" the process so that " 'when it swept from the jury all who expressed [any] scruples against capital punishment ..., the State crossed the line of neutrality ... [by] produc[ing] a jury uncommonly willing to condemn a man to die.' " *Id.* at ——, 106 *S.Ct.* at 1768, 90 *L.Ed.*2d at 151 (quoting *Witherspoon v. Illinois, supra,* 391 *U.S.* at 520–21, 88 *S.Ct.* at 1776, 20 *L.Ed.*2d at 784). The Court further distinguished *Witherspoon* and *Adams* by noting the lesser role of jury discretion at a traditional guilt trial than at a capital sentencing proceeding. *Id.* at ——, 106 *S.Ct.* at 1769, 90 *L.Ed.* 2d at 154.

 We find that the protections regarding death qualification afforded under the New Jersey Constitution are no different from or greater than those under the federal Constitution. We find no distinct tradition of state constitutional doctrine that would call for such a difference. As previously noted (*see supra* at 169–170), New Jersey does not appear to have a unique public attitude toward the death penalty. The specific question of death qualification in the context of the bifurcated trial is novel, but as lower courts have noted, *see State v. Cohen,* 211 *N.J.Super.* 544, 551 (App.Div.1986); *State v. Bass,* 189 *N.J.Super.* 461, 467 (Law Div.1983), this Court previously permitted death qualification in trials where the guilt and penalty phases were combined. *See State v. Holland,* 59 *N.J.* 451, 463 (1971). We thus find no reason in state tradition or doctrine to depart from *Lockhart.*[54]

Nor do we find that death qualification of jurors prior to the guilt phase of a capital trial offends notions of fundamental fairness. Three reasons support this conclusion.

 First, we note that the Legislature has addressed the fairness issue in the scheme that it has developed. Although there is no constitutional compulsion that there be a jury at the penalty phase, *Spaziano v. Florida,* 468 *U.S.* 447, 104 *S.Ct.* 3154, 82 *L.Ed.*2d 340 (1984), our statute presupposes in most

---

[54]We place one reservation on this decision. The reservation concerns the defendant's argument that, as one federal district court put it, all of the "evidence establishes that one consistent and inevitable result of the death qualification process is the disproportionate exclusion of blacks and women." *Grigsby v. Mabry,* 569 *F.Supp.* 1273, 1283 (E.D.Ark.1983), aff'd as mod., 758 *F.*2d 226 (8th Cir.1985), rev'd *sub nom. Lockhart v. McCree,* 476 *U.S.* ——, 106 *S.Ct.* 59, 90 *L.Ed.*2d 137 (1986). We have before us no evidence that in New Jersey there has been a resultant systematic exclusion of blacks and women in disproportionate numbers. In *State v. Gilmore, supra,* 103 *N.J.* 508, we recently expressed our disdain for the systematic exclusion of distinctive groups because of our special commitment to the fair cross-section requirement. Therefore, if data relevant to the New Jersey practice are presented to us indicating such a result, we would be prepared to address this constitutional concern.

instances that there shall be the same jury that heard the guilt/innocence phase of the trial.[55] This scheme is seen as "evidencing a desire for 'death qualification' before the guilt phase." *State v. Bass, supra,* 189 *N.J.Super,* at 464. Ordinarily we defer to such a determination when "substantive fairness is a matter of legislative policy that does not offend constitutional principle." *State v. Roth, supra,* 95 *N.J.* at 345 (sustaining procedures for state appeal of certain criminal sentences).[56]

Second, we note that other jurisdictions that have addressed the issue since *Lockhart v. McCree* have maintained their belief that death qualification before the guilt phase of a capital trial does not offend their principles of state criminal procedure, whether based on state constitutional doctrine or fairness to the defendant. *See Blount v. State,* 511 *A.*2d 1030, 1038 (Del. 1986); *State v. Hughes,* 106 *Wash.*2d 176, 721 *P.*2d 902, 908 (1986). Each of these jurisdictions has considered and rejected challenges to death qualification prior to the guilt phase.

---

[55]Section c(1) provides:

> Where the defendant has been tried by a jury, the [separate sentencing] proceeding shall be conducted by the judge who presided at the trial and before the jury which determined the defendant's guilt except that, for good cause, the court may discharge that jury and conduct the proceeding before a jury empaneled for the purpose of the proceeding.

[56]We cannot agree with the concurring opinion's suggestion that avoidance of a jury prone to convict in the guilt phase may constitute "good cause" for empanelling a new sentencing jury within the meaning of Section c(1). Such an interpretation would mean that "good cause" for empanelling a new jury would exist in most if not practically all death penalty cases. The language of the statute and its legislative history clearly demonstrate, however, that the Legislature intended the "good cause" provision to be reserved for the exceptional, not the ordinary, case. See Capital Punishment Act: Hearings on S.112 Before the N.J. Senate Judiciary Comm., 200th Leg., 2nd Sess. (1982). Nor are we free, as the concurring opinion suggests, to require post-guilt death qualification pursuant to our common-law supervisory powers over the administration of criminal justice. The Legislature has spoken in this area, explicitly requiring that generally the same jury must decide both guilt and sentencing. Absent a constitutional basis, this Court is not empowered to override the Legislature's determination.

Finally, we believe, as do the other jurisdictions that have addressed the issue, that there is no satisfactory alternative to death qualification of jurors prior to the guilt phase. Following the Eighth Circuit's decision in *Grigsby v. Mabry*, 637 *F.*2d 525 (1980), and before the Supreme Court's 1986 reversal of that decision in *Lockhart v. McCree*, the Arkansas Supreme Court reconsidered its death qualification practices. That court noted that "we should not be averse to suggested changes in the jury system (which we think should be specified by legislation, not by judicial directive) if the resulting advantages could be shown to outweigh the disadvantages. So far we have not seen a suggested change meeting that test." *Rector v. State*, 280 *Ark.* 385, 659 *S.W.*2d 168, 173 (1983), *cert.* den., 466 *U.S.* 988, 104 *S.Ct.* 2370, 80 *L.Ed.*2d 842 (1984).

The Arkansas court concluded that "[t]he *Grigsby* proposed modification, involving the same case being tried twice before successive juries, is the least appealing of the possibilities ... [, the effect being] comparable to having the actors in a play, after the audience had left the theater, repeat their lines in a second performance." 659 *S.W.*2d at 173. It rejected as well the use of alternative jurors in the penalty phase as involving an unnecessary "shuffling [of] jurors in and out of the jury box ... [resulting in] the separation of certain jurors' responsibility for the verdict from their responsibility for fixing the penalty. The two must go hand in hand, else the common law jury system no longer exists." *Id.* at 174. Finally, the court perceived a danger that jurors strongly opposed to capital punishment, in an effort to avoid feeling any responsibility, would tend to vote for acquittal. *Id.*

The Delaware Supreme Court has noted that it had a long established statutory preference for a single jury qualified to try both phases of a capital trial and found that "[t]he State has a strong interest in avoiding ... repetitive trials." *Blount v. State, supra,* 511 *A.*2d at 1038. As to the selection of additional jurors who would hear the trial

and be substituted for the jurors who could not impose the death penalty at the beginning of the penalty phase of the trial, ... these new jurors would have to deliberate on the penalty with jurors who had already deliberated on and considered the evidence at the guilt/innocence phase of the trial. These new members would be ignorant of the prior discussions, running afoul of the concept that a jury reach a verdict through deliberations which are the common experience of all jurors. [*Id.*]

*See also People v. Fields,* 35 *Cal.*3d 329, 673 *P.*2d 680, 197 *Cal.Rptr.* 803 (1983) (state interest in unitary jury sufficient to exclude noncognizable group of persons who would automatically vote against death at the penalty phase), *cert.* den., 469 *U.S.* 892, 105 *S.Ct.* 267, 83 *L.Ed.*2d 204 (1984).

As the Washington Supreme Court has noted, the two-jury system may indeed not be beneficial to the defendant. "Jurors may harbor what one court has referred to as 'whimsical doubts' in the guilt phase that might prevent them from voting for the death penalty in the sentencing phase. If a new jury sits in the sentencing phase, it will harbor no such doubts and may be more likely to vote for the death penalty." *State v. Hughes, supra,* 721 *P.*2d at 908 (quoting *Smith v. Balkcom,* 660 *F.*2d 573, 580 (5th Cir.1981), mod. on other grounds, 671 *F.* 2d 858 (5th Cir.), *cert.* den., 459 *U.S.* 882, 103 *S.Ct.* 181, 74 *L.Ed.*2d 148 (1982)).

In sum, we believe the State is entitled to insist on a properly conducted interrogation of jurors prior to the guilt phase of a capital trial to determine whether their views on capital punishment will substantially interfere with the performance of their duties as jurors. Those duties contemplate both phases of a capital trial, the guilt/innocence phase and the penalty phase. We believe that a jury should, to the extent it can, reach a verdict through deliberations which are the common experience of all jurors.[57]

---

[57]Defendant also contends that death qualification procedures are invalid under the eighth amendment to the federal Constitution. According to defendant, that amendment's function to insure that criminal punishments accord with contemporary standards of decency is eviscerated by a procedure that

## 2.

Defendant contends that the trial court erred in excluding two jurors for cause under *Witherspoon v. Illinois, supra,* 392 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776. For some time, it was thought that under *Witherspoon* prospective jurors could be excluded from the jury for cause only if they

> made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt. [Id.* at 522 n. 21, 88 *S.Ct.* at 1777 n. 21, 20 *L.Ed.*2d at 785 n. 21 (emphasis in original).]

In 1980, the Supreme Court re-examined the test for when a prospective juror may properly be excluded from a jury based on views about capital punishment. "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas, supra,* 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589. If a prospective juror is excluded on any broader grounds than his ability to follow

---

totally eliminates one important viewpoint from finding expression in jury deliberations in capital cases. We disagree. While defendant invokes the principle of reliability guaranteed in capital cases by the eighth amendment, that principle is designed to insure individualization of capital sentencing decisions, and is not offended by the exclusion of those jurors who, regardless of the facts and circumstances, would automatically vote against imposition of the death penalty. It is difficult to see how the eighth amendment gives a capital defendant a right to implant a veto power in his sentencing-phase jury. Indeed, adoption of defendant's proposal would plainly violate the other important principle embedded in the eighth amendment, the principle of consistency, inasmuch as it would make eligible for the death sentence only those defendants unlucky enough to have failed to draw any *Witherspoon* excludable jurors from the randomly selected jury venire. We believe that defendant's eighth amendment argument amounts to no more than a restatement of his contention discussed *supra* at 249 that death qualification violates his sixth amendment right to a jury drawn from a fair cross-section of the populace. The eighth amendment insures that the state's sentencing policies are consistent with contemporary standards of decency; it does not leave the state powerless to effectuate those sentencing policies, such as the death penalty, that are in accord with those contemporary standards.

the law or abide by his oath, the death penalty cannot be imposed. *Id.* at 48, 100 *S.Ct.* at 2528, 65 *L.Ed.*2d at 591. "The apparent conflict between the two-part *Witherspoon* test and this test enunciated in *Adams* is to be resolved in favor of the *Adams* test." *Blount v. State, supra,* 511 *A.*2d at 1036 n. 2; *see Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985). We agree. Henceforth, trial courts shall use the *Adams* test in death-qualifying a jury.[58]

This standard does not require that a juror's bias be proven with unmistakable clarity. "This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism...." *Wainwright v. Witt, supra,* 469 *U.S.* at 424, 105 *S.Ct.* at 852, 83 *L.Ed.*2d at 852.

 The converse of this proposition is obviously that capital jurors are not expected to demonstrate that the gravity of the task would not have any effect at all on their ability to perform their duties. As the Court explained in *Adams:*

> But neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. [448 *U.S.* at 50, 100 *S.Ct.* at 2529, 65 *L.Ed.*2d at 592–93.]

 It is against these standards that we must test the exclusion of the two jurors. Of necessity, a sound measure of discretion must be reposed in our trial courts to determine whether a given juror can well and truly discharge the grave responsibility entrusted or whether the juror's views on the

---

[58]The New Jersey Judges' Bench Manual for Capital Cases has adopted the *Adams* test:

> The prospective juror must be able to respond affirmatively to [this] ultimate inquir[y]: ... Do you believe that if you are a juror considering the penalty to be imposed, that your individual views on capital punishment would not prevent or substantially impair the performance of your duties as a juror and your ability to decide on a penalty of death? [*Id.* at 33.]

death penalty would prevent or substantially interfere with the performance of that duty.

█ Jurors must not be asked categorically to prejudge their willingness to impose the death penalty in the case. As noted, significant uncertainty is to be expected in the average citizen when asked to discharge the task. Just as we should not expect jurors to state "unambiguously" or "with unmistakable clarity" that they would never impose the death penalty, we should not expect the conscientious juror to state with the same clarity a willingness to convict in a case that has not yet been heard.

█ A sensitive weighing and appraisal of a juror's entire response must be made by the trial court in its duty to resolve the question of whether the juror has shown bias or prejudgment in answering the questions. With these concerns in mind, we turn to the *voir dire* of the two jurors involved.

a.

Juror C, when initially questioned by the court, stated that he did not think that he could make a determination based on the evidence if the possibility existed that the defendant could receive the death sentence. Upon further questioning by the court, he qualified his answer to state that in certain circumstances, such as the killing or torture of a child, he could return a verdict calling for the death penalty. This exchange then followed:

THE COURT: It is correct to say that you could reach a verdict that would ultimately call upon the court to impose a lesser sentence, is that correct?

THE JUROR: Yes, yes.

THE COURT: So it is the death penalty that concerns you?

THE JUROR: That's right.

THE COURT: But there are circumstances under which you feel you could reach a verdict?

THE JUROR: Yes.

THE COURT: Knowing that it would have the effect of condemning the defendant to death?

THE JUROR: Yes.

At this point the prosecutor questioned Juror C, who stated that he held religious beliefs against the death penalty, and that while he could find a person guilty of murder, he could never impose capital punishment. Even in response to defense counsel, Juror C stated that although he could decide whether aggravating or mitigating factors existed and could weigh them, "I wouldn't give him the death penalty." He again added the qualification that he would return a death verdict if the brutal death of a child was involved.

■■■ Defendant argues that because Juror C did not state his unequivocal opposition to the death penalty, and did not make "unmistakably clear" that he would "automatically" vote against death at the penalty phase or that he would not be impartial at the guilt/innocence phase, exclusion was improper. This argument tracks the language of *Witherspoon v. Illinois*, *supra*, 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776, whose test, as previously noted, has been modified by later Supreme Court cases. We are satisfied that the trial court correctly evaluated the juror's ability to perform his duty under *Adams*.

b.

The exclusion of Juror M presents a much more difficult question. Unlike Juror C, Juror M initially expressed an open attitude toward the death penalty. When initially asked by the court whether he had views regarding the death penalty, he responded, "no, no." Although he stated that as for favoring or opposing the death penalty, he would not favor it, he also stated there were certain types of crimes that would warrant capital punishment. When he was asked if he could weigh aggravating and mitigating factors even though a possible consequence could be the death of a defendant, he answered, "I don't think I could." But in further colloquy with the court, after fuller explanation of the aggravating and mitigating factors, he agreed that, depending on the evidence in this case,

he could reach a verdict that ultimately would lead to condemning the defendant to death. The colloquy concluded:

THE COURT: And you say you feel that you could be a juror and in certain circumstances return a verdict that would lead me to condemn the defendant to death. Is that correct?

THE JUROR: Yes.

THE COURT: All right.

Defense counsel then undertook to probe further and asked Juror M if he felt that death was the appropriate punishment any time a person was convicted of murder. To this Juror M said: "In self-defense I would say no." He later included mentally disturbed and alcoholic defendants in the category of those whom he felt should not be sentenced to death. After further discussion concerning workings of the statute and the trial, Juror M again said he could fairly weigh the aggravating and mitigating factors.

The prosecutor then undertook the questioning and asked whether Juror M could return a verdict that condemned the defendant to die, to which he replied: "At the moment I said I would have to actually think about that." The court then took up the questioning and, in an extended colloquy, reinterrogated the juror with the final question being:

THE COURT: Do you feel you could sit as a juror in this case and reach a verdict as to guilt or innocence knowing that, depending upon your finding, that it could well be the first step leading to the death of this defendant?

THE JUROR: Yes, I could sit in the jury.

The court continued the inquiry, informing the juror that "[t]oday is the deadline, we have to know," to which the juror ultimately said, "I don't actually think I could go along with the death penalty."

In further colloquy between defense counsel, the court, and the juror, the juror said that he could properly weigh aggravating and mitigating factors, although he expressed his preference not to be involved with a capital case. Defense counsel resumed attempts to determine whether the juror could set aside his personal feelings and follow the law. The court then finally asked:

> THE COURT: Why can't you follow the law? Do you feel that the law is so morally repugnant to your views, in other words, the law is inconsistent with your views on capital punishment?
>
> THE JUROR: Yes. I feel I just—I just don't feel right about the death penalty. I don't—it's just something within me, Your Honor. I can't.

The defendant contends that the trial court erred by excusing Juror M from the jury because of his views on the death penalty. While there may now appear in the cold print of this record some lack of patience in the questioning of this juror, we are perhaps too far removed from the courtroom to appreciate fully the exchange as it developed. Justice Clifford reminded us of this reality in his dissent in *State v. Gilmore, supra,* 103 *N.J.* at 547:

> We can profit from an occasional reminder of the limitations that our isolation from the courtroom imposes on a full appreciation of the trial dynamics. As Judge Jayne once put it, even the best and most accurate record of oral testimony is like "a dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried." *Trusky v. Ford Motor Co.,* 19 *N.J.Super.* 100, 104 (App.Div.1952). A bloodless record conceals subtle nuances; although we cannot always sniff them out, they do not often escape detection by our trial judges.

Here, as in the case of Juror C, the court ultimately had to determine whether the juror's views could prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. The court's conduct reflects a sufficiently sensitive appraisal of the capacity of this juror, whether its result was one we might or might not have reached ourselves. We do not find that the court's exercise of judicial discretion was unconstitutional.

c.

Although defendant has not raised the point, we have also considered whether there was plain error in the questioning of Juror S. (She will be known to the parties from the trial court proceedings.) She too originally said that she had no views on capital punishment. Even though she said she would not like to weigh aggravating and mitigating circumstances, knowing a possible consequence of her decision would be death, she at first thought she could do it. After further thought, however,

she finally stated, "I don't think I could sentence—go along with the capital punishment." But upon further questioning, she answered differently, saying:

I could sit, but like I said, I would have to hear the facts presented, listen, you know, to all the evidence and what not and I would have to be fair, you know, whether I agree with the rest of them or not. I have to be fair to myself and also to the person on trial.

Questioned again about the discrepancy, she agreed that she would be unable to reach a verdict knowing the effect of her decision would be to condemn the defendant to death.

Defense counsel then questioned her. Although agreeing she would follow the law, she stated, "but I still, you know, am hesitant when it comes to the final result." The court informed her that her answers would be final as of that day and that it needed to know whether she could participate in this process. At that point she said: "I'm going to retract my statement. I couldn't do it. Couldn't't." She finally agreed with the court that her opposition was so firmly held and so strong that she would be unable to weigh the factors knowing that a consequence of her verdict could be to condemn the defendant to death. Further colloquy did not resolve the ambiguity. In final response, the juror stated that although she felt perfectly capable to sit as a juror and make any and every fact-finding, her difficulty was making that fact-finding knowing that the consequence could be death.

Again, this presents a difficult case of deciphering the answers of a confused juror. The answers portray the same problems that we noted in the case of Juror M. We are not left with the conclusion that the trial court erred in its assessment of the juror's views.

## V.

### Trial Issues

A. Psychiatric Defense

Proceeding to the claims of error at trial, we first take up defendant's argument that two decisions by the trial court

deprived him of due process and effective assistance of counsel with respect to his psychiatric defense.

First, defendant attacks the trial court's refusal to rule on the issue whether defendant's prior murder conviction would be admissible in evidence until after one of the defendant's psychiatric experts, Dr. Lewis, had testified. Defendant contends that he chose not to bring out the conviction in direct examination of Dr. Lewis because he was unsure whether the conviction would be admissible. When the court later did rule this evidence to be admissible and the State raised the evidence in its direct examination of its own expert, the jury, according to defendant, was led to the erroneous conclusion that Dr. Lewis had ignored the conviction in reaching her findings regarding defendant's psychiatric condition.

We find no error. The trial court's decision to delay its ruling until the State requested to offer the prior conviction was not improper. We have advised courts against making evidentiary decisions prematurely. *See State v. Cary*, 49 *N.J.* 343, 352 (1967) ("a trial judge generally should not rule on the admissibility of particular evidence until a party offers it at trial"); *State v. Hawthorne*, 49 *N.J.* 130, 143 (1967) ("most evidence problems are best and most expeditiously settled in the atmosphere and context of the trial"), overruled on other grounds, *State v. Sands*, 76 *N.J.* 127 (1978).[59] Even assuming that the court should have made a ruling on the admissibility of the conviction prior to Dr. Lewis' testimony, the fact is that defense counsel did not, at the time, object to the court's decision to postpone his ruling. The predicament, if such it be, in which defense counsel found themselves was one of their own making.

---

[59] Of course, the general admonition against premature evidentiary rulings should not apply with the same force in capital cases. Trial courts should feel no compulsion to adhere to the rule where a capital defendant has shown that his examination of a witness might be impaired in the absence of an early ruling.

Most important, defendant was not prejudiced by the court's actions. Defendant does not challenge the correctness of the trial court's ruling, reached after a full *Evidence Rule* 8 hearing, that the prior conviction was admissible. Defendant was free to raise the issue in direct examination of Dr. Lewis if he so desired. The record tends to support the State's assertion that it was defense counsel's strategy rather than the absence of a trial court ruling that led defense counsel not to question Dr. Lewis about the prior conviction; even after the State had raised this matter in direct examination of its own witness, defendant did not question his rebuttal witness, Dr. Ervin, about it. Having chosen not to elicit testimony regarding the prior conviction from either Dr. Lewis or Dr. Ervin, defendant cannot now renounce his strategy. Accordingly, we hold that the trial court's refusal to rule on this issue earlier was not an abuse of discretion.

Second, defendant contends that the trial court forced the case to trial even though defense counsel's preparations for the psychiatric defense were incomplete, thereby depriving him of effective assistance of counsel.

A defendant is entitled to a reasonable time to prepare for trial. 3 C. Torcia, *Wharton's Criminal Procedure* § 422 (12th ed. 1975). What constitutes a reasonable time depends upon the facts of each case. Relevant factors include the time available for investigation and preparation, the gravity of the charge, the experience of counsel, the complexity of possible defenses, and the accessibility of witnesses. *United States v. Golub*, 638 *F*.2d 185, 189 (10th Cir.1980). Whether defense counsel has had enough time to prepare for trial is ordinarily a question for the trial court, and its decision will not be set aside unless the court abused its discretion. *United States v. Gallagher*, 620 *F*.2d 797, 800 (10th Cir.), *cert.* den., 449 *U.S.* 878, 101 *S.Ct.* 224, 66 *L.Ed.*2d 100 (1980); *see State v. Tulenko*, 133 *N.J.L.* 385, 391 (E. & A.1945) (whether to grant a continuance is a matter for the discretion of the trial court); *In*

*re Elizabeth Educ. Ass'n,* 154 *N.J.Super.* 291, 299 (App.Div. 1977) ("[t]he granting of a continuance is a matter exclusively within the province and sound discretion of the trial judge"), certif. den., 77 *N.J.* 492 (1978).

Under the facts of the present case, we cannot say that the trial court abused its discretion. Defendant was indicted on September 17, 1982. The first trial date set was February 14, 1983. On January 3, 1983, defense counsel advised the court that medical and psychiatric examinations of the defendant were not complete, and the court postponed the trial date until February 28. On February 14 defendant again requested an adjournment on the ground that weather conditions had delayed the arrival of his doctors. The trial date was postponed until April 4, with no objection to that date from defense counsel. Although jury selection began on April 4, the actual trial did not commence until April 25. Despite some difficulty in obtaining written reports from his experts, defendant did have these reports prior to the start of the trial on April 25 and presumably had ample time prior to that date to communicate with his expert. We thus can find no prejudice resulting from the trial court's adherence to the April 4 schedule. Accordingly, we hold that the trial court's scheduling decision did not deprive defendant of a fair trial.

## B. Admissibility of Prior Acts

Defendant next contends that the trial court committed reversible error in permitting the State to present evidence of his prior crimes or threats directed at Asaline Stokes, the victim.

In order to prove that the attack on Asaline Stokes was knowing and purposeful, the State introduced testimony that defendant had threatened her on several occasions. Venus Naylor, Ms. Stokes' grandchild, testified that approximately one or one and one-half years before the murder, she witnessed an argument between defendant and her grandmother. Defendant allegedly told Ms. Stokes that she "was going to regret it."

The next day, defendant and Ms. Stokes had another argument because Ms. Stokes had been visited by a male friend, Bradford Foster. According to Venus, defendant said that "what he say yesterday was about to come true." Venus left the room, and when she returned, Ms. Stokes was lying on the floor, bleeding from her cheek.

Venus testified about two other incidents that happened three or four months before the killing. Venus said that one day defendant came to the house while Bradford Foster was there and told Ms. Stokes that "he would kill her and him if he see—if he see him with her." Later, defendant came to Ms. Stokes' front door and, according to Venus, told Ms. Stokes that "he would kill her and the kids or just by herself...."

Venus' testimony concerning defendant's actions toward Ms. Stokes was admitted by the trial court, after an *Evidence Rule* 8 hearing, for the limited purpose of showing defendant's state of mind at the time of the stabbing. Defendant argues that this evidence should have been excluded because the prior incidents were so remote in time that their probative value was outweighed by their prejudicial effect.

■■ Evidence that a person committed a past crime or prior wrong is inadmissible to prove a defendant's disposition to commit the crime for which he or she is currently being charged. *Evid.R.* 55. This rule seeks to guard a defendant's right to a fair trial by avoiding the danger that a jury might convict the accused simply because the jurors perceive him to be a "bad person." *See State v. Sempsey*, 141 *N.J.Super.* 317, 322–23 (App.Div.1976), certif. den., 74 *N.J.* 272 (1977). Evidence of prior wrongs and past crimes may be admissible, however, as evidence on relevant issues such as motive and intent. *Evid.R.* 55.

■ Evidence of past crimes does not automatically become admissible just because it is relevant to the issue of motive or intent. In each case the trial court must weigh the probative value of the evidence against its prejudicial effect.

*State v. Atkins,* 78 *N.J.* 454, 461 (1979). The temporal remoteness of a past wrong affects its probative value. *See State v. Schuyler,* 75 *N.J.L.* 487, 488 (E. & A.1907). If the probative value of the evidence is outweighed by the threat of prejudice, the evidence should be excluded under *Evidence Rule* 4. The trial court, because of its intimate knowledge of the case, is in the best position to engage in this balancing process. Its decisions are entitled to deference and are to be reviewed under an abuse of discretion standard. *See State v. Atkins, supra,* 78 *N.J.* at 462.

Evidence of arguments or violence between a defendant and a homicide victim has been admitted in prior New Jersey cases. *See State v. Mulero,* 51 *N.J.* 224, 228–29 (1968) (evidence that defendant beat mother admissible to show defendant's intent when he beat daughter to death); *State v. Donohue,* 2 *N.J.* 381, 388 (1949) (evidence of prior beatings of defendant's wife, the murder victim, including incident that occurred eight years prior to murder, admissible to show malice when defendant accused of homicide of wife); *State v. Lederman,* 112 *N.J.L.* 366, 372–73 (E. & A.1934) (evidence of beating by defendant of husband three days before she allegedly beat husband to death admissible to show malice and common scheme); *State v. Schuyler, supra,* 75 *N.J.L.* at 488 (evidence of altercation between defendant and homicide victim admissible to show malice even though altercation occurred ten years earlier); *State v. Slobodian,* 120 *N.J.Super.* 68, 75 (App.Div.) (evidence that defendant threatened wife with a pistol two months before he shot her admissible to show defendant's state of mind), certif. den., 62 *N.J.* 77 (1972).[60]

---

[60]Arguing that prior case law allows admission of prior threats only to identify the perpetrator by showing the existence of a motive, defendant seems to contend that prior threats are inadmissible to show intent. We disagree with this reading of the cases and note that *Evidence Rule* 55 itself clearly allows the introduction of prior threats to prove intent as well as motive.

In this case, we do not agree with the defendant that the trial court should have excluded the evidence of defendant's prior actions toward Ms. Stokes. The arguments that defendant had with Ms. Stokes one and one-half years prior to the stabbing were so serious that one led to an act of violence that left Ms. Stokes lying on the floor bleeding. Defendant's continuing hostility toward Ms. Stokes and jealousy over her contacts with other men were again demonstrated by the threats he made three or four months prior to the stabbing. Defendant's conduct evidences an enduring hostility toward Ms. Stokes and to that extent casts doubt on his claim that the stabbing of Ms. Stokes was unknowing and occurred as a result of his epilepsy. Accordingly, we hold that the trial court did not abuse its discretion in admitting the evidence.

C. Diminished Capacity Instructions

Defendant asserts that the trial court's guilt-phase charge on diminished capacity effectively coerced a jury verdict of capital murder. He sought a jury instruction that "diminished capacity will reduce murder to manslaughter where the defendant is found to have suffered trauma that impaired his ability to meet the requisite mental state for murder." The stated legal basis for defendant's request was that "the diminished capacity defense is one of mitigation, not of acquittal," and that if the jury did not conclude that defendant had the requisite state of mind when he killed the victim—that is, "knowingly" or "purposely" —then diminished capacity would serve to "mitigate the offense to manslaughter, regardless of whether defendant met the specific mental state required for manslaughter."

The trial court rejected defendant's request, and instead charged the jury as follows:

> With respect to murder the requisite mental state is knowing or purposeful conduct. As to aggravated manslaughter the requisite mental state is a conscious disregard of the substantial and unjustifiable risk. The definition of reckless under the code of criminal justice specifically states that the jury is to consider the nature and purpose of the actor's conduct and the circumstances known to him.

Further, under the applicable definition defendant must have consciously disregarded an unjustifiable risk. *Thus, should you find that the defense of diminished capacity is present·in this case and the State has failed to sustain its burden of proving the requisite mental state as to murder, that is, purposeful or knowing conduct and as to aggravated manslaughter, a conscious awareness of an unjustifiable risk, then you would be obliged to acquit the defendant completely with respect to count one of the indictment.* (Emphasis added.)

The effect of this charge, according to defendant, was to direct a verdict of guilty to capital murder and to deprive him of a defense. We disagree.

The statute that forms the basis for defendant's argument, *N.J.S.A.* 2C:4–2, reads:

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.

Hence a trial court is obliged to instruct the jury to consider relevant evidence tending to show that a defendant did not have the requisite state of mind to commit the offense charged. That the trial court here fulfilled that obligation is clear, as indicated in the above-quoted portion of the charge. The jury was properly instructed that if it did not find that the defendant acted with "purpose or knowledge," it would consider whether defendant was guilty of aggravated manslaughter. The court specifically charged:

To reiterate, should you find that the defendant by virtue of a mental defect did not purposely or knowingly kill Asaline Stokes, then you are to go on to consider whether he is nonetheless guilty of aggravated manslaughter and I will charge the elements of that offense.

Defendant constructs an elaborate argument around his contention that "diminished capacity" is a mitigation defense. His brief argues that "the defense of diminished capacity [should] be permitted to act as a substitute *mens rea* of recklessness in cases involving murder or manslaughter"—that is, the jury should be permitted to find that "defendant was guilty of a lesser included offense of aggravated manslaughter without

the required consciousness of risk the manslaughter statute's *mens rea* of recklessness requires...." In cases other than homicide, defendant urges that diminished capacity should operate to "reduce the offense to one a degree lower than the charged crime." This approach, says defendant, would "achieve[ ] something of the result which attends the use of the voluntary intoxication defense."

Defendant's argument might have some appeal were it being made to a legislative body that was formulating a new criminal code. But we deal with our Code as it comes to us. Unlike our pre-Code law, the Code itself defines the *mens rea* requirements for all offenses. *See N.J.S.A.* 2C:2–2; 2 *Final Report of the New Jersey Criminal Law Revision Commission* 40 (1971). Before a defendant can be convicted of any offense, he must act with one of the states of mind set forth in *N.J.S.A.* 2C:2–2(b). There is, therefore, a state of mind for every offense save those that rest on strict liability. The "mental disease or defect" statute, *N.J.S.A.* 2C:4–2, makes admissible any relevant proof that defendant suffered from a mental disease or defect, for the purpose of demonstrating that defendant "did not have a state of mind which is an element of the offense." Thus under the statute, diminished capacity either negates the state of mind required for a particular offense, if successful, or it does not. It either provides a complete defense, if successful, or it does not.

■ A charge on a lesser-included offense cannot be automatically given to a jury when the defense of diminished capacity is raised by a defendant. The "included offense" statute, *N.J.S.A.* 2C:1–8(e), specifically states as to lesser-included offenses that the court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense. The trial court charged on aggravated manslaughter in this case *not* because diminished capacity could reduce the offense from murder to aggravated manslaughter, but because the

evidence warranted consideration of aggravated manslaughter by the jury in the event it was unpersuaded that defendant had acted "purposely" or "knowingly." The trial court determined, and we agree, that if the jurors did not find knowing or purposeful conduct, they should then appraise the evidence to determine whether defendant acted with a "conscious disregard of a substantial and unjustifiable risk," *N.J.S.A.* 2C:2-2, "under circumstances manifesting extreme indifference for human life," *N.J.S.A.* 2C:11-4—the constituent elements of manslaughter.

In sum, under *N.J.S.A.* 2C:4-2, diminished capacity does not operate to transform an offense, it can only negate it. It leads not to a rational finding of some other crime but rather to an acquittal.[61] Defendant's strained analogy to the intoxication defense is unpersuasive. *See State v. Warren,* 104 *N.J.* 571 (1986); *State v. Cameron,* 104 *N.J.* 42 (1986). The trial court's charge in this regard was therefore without error.[62]

---

[61]Defendant's sole contention concerning diminished capacity was that, *as a matter of law,* its existence transforms murder into manslaughter. No claim was made that, *in fact,* defendant's state of mind, because of its diminished capacity, could be found to meet the requirement of manslaughter, *i.e.,* a "conscious awareness of an unjustifiable risk." Accordingly, the trial court did not relate its manslaughter charge to any claim of diminished capacity, but in effect left it to the jury to determine whether there was other evidence from which the requisite state of mind for manslaughter could be found.

[62]Our attention is drawn to a related point. The trial court gave an insanity charge, *see N.J.S.A.* 2C:4-1, as well as a "diminished capacity" instruction, even though defense counsel specifically waived the defense of insanity. Because defendant does not raise on appeal any claim of error in the trial court's submission of the "insanity" defense to the jury—and hence the point has not been briefed or argued—we confine our comment to no more than a cautionary instruction to trial courts to consider with the greatest care the giving of a jury instruction on a defense that has been waived.

Although the competing considerations are obvious, they are difficult to reconcile. We accept the proposition that in a murder case the trial court has a duty "to charge the applicable law to the jury based upon facts *regardless* of what requests counsel may make," *State v. Powell,* 84 *N.J.* 305, 318 (1980) (emphasis in original), based on the belief

## VI.

### Sentencing Issues

We thus conclude that defendant's conviction of murder for the killing of Asaline Stokes must be affirmed. We turn now to defendant's contentions that the sentence of death was improperly imposed upon him.

### A. Use of *Non Vult* Plea

The jury found that the aggravating factors defined by Section c(4)(c), that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery," and Section c(4)(a), that the defendant "ha[d] previously been convicted of murder," out-

---

> that the public interest may require that a particular charge be given to the jury, where the facts rationally support such a charge, even though neither the defense nor the prosecution has requested it; that enforcement of the criminal law is too important to be controlled completely by the contentions of the adversaries; and that the court has an obligation to see to it that the jury, as the representative of the public, is given all of the facts *and* all of the possible offenses that might reasonably be found from such facts. [*State v. Choice*, 98 *N.J.* 295, 298–99 (1985) (emphasis in original).]

On the other hand, there is considerable force behind the position that a *competent* defendant may reject the defense of insanity for any number of reasons, *see, e.g., State v. Khan*, 175 *N.J.Super.* 72, 81 (App.Div.1980) (discussing *Whalem v. United States*, 346 *F.*2d 812 (D.C.Cir.), *cert.* den., 382 *U.S.* 862, 86 *S.Ct.* 124, 15 *L.Ed.*2d 100 (1965), and *Frendak v. United States*, 408 *A.*2d 364 (D.C.Ct.App.1979))—a proposition not confronted directly by *Powell* and *Choice.* Moreover,

> [w]hile the public interest in giving the jury all of the facts and the option to choose from all of the consequent possible offenses may ·prevail over counsel's interest ..., that may *not* be the case where the injection of [unsolicited jury instructions] by the court will enhance the risk of a murder conviction. [*State v. Choice, supra,* 98 *N.J.* at 300–01 (emphasis in original).]

Given the state of the record before us and the absence of any discussion of the issue on appeal, we simply exhort trial courts in capital cases to weigh most carefully the questions raised by a defendant's request to waive a defense. On this record, we will not raise and decide the issue on our own motion.

weighed beyond a reasonable doubt the mitigating factors in defendant's murder of Asaline Stokes.

Defendant contests the trial court charge that the jury could consider his 1966 conviction for the murder of his first wife, Rosalind Ramseur, as an aggravating factor under Section c(4)(a). That conviction was based on his *non vult* plea to an indictment that had charged him with murder, but under which he might have been convicted of either murder or manslaughter. Defendant argues that because he might have been convicted only of manslaughter had he been tried, the jury could not have found beyond a reasonable doubt that he had previously been convicted of murder.

 We disagree with defendant and hold that the conviction based upon his prior *non vult* plea to the 1966 indictment for murder suffices to prove the aggravating factor defined in Section c(4)(a) that he had "previously been convicted of murder." Although it is possible that if he had contested the murder charge against him, he might have been acquitted of murder and instead convicted of and sentenced for the lesser offense of manslaughter, that possibility does not affect the legal significance of Ramseur's *non vult* plea.

The Legislature's purpose in enacting Section c(4)(a) was to subject those who have been convicted of murder once to the death penalty if they are convicted of murdering again. The Legislature could not have intended this aggravating factor to encompass only convictions based on a jury verdict and not those based on a *non vult* plea. It would thereby have excluded a substantial portion of all murder convictions. And its language is unambiguous: "The defendant has previously been convicted of murder." While questions are sometimes raised about the use of a conviction, rarely is there any question about the *fact* of a conviction, and there is none here. It is simply undeniable that Ramseur was convicted, and that he was convicted of murder. Furthermore, in this case, there is no question at all about the permissible *use* of the conviction, for in this

very section the Legislature has said it may be used as an aggravating factor.

It has long been settled that in criminal cases a *non vult* plea is regarded as the equivalent of a guilty plea to the charge to which defendant pleaded. *State v. Pometti*, 12 *N.J.* 446, 452 (1953). This is true not only in the proceedings that directly arise out of the indictment to which the plea is made, but also in subsequent criminal prosecutions. In *State v. Henson*, 66 *N.J.L.* 601, 608 (E. & A.1901), the Court of Errors and Appeals was faced with the question whether a defendant in a trial for homicide could be asked on cross-examination whether he had pleaded *non vult contendere* [63] to an indictment for petit larceny. After determining that the defendant could have been asked the question had the plea been a guilty plea, the Court held that the question was also proper when the plea had been a *non vult* plea. In reaching this conclusion, the Court stated:

> The plea of *nolo contendere* has the same effect as a plea of guilty, so far as regards the proceedings on the indictment.
>
> It is a confession only for the purposes of the criminal prosecution, and does not bind the defendant in a civil suit for the same wrong. *Whart.Cr.Pl. & Pr.*, § 418; *Bish.Cr.Pro.*, § 802.
>
> *A judgment founded on a plea of guilty, or of nolo contendere, is in like manner conclusive in a subsequent criminal prosecution*, but in civil suits it is not such an admission of guilt as to be evidence against the party pleading it. 2 *Whart.Ev.*, § 783. [*Id.* at 608 (emphasis added).]

Subsequently, in *Schireson v. State Board of Medical Examiners, supra*, 129 *N.J.L.* at 207, the Supreme Court held that the Board of Medical Examiners could revoke the license of a doctor on grounds that he had been convicted in federal court of crimes involving moral turpitude even though the doctor had entered *non vult* and *nolo contendere* pleas to the crimes. There the Court stated:

---

[63] A *nolo contendere* plea and a *non vult contendere* plea are the same thing. *See Schireson v. State Bd. of Medical Examiners*, 129 *N.J.L.* 203, 204 (Sup.Ct. 1942), rev'd on other grounds, 130 *N.J.L.* 570 (E. & A.1943).

So far as the state is concerned the judgment of conviction follows as well a plea of *nolo contendere* as a plea of guilty. A plea of *nolo contendere* is an implied confession of the offense charged. The judgment of conviction follows that plea as well as a plea of guilty. In our opinion the proceedings in the federal court constituted a conviction within the meaning of the statute. [*Id.* at 208 (citations omitted).]

Although the Court of Errors and Appeals reversed *Schireson* on just this point, *see Schireson v. State Bd. of Medical Examiners*, 130 *N.J.L.* 570, 574–75, 33 *A.*2d 911 (E. & A.1943), that Court soon overruled its reversal. *See Kravis v. Hock*, 136 *N.J.L.* 161, 165, 54 *A.*2d 778 (E. & A.1947). In *Kravis v. Hock*, the Court stated:

Following sentence a person is *convicted* after both the pleas of guilty and *nolle contendere* even though there are differences in the general purpose of these pleas. If the Schireson case in this court is not overruled it would merely increase the great difficulty found by the legislature in attaining desired results in legislation because of the many fine spun niceties woven by the courts into words which seem clear and understandable to the legislature when statutes are enacted. [*Id.* at 165–66 (emphasis in original).]

There can be no doubt that the indictment to which Ramseur pleaded *non vult* had specifically charged him with murder. It alleged that he "did willfully, feloniously and of his malice aforethought kill and murder" Rosalind Ramseur. It did not mention manslaughter, which would have been charged separately.

*Revised Rule* 3:5–2(a), which was operative during all proceedings arising out of the 1966 indictment, provided: "A defendant may plead only *non vult, nolo contendere* or not guilty to an indictment for murder. In all other cases the defendant may plead only guilty or not guilty."

A *non vult* plea to a murder indictment made with knowledge of its possible consequences precluded the defendant after judgment of conviction from contending that he was guilty merely of manslaughter. *See State v. Wall*, 36 *N.J.* 216 (1961) (denying defendant's motion to retract *non vult* plea to murder indictment, claiming he was insufficiently informed of its effect; "The central theme of defendant's complaint is that he ... at most was guilty of manslaughter"); *cf. Johnson v.*

*State,* 18 *N.J.* 422, 429 (1955) ("[b]y his plea of *'non vult'* ... [the defendant] admitted his guilt of the crime of murder"), *cert.* den., 350 *U.S.* 942, 76 *S.Ct.* 318, 100 *L.Ed.* 822 (1956). At the time of defendant's plea, the statutory sentence following a *non vult* plea was distinct from that imposed for a conviction of manslaughter:

the sentence to be imposed, if [a *non vult*] plea [to an indictment for murder] be accepted, shall be either imprisonment for life or the same as that imposed upon a conviction of murder in the second degree. [*N.J.S.A.* 2A:113-3.[64]]

Hence, the sentence for manslaughter "not more than 10 years," *N.J.S.A.* 2A:113-5, would not have been a permissible punishment for a *non vult* plea to murder. Ramseur's sentence, a minimum of twenty-four years and a maximum of twenty-eight years, was within the range provided for second-degree murder ("not more than 30 years"). *N.J.S.A.* 2A:113-4. Clearly, he was punished for a conviction of murder.

We have found nothing to persuade us that the Legislature intended to exclude from the scope of Section c(4)(a) convictions arising out of *non vult* pleas. Therefore, in light of the foregoing, we conclude that the evidence of defendant's 1966 conviction justified the jury finding that he had "previously been convicted of murder."

Defendant argues that if Section c(4)(a) is so construed, it violates the federal and state constitutional mandate that the evidence that supports a jury finding of an aggravating factor in a capital sentencing decision be reliable. He cites *Zant v. Stephens, supra,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235, in which the United States Supreme Court noted that any sentence based even in part on " 'misinformation of a constitutional magnitude' such as a prior uncounseled conviction" must be set aside, *id.* at 887 n. 23, 103 *S.Ct.* at 2748 n. 23, 77 *L.Ed.*2d

---

[64]The portion of the previous murder statute allowing a defendant to escape the death penalty if he or she entered a plea of guilty or agreed not to contest the charges was held to be unconstitutional. *See State v. Funicello, supra,* 60 *N.J.* 60.

at 256 n. 23 (quoting *United States v. Tucker,* 404 *U.S.* 443, 447, 92 *S.Ct.* 589, 30 *L.Ed.*2d 592, 596 (1972)), and indicated that it might reverse a death sentence where a finding of an aggravating factor had been based on "materially inaccurate or misleading information." *Id.* at 887 n. 24, 103 *S.Ct.* at 2748 n. 24, 77 *L.Ed.*2d at 256 n. 24.

Defendant argues that because no jury verdict established the underlying fact that he murdered his wife, the trial court should not have allowed the jury to consider his conviction of that murder as an aggravating factor. That argument amounts to no more than a rephrasing of the contention that a conviction following a plea was not intended as an aggravating factor.

We ordinarily will not look behind the fact of the conviction [65] because the conviction itself is the statutory aggravating factor. By establishing a prior conviction as an aggravating factor the State adequately fulfills its constitutional duty to
narrow the class of persons eligible for the death penalty and ... [to] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. [*Id.* at 877, 103 *S.Ct.* at 2748, 77 *L.Ed.* 2d at 249–50.]

In fact, *Zant* specifically approved the Georgia death penalty statute, Ga. Code § 27–2503 (1975), which allows the sentencer to consider as aggravating information "prior criminal convictions and pleas of guilty or pleas of nolo contendere." *See* 462 *U.S.* at 886, 103 *S.Ct.* at 2747, 77 *L.Ed.*2d at 255–56; *accord State v. Watson,* 120 *Ariz.* 441, 586 *P.*2d 1253, 1260 (1978), *cert.* den., 440 *U.S.* 924, 99 *S.Ct.* 1254, 59 *L.Ed.*2d 478 (1979); *Miller*

---

[65] Of course, as noted later, defendant was entitled to present mitigating evidence relating to that conviction. Sec. c(2)(d). He argues that he was denied this right when some of his discovery requests were barred by *Rule* 3:13–3(c), which protects attorney work product. We have reviewed the trial court's sealed transcript of its *in camera* inspection of the items defendant unsuccessfully sought to discover and are fully satisfied that the trial court's *Rule* 3:13–3(c) ruling was proper and that defendant received all the discovery to which he was entitled.

*v. State,* 269 *Ark.* 341, 605 *S.W.*2d 430, 436 (1980), *cert.* den., 450 *U.S.* 1035, 101 *S.Ct.* 1750, 68 *L.Ed.*2d (1981) (all holding that notwithstanding its displacement of a factual determination by a jury, a guilty plea does result in a "conviction" that properly constitutes an aggravating factor in a subsequent death penalty case).

We agree that—regardless of whether it is based on a guilty or *non vult* plea or a jury determination of guilt—a prior murder conviction does "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens, supra,* 462 *U.S.* at 877, 103 *S.Ct.* at 2742, 77 *L.Ed.*2d at 249–50. Of course, we remain mindful that a prior conviction may not be used to enhance punishment for a later conviction if the prior conviction was obtained in a constitutionally impermissible way. *Burgett v. Texas,* 389 *U.S.* 109, 88 *S.Ct.* 258, 19 *L.Ed.*2d 319 (1967). That limitation, however, is not relevant in the present case. There is no suggestion here that there was anything impermissible, constitutionally or otherwise, about defendant's *non vult* plea.

Ordinarily the defendant's statutory right (Sec. c(2)(d)) to "rebut any evidence presented" by the State would be limited, as to this aggravating factor, to a showing that in fact there was no prior murder conviction (or, since the 1985 amendment, to a rebuttal of the State's permitted proof of the "identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant." Sec. c(2)(f)). We have no doubt that the Legislature did not intend to allow the defendant to attack the prior murder conviction itself by trying *that* case before the jury in the sentencing proceeding. Nevertheless our analysis of the purpose of Section c(4)(a) when applied to this case convinces us that under some circumstances—even though the conviction is valid, was obtained without any constitutional infirmity, and is beyond any conceivable attack—defendant may

be permitted to show the unreliability of a conviction through evidence that suggests he was *not* guilty of murder.

The purpose of Section c(4)(a) is to allow the jury, through proof of the conviction, to consider as an aggravating factor the fact that defendant committed another murder. The conviction is used because of the high degree of its reliability, because of the time and energy that would be spent trying to prove the prior murder through a trial within a trial—to say nothing of the potential confusion that might result. Those are some of the reasons that explain the usual rule that a conviction is almost invariably regarded as conclusive proof that defendant committed the crime. The same considerations apply to convictions resulting from pleas. The situation before us, however, is unique. The very plea that was entered was part of a capital punishment system declared unconstitutional by the United States Supreme Court for the very reason that such a plea was coerced because with it, defendant was assured of life, and without it he risked death. Such a plea, therefore, when combined with other facts suggesting defendant did not commit murder, can cast some doubt about the conviction's reliability as proof that defendant committed murder. To the extent it is unreliable, it fails to achieve the Legislature's purpose.

We therefore will allow, under limited circumstances, an attack on a conviction resulting from such a *non vult* plea. We limit those circumstances to the situation in which the *non vult* plea was entered at a time when its acceptance eliminated the possibility of a death sentence, and in which the record—usually of the proceedings at the time of the plea—suggests a realistic possibility that defendant did not commit murder. For instance, in this very case the *non vult* plea insulated defendant from the death penalty, and the plea proceedings, including defendant's statement of his version of the homicide, suggested the possibility of manslaughter. Under those circumstances, the trial court, upon motion by the defense, should conduct a preliminary hearing (before the *guilt* phase—otherwise pro-

ceedings on such motion if heard before the sentencing phase might unduly lengthen the time between the two phases) concerning the reliability of the prior conviction. Assuming the foregoing conditions are met, defendant shall be allowed to testify, in support of the motion, that he did not commit murder and that the sole reason for the plea was the avoidance of even the possibility of the death penalty. The admission of any further testimony from defendant or other witnesses, on behalf of defendant or the State, shall be within the sound discretion of the trial court. If the trial court determines from those proceedings and from the evidence presented, including the plea itself and the plea proceedings, that no factual basis existed for a plea to murder, the State shall be barred in the sentencing proceedings from relying upon this prior conviction to prove aggravating factor c(4)(a). If the trial court does not so determine, but instead finds there was a factual basis for a plea to murder, the State shall be allowed to prove the aggravating factor at the sentencing proceedings. The defendant, however, may offer evidence concerning the *circumstances*, not the *fact*, of the homicide and the circumstance of the plea as bearing on the weight to be accorded to this aggravating factor. In the discretion of the trial court other witnesses may be called by the defendant or, in rebuttal, by the State.

We need express no opinion on the applicability of these principles to this particular *non vult* plea and the ensuing conviction, since there will be no resentencing proceeding in this matter.

## B. Trial Court Comments on Evidence

Defendant contends that the trial court violated his right to a fair trial and a trial by jury by making one-sided comments on the evidence and by inaccurately summarizing defense testimony during the jury charges at both the guilt and sentencing phases. He did not object below to the charges. However, we have considered his objection on appeal and find it to be without merit.

A trial court "has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as [it] clearly leaves to the jury the ultimate determination of the facts and the rendering of a just and true verdict on the facts as [the jury] finds them." *State v. Laws*, 50 *N.J.* 159, 177 (1967) (minor inaccuracies in court's review of testimony cured by instructing jurors that their own recollection of testimony governs), reargued, 51 *N.J.* 494, *cert.* den., 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968). In passing on the propriety of a trial court's charge, an appellate court reviews all that was said on the particular subject being challenged, *State v. Brown*, 46 *N.J.* 96, 101 (1965), and if on reading the charge as a whole, "prejudicial error does not appear, then the verdict must stand." *State v. Council*, 49 *N.J.* 341, 342 (1967); *see also State v. Thompson*, 59 *N.J.* 396, 411 (1971) (trial court not bound to instruct jury in language requested by a party if subject matter adequately covered in charge).

Here, defendant contends that the trial court specifically focused on the State's evidence to the exclusion of the defense's evidence and so conveyed to the jury a prejudice against the defendant. It is true that during the guilt phase, the trial court focused on evidence of defendant's prior crimes and violent acts, but this was only to explain to the jury the limited purposes for which this evidence could be considered, *i.e.,* as the basis for the opinion of the State's experts that defendant was not insane nor suffering from diminished capacity when he committed the crime. Similarly, during the sentencing phase, the charge necessarily focused on the fact that the murder had been committed in the presence of the victim's grandchildren. The court explained to the jury that it could consider this fact only as evidence of defendant's depravity of mind, and that it could not consider the effect of the crime on those children, something to which the prosecutor had alluded in his opening statement.

These specific references were proper and necessary. If the court had not so focused on these two elements of the evidence, the jury might have misused them to defendant's disadvantage.

Taken as a whole, the charge is evenhanded. It does not purport to survey either side's evidence. Moreover, the court repeatedly advised the jury that its recollection and judgment of the evidence, rather than the court's or either counsel's, were to be determinative.

Defendant also contends that the trial court inaccurately summarized the testimony of his experts by stating that they "relied, in part, upon evidence of prior violent acts as disclosing a lack of insight." Defendant states that these experts testified that brain damage caused his lack of insight, and that brain damage probably caused his prior violent acts. He contends that the trial court's misleading identification of prior violence as the basis of his experts' diagnosis negated the potentially positive impact of their testimony.

This contention is patently frivolous in that defense counsel specifically asked the trial court to include the statement defendant now challenges in the charge.[66] "The

[66]Prior to charging the jury in the guilt phase, the court entertained counsel's suggestions concerning changes it should make in its proposed charge. The following colloquy between defense counsel and the court took place:

MR. JONES: Along the same line, your Honor, on page 19 you had explained the conclusions that Dr. Herman and Dr. Flicker [the prosecution's experts] drew from those prior instances of violence, and you hadn't explained the conclusions that Dr. Lewis and Dr. Ervin [defendant's experts] drew, and, as is noted in your Honor's charge . . ., Dr. Lewis and Dr. Ervin did know and were aware of previous acts of violence, did consider them, but said that they would not alter their opinion because of them.

THE COURT: Well, Dr. Lewis went beyond that, I believe, and perhaps Dr. Ervin did, too. I'm almost sure Dr. Ervin did also. I think both stated that the prior acts of violence would add to—

MR. JONES: That's correct. I believe when I asked the question they said it would support their diagnosis as opposed to undermining it.

defendant cannot ... request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." *State v. Pontery*, 19 *N.J.* 457, 471 (1955). To justify reversal on the grounds of an invited error, a defendant must show that the error was so egregious as to "cut mortally into his substantive rights....." *State v. Harper*, 128 *N.J.Super.* 270, 277 (App.Div.), certif. den., 65 *N.J.* 574 (1974). The statement complained of here was inaccurate in such a minor way that it cannot be said to have prejudiced Ramseur's defense. This is especially certain in light of the trial court's repeated direction to the jury that its own recollection of the evidence, and not the court's summary of it, should control deliberation. *See State v. Laws, supra*, 50 *N.J.* at 177.

Reviewing the trial court's entire charge and numerous instructions to the jurors concerning their responsibility as factfinders, we hold that the charge neither constituted an abuse of discretion nor violated the defendant's fundamental right to a fair trial and to a trial by jury.

## C. Flight Charge

Shortly after defendant stabbed Asaline Stokes, Newark Police Officer Andrew Byrd arrived at the scene. At trial Officer Byrd testified that he observed defendant "walking quickly" from the scene and raising his leg as if he were about to begin running away. Byrd testified that three times he ordered defendant to halt before defendant finally turned around with a knife in hand, at which point Byrd drew his revolver, forced

---

THE COURT: What specifically do you want me to put in?

MR. JONES: I think, specifically, what should be added is the conclusion that they—Drs. Lewis and Ervin drew from this was indicative of lack of impulsive control or lack of insight or judgment.

. . . . . . . . .

THE COURT: All right. I will add their diagnosis in that regard.

MR. JONES: Yes, sir.

defendant to drop his knife, and arrested him. Defendant's psychiatric expert, Dr. Lewis, testified at trial that defendant's failure to respond immediately to Byrd's commands suggested that he remained in an altered state of consciousness induced by a psychomotor seizure; the prosecution contended that defendant's conduct evidenced a conscious attempt to flee from the murder scene and undermined his claim that the killing was not purposeful or knowing. In both the guilt and the penalty phases, the trial court instructed the jury that it could consider the evidence of defendant's alleged attempted flight.

Defendant contends that the trial court's penalty-phase charge with respect to flight was erroneous in several respects. At the penalty phase the defense relied on four mitigating factors: (1) defendant suffered extreme mental or emotional disturbance insufficient to constitute a defense to prosecution (Sec. c(5)(a)); (2) defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect or intoxication, but again to a degree insufficient to constitute a defense (Sec. c(5)(d)); (3) defendant's age (Sec. c(5)(c)); and (4) any other factor relevant to defendant's character or record or to the circumstances of the offense (Sec. c(5)(h)). The defense claims that these mitigating factors could not have been properly considered or weighed by the jury in light of the court's flight charge.

Before instructing the jury, the court overruled a defense objection to its penalty-phase charge on flight, observing that flight to some extent "would have a bearing upon whether the defendant was suffering from a psychomotor seizure at the time of the killing...." According to defendant, this analysis seriously misconstrued the defense. In the penalty phase, the defense claims, it no longer sought to persuade the jurors that defendant had suffered a seizure during the stabbing that prevented him from forming the requisite intent for murder. Rather, defendant sought to have the jury find that he was not

a whole man, but the victim of either a mental disease or an extreme mental or emotional disturbance.

The trial court's actual charge, however, tied the flight issue explicitly to the mitigating factors defendant sought to prove:

> For departure to take on the legal significance of flight there must be circumstances present which in conjunction with leaving reasonably justify an inference that it was done with consciousness of guilt....
>
> You may consider such evidence [of flight] in determining the defendant's state of mind. In other words, you can consider such evidence in determining whether the defendant had the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law and also whether the defendant was under the influence of extreme mental or emotional disturbance at the time of the killing.

This explicit link between the flight charge and the jury's consideration of mitigating factors also causes us to reject defendant's argument that the trial court had, in effect, charged a non-statutory aggravating factor, "consciousness of guilt." The trial court's reference to consciousness of guilt occurred in the context of its discussion of considerations relevant to the mitigating factors, and cannot be construed as charging an additional aggravating factor. The trial court clearly explained that only two aggravating factors—c(4)(a) and c(4)(c)—were appropriate for the jury's consideration, neither of which incorporated or expressed the "consciousness of guilt" language.

Defendant contends that the flight charge did not belong in the penalty-phase instructions at all. Extensive trial evidence relating to defendant's mental and emotional condition was introduced by the defense during the guilt phase of the trial. This evidence clearly relates also to mitigating factors c(5)(a) and c(5)(d), and, in fact, was considered by the jury in determining that those factors existed. Factual issues relating to flight involve defendant's mental or emotional condition, for flight implies that defendant had the presence of mind to recognize the need to flee from the scene. If the jury believed that there was a link between defendant's alleged flight and his mental or emotional condition, flight would be relevant in its

consideration of mitigating factors. Hence, we cannot conclude that it was error for the flight charge to be given to the jury.

 Defendant contends further that the flight charge heavily favored the prosecution. The court supplied a short summary of the prosecution's factual contentions regarding flight, followed by a terse reference to the defense's contention that defendant denied that he sought to flee. Nevertheless, the trial court carefully and repeatedly admonished the jurors that it was not attempting to summarize the evidence, that it would not tell them what they should consider to be salient features of the case, and that their own recollections of the evidence were to be controlling. Furthermore, it urged the jurors not to abdicate their responsibility to weigh, evaluate, and assess the aggravating and mitigating factors. We find no prejudicial error.

Nor can we agree with defendant's assertion that the court failed to tailor the flight charge to the facts of the case and the special issues at the penalty phase. It is true that the court gave a conventional charge on the issue of flight, *e.g.*, *State v. Sullivan*, 43 *N.J.* 209, 238 (1964), *cert.* den., 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.*2d 477 (1966); *see* New Jersey Supreme Court Committee on Model Jury Charges, Criminal, *Model Jury Charges, Criminal* 4.152 (1980), but it does not appear that the charge was inaccurate or inadequate in terms of the jury's consideration of the relevance and probative worth of the circumstances.[67]

---

[67]Defendant also argues that the trial court's charge failed to reflect the distinction, recognized in the model charge, between a defendant who denies flight altogether and one who contends that his actions did not constitute flight. The court's charge, says defendant, created the impression that defendant denied flight altogether, thus implying that the defense disputed Officer Byrd's testimony, whereas in fact the defense's position was that the conduct Officer Byrd described did not constitute flight. This argument mischaracterizes the trial court's charge. Contrary to defendant's contention, the court did not charge that "the defense ha[s] 'denied' flight"; rather, it charged that "[t]he defense denies that the defendant sought to flee." In the context of the entire

Finally, defendant contends that in discussing mitigating factors c(5)(a) and c(5)(d) the trial court's flight charge omitted that part of the statutory language providing that the defendant's mental or emotional disturbance, or mental disease or defect, need not constitute a defense to prosecution to qualify as a mitigating factor. *See* Sec. c(5)(a), (d). Defendant cites *State v. English,* 367 *So.*2d 815 (La.1979), in which the trial court improperly indicated to the jury that the test for determining the applicability of the mitigating factor similar to New Jersey's factor c(5)(d) was the same as that for determining sanity at the guilt phase, and *Lewis v. State,* 380 *So.*2d 970 (Ala.Crim.App.1980), in which the sentencing court failed to consider mitigating factors similar to our factors c(5)(a) and c(5)(d). The trial court here, however, did indicate clearly that the evidence necessary for a finding as to each of these mitigating factors was not the same as that required to constitute a defense. This understanding is confirmed by the fact that both mitigating factors *were found* by the jury and were included in the verdict sheet.

We are satisfied that under the circumstances the trial court did not commit error when it instructed the jury that it could consider the defendant's flight from the murder scene, as this flight related to the jury's determination of the applicability of mitigating factors c(5)(a) and c(5)(d).

D. Constitutionality of *N.J.S.A.* 2C:11–3c(4)(c) as Applied to Defendant

Defendant claims that the facts of this case cannot be fit within aggravating factor c(4)(c); that any valid construction of that factor would not allow a reasonable person to conclude beyond a reasonable doubt that the murder "involved torture,

---

charge and trial, the portion of the charge did not indicate to the jury that defendant denied that he took the actions described by Officer Byrd. The charge was consistent with the testimony that defendant contested Officer Byrd's conclusions that defendant's actions necessarily constituted flight.

depravity of mind, or an aggravated battery to the victim." [68]
He also contends that, in any event, the trial court's instruc-
tions on this issue were so ambiguous and confusing as to leave
the jury, in effect, uninstructed. The ultimate result, according
to defendant, was that the jury was left free, arbitrarily and
capriciously, to find or not to find that this factor had been
proved, precisely the situation that was condemned in *Furman
v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346.

We disagree with defendant's contention that the facts of this
case cannot fit within Section c(4)(c) properly defined. And
while we agree that the instructions to the jury may have been
inadequate to guide its deliberations, we find it unnecessary, in
view of our decision to reverse on other grounds (see VI(F)
*infra* at 299–300), to decide whether this deficiency also war-
rants reversal. We consider the claim, nevertheless, for the pur-
pose of guidance in other cases.

As noted above, we have interpreted aggravating factor
c(4)(c) to require a showing by the State that defendant pur-
posely caused severe mental or physical pain or suffering to the
victim prior to death.[69] No better demonstration of the fit

---

[68]Defendant also asks this Court to find that even if there was sufficient
evidence to submit Section c(4)(c) to the jury as an aggravating factor, the
jury's finding of the factor is against the weight of the evidence and should
therefore be set aside. In *State v. Reyes, supra,* 50 *N.J.* at 459, this Court
established that a claim of lack of proof will be rejected where

> viewing the State's evidence in its entirety, be that evidence direct or
> circumstantial, and giving the State the benefit of all its favorable testimo-
> ny as well as all of the favorable inferences which reasonably could be
> drawn therefrom, a reasonable jury could find guilt of the charge beyond a
> reasonable doubt.

We find that in this case there was sufficient evidence to support a reasonable ju-
ry's finding that defendant's acts were within the scope of the statute.

[69]The State claims that the murder involved an aggravated battery. We
therefore will not treat any possible contention concerning "depravity of
mind." We treat this aggravating factor, for purposes of this opinion, as a
claim that the murder involved torture or an aggravated battery to the victim.

between that definition of the aggravating factor and the facts of this case can be found than the statement by the trial court in the course of colloquy with counsel (outside of the presence of the jury):

> I've also considered the aggravated battery upon the victim by the defendant. Again, there was plainly a disfigurement, there was a brutal attack upon the victim consisting of many stab wounds. The defendant then left the scene and walked across the street. The victim was still alive. Defendant according to the witnesses calmly returned. The victim knew she was dying and so stated at the time. She was plainly conscious. The fact that the defendant while the victim was alive threatened to kill her grandchildren if he could find them, the fact that the killing occurred in the presence of the grandchildren and the fact that after making this threat, probably the worst threat that could possibly be made to a dying person, the victim was executed.
>
> There is a saying with regard to those who are in the armed forces that the worst they can do is kill you. That really isn't true. The worst thing they can do is while you are dying and knowing you are dying they can destroy your claim to immortality, your children or grandchildren and in effect that is the evidence presented by the State in this case.
>
> Were it not for the threat which was clearly testified to by at least one witness, were it not for the fact that the killing occurred in the presence of the grandchildren, were it not for the fact the victim was still alive knowing she was going to die, were it not for the fact there was some lapse of time, however brief, when the defendant left the scene and returned to execute the victim, perhaps the matter would not be presented to the jury in the way it has been presented but I can think of no greater cause for mental anguish. I can think of no greater brutality than to threaten the victim as she lay dying with the intent to kill the grandchildren. Even if *State [v.] Reyes* [50 *N.J.* 454 (1967)] were not applicable in this case and that a greater burden were required, I believe that the factual pattern presented here as disclosed by me and more importantly as presented by the evidence would plainly fall within the aggravating factor. Of course, the truth of that evidence is an issue of fact for the jury.
>
> I make no finding in that regard. All I conclude at this point is that a reasonable trier of fact could return a verdict finding the aggravating factor present under the evidence submitted by the Prosecutor.

Put differently, from these facts a jury could find beyond a reasonable doubt that Ramseur, in addition to purposely killing the victim, also purposely inflicted severe mental pain prior to her death.

---

Our analysis of Section c(4)(c), *supra* at 207–209, suggests that there is little difference between the two for these purposes.

In its instructions to the jury the trial court noted that the aggravating factor here involved "does not exist with respect to every purposeful or knowing killing." The court then gave the essence of the factor by telling the jury that in order to find it "you must be convinced beyond a reasonable doubt that the defendant inflicted upon the victim brutal and agonizing mental and bodily harm before death." That summary comes quite close to our definition and, were it standing alone, might be adequate with but little revision (although we do not require a finding of both mental and physical harm). The court also, however, defined "depravity of mind" ("that mental state which leads a murder[er] to torture or commit an aggravated battery upon the victim before committing the crime of murder"); and then "aggravated battery" ("purposely causes bodily harm to another by depriving him or her of the member of his or her body or by rendering a member of his or her body useless or by seriously disfiguring his or her body or a member thereof"). The court then defined "serious bodily injury," presumably referring to the "bodily harm" previously mentioned: "[t]hat term can be defined as bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. The injuries need not be permanent, but they must nevertheless be substantial rather than superficial." Thereafter the court told the jury that the "aggravated battery must not be the cause of the death of the victim, it must occur prior to the death and be independent of the cause of death." The court further instructed that "[t]orture occurs when a victim is subjected to serious physical or mental abuse before death," and "[i]nsofar as aggravated battery and torture are concerned, only acts and conduct occurring prior to death may be considered in determining whether this aggravating factor is present."

While it is possible that the jury understood the essence of this aggravating factor in the same way as we have defined it, the potential for confusion in the above charge is apparent.

After quoting the statute, the trial court never referred to the function, or lack of function, of the introductory language—that the murder was "outrageously or wantonly vile, horrible, or inhuman ..."; it is possible that the jury, confused by the balance of the charge, simply concluded that the murder was either vile, horrible or inhuman and that the aggravating factor was therefore proven. As to what constituted an aggravated battery the jury would wonder whether the injuries "depriv[ed the victim] of a member of his or her body," or whether the injuries rendered such member useless. The only portion of the charge that might appear to the jury related to the facts was the definition that linked aggravated battery to a serious disfigurement, although there was no real proof of that other than the stab wound to the face, nor any proof of any loss of a member or use of a member. A further instruction suggested either an independent meaning or an added condition to finding "serious bodily injury," the phrase that the court equated with aggravated battery. This additional definition was that serious bodily injury "creates a substantial risk of death" or "protracted loss" or "impairment of the function of any bodily member or organ." But there was no testimony of this either except the obvious fact that the injuries did cause death. The confusion here is caused substantially by the extent to which the definitions were unrelated to the evidence, for instance, "[t]he injuries need not be permanent, but they must nevertheless be substantial rather than superficial." There had been no testimony concerning whether the injuries were "permanent," or whether they were "substantial" rather than "superficial."

The instruction that the "aggravated battery must not be the cause of the death of the victim, it must occur prior to the death and be independent of the cause of death" is perplexing. There was no testimony that any of the injuries inflicted upon the victim were "independent of the cause of death." If the law required such a finding, the "aggravated battery" issue probably should not have been submitted to the jury. The only possible claim that the defendant inflicted injury upon the

victim *independent* of the cause of death would be his state-
ment, made while the victim was still alive, that he would kill
her children in the future, but that of course was not "an
aggravated battery." The jury might have understood this as
"torture," but the trial court was not defining torture when it
specified that the aggravated battery must be "independent of
the cause of death."

It is clear that the trial court's instruction was pat-
terned largely after the decision in *State v. Bass, supra,* 189
*N.J.Super.* 445, which in turn followed the United States Su-
preme Court decisions in *Gregg, supra,* 428 *U.S.* 153, 96 *S.Ct.*
2909, 49 *L.Ed.*2d 859, and *Godfrey v. Georgia, supra,* 446 *U.S.*
420, 100 *S.Ct.* 1759, 64 *L.Ed.*2d 398. While it is possible that
the charge was beneficial, even possible that it unduly *favored*
defendant, it seems clear that the charge was confusing and
lacking in the clarity necessary to satisfy the requirement of
*Gregg, supra,* 428 *U.S.* at 192–93, 96 *S.Ct.* at 2934, 49 *L.Ed.*2d
at 885, that the jury's discretion be rationally channeled.

What was needed was a relatively simple charge
patterned after our definition. Assuming the State claimed
defendant's acts fell within Section c(4)(c) as involving either
torture or an aggravated battery, the trial court could have
instructed the jury as follows:

> The State claims the killing of Ms. Stokes involved torture or an aggravated
> battery, or both. If you unanimously find beyond a reasonable doubt that it
> did, then your answer shall be yes to that question on the jury sheet: "That this
> murder involved torture or an aggravated battery to the victim." I charge you
> that in order to find that the killing involved an aggravated battery, you must
> find that defendant had as his purpose more than just killing Ms. Stokes, that
> additionally it was his purpose to cause her severe physical pain, and you must
> find that he achieved that goal, that she did in fact suffer the severe physical
> pain he intended before her death. In other words, in order to find that the
> killing involved an aggravated battery, you must find two facts: first, that
> defendant wanted to cause Ms. Stokes severe physical pain before death, and
> second, that in fact she suffered that severe physical pain as he intended, in
> other words, he succeeded in his goal.
>
> The State also claims that in the killing of Ms. Stokes defendant tortured her,
> and that aggravating factor c(4)(c) has been proven in that regard as well. I

charge you that in order to find that the killing involved torture, you must find that defendant had as his purpose more than just killing Ms. Stokes, that in addition it was his purpose to cause her severe psychological pain before her death, and that he achieved that goal, that she did in fact suffer the severe psychological pain he intended before her death. In other words, in order to find that the killing involved torture, you must find two facts: first, that defendant wanted to cause Ms. Stokes severe psychological pain before death, and second, that in fact she suffered that severe psychological pain as he intended, in other words, he succeeded in his goal.

These instructions should also obviously contain directions to the jury to consider all of the circumstances of the matter in determining defendant's intent, that it is unusual for a defendant to state what his intent may have been, and that his state of mind can be determined only from the circumstances.

We intend no criticism of the trial court. We note, as we did *supra* at 155, that this was among the first cases tried under the Act, and that the trial court was without any guidance on the construction of this aggravating factor.

E. Instructions Concerning Mitigation

Defendant makes four claims concerning the trial court's instructions regarding mitigating factors.

■■■■ Defendant first asserts that the trial court's refusal to give instructions that were submitted by the defendant violated the eighth and fourteenth amendments of the federal Constitution. We find this assertion to be without merit. "It is fundamental that a trial court is not bound to instruct a jury in the language requested by a party. If the subject matter is adequately covered in the text and purport of the whole charge, no prejudicial error comes into existence." *State v. Thompson, supra,* 59 *N.J.* at 411; *see State v. Green,* 86 *N.J.* 281, 290 (1981); *State v. Brown, supra,* 46 *N.J.* at 103. Defendant had "no right to select the particular phrasing of the jury instructions in his case." *United States v. Gaines,* 690 *F.*2d 849, 855 (11th Cir.1982); *see United States v. Rothbart,* 723 *F.*2d 752, 754 (10th Cir.1983); *Irving v. State,* 441 *So.*2d 846, 851 (Miss. 1983) (trial court properly refused detailed instructions on miti-

gating factors submitted by defendant), *cert.* den., 470 *U.S.* 1059, 105 *S.Ct.* 1774, 84 *L.Ed.*2d 834 (1985).

Defendant's second contention is that the trial court failed to explain the meaning of the mitigating factors in violation of the eighth and fourteenth amendments. The trial court instructed the jury in the following manner:

> For purposes of this case you may consider whether the following mitigating circumstances are present:
>
> First, the defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to the Prosecution. In order to find the existence of this mitigating circumstance you must determine that the defendant was suffering from an extreme mental or emotional disturbance and that such extreme mental or emotional disturbance influenced him in committing the act with which he is charged.
>
> Defendant's age.
>
> Thirdly, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect or intoxication but not to a degree sufficient to constitute a defense to the Prosecution.
>
> In order to find the existence of this mitigating circumstance you must determine that the defendant's ability to [sic] capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired by reason of a mental disease or defect. In other words, you must find that such mental disease, defect or intoxication significantly impaired defendant's capacity to appreciate right from wrong or to conform his conduct to the law.
>
> Fourth, any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.
>
> Now, with respect to this mitigating factor I charge you that you are required to consider anything concerning defendant's life and characteristics and the particular circumstances of the crime for which you have found him guilty.

We believe that the instructions given by the trial court were adequate. We first note that despite defendant's contention that the trial court failed to explain mitigating factors, the jury did in fact find that two mitigating factors existed: that defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, and that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental

disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution. The trial court's explanation regarding mitigating factors did not preclude the jury "from considering *as a mitigating factor*, any aspect of a defendant's character or record and of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio, supra*, 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990 (footnote omitted; emphasis in original). In addition, the trial court instructed the jury to consider "any evidence" regarding mitigating factors and that testimony and physical evidence presented at the guilt phase could be considered by the jury in the penalty phase. For example, the trial court charged as follows:

> Defendant also contends that he was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to the Prosecution. In determining whether the defendant was laboring under a mental disturbance or defect, you are to consider the testimony of both the defense and the State witnesses and that, of course, includes both the State's experts and the experts of the defense.

We recognize that the trial court did not provide a definition for the mitigating factor of the age of the defendant. Defendant was forty-two years old at the time of the killing. Defendant sought to argue that death was inappropriate since the imposition of a mandatory thirty-year term without parole would protect society: at the time defendant would become eligible for parole, he would be too old to constitute a threat to anyone. This argument addresses defendant's age not as a mitigating factor but as part of his "potential for rehabilitation." We therefore conclude that the pertinent mitigating factor here is *not* Section c(5)(c), but Section c(5)(h) ("[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense"). This Court has allowed the introduction of statistical data to assist the jury in evaluating an individual's potential for rehabilitation. *State v. Davis*, 96 *N.J.* 611, 616–17 (1984) (statistical evidence indicating defendant was less likely to commit an offense after a long prison term is admissible under Section c(5)(h)). We therefore

conclude that the trial court correctly declined to explain the significance of the age of defendant within the meaning of Section c(5)(c).

 Our position is supported by the simple language of Section c(5)(c): the jury may find as a mitigating factor "[t]he age of the defendant *at the time of the murder.*" (Emphasis added.) This language does not consider what age a defendant will be when he is released from prison. We believe that age should be recognized as a mitigating factor under Section c(5)(c) only when the defendant is relatively young, *see Eddings v. Oklahoma, supra,* 455 *U.S.* at 116, 102 *S.Ct.* at 877, 71 *L.Ed.*2d at 12; *State v. Valencia,* 132 *Ariz.* 248, 645 *P.*2d 239, 242 (1982); *Giles v. State,* 261 *Ark.* 413, 549 *S.W.*2d 479, 483, *cert.* den., 434 *U.S.* 894, 98 *S.Ct.* 272, 54 *L.Ed.*2d 180 (1977); *State v. Oliver,* 309 *N.C.* 326, 307 *S.E.*2d 304, 333 (1983), or when the defendant is relatively old, in accordance with the probable legislative intent to recognize our society's reluctance to punish the very young and the very old as severely as it punishes others.

However, the trial court's instruction under Section c(5)(h) did not include whether the jury may consider defendant's "potential for rehabilitation," in possible violation of the Supreme Court's mandate in *Eddings v. Oklahoma, supra,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1, and *Lockett v. Ohio, supra,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973, that all mitigating evidence must be considered. We decline to address the propriety of the trial court's lack of instruction in light of our decision to reverse on other grounds. (*See* VI(F), *infra* at 299–300.)

 Defendant's third contention is that the trial court failed to instruct the jury that any aspect of the defendant's character or record or the circumstances of the offense could be given independent mitigating weight. This claim is simply not supported by the instructions that were actually given by the trial court. The trial court did not inhibit the independent consideration of mitigating factors:

> If any evidence has been presented with respect to *a mitigating factor*, you are bound by the law to consider it and weigh it against any aggravating factor or factors that you have found to be present. [Emphasis added.]

We now turn to the final claim concerning mitigation, which arises from the trial court's denial of a so-called "sympathy" instruction. At the close of the penalty phase, defendant requested that the jury be instructed to consider "fairness and mercy" and "compassion and sympathetic understanding" as mitigating factors. The trial court rejected the request and instructed the jury that it "should decide the case on the evidence without any bias, prejudice or *sympathy* and, of course, without reference to conjecture" and with "cool, calm and dispassionate judgment." (Emphasis added.) Also in its charge, the trial court carefully explained the process by which the jury was to weigh the aggravating against the mitigating factors, including an instruction that the jury might consider as mitigating evidence "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense." Without identifying the provision of the state or federal Constitution that allegedly was offended, defendant argues that the charge violated his rights under both charters. We disagree.

Tracking the language of Section c(5)(h), the charge advised the jury to consider in mitigation circumstances pertaining to defendant. As a result, the jury was free to consider as mitigating all evidence pertaining to defendant's character or record or the circumstances of the offense. The reference to these factors as "mitigating" inevitably suggests that the jury may properly consider whether they engendered feelings of sympathy for the defendant. In that regard, "[t]he defendant [had] the burden of producing evidence of the existence of any mitigating factor[ ]...." Sec. c(2)(a). The instruction actually given by the court did nothing to prevent the jury from considering any such evidence. Instead, the instruction merely refused to encourage the jury to generate feelings of sympathy unrelated to mitigating factors recognized by the Act. Its purpose in this regard was to prevent the arbitrary and capri-

cious exercise of discretion by the jury. The United States Supreme Court has recently held that instructing a capital jury "not [to] be swayed by mere sentiment, conjecture, sympathy ..." did not violate a defendant's eighth and fourteenth amendment rights. The Court, in *California v. Brown,* — *U.S.* —, 107 *S.Ct.* 837, 93 *L.Ed.*2d 934 (1987), concluded that an admonition to avoid "mere sympathy" properly functioned to focus the jury's attention upon only record evidence of mitigation and to avoid the jury's exercise of unbridled discretion, thereby furthering the reliability and consistency mandated by the Constitution. This instruction, the Court found, did not in any way preclude the jury from fulfilling its constitutional obligation to consider any mitigating evidence. As in *California v. Brown, supra,* the instructions here did not preclude the jury from considering all possible mitigating circumstances and such sympathy as those circumstances might inspire. *Cf. State v. Conyers,* 58 *N.J.* 123, 136–37 (1971) (under former death penalty law that provided for unified trial, instruction against bias and sympathy related to jurors' role in finding facts on guilt phase, and was not intended to foreclose compassion for defendant with respect to punishment).

Nor could the charge have confused the jury by conflicting with other parts of the charge that directed it to consider all mitigating circumstances. As noted above, the court specifically charged that the jury could consider any factor relevant to defendant's character or record or to the circumstances of the offense. The charge given was far different from the charge in *People v. Lanphear,* 36 *Cal.*3d 163, 680 *P.*2d 1081, 203 *Cal.Rptr.* 122 (1984), which, in the absence of a direction to consider defendant's character or background, admonished the jury not to be swayed by sympathy. *Id.* at 167–68, 680 *P.*2d at 1084, 203 *Cal.Rptr.* at 125 (instructions held to be constitutionally inadequate).

If defendant's claim is one under the eighth and fourteenth amendments (although these amendments are not specifically alluded to), it must fall. *California v. Brown,*

*supra,* —— *U.S.* ——, 107 *S.Ct.* 837, 93 *L.Ed.*2d 934. Those constitutional provisions "require that the sentencer ... not be precluded from considering, as *a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990 (emphasis in original), and this guarantee is not violated by an instruction directing the jury to decide the case on the evidence without sympathy.[70] Thus viewed, we fail to find erroneous the instruction that the jury "should decide the case ... without any ... *sympathy,*" especially since the charge at that point had nothing to do with sympathy but was simply an attempt to charge the jury not to be irrational—"without any bias, prejudice or sympathy." [71]

While we find no confusion here, it is possible that this traditional—and proper—general admonition to the jury against

---

[70]We do not regard the essence of the Supreme Court's holding in *Brown* as resting on the trial court's use of the word "mere" to modify the word "sympathy." We believe the more important consideration to be whether the jury was improperly directed in any way to ignore *any* mitigating evidence. In *Brown* the jury was allowed to consider any mitigating evidence introduced by defendant. Despite the fact that the charge in this case instructed the jury to decide the case without "any ... sympathy," we find that in the context of the entire charge, *see Brown, supra,* —— *U.S.* at ——, 107 *S.Ct.* at 838, 93 *L.Ed.*2d at 941, the effect was not to discourage proper consideration of mitigating evidence.

[71]We note that state courts are divided on the propriety of a charge instructing the jury to disregard sympathy in death penalty deliberations. California, Georgia, and Washington have held that a jury charge instructing the jury to disregard sympathy in their deliberations is improper. *People v. Lanphear, supra,* 36 *Cal.*3d at 165–66, 680 *P.*2d at 1082–83, 203 *Cal.Rptr.* at 123–24; *Legare v. State,* 250 *Ga.* 875, 302 *S.E.*2d 351, 354 (1983); *State v. Quinlivan,* 81 *Wash.* 2d 124, 499 *P.*2d 1268, 1271–72 (1972). Illinois, Nevada, Ohio, Oklahoma, and South Carolina, however, have held that such a jury charge is proper. *People v. Neal,* 111 *Ill.*2d 180, 95 *Ill.Dec.* 283, 489 *N.E.*2d 845, 853–54 (1985), *cert.* den., —— *U.S.* ——, 106 *S.Ct.* 2292, 90 *L.Ed.*2d 733 (1986); *State v. Watson, supra,* 101 *Nev.* at 250–51, 699 *P.*2d at 1060–61; *State v. Scott,* 26 *Ohio St.*3d 92, 497 *N.E.*2d 55, 68 (1986); *Parks v. State, supra,* 651 *P.*2d at 693–94; *State v. Chaffee,* 285

"bias, prejudice, or sympathy" might in some other case, depending on the circumstances, conflict with the permissible role of sympathy specifically engendered by any mitigating factor. As noted by Justice O'Connor, concurring in *Brown, supra,* —— *U.S.* at ——, 107 *S.Ct.* at 840, 93 *L.Ed.*2d at 942–43, "one difficulty with attempts to remove emotion from capital sentencing through instructions such as those at issue in this case is that juries may be misled into believing that mitigating evidence about a defendant's background or character also must be ignored.... On remand, the California Supreme Court should determine whether the jury instructions, taken as a whole, and considered in combination with the prosecutor's closing argument, adequately informed the jury of its responsibility to consider all of the mitigating evidence introduced by the respondent." Trial courts should be aware of that possibility and frame their charges so as to avoid it.

F. Instructions Concerning Jury Deliberations

Defendant contends that his death sentence was improper as a result of several other errors committed by the trial court in instructions to the jury delivered in the course of its penalty-phase deliberations. We agree with some of defendant's contentions in this regard and hence reverse the sentence of death and remand for resentencing by the trial court.

Specifically, defendant contends that under the Act, a decision by a penalty-phase jury that it cannot reach unanimity is itself a final verdict and must be entered by the trial court when announced. Defendant asserts that such a non-unanimous verdict was reached by the jury and should have been accepted by the trial court, and that therefore he is entitled to the entry by this Court of a sentence of imprisonment, which is mandated under Section c(3)(c) when the verdict is non-unanimous. In addition, defendant argues that even if the decision

*S.C.* 21, 328 *S.E.*2d 464, 470 (1984), *cert.* den., 471 *U.S.* 1009, 105 *S.Ct.* 1878, 85 *L.Ed.*2d 170 (1985).

of the trial court to require the jury to deliberate further was permissible, the court's supplemental charges were coercive and misleading, and the resulting unanimous verdict leading to the sentence of death must be reversed.

We are not convinced by defendant's argument that the jury had reached a non-unanimous verdict; the trial court acted properly, therefore, in requiring continued deliberation. We agree with defendant, however, that the trial court's supplemental instructions were improper. The instructions injected two distinct doses of unfairness into the sentencing proceeding. First, they impermissibly coerced the jury to reach a unanimous verdict by incorrectly suggesting different kinds of adverse consequences that would be caused by a hung jury, including the suggestion that the jury would not be performing its civic duty properly unless it reached unanimity; such a suggestion is entirely untrue in a capital trial, where by statute a non-unanimous verdict is a permissible final result of the jury's deliberations. Second, the supplemental instructions relieved the jury of full responsibility for the death decision and instead allowed it to regard its function as mechanical, simply determining, calculating, and weighing factors regardless of outcome. We believe that both these errors, unlike others, may have affected the outcome of this case; that but for these errors, there is a realistic possibility that the death sentence would not have been imposed. Moreover, we regard the first of these errors—which effectively prevented a jury that had already indicated its inability to agree from returning a final non-unanimous verdict resulting in imprisonment—as so prejudicial that the only adequate remedy to redress the prejudice is to ban the imposition of the death penalty on remand.

### 1. Jury Deadlock

We turn first to the issue whether the trial court failed to recognize that the jury had indeed reached a non-unanimous verdict requiring entry of a sentence of imprisonment.

Section c(3)(c) of the Act provides:

If the jury is unable to reach a unanimous verdict, the court shall sentence the defendant pursuant to subsection b [providing for a prison sentence rather than the death penalty].

From this statutory language, it is clear that the Legislature contemplated three possible final verdicts in a capital case: a unanimous verdict that results in imprisonment, a unanimous verdict that results in death, and a non-unanimous verdict that results in imprisonment.

The penalty phase of this trial occurred on Monday, May 16. No additional evidence was adduced other than documentation of Ramseur's prior conviction. Counsel delivered summations. The jury was charged by the court, and, at 3:20 p.m., retired to deliberate on the issue of penalty. At 8:40 p.m., the trial court received a note from the jurors stating: "Jury unable to reach a unanimous decision. Suggestions please."

Upon receiving this communication, the trial court informed counsel that it believed its obligation was to "instruct the jury with regard to the A.B.A. Model Charge," [72] and that it intended to do so. Defense counsel objected on the ground that such a charge had already been included as part of the original instructions, and argued further that the fact that the jurors' note disclosed "that they cannot reach a unanimous verdict is in fact a verdict in and of itself.... Here a hung jury ends the case as effectively as any other type of verdict...."

The trial court nevertheless overruled defense counsel's objections and proceeded to give the jurors specific supplemental instructions that required them to engage in further deliberations in order to reach a unanimous verdict. The court at the same time informed the jurors of arrangements being made to sequester them overnight and emphasized that the court was not attempting to pressure the jurors. The jurors resumed their deliberations at 9:45 p.m. and continued until approximate-

---

[72]The ABA Model Charge is reproduced in State v. Czachor, 82 N.J. 392, 405 n. 4 (1980). Essentially, it reminds jurors of their duty to consult with one another with a view to reaching a unanimous verdict, while urging dissenting jurors not to give in merely for the purpose of achieving unanimity.

ly 11:00 p.m. The court again gave the jurors hortatory instructions before they recessed for the night.

The following morning, the court began the proceedings by giving the jury further instructions regarding its attempts to come to a verdict. Emphasizing that "no one wishes to coerce a verdict," the court nonetheless added that it "would be remiss were [it] not to emphasize the importance of . . . reaching a unanimous verdict." After these instructions the jury resumed deliberations at 10:20 a.m. It deliberated until 12:25 p.m. Just prior to the lunch recess, the court again encouraged the jury "to reach a verdict." The jury returned from lunch at 1:25 p.m. and returned its verdict at 1:55 p.m.

Defendant contends that because Section c(3)(c) provides for a verdict that is not unanimous, the court could not direct the jury to resume further deliberations once the jury had declared that it was unable to reach unanimity. Defendant contends, in effect, that a declaration of deadlock by a penalty-phase jury in a capital case is qualitatively different from a "hung" jury in the ordinary criminal trial involving guilt or innocence. Since, by statute, a non-unanimous verdict can be given finality, defendant argues that a jury's declaration of non-unanimity must be treated as final by the trial court.

 We disagree. When the jury indicated by its note to the court an inability to agree upon a unanimous verdict, the trial court concluded that the jury had not deliberated for a reasonable amount of time. It concluded further that "suggestions please" clearly indicated the jury did not regard itself as deadlocked. In a non-capital case, in which a jury must reach a unanimous verdict, this approach is appropriate. *See State v. Czachor,* 82 *N.J.* 392, 407 (1980). The American Bar Association's standards on this issue provide that when the court perceives the jury has been unable to agree, the court may require the continuation of deliberations. 3 *ABA Standards for Criminal Justice* Standard 15–4.4(b) (2d ed. 1980). The court may not, however, "require the jury to deliberate for an *unreasonable* length of time." *Id.* (emphasis added).

██ Such approach was also appropriate here, where the trial court, in deciding to send the jury back for further deliberation, was influenced by the length of the trial and the complexity of the penalty issue. In the penalty phase, the jury issues included the difficult determination of whether the crime fit within the category of murders that are "outrageously or wantonly vile, horrible or inhuman." *See* Sec. c(4)(c). In addition, the jury had to assess the defendant's mental state and decide whether mitigating factors outweighed aggravating factors. Given these complexities, there was no abuse of discretion in the trial court's decision that jury deliberation of roughly four hours was inadequate. *See Berryhill v. State,* 249 *Ga.* 442, 291 *S.E.*2d 685, 694 (deliberations of more than ten hours insufficient in capital case), *cert.* den., 459 *U.S.* 981, 103 *S.Ct.* 317, 74 *L.Ed.*2d 293 (1982); *Muniz v. State,* 573 *S.W.*2d 792 (Tex.Crim.App.1978) ("the exercise of discretion ... will be judged by the amount of time the jury deliberates in light of the nature of the case and evidence"), *cert.* den., 442 *U.S.* 924, 99 *S.Ct.* 2850, 61 *L.Ed.*2d 291 (1979).

We are not convinced, moreover, that the jury in fact had reached a non-unanimous verdict that the trial court was required to accept. The jury in this case had initially been instructed by the trial court:

> [i]f after a careful conscious and thorough deliberation you're unable to agree upon your findings and your verdict, you should report that to me. In such a case I will either *require further deliberations with additional instructions* or I will accept your inability to reach a verdict in which case the penalty shall not be death. [Emphasis added.]

As noted, the jury had deliberated for several hours. Its note to the court, however, not only indicated that it was split but also asked for instructions, almost parroting the situation described in the initial charge as calling for "further deliberations." In this respect, this case resembles *Jones v. State,* 381 *So.*2d 983 (Miss.), *cert.* den., 449 *U.S.* 1003, 101 *S.Ct.* 543, 66 *L.Ed.*2d 300 (1980), in which the jury deliberated for approximately two hours and fifteen minutes and then sent out a note stating: "We the jury cannot come to a unanimously [sic]

decision—what shall we do?" *Id.* at 992. The court held that this note was not the equivalent of a verdict and the trial court did not commit error in not imposing a life sentence. *Id.* [73]

It is not apparent that the jury in fact had reached the point where it could not agree and where further deliberations would be unreasonable. Under these circumstances, perhaps the trial court should have explored with the jury whether it had deliberated sufficiently and had reached a genuine stalemate, a point at which any further deliberations would have been counterproductive. We conclude nonetheless that the trial court did not abuse its discretion in remanding the matter to the jury for further deliberations.

### 2. Jury Coercion

The defendant also argues, however, that regardless of the propriety of requiring further deliberations, the trial court

---

[73]Defendant's reliance on *Rush v. State,* 491 A.2d 439 (Del.1985), is misplaced. In *Rush,* the Delaware Supreme Court vacated a death sentence and ordered a sentence of life imprisonment because the trial court had erroneously given supplemental instructions to a deadlocked jury, which, after deliberating further, unanimously recommended the death penalty. There, however, the evidence that the jury had in fact reached a deadlock prior to the supplemental instructions are unmistakable. The jurors, through the bailiff, sent a message to the trial court stating that "they cannot reach a unanimous decision and that those who are strongly opposed feel they cannot reach an agreement." *Id.* at 450. Further, in colloquy with the trial court, the foreman stated that there are "jurors of opposing viewpoints that say they cannot have their viewpoint changed under any circumstances" and that the jurors had already signed the verdict sheet while leaving the ultimate question blank pending further instruction from the court. *Id.* at 451. These facts fully justified the Delaware Supreme Court's holding that, "under all of the circumstances" and "[i]n view of the *unequivocal* announcement that the jury was unable to reach unanimous agreement as to the death penalty," the jury's announcement constituted a final non-unanimous verdict. *Id.* at 454 (emphasis added). Here, in contrast, the jury's note was far from "unequivocal"; as we have explained, the equivocation in the note justified, in these circumstances, the trial court's conclusion that further deliberations were appropriate. There was no indication, as in *Rush,* that jurors had reached strongly held and opposing viewpoints that they would not change under any circumstances.

committed prejudicial error by instructing the jurors to engage in further deliberations in terms that strongly impelled them to reach a unanimous verdict. We agree.

In its original charge the trial court did inform the jury of the consequences of a non-unanimous verdict. But after the jury announced that it could not reach unanimity, the court gave three separate supplemental charges. At no time during these supplemental instructions did it reinform the jury that in capital cases the law permits the issue of penalty to be finally resolved by a non-unanimous verdict, and that a non-unanimous verdict would result in a sentence of imprisonment. Indeed, the trial court failed even to remind the jury of the brief references in its main charge to the possibility and consequences of a non-unanimous verdict.

We hold that the trial court's supplemental hortatory charges were coercive. In *State v. Czachor, supra,* 82 *N.J.* at 402, as a matter of state law and our "own supervisory standards as to the basic requirements of a fair trial," we disapproved the traditional *Allen* charge, *see Allen v. United States,* 164 *U.S.* 492, 17 *S.Ct.* 154, 41 *L.Ed.* 528 (1896) (approving instruction informing jurors that, *inter alia,* "it was their duty to decide the case if they could conscientiously do so" and "they should listen, with a disposition to be convinced, to each other's arguments"), because it contained a number of features that the Court identified as coercive.

> It is fair to say that the typical *Allen* charge does not simply remind jurors of their duty to cooperate in collective deliberations. It has a rather different thrust. The charge is intended to undo a jury deadlock. It tends therefore to focus upon possibly the weakest links in the chain locking the jury in disagreement, namely, the minority holdouts on the jury. Hence, the charge usually admonishes specifically and pointedly only those in the minority to reconsider their beliefs in light of the adverse position held by the majority. It also exerts pressures upon jurors by casting indirectly upon them a personal responsibility and sense of guilt for the impasse.... The charge further intimates that the dissenting jurors may not be acting properly or conscientiously since another similar jury will be called upon in a new trial to perform the identical task and presumably will ... reach a unanimous verdict on the same evidence. [82 *N.J.* at 398.]

The supplemental charges delivered by the trial court here were saturated with remarks that offend the *Czachor* strictures against charges which do not "permit jurors to deliberate objectively, freely, and with an untrammeled mind." *Id.* at 402. Several times the trial court improperly and inaccurately emphasized to the jurors the "importance of reaching a unanimous verdict," *e.g.*:

you are sophisticated enough to know the importance of your role in this case and the importance of reaching a unanimous verdict.

. . . .

I tend to think that there's something that I as a Judge of the law can do for you to assist you in reaching a unanimous verdict in this case.

I've already told you that no one wishes to coerce a verdict; nonetheless, I would be remiss were I not to emphasize the importance of this case and the importance of reaching a unanimous verdict. Indeed, our entire jury system presupposes that twelve people of varied backgrounds, cultures, views will reason together and reach a consensus.... As I've told you, our system presupposes that you will be able to reach a consensus and as the judge of the law it is my responsibility in part to aid you in so doing.

. . . .

As I told you, I keep thinking perhaps I failed to do something to assist you in your rol[e] in reaching a consensus of unanimous verdict.... If you wish, you could have testimony read back within reason so that there are avenues that exist which perhaps can help you reach [a] unanimous verdict.

These comments undoubtedly coerced the jurors to conclude that a unanimous verdict was their only acceptable alternative.[74]

---

[74]The State argues that *Czachor* "implicitly" authorizes the trial court to emphasize the importance of reaching a unanimous decision, relying on the following language in the model charge quoted in *Czachor:* "It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement." *State v. Czachor, supra,* 82 *N.J.* at 405 n. 4. We reject this reading of *Czachor.* The quoted language is carefully worded precisely to avoid the result sought by the State. It speaks not of a duty to *reach* a unanimous verdict, but of a duty to *deliberate* with a view to reaching unanimity. *Czachor* makes quite clear that a charge that "repeatedly emphasizes a 'duty' to agree on a verdict" is improper. *Id.* at 405.

Additionally, on numerous occasions, the trial court stated or implied that by failing to reach unanimity, the members of the jury were betraying their oaths as jurors and shirking their responsibilities as citizens, *e.g.:*

> I don't want you to think that the Court is seeking to pressure you but I must be candid in saying that at this point it is inadequate for you to state that you are unable to reach a verdict.... I realize your job is unpleasant, but under the oath you took you are to follow the law and apply it to the facts as you find those facts to be.
>
> I'm going to ask you to fulfill your obligation under your oath.... I would ask you to return to the jury room.
>
> . . . .
>
> I would ask you to simply rest this evening tonight, come back tomorrow fresh and willing and able to properly perform your function as jurors.
>
> . . . .
>
> I am confident that you will be equal to your oath. Last night I kept thinking of ways of which I could be of greater assistance to you. As I've told you, our system presupposes that you will be able to reach a consensus....
>
> . . . .
>
> Under the oath that was administered to you, you agreed and promised that you would not only obey the law, but faithfully apply our statutes duly enacted by our legislature. Your function in this case can be stated rather simply.
>
> You are to make factual determinations and assessments from the evidence.... I do feel it necessary to advise you that your rol[e] although difficult is rather simple. You are simply to determine whether aggravating and mitigating factors are present....
>
> As I told you, I keep thinking perhaps I failed to do something to assist you in your rol[e] in reaching a consensus of unanimous verdict.
>
> Obviously we do not wish to coerce you or pressure you in reaching a verdict, but nonetheless, you are sophisticated enough to know the importance of your role in this case and the importance of reaching a unanimous verdict. When you took your oath as jurors you agreed and promised to try the issues in this case in a fair and reasoned manner. You promised to apply the law to the facts as you found them to be.

These remarks could have been understood only to mean that by failing to reach unanimity, the jury was not properly performing its function. This remark implied, moreover, that because they were unable to agree, the jurors were

lacking in ordinary intelligence. We have recognized that a trial court must not make comments that reflect adversely upon the honesty, integrity, or intelligence of the jurors in case of a failure to agree. *See State v. Czachor, supra*, 82 *N.J.* at 398–99, 402.

In addition, the trial court emphasized more than once the amount of time and effort that went into the case, and implied that by failing to reach unanimity the jurors would be responsible for wasting all of those resources, *e.g.:*

> Remember this case is an extremely important one. Remember that the trial has gone on over a substantial period of time. Remember the oath that you took. It is my view again that deliberations over a relatively short period of time less than four hours is wholly inadequate.
>
> . . . .
>
> Now, after you have made those arrangements I'm going to ask you to continue your deliberations. We do not want to waste time in this case. Further deliberations tonight will proceed. . . .
>
> If you wish, you could have testimony read back within reason so that there are avenues that exist which perhaps can help you reach [a] unanimous verdict.
>
> In sum, we have all invested a great deal of time and effort in the case. It would be a breach of your duty not to work as hard as you can to resolve the issues in the case consistent with your conscientious judgment.

As noted in *State v. Czachor, supra*, 82 *N.J.* at 403, implications that a jury should render a unanimous verdict so as to avoid additional expense and prevent a "waste" of time and resources are completely improper even in the ordinary criminal prosecution, where deadlock actually may result in a second trial. In a capital trial, where by statute a non-unanimous verdict constitutes a final resolution of the case, such implications are not only prejudicially coercive but completely untrue.

Although we rest our decision on our state-law supervisory power over the administration of criminal justice,[75] we are

---

[75]This Court has often invalidated procedural practices which infringe on a defendant's right to be treated in a manner that comports with principles of fundamental fairness, even though no constitutional violation has occurred.

guided as well by the constitutional imperative in a capital case that jurors be made to understand the ultimate consequences of their decision. In *State v. Williams*, 392 *So.*2d 619 (La.1980), the penalty phase jury announced a deadlock after four hours of deliberation. The trial court did not inform the jurors that if they could not reach unanimity, the defendant would be sentenced to life imprisonment. The court found that the trial court's failure to so instruct the jurors violated defendant's federal constitutional rights. *Id.* at 634. The court explained:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. They were not told that, by their failure to decide unanimously, they would in fact decide that the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. Instead, the members of the sentencing body were left free to speculate as to what the outcome would be in the event there was not unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required.
>
> Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings. Consequently, by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action. The death penalty was imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. [*Id.* at 634–35.]

---

*See, e.g., State v. Czachor, supra*, 82 *N.J.* at 402; *State v. Tropea*, 78 *N.J.* 309, 313 (1978) (declining to hold that double jeopardy bars retrial of speeding offense but finding that retrial was barred by considerations of fundamental fairness); *State v. Gregory*, 66 *N.J.* 510, 519 (1975) (prohibiting multiple prosecution for acts arising out of same arrest under court's supervisory power to ensure fairness in the administration of justice, although rejecting constitutional attack); *State v. De Bonis*, 58 *N.J.* 182 (1971) (as a matter of policy, not due process, defendant who appeals from conviction entered in municipal court and receives trial *de novo* in county court may not receive harsher sentence on retrial). We find such considerations of fairness clearly no less compelling in a capital case. *See also State v. Biegenwald, supra*, 106 *N.J.* at 53 (holding that failure to charge that jury must find aggravating factors outweigh mitigating factors beyond a reasonable doubt violates fundamental fairness and requires reversal of death sentence).

While *Williams* is distinguishable from the instant case in that the trial court there failed to inform the jury of the consequences of a unanimous verdict even in its original charge, this distinction is not of constitutional significance. Part of the constitutional concern is with the clarity of the court's instructions. *See People v. Durre,* 690 *P.*2d 165, 173 (Colo.1984) (en banc) ("[T]he certainty essential to a jury verdict directly resulting in death can only be achieved when the jurors are clearly instructed concerning the effect of their verdicts on the ultimate question of life imprisonment or death."); *Whalen v. State,* 492 *A.*2d 552, 562 (Del.1985) (holding that trial court's instruction implying that the jury had to be unanimous in imposing a sentence of life imprisonment violated defendant's constitutional rights because "this instruction could have been clearer—and should have been"). For the reasons previously set forth at length, the trial court's supplemental instructions in this case clearly tended to dispel whatever impact its original proper instruction had on the jury.

Relying on the holdings of a number of state courts that a trial court is not obliged, even in its initial charge, to inform a capital jury of the consequences of its inability to agree, *see, e.g., Coulter v. State,* 438 *So.*2d 336, 346 (Ala.Crim.App.1982), aff'd *sub nom. Ex parte Coulter,* 438 *So.*2d 352 (Ala.1983); *State v. Johnson,* 298 *N.C.* 355, 259 *S.E.*2d 752, 761–62 (1979); *Justus v. Commonwealth,* 220 *Va.* 971, 266 *S.E.*2d 87, 92 (1980), the State argues that any confusion caused by the supplemental instructions cannot be found to constitute error. The cases relied upon by the State reason that because informing the jury that non-unanimity is itself a final verdict creates an "open invitation for the jury to avoid its responsibility and disagree," *Justus v. Commonwealth, supra,* 220 *Va.* 971, 266 *S.E.*2d at 92, the statutory mandate attaching finality to non-unanimous conclusions is "an instruction for the trial court, not for the jury." *Coulter v. State, supra,* 438 *So.*2d at 346.

We do not believe that the premise underlying this reasoning—that jurors will, if given the chance, take the easy way out

and fail even to try to reach agreement—is sound. The process of death qualification, the jurors' oath, and the trial court's instructions are all designed to assure that the jury will make a conscientious attempt to follow the law in reaching its verdict. The entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die. To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence. A capital jury does not "avoid its responsibility" by disagreeing—genuine disagreement is a statutorily permissible conclusion of its deliberations. *See* Sec. c(3)(c).

 Whatever its merits in other states, the position urged by the State is clearly contrary to current policy in New Jersey. In 1985, the Legislature amended the death penalty statute to require explicitly that the jury "be informed that a failure to reach a unanimous verdict shall result in sentencing by the court pursuant to subsection b [*i.e.*, a prison term]." *L.*1985, *c.* 178. Ramseur was sentenced in 1983, before the passage of this amendment. This Court would, however, do technical rather than substantial justice were we to exclude consideration of the subsequent amendment in determining state policy in this area. *Cf. State v. Biegenwald, supra,* 106 *N.J.* at 63–65 (similarly drawing on subsequent legislative amendment in holding erroneous trial court's charge regarding weighing of aggravating and mitigating factors in capital case).[76] The

---

[76]Because the trial court instructed the jury in accordance with the subsequent amendment, we need not decide whether we would apply the amendment retroactively. *Cf. State v. Biegenwald, supra,* 106 *N.J.* at 63–65 (1985 legislative amendment, although inapplicable to prior offense, given substantial consideration in clarifying meaning of prior statute concerning weighing of aggravating and mitigating factors).

evidence of legislative intention provided by the 1985 amendment, in addition to constitutional considerations and our own assessment of the policy interests involved, fortifies our conclusion that *Czachor* requires that juries in capital cases be informed of, and free to exercise, their statutory option to return a final, non-unanimous verdict resulting in imprisonment if, after a reasonable period of deliberations, they are unable to agree.

We come now to the issue of remedy. Clearly, coercive and misleading supplemental instructions such as were given in this case constitute reversible error. *See, e.g., Rose v. State,* 425 *So.*2d 521, 525 (Fla.) (holding that trial court commits reversible error in giving *Allen*-type charge during penalty phase of capital trial), *cert.* den., 461 *U.S.* 909, 103 *S.Ct.* 1883, 76 *L.Ed.*2d 812 (1983); *Legare v. State,* 250 *Ga.* 875, 302 *S.E.*2d 351, 353 (1983) (same); *see also State v. Williams, supra,* 392 *So.*2d at 635 (trial court's failure to inform jury of its ability to return final non-unanimous verdict "must be held to have been prejudicial"). As we explained in *Czachor,* such instructions cannot be considered harmless error because

errors which impact substantially and directly on fundamental procedural safeguards, and particularly upon the sensitive process of jury deliberations, are not amenable to harmless error rehabilitation. Their prejudicial effect "cannot be readily measured by the empirical or objective assessment of the evidence bearing upon defendant's guilt." A defendant confronted with this kind of trial error need not demonstrate actual prejudice in order to reacquire his right to a fair trial. [82 *N.J.* at 404 (citations omitted).]

The singular vice of the coercive *Allen*-type charge is its actual purpose and effect to "undo a jury deadlock." *Id.* at 398. In the ordinary criminal trial, where a jury deadlock results in a hung jury and hence a mistrial, the remedy for a *Czachor* violation is reversal of the defendant's conviction and a new trial. But we believe such a remedy to be wholly inadequate and inappropriate in a capital case. In a capital trial, unlike the ordinary criminal prosecution, the jurors need not reach a unanimous verdict; a true jury deadlock results not in a mistrial but in a final verdict. Thus the evil of the *Allen*

charge in a capital murder trial is infinitely worse and signifi-
cantly more prejudicial than in an ordinary criminal case. In
the latter, the defendant is deprived of a deadlock that would
have given him a new trial; in the former he is deprived of a
deadlock that would have saved his life.

The remedy must be commensurate with the wrong.
We hold that where a trial court in a capital case has erroneous-
ly given coercive supplemental instructions in violation of *Cza-
chor* to a jury that has expressed its inability to agree, the law
must afford defendant the benefit of the final non-unanimous
verdict that might have been returned absent the coercion.
Having erroneously been deprived of a substantial opportunity
to receive a jury verdict resulting in imprisonment rather than
death, the defendant may not be subject to another capital
sentencing proceeding.

We recognize that any reversible error in a capital case may
be said in some sense to have deprived a defendant of the op-
portunity to receive a jury verdict resulting in imprisonment, and
that nevertheless the usual and proper remedy for such errors
is reversal of the death sentence and a retrial of the sentencing
proceeding in which the defendant may again face the death
penalty.[77] *See State v. Biegenwald, supra,* 106 *N.J.* at 67
(holding that defendant may be subject to death penalty on
resentencing). But a *Czachor* error is critically different from
other prejudicial errors in that by definition it occurs after the
jury has clearly demonstrated an inability or unwillingness to
bring in an uncoerced unanimous verdict for the death sen-
tence. The erroneous coercive charge has, not simply as a
possible consequence but as its sole purpose, ending the dis-
agreement that would save defendant's life. Even if the jury's
disagreement has not reached the point at which further delib-

---

[77]We also recognize that other courts have rejected our analysis. *See, e.g.,
Legare v. State, supra,* 250 *Ga.* 875, 302 *S.E.*2d at 353 (hung jury cannot be
presumed from the giving of an *Allen* charge because "we [cannot] say with
assurance that the jury would not have reached a [unanimous] verdict").

erations would be improper, those deliberations must take place in an atmosphere free of coercion. If such coercion occurs, the defendant has irrevocably lost not merely a theoretical possibility but a substantial likelihood that, absent the error, the jury would have reached a verdict resulting in imprisonment rather than death.

It is apparent from the foregoing analysis that, in a sense, the remedy for a *Czachor* violation in a capital case is no different in quality from the remedy in an ordinary criminal case: in each, the remedy is determined by the legal consequences that would have resulted had the jury remained deadlocked. In the ordinary case, the legal consequence of a deadlock is a mistrial; in a capital case, the legal consequence of a deadlock is imprisonment.

Treating the matter in this way is particularly appropriate in a capital case. There, unlike the ordinary criminal case, the jury must be told, in effect, that the law recognizes deadlock as a permissible result, an outcome allowed by the statute, a legal trial verdict that by law results in imprisonment rather than death. The probability that such a jury, so instructed, would remain deadlocked—if not coerced—is significantly greater than is the case with the ordinary jury that has been properly advised of the law's preference for unanimity. In these circumstances, we would regard it as intolerably unfair to require the defendant to undergo a second capital resentencing proceeding.

Accordingly, we hold that the supplemental instructions were coercive in content, language, and implication; that the judgment imposing a sentence of death must for this reason be reversed; and that the case must be remanded for resentencing by the trial court.[78] On remand the defendant shall not be subject to the death penalty and the trial court shall proceed as

---

[78]We need not, therefore, reach defendant's additional claims that these coercive features were exacerbated by certain of the surrounding circumstances, such as the poor ventilation of the jury room and the trial court's sequestration order.

if the jury had reached a final non-unanimous verdict.[79] *See* Sec. c(3)(c) (providing that in the event the jury is unable to agree, the court shall sentence the defendant to a term of at least thirty years without parole as provided in Section b).

### 3. Other Errors at Sentencing

Reversal is also required because the supplemental instructions were deficient in another vitally important respect: they may well have left the jury with the impression that it was not responsible for the decision sentencing defendant to death. While the jurors were told at various points of the consequences of a finding that the aggravating factors outweighed the mitigating, the supplemental charges could very well have left them with the impression that their task was simply fact-finding and weighing, *i.e.*, finding the aggravating and mitigating factors, and then weighing them. For example, in one of its supplementary charges the trial court stated:

> I do feel it necessary to advise you that your rol[e] although difficult is rather simple. You are simply to determine whether aggravating and mitigating factors are present and you are to weight [sic] them should you find they are present.
>
> . . . .
>
> Now again, I realize that your task is a difficult one but I emphasize that your role is merely to apply the law and that is a rather simple task at least as it has

---

[79]In connection with our remand of this case, we note that, in addition to his conviction for the murder of Asaline Stokes, defendant was found guilty of knowingly and unlawfully possessing and carrying a knife under circumstances not manifestly appropriate for lawful use (*N.J.S.A.* 2C:39–5d), and of knowingly and unlawfully possessing a knife with a purpose to use it unlawfully against the person of another (*N.J.S.A.* 2C:39–4d). So long as the defendant was under a sentence of death, of course, these convictions could not augment that sentence. Our disposition of this appeal, however, requires that the defendant be resentenced to a term of years in accordance with *N.J.S.A.* 2C:11–3b, and thus may raise the issue of whether the weapons offenses should be merged with the murder conviction. This issue is committed to the discretion of the sentencing court on remand. *See State v. Rodriguez,* 97 *N.J.* 263 (1984); *State v. Arriagas,* 198 *N.J.Super.* 575, 584 (App.Div.1985), aff'd on other grounds *sub nom. State v. Crisantos,* 102 *N.J.* 265 (1986).

been defined to you. You are merely to determine the presence or absence of aggravating and mitigating factors and if you find that they are present you are to weigh them.

But in "merely" determining whether aggravating and mitigating factors exist and striking a balance between them, the jury decides whether defendant shall live or die. In no other determination in the criminal law is the jury more truly to act as the conscience of the community. In no other determination in the criminal law is it more important to make absolutely certain the jury is aware, not simply of the consequences of its actions, but of its total responsibility for the judgment. As the United States Supreme Court has recently made clear, jury instructions in capital cases should never lead the sentencer to believe that responsibility for determining the appropriateness of defendant's death rests elsewhere. *Caldwell v. Mississippi,* 472 *U.S.* 320, 105 *S.Ct.* 2633, 86 *L.Ed.*2d 231 (1985). This command flows from the premise that the death penalty can be constitutionally imposed only if the procedure assures reliability in the determination that " 'death is the appropriate punishment in a specific case.' " *Id.* at 323, 105 *S.Ct.* at 2637, 86 *L.Ed.*2d at 236 (quoting *Woodson v. North Carolina, supra,* 428 *U.S.* at 305, 96 *S.Ct.* at 2991, 49 *L.Ed.*2d at 961).

Under New Jersey's prior death penalty statute, this Court held that any instruction that "tend[s] to dilute the jury's sense of responsibility in passing on the issue of life or death" is erroneous. *State v. Mount,* 30 *N.J.* 195, 214 (1959); *accord State v. Hipplewith,* 33 *N.J.* 300, 319–20 (1960). It is apparent that this rule should apply with equal force under the current capital sentencing scheme, and that the trial court's instructions here violated this rule and hence constituted prejudicial error.[80]

---

[80]We reject, however, defendant's argument that the jury must make an explicit finding that "death is an appropriate punishment." We are fully in accord with the important, indeed constitutionally mandated, objective purportedly served by this proposal, namely, ensuring that death is the appropriate

A final error in the trial court's penalty-phase instructions must also be noted, although we need not and do not decide whether this error standing alone would warrant reversal. This error relates to the trial court's charge on weighing the aggravating against the mitigating circumstances, a charge that suffered from one of the defects analyzed in greater detail in *State v. Biegenwald, supra,* 106 *N.J.* at 53–67. While the trial court required that the jury's weighing process be determined "beyond a reasonable doubt" (thereby correcting what we find in *Biegenwald* to be a deficiency in the original statute), the court did not require that in order for death to be imposed, the jury must find that the aggravating factors outweigh the mitigating factors. On various occasions in its charge the court asked the jury, assuming it found any aggravating factor or factors, to determine whether or not the aggravating factors were outweighed by the mitigating factors. At one point in the charge it indicated that the sentence would be death unless the mitigating factors outweighed the aggravating factors, thereby possibly causing con-

---

punishment in a specific case. As our holding above indicates, we will tolerate no suggestion, from court or counsel, tending to dilute a capital jury's sense of responsibility for its sentencing verdict. We are satisfied that our procedures ensure that no diminution of the jury's sense of responsibility will take place: the Trial Judges' Bench Manual for Capital Cases advises trial courts to instruct jurors that they must be convinced that "the death penalty is fitting and appropriate punishment in this case," the verdict sheet (at least in this case) explicitly tells the jury that if it has checked the appropriate boxes, "the penalty will be death," and the jurors are individually polled by the court to assure that each of them agrees with the verdict. In these circumstances, we do not believe that requiring the jurors to recite the proposed incantation, "we find that death is an appropriate punishment," would measurably increase their sense of responsibility for their verdict. Moreover, even if defendant's proposal could be said to do some good, it could also do harm, indeed more harm. The vagueness inherent in the term "appropriate" might well give jurors the impression they have substantially unguided discretion, undermining the principle, also constitutionally mandated, that the death sentence be meted out in a manner that is not arbitrary or capricious. *See People v. Albanese,* 104 *Ill.*2d 504, 85 *Ill.Dec.* 441, 456, 473 *N.E.*2d 1246, 1261 (1984), *cert.* den., 471 *U.S.* 1044, 105 *S.Ct.* 2061, 85 *L.Ed.*2d 335 (1985).

fusion as to what the proper balance was in any event. The importance of this error may be diminished by the fact that the jury, on the verdict sheet, found, beyond a reasonable doubt, that the aggravating factors outweighed the mitigating factors. That jury, however, had been instructed that an affirmative answer to the next question on the verdict sheet (which it did not answer at all), namely, were the aggravating factors and the mitigating factors of equal weight, would also result in death. There was therefore no point for any juror who felt that the factors were of equal weight to attempt to persuade other jurors of the correctness of her view, since her view apparently led to the same result. Therefore, we cannot necessarily assume that the finding of the jury in the special verdict sheet rendered the error harmless.[81]

---

[81]Related to the resolution of the State's burden of proof at the sentencing trial is the claim that defendant should have been provided the opportunity to make the final closing remarks before the jury. *Rule* 1:7–1 provides that in a criminal trial the State shall make an opening statement and the defendant shall, if he so chooses, make his opening statement immediately thereafter. The rule provides that at the close of the trial "the parties may make closing statements in the reverse order of opening statements." The justification for allowing the prosecutor both the first and last word is the heavy burden of proof the State bears at trial. This same procedure, however, was applied at defendant's sentencing trial and defendant argues that, as a matter of fairness, he should have been allowed the final word when life hung in the balance. Defendant offers two arguments in support of this claim. Because of our holding today as to the burden of proof at sentencing, defendant's primary contention is no longer pertinent. Defendant had argued that because at the penalty trial the statute relieved the State of its normal burden of proof, there was no justification for allowing the State the advantage of the first and last word. Today we hold that the Act requires the State at the penalty trial to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. Accordingly, with respect to the State's burden of proof we do not distinguish a trial on guilt from a capital sentencing proceeding.

Defendant's second contention is that many jurisdictions have abandoned this common-law rule giving this procedural advantage to the State. He notes that the federal courts allow a defendant to close after the prosecution, although allowing the prosecution a chance for final rebuttal. Fed.R.Crim.P. 29.1. More on point, several states have by statute given the defendant the right to the final closing argument at the penalty phase of a capital proceeding. *See, e.g.,* Ga.Code Ann. § 17–10–2(a) (1982); Ky.Rev.Stat. § 532.025(1)(a)

## G. Prosecutorial Misconduct

Defendant also argues that his right to a fair trial was violated by various instances of prosecutorial misconduct. We are satisfied from our review of the record that extended treatment of several of defendant's allegations is not necessary, since the misconduct alleged is not of the magnitude that would require us to conclude that defendant was deprived of a fair trial.[82] Our review of the record discloses two instances of misconduct that should be discussed—the prosecutor's cross-ex-

---

(1985); N.H.Rev.Stat.Ann. § 630.5(III) (1986); N.C.Gen.Stat. § 15A–2000(a)(4) (1983); S.C.Code. § 16–3–28 (1976). Where, however, the burden of proof remains on the State at the penalty phase, even where this is a lesser burden than proving the existence of aggravating factors beyond a reasonable doubt, other states have refused to reverse the order of arguments. *See* Mo.Stat. 565.030(4) (1984) (State opens and closes in a capital trial; State has the burden of proving aggravating factors beyond a reasonable doubt); *Collins v. State,* 259 *Ark.* 8, 531 *S.W.*2d 13, 17 (1975) (because State must prove that aggravating factors justify death beyond a reasonable doubt, State has right to open and close), vacated on other grounds, 429 *U.S.* 808, 97 *S.Ct.* 44, 50 *L.Ed.*2d 69 (1976); *see also Smith v. Commonwealth,* 219 *Va.* 455, 248 *S.E.*2d 135 (1978) (final rebuttal by State proper when State has burden of proving aggravating factors beyond a reasonable doubt), *cert.* den., 441 *U.S.* 967, 99 *S.Ct.* 2419, 60 *L.Ed.*2d 1074 (1979).

Other courts have accorded defendant the right to a final closing in various procedural contexts such as hearings on insanity or amnesia when defendant has the burden of proof. No court, however, has recognized a constitutional right to a last word. As an issue grounded in fundamental fairness, we find, as have most other jurisdictions, that the order of closing arguments is linked directly to the relative burdens of proof borne by the parties. Although it is clearly more advantageous to the defendant to allow him to have the last word, we find the defendant is not unfairly prejudiced by the absence of such a right under the New Jersey rule requiring use of the reasonable doubt standard at sentencing.

[82]Included in this category are defendant's claims that the prosecutor illustrated disrespect toward the defense's expert witnesses, that he ridiculed the capabilities of these experts as witnesses, that he expressed his personal feelings regarding the testimony of Dr. Ervin (another of defendant's psychiatric experts), that he misstated and improperly used evidence, and that he misstated the reasons why defense counsel did not extract testimony directly from the defense experts with respect to defendant's prior conviction.

amination of Dr. Lewis, one of defendant's psychiatric experts, and his summation at the penalty phase.

Prosecutors occupy a unique position in our criminal justice system. The primary duty of a prosecutor is not to obtain convictions, but to see that justice is done. *State v. Farrell*, 61 *N.J.* 99, 104 (1972). Thus, "[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* at 105 (quoting *Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)). This duty does not, however, preclude the prosecutor from making a "vigorous and forceful presentation of the State's case...." *State v. Bucanis*, 26 *N.J.* 45, 56, *cert.* den., 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). When reviewing a prosecutor's conduct, we are mindful that criminal trials create a "charged atmosphere ... [that] frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety." *Id.*

With due regard to the difficulties prosecutors face in balancing these responsibilities, we conclude, after a careful review of the entire record, that the prosecutor in this case did exceed the bounds of proper conduct in his cross-examination of Dr. Lewis and in his summation at the penalty phase.

In cross-examining Dr. Lewis, the prosecutor made several statements that can be construed as providing his personal opinion about defendant's guilt. He asked Dr. Lewis whether she knew anything about his (*i.e.*, the prosecutor's) qualifications and background in homicide cases. Then, while questioning her about her interpretations of defendant's actions following the stabbing, he asked her whether she thought that her "common sense" was better than that of the prosecutor who had "tried two hundred criminal cases and investigated a thousand." These comments in the disguise of inquiries exceeded the scope of proper cross-examination.

A prosecutor may, of course, challenge the opinions expressed by a witness. In the comments quoted above, however, the prosecutor placed his own credibility, and alleged expertise, against that of the expert, forcing the jury to side with either him or her. Such actions constituted prosecutorial misconduct, violating the well-established rule that a prosecutor may not declare his personal belief in a defendant's guilt in such a manner as to lead the jury to believe that his opinion is based on something other than the evidence adduced at trial. *See State v. Farrell, supra,* 61 *N.J.* at 103; *State v. Thornton,* 38 *N.J.* 380, 398 (1962), *cert.* den., 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.*2d 1039 (1963). As we explained in *State v. Thornton:*

[T]he reason for the rule is that in the minds of jurors such statements may add the weight of the prosecutor's official and personal influence and knowledge to the probative force of the evidence adduced, thus creating the possibility that the jurors consciously or unconsciously might adopt the prosecutor's view without applying their own independent judgment to the evidence. [38 *N.J.* at 398.]

The prosecutor also acted improperly when, in his summation in the penalty phase, he suggested that the jury's deliberations be influenced by the need to protect society from crime. The prosecutor stated:

The laws are made for our protection and in this case, ladies and gentlemen, we must realize that it is our responsibility to protect everybody here who has no interest in this case and to protect everybody out there in the culture of Essex County from the cruel, horrible, inhumane acts of murder.

Under New Jersey's prior death penalty statute, we held that remarks suggesting that the jury must impose the death penalty to satisfy its responsibility to society were improper. *See State v. Johnson,* 31 *N.J.* 489, 512–13 (1960) (reversal unnecessary because trial as a whole was fair).

Some courts have allowed reference to the possible deterrent effects of the death penalty. *See People v. Lewis,* 88 *Ill.*2d 129, 58 *Ill.Dec.* 895, 904, 430 *N.E.*2d 1346, 1355 (1982) ("prosecutor could properly urge the imposition of death as a deterrent to murder"), *cert.* den., 456 *U.S.* 1011, 102 *S.Ct.* 2307, 73 *L.Ed.*2d 1308 (1982); *Commonwealth v. Zettlemoyer,* 500 *Pa.* 16, 454 *A.* 2d 937, 958 (1982), *cert.* den., 461 *U.S.* 970, 103 *S.Ct.* 2444, 77

*L.Ed.*2d 1327 (1983). We believe, however, that the better rule is that such references do constitute misconduct. *See, e.g., Darden v. Wainwright,* 477 *U.S.* ——, ——, 106 *S.Ct.* 2464, 2471, 91 *L.Ed.*2d 144, 156–57 (1986) (comments implying "that the death penalty would be the only guarantee against a future similar act" were undoubtedly improper); *Tucker v. Zant,* 724 *F.*2d 882, 889 (11th Cir.1984) (prosecutor's statement that "if [defendant] is executed, ... I'll sleep just as good, or I'll sleep better knowing that one of them won't be on the street" improperly "serves only to arouse the generalized fears of the jurors and divert the focus of their attention from the character of [the] crime and [the] criminal"); *Jones v. State,* 610 *P.*2d 818, 820 (Okla.Crim.App.1980) (improper to state that law enforcement is in bad shape due to jurors' lack of courage and that "[w]e can't live here if people in these [juries] let these people, for no reason, go around killing their policemen"). Statements such as those made by the prosecutor are improper because they divert the jurors' attention from the facts of the case before them.

The determination that the prosecutor was guilty of misconduct does not end our inquiry. Prosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial. *See State v. Kelly,* 97 *N.J.* 178, 218 (1984) ("While not condoning all aspects of the prosecutor's conduct, we conclude that, in the context of the entire trial, it did not cause defendant to be denied a fair trial"); *State v. Tirone,* 64 *N.J.* 222, 229 (1974) ("In the context of the summation as a whole, we cannot say that the prosecutor's comments were so inflammatory as to deny defendant a fair trial"); *State v. Bucanis, supra,* 26 *N.J.* at 56 (to justify reversal, prosecutor's conduct must "substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his defense").

In determining whether prosecutorial misconduct is prejudicial and denied defendant a fair trial, we consider wheth-

er defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them. *See State v. Bogen,* 13 *N.J.* 137, 141–42 (1953). If no objection is made, the remarks usually will not be deemed prejudicial. *Id.* In this case the defense counsel objected to the prosecutor's comments in cross-examining Dr. Lewis and requested a mistrial, which was denied. No objection was made to the prosecutor's comments in his summation discussed above.

We are convinced that defendant was not deprived of a fair trial. The prosecutor's misconduct must be viewed in the context of a fourteen-day trial. During the trial the court sustained the defendant's objections many times. Moreover, the court charged the jury that statements made by the attorneys were not to be considered as evidence. Additionally, the court instructed the jury to consider only the statutory aggravating factors in the penalty phase of the case. Accordingly, while the prosecutor's comments in the instances cited above were improper, they did not reach the level of reversible error.[83]

We stress, however, that the fact that the prosecutor's misconduct in this case cannot be said to have prejudiced defendant in no way excuses it. Prosecutors in capital cases are hereby on notice that in the future, this Court will not hesitate to refer on its own motion possible violations of the special ethical rules governing prosecutors to the appropriate district ethics committee for disciplinary action. We are well aware that within the legal profession the prosecutor's double calling—to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused

---

[83]Our references to prosecutorial misconduct are not intended to suggest that this Court has adjudicated an ethical offense on the part of the prosecutor. Issues of that kind can be determined only in disciplinary proceedings. Our conclusions are based on the facts that appear before us on this record and are limited to this case only.

is treated fairly and that justice is done—is uniquely challenging. That challenge is what makes the prosecutor's mission such a difficult one and such an honorable one. A prosecutor willing to engage in proscribed conduct to obtain a conviction in a capital case betrays his oath in both its respects. Not only does he scoff at rather than seek justice, he also represents the state poorly. Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters; prosecutors who fail to take seriously their particularly stringent ethical obligations in capital cases thus strongly risk postponing, and even jeopardizing, the enforcement of the law. We are confident that our prosecutors will be equal to this ethical challenge, but we also stand ready to take whatever action is required to remedy any abuses.

## H. Proportionality Review

At the time of his trial, defendant would have been automatically entitled to "proportionality review" under Section e. Subsequently, in response to the United States Supreme Court's decision in *Pulley v. Harris*, 465 *U.S.* 37, 104 *S. Ct.* 871, 79 *L.Ed.*2d 29 (1984), the Legislature amended the statute to provide for proportionality review only when requested. *L.* 1985, *c.* 478. Our disposition of this case makes it unnecessary to undertake such a review under either statutory scheme.[84]

---

[84]We also need not reach a conclusion as to whether, as defendant claims, his death sentence is "manifestly excessive" and "inappropriate." This claim, based on Ramseur's character and medical history, is distinct from claims that death is always excessive or that this sentence is disproportionate when compared with other defendants sentenced to death under the Act. In fact, the claim raised by defendant that death is excessive in his particular case appears to be similar to "excessiveness" claims raised in non-capital cases. Upon analysis we assume, however, that a disproportionality contention was intended because we find conventional excessiveness review inadequate in a capital case. In reviewing a death sentence, appellate courts must adhere to a stricter standard of review than in reviewing the jury's findings of fact in a non-capital trial. In *State v. Roth, supra,* 95 *N.J.* at 363–64, we held that before an

Nevertheless, it is appropriate that we now express some preliminary views concerning this important aspect of the death-penalty review process. In doing so, we intend only to guide future parties in their exploration of some of the issues that appear essential to the development of a proportionality review process that would satisfy the requirements of the statute and any applicable constitutional obligations.

1.

In *Pulley v. Harris, supra,* 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29, the United States Supreme Court held that proportionality review is not mandated by the eighth amendment where there are other procedural safeguards against arbitrary or capricious sentencing. The California capital punishment statute under which Harris was sentenced did not require proportionality review. Focusing on the other procedural review mechanisms provided by the statute, *e.g.,* its requirement of "special circumstances," independent review of jury findings by the trial court, and automatic appeal, the Court concluded that proportionality review is not constitutionally required. *Id.* at 51–54, 104 *S.Ct.* at 879–81, 79 *L.Ed.*2d at 41–42. Under the statutory scheme, the Court found, adequate safeguards existed to preclude arbitrary sentencing and proportionality review was not needed to prevent the systematic arbitrariness invali-

appellate court will find a sentence excessive one of three things must be established: (1) the findings on which the decision is based are unsupported by competent, reasonably credible evidence; (2) the factfinder applied incorrect legal principles in exercising its discretion; or (3) the application of the facts to the law was such a clear error of judgment that it "shocks the judicial conscience." We find this standard as it is applied to review a non-capital sentence insufficiently stringent where death is the sentence under review. However, because we are reversing Ramseur's sentence on other grounds, it is unnecessary to review the evidence on which his death sentence was based. We note, however, that the judicial conscience may be shocked more easily when a person is sentenced to death than when liberty is at stake. A showing of more than the minimal "competent credible evidence" may be required to sustain a death sentence.

dated by *Furman v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346.

Proportionality review has a function entirely unique among the review proceedings in a capital proceeding. Proportionality review, in the context of a capital sentencing scheme, is not appellate review to ensure that the aggravating factors outweigh beyond a reasonable doubt all the mitigating factors, *L.*1985, *c.* 178, or to determine if the death sentence is disproportionate to the crime in violation of the ban against cruel and unusual punishment. That death is not disproportionate in the sense of being a cruel and unusual punishment is presumed by the nature of the review. *Pulley v. Harris, supra,* 465 *U.S.* at 43, 104 *S.Ct.* at 875, 79 *L.Ed.*2d at 36. Rather, the purpose of review here is "of a different sort. . . . It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Id.*

The heightened concern in a capital case for whether a sentence is disproportionate in this sense is twofold and derives from the finality of the result and the risk that the proceedings are vulnerable to the influence of impermissible considerations. First, "the imposition of death by public authority is . . . profoundly different from all other penalties. . . ." *Lockett v. Ohio, supra,* 438 *U.S.* at 605, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990. Because of this fundamental distinction between the death penalty and all other punishments, there is "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina, supra,* 428 *U.S.* at 305, 96 *S.Ct.* at 2991, 49 *L.Ed.*2d at 961. Proportionality review assists us in assuring that " 'we have designed procedures which are appropriate to the decision between life and death and . . . [that] we have followed those procedures.' " *Pulley v. Harris, supra,* 465 *U.S.* at 68–69, 104 *S.Ct.* at 888–89, 79 *L.Ed.*2d at 52

(Brennan and Marshall, JJ., dissenting) (quoting Kaplan, "The Problem of Capital Punishment," 1983 *U.Ill.L.Rev.* 555, 576).

Proportionality review further acts "as a check against the random and arbitrary imposition of the death penalty" by an aberrant jury. *Gregg v. Georgia, supra,* 428 *U.S.* at 206, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d at 893. "[G]iven the emotions generated by capital crimes, it may well be that juries, trial judges, and appellate courts considering sentences of death [may be] affected by impermissible considerations." *Pulley v. Harris, supra,* 465 *U.S.* at 64, 104 *S.Ct.* at 886, 79 *L.Ed.*2d at 49 (Brennan and Marshall, JJ., dissenting). Discrimination on the basis of race, sex, or other suspect characteristic cannot be tolerated. As the Florida Supreme Court stated:

> [Proportionality r]eview by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another man live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in *Furman v. Georgia, supra,* can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all. [*State v. Dixon,* 283 *So.*2d 1, 10 (Fla.1973), *cert. den. sub nom. Hunter v. Florida,* 416 *U.S.* 943, 94 *S.Ct.* 1950, 40 *L.Ed.*2d 295 (1974).]

Proportionality review therefore is a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty.

## 2.

While proportionality review is no longer mandatory, and shall be undertaken only "[u]pon the request of the defendant," *L.*1985, *c.* 478, we assume that almost all defendants who are sentenced to death will request such review.

After the decision in *Pulley v. Harris,* "the states have been left to design their own proportionality review." Rodriguez, Perlin & Apicella, "Proportionality Review in New Jersey: An Indispensable Safeguard in the Capital Sentencing Process," 15

*Rutgers L.J.* 399, 437 (1984) (hereafter "Proportionality Review"). The Act provides us with little guidance. It states that "the Supreme Court shall ... determine whether the sentence is disproportionate to the penalty imposed in *similar* cases, *considering* both the *crime* and the *defendant.*" (Emphasis added.) Sec. e. We foresee that our efforts to devise a procedure of review that will adequately protect defendants from the arbitrary and capricious imposition of the death penalty prohibited by *Furman v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346, will be an evolving process. In addition to involving criminal justice experts, these efforts may involve experts from disciplines outside the law. We shall seek the advice of such experts to assist us in this process.

In preparation for this review process, those parties who expect to participate in the appellate review process in future capital cases should begin gathering the data necessary for proportionality review of a death penalty in comparison to similar crimes and defendants. Moreover, these statistics will be helpful in determining whether there is race and gender discrimination in the imposition of the death penalty.

These are difficult and sensitive issues, and hence review, reflection, and modification of the analysis we develop may be required as more information is gathered. Nevertheless, there appear to be general principles and problems concerning proportionality review that we anticipate will be addressed in the analysis. Many of these issues have been thoroughly discussed in "Proportionality Review," *supra,* 15 *Rutgers L.J.* 399, and Liebman, "Appellate Review of Death Sentences: A Critique of Proportionality Review," 18 *U.C.D.L.Rev.* 1433 (1985) (hereafter "Appellate Review").

First, we must determine what will be the "universe of cases," "Proportionality Review," *supra,* 15 *Rutgers L.J.* at 441, against which a comparison of the imposed death sentence will be made, in order to assure proportionality. Some states such as Louisiana require uniformity in death sentences merely

on a county- or parish-wide basis, *see State v. Sonnier*, 379 *So.* 2d 1336, 1362 (La.1980). Others such as Georgia require state-wide uniformity. *See Gregg v. Georgia, supra*, 428 *U.S.* at 205–06, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d 892–93. We believe that statewide uniformity is the more appropriate measure, and therefore anticipate that comparisons will be made to "similar" cases throughout the state.

But a decision to adopt statewide comparisons does not end the analysis. We must also decide whether to include in the statewide universe of cases only those in which a death penalty was actually imposed, or to expand the potential cases for comparison to include all those in which the death penalty could have been requested by the State. *See* Sec. a(1), (2). Here we may anticipate considering whether to address concerns about possible misuse of prosecutorial discretion presented to the courts of this state, including in the review all cases in which a prosecutor had the discretion to seek the death penalty. *See State v. McCrary*, 97 *N.J.* 132, 147, 478 *A.*2d 339 (1984) (permitting limited judicial review of prosecutorial discretion to charge capital murder authorized under the Act); Foley & Powell, "The Discretion of Prosecutors, Judges, and Juries in Capital Cases," *Crim.Just.Rev.*, Fall 1982, at 16. *But cf. State v. Campbell*, 103 *Wash.*2d 1, 691 *P.*2d 929, 942–43 (1984) (rejecting argument that prosecutorial discretion to seek death penalty invites arbitrary imposition of the sentence), *cert.* den., 471 *U.S.* 1094, 105 *S.Ct.* 2169, 85 *L.Ed.*2d 526 (1985).

Second, we must determine what are "similar crimes." Sec. e. As an initial proposition, broad categories are too ambiguous and cannot limit the range of comparison necessary for substantive proportionality review. "Appellate Review," *supra*, 18 *U.C.D.L.Rev.* at 1442–44. Therefore, in order to narrow the scope of the similar crimes to be used in the proportionality review, such categories as "torture," "sexual mutilation," or "multiple victim" crimes have been suggested. But beyond these, there is a difficult question whether there are subcategories of "murder" that can be appropriately identified and con-

sidered. "Domestic," "depravity of mind," and "execution style" crimes, for example, may be too broad or ambiguous to allow any real comparison for proportionality. *Id.* We anticipate and welcome suggestions regarding which criminological, sociological, and statistical models are appropriate for analyzing the similarity of crimes and sentencing.

 Third, after the crimes similar to the case on review are identified, we must compare those defendants with the one before the court. Sec. e. We will need to determine the relevant underlying characteristics necessary to insure consistent sentencing. The aggravating and mitigating factors set forth in Section c(4) and Section c(5) are a beginning. But other factors such as race, sex, and socioeconomic status might also be appropriate considerations for reviewing proportionality. *See* Foley & Powell, *supra.* Moreover, the relationship between the defendant and victim, whether defendant pleaded guilty or not guilty, and the race and sex of the victim might also be appropriate factors. *Id.* This list is only a beginning and still other factors could be relevant to proportionality review of the defendants. Our task in this process will be to sift through these factors to determine those that have an effect on the capital sentencing decision. We must ensure that discriminatory factors are not shifting the balance between life and death.

### 3.

The proportionality review provision in the Act is an important procedural mechanism to safeguard against the arbitrary and capricious imposition of the death penalty. Within the framework outlined, we hope to develop an analysis that assures similar results in similar cases and will prevent discrimination on an impermissible basis, including, but not limited to, race and sex.

We must acknowledge at the outset an inherent paradox in the process. Our Court has recognized that the paramount

theme of our criminal sentencing process is that the punishment must fit the crime, not the criminal. *State v. Yarbough, supra,* 100 *N.J.* at 631; *State v. Roth, supra,* 95 *N.J.* at 360. We believe that uniformity is the paramount goal of sentencing because "there can be no justice without … uniformity." *State v. Hodge,* 95 *N.J.* 369, 379 (1984).

 But the Supreme Court has categorically rejected blind uniformity in the sentencing of capital defendants. *Woodson v. North Carolina, supra,* 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944. Under constitutionally approved sentencing schemes, the process must guarantee an individualized assessment of the defendant. *Lockett v. Ohio, supra,* 438 *U.S.* at 605, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990; *see State v. Davis, supra,* 96 *N.J.* at 618 (evidence bearing upon defendant's potential for rehabilitation may be presented to jury in capital sentencing phase). How we will resolve this paradox remains as yet fully unrevealed to us. We shall continue to labor on the process.

## Conclusion

It is not for this Court to pass on the wisdom or the ultimate morality of the death penalty. That issue is for the Legislature and the Governor, and for them alone. Our function is to determine whether their decision and the law implementing it are constitutional, and thereafter to review cases in which the death penalty is applied. We find the Act constitutional in all respects but reverse the imposition of the death penalty in this case for the reasons set forth above, and remand the matter for resentencing by the trial court in accordance with this opinion. We affirm the murder conviction.

O'HERN, J., concurring in the result.

I concur with the Court's decision today upholding the constitutionality of the death penalty under our state constitution. On this as on certain other issues probing the content of

counterpart measures of state and federal constitutions, I do not discern a distinct New Jersey understanding. On such issues I believe that the values of our society are the shared values of our nation.

> Our frame of reference is not some abstract notion of civilization or free government, but the *American* vision. Promises of freedom of speech and worship, guarantees of privacy of the home and the person, a ban on cruel and unusual punishment—these things are in the Bill of Rights because they define *our* aspirations, *our* idea of a just society. [L. Tribe, *God Save This Honorable Court* 96 (1985).]

As the Court's opinion demonstrates, the delegates to our 1947 Constitution did not view capital punishment as a cruel and unusual punishment beyond the pale of a civilized society. I cannot say that the circumstances or the structure of our society have so changed since that date that a *per se* challenge to the death penalty could be sustained under the New Jersey Constitution.

I have expressed on another occasion my concern about whether capital punishment as applied will not indeed prove to be cruel and unusual in the sense that it is applied dispropor-tionately. *State v. McCrary*, 97 *N.J.* 132, 149 (1984) (O'Hern, J., dissenting). That issue is not before us. Contemporary studies indicate that New Jersey has not yet demonstrated any significant disproportionality with respect to the infliction of the death penalty upon minorities or the poor. Time will be the test of the ability of the act to sustain that record. Nor can I yet agree with Justice Handler's forecast that the act will inevitably result in death sentences that are "wantonly and * * * freakishly imposed" in the sense condemned by *Furman v. Georgia*, 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). As interpreted by the Court, the legislative scheme "attempted to provide standards for a constitutional death penalty that would serve both goals of measured, consistent application and fairness to the ac-cused." *Eddings v. Oklahoma*, 455 *U.S.* 104, 111, 102 *S.Ct.* 869, 874, 71 *L.Ed.*2d 1, 8 (1982). That the Supreme Court itself has not demonstrated a measured, consistent application of

principle to capital cases does not mean that New Jersey cannot or will not. Our willingness to apply our own principles of fundamental fairness to the cases before us should dispel any belief that we shall fail to employ "the maximum substantive and procedural protections possible * * *, protections that can realistically minimize the risk of arbitrary enforcement." *Post* at 380 (Handler, J., dissenting).

I write separately to express my view that continuing to death-qualify juries at the guilt phase of a capital trial is inconsistent with New Jersey's traditional sense of fairness and justice. I reach this conclusion not as a matter of state constitutional doctrine, but in the exercise of our judicial supervision over the criminal justice system in New Jersey. In doing so, I need not quarrel with the holding of *Lockhart v. McCree*, 476 *U.S.* ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986), that the federal Constitution does not prohibit a state from excluding from the guilt phase of a capital trial a prospective juror whose views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at —— n. 1, 106 *S.Ct.* at 1761 n. 1, 90 *L.Ed.*2d at 144 n. 1 (citing *Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985)). Nor do I disagree with our Court's holding that the New Jersey Constitution contains no distinct guarantee that would warrant a contrary constitutional finding. Finally, in reaching this result, it is not necessary to reverse this conviction since there was no trial error in following a practice that was sanctioned by our procedures. *Cf. State v. Brunson*, 101 *N.J.* 132 (1985) (order of exercise of peremptory challenges shown here should not be followed in future cases, although not grounds for reversal).

It is the Supreme Court's function to define the limits of what states can do, not what they should do. Focusing on the outer limits of state power averts attention from the inner question: what is the proper exercise of criminal procedure? The real question for us is not what the State can do, but rather

what we should do in the just exercise of our common law supervisory power over criminal practice within our jurisdiction.

## I.

Stripped of all analysis of what constitutes a legally cognizable group for purposes of analysis of a fair cross-section of jurors, *Lockhart v. McCree, supra*, 476 *U.S.* ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 holds that it is all right to determine a defendant's guilt by a jury more prone to convict than by a jury representative of a cross-section of the community. For although it questioned the reliability of the data that suggests that death-qualified jurors are more conviction-prone, the *Lockhart* Court, in the last analysis, had to accept that "the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more conviction-prone than 'non-death-qualified' juries." 476 *U.S.* at ——, 106 *S.Ct.* at 1764, 90 *L.Ed.*2d at 147.

The *Lockhart* Court nonetheless held that the Constitution does not prohibit the states from death-qualifying juries in capital cases. *Id.* at ——, 106 *St.Ct.* at 1770, 90 *L.Ed.*2d at 155. The Court permits that result because it believes that the State is entitled to have jurors in the penalty phase who will conscientiously apply the laws of the state. The Court extends this entitlement to the guilt phase, not because it believes that such a trial produces a fairer verdict, but because it does not believe in the limited exercise of its constitutional supervision over state criminal trials it should impose upon the states the burden of empaneling a penalty-phase jury if the guilt-phase jury cannot sit to resolve the penalty in those cases in which it has convicted of a capital offense. I recognize that the added burdens are real and are not insubstantial, but I believe that they are ones that society would be willing to make to preserve the central value of our criminal justice system—trial by an impartial jury, not one that is more prone to convict.

## II.

In analyzing the question, I believe that we have approached the issue in a confrontational way in debating, as I have noted, the outer limits of state power. The Supreme Court has determined those. It is our duty now not to be distracted by that debate but to focus on the essentials of a criminal trial and determine, from a common law viewpoint, what is just cause for excusing a juror, and why it is that we death-qualify jurors. Holmes has reminded us that "whenever we trace a leading doctrine of substantive law far enough back, we are very likely to find some forgotten circumstance of procedure at its source." O.W. Holmes, Jr., *The Common Law* 253 (1881).

The forgotten circumstance that now places capital defendants at a disadvantage is that prior to this century death was the automatic penalty for many felonies. Juries sat *only* to resolve guilt; the death penalty followed automatically from the guilty verdict. Fear that "a defendant who was clearly guilty of a capital charge would nevertheless be acquitted or not convicted of that charge because a juror's antipathy toward capital punishment," Welsh S. White, *Life in the Balance* 97–98 (1984) (citing Oberer, "Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?," 39 *Tex.L.Rev.* 545 (1961)), led to statutes or rulings that "those with conscientious or religious scruples against the death penalty would not be permitted to serve as jurors in capital cases." Welsh S. White, *supra*, at 98.

Once set in motion, death qualification has moved glacier-like with the law of capital punishment through eras when juries began to decide both guilt and penalty to this era when guilt can be decided separately from penalty.

What is the common-law justification for continuing to death-qualify jurors before the guilt phase of a capital trial? To answer this, we must ask ourselves why a juror should be excused in any case. Challenges for cause to jurors are permitted by statute and rule, *N.J.S.A.* 2A:78–4 to –9, *Rule* 1:8–3, but

neither offers any guidance as to what constitutes cause for challenge. That task has been left to the courts. *N.J.S.A.* 2A:78–8. Generally, individuals may be excused for cause from a jury because they will be unable to abide their oath or follow the court's instructions. Basically, what we are looking for is jurors who are not biased or prejudiced in the fulfillment of their duties. *State v. Singletary*, 80 *N.J.* 55 (1979).

Heretofore, in capital cases our courts have excluded jurors for cause on the basis of their inability to answer with certainty that they would be able to consider the imposition of the death penalty upon a finding of guilt. *State v. Mathis*, 52 *N.J.* 238 (1968), *rev'd*, 403 *U.S.* 946, 91 *S.Ct.* 2277, 29 *L.Ed.*2d 855, *reh. den.*, 404 *U.S.* 876, 92 *S.Ct.* 31, 30 *L.Ed.*2d 125 (1971). But that practice was obtained under pre-Code law where there was no bifurcated trial and the death penalty was automatic for first-degree murder convictions unless the jury recommended mercy. The guilt jury had to be the sentencing jury. That practice is no longer available. We now have a bifurcated capital trial system.

It will be seen at once that under a bifurcated capital trial system "*Witherspoon* excludables" are not disqualified for bias in the guilt phase of the trial. By definition they can decide guilt or innocence fairly but are conscientiously opposed to voting a fellow citizen to death.[1] The constitutional validity of death qualification is one that deeply divides the Supreme Court. *See Lockhart v. McCree, supra*, 476 *U.S.* ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137. A respected journal of opinion sees that the decision "rigs matters against [capital defendants]. A

---

[1] I recognize that there are a small number of citizens who are called "nullifiers" who would refuse to participate in the guilt phase because of their conscientiously-held views against the death penalty and might vote to acquit of guilt because of their belief in the injustice of the punishment. I agree that such persons should be excluded from the guilt phase. I believe this can readily be done by a limited pretrial inquiry.

system that must rely on biased juries hardly needs opponents to condemn it."

I need not even dwell on the question of whether death-qualified juries are conviction-prone juries. The point is that a jury selection process that systematically excludes all jurors who cannot state a commitment to the death penalty results in a jury that, although not suspect for excluding constitutionally "distinct" groups, is not a truly representative cross-section of the community and deprives the capital defendant of a jury of his peers on the fundamental question of guilt or innocence.

I repeat that this is not to say the State is entitled to anything less than a jury that is without bias towards its established laws and statutory requirements. *State v. Reynolds*, 43 *N.J.* 597 (1965); *State v. Rios*, 17 *N.J.* 572 (1955). Thus, supervention of the fair cross-section requirement is justified, if not required, at the penalty phase. However, those reasons do not demand the exclusion of jurors with conscientious scruples about the death penalty at the guilt phase of a capital trial. Some may argue that a jury that includes jurors with scruples against the death penalty at the guilt phase will be acquittal-prone, and yet the empirical studies conducted at the impetus of the United States Supreme Court decision in *Witherspoon v. Illinois*, 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 777 (1968), suggest that the negative attitude of a juror towards the imposition of the death penalty is irrelevant to the juror's determination of guilt or innocence. *See Grigsby v. Mabry*, 569 *F.Supp.* 1273 (E.D.Ark.1983), *aff'd as modified*, 758 *F.*2d 226 (8th Cir.1985), *rev'd o.g. sub nom. Lockhart v. McCree, supra*, 476 *U.S.* ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137; Jurow, "New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process," 84 *Harv.L.Rev.* 567 (1971); White, "Death-Qualified Juries: The 'Prosecution-Proneness' Argument Reexamined," 41 *U.Pitt.L.Rev.* 353 (1980); Special Project, "Constitutionality of the Death Penalty in New Jersey," 15 *Rutgers L.J.* 261, 360–62 (1984).

As noted at the outset, we seek jurors who can abide by their oaths and follow the court's instructions. The studies of *Witherspoon/Wainwright* excludables confirm that such jurors, in addition to forming a fair cross-section of the community, can be trusted to judge questions of fact fairly. Therefore, at the guilt phase there is no cause related to their ability to follow their oaths to excuse these jurors.

Why then do we continue to do it? And why must we, as a State, continue to approach the question in terms of the limits of power rather than the proper exercise of power? Our criminal practice and procedure have been shaped by more than constitutional compulsion. Our goal has been to produce trials that are fair and result in substantial justice. Thus we have perhaps the broadest discovery rules extant. *See R.* 3:13–3 and comment (Pressler ed. 1987) (making "prosecutor's entire file" available to the defendant as a matter of the defendant's right and upon the defendant's demand, subject to State's legitimate and disclosed need for appropriate protective order); *R.* 3:17–1 (making available to defendant any statement or record of a statement in prosecutor's possession, relevant to offense charged, made by a witness about to testify on behalf of State); *see also* "Report of Supreme Court Committee on Criminal Procedure," 96 *N.J.L.J.* 449, 459, 462 (1973) (overview of recommended changes to Criminal Procedure Code). We do this as a State out of a fundamental sense of fairness—that this is not a game that is being played but is truly a quest for justice—and because we believe that a criminal trial "although inevitably an adversarial proceeding, is above all else a search for truth." *State v. Fort,* 101 *N.J.* 123, 131 (1985).

Hence I believe that we should approach this issue as we have approached countless other issues in the administration of the criminal justice system, with the goal of achieving fair accommodations of the rights of the State and the defendant.

The defendant's interest is in having a fair and impartial jury, a preeminent right in our system. The State's interest is in

having a just and efficient trial of the case. I do not dispute that there are important values in having the guilt-phase jury act as the penalty-phase jury. We must primarily be guided by the language of our statute. *N.J.S.A.* 2C:11–3c(1) presupposes that there shall be one jury that shall sit in both penalty and guilt phases unless good cause be shown. The question is this: is trial by a jury that is not more prone to convict a good cause for a truly bifurcated trial? I think that it is. It is hard to state a better cause.

On the other hand, I can recognize that delay, inefficiency, and general distrust of the criminal justice system are good causes for not empaneling separate juries at the guilt and penalty phases. But I believe that accommodation of these two interests can be achieved without sacrifice of either. In the first instance we know that in almost one-third of the capital cases the guilt-phase verdict results in acquittal. Thus in these cases society would be saving the time, expense, and loss of impartiality that is occasioned by empaneling a death-qualified jury at the guilt phase.

In the remaining cases, it may turn out in many, if not most, instances that the guilt-phase jurors will, in fact, not prove to be disqualified. In addition, I would explore the possibility that use of the alternate jurors, who, in almost all circumstances, will have sat through the guilt phase of a capital trial, would be sufficient to replace any jurors disqualified from the penalty phase. As many as sixteen jurors are often seated in capital cases. A reservoir of four will have heard all the guilt phase evidence and would be available if four are disqualified during death qualification.

I recognize that there are difficult constitutional and statutory problems in the consideration of whether this is the "same jury" under *N.J.S.A.* 2C:11–3c(1) that would be statutorily and constitutionally authorized to proceed to the penalty phase. But since the paramount interest in this issue resides with the defendant, it is possible that defendants would concur in such a

procedure prior to trial. Obviously, the problems involved cannot be insurmountable as our courts have contemplated the use of a jury that has not been death-qualified in the guilt phase of a trial where only one of two defendants is charged with capital murder. *State v. Savage*, 198 *N.J.Super.* 507, 511 (Law Div.1984). Justice Marshall has outlined in his dissent in *Lockhart v. McCree, supra*, 476 *U.S.* at ——, 106 *S.Ct.* at 1780–81, 90 *L.Ed.*2d at 167–68, various other remedies that are available to a state in fashioning appropriate guilt and penalty proceedings in capital trials.

In many circumstances we have not attempted to institute full-scale revision of criminal procedures without testing their efficiency. It may be that even despite the majority's reluctance to undertake such exploration, there will be conscientious prosecutors and defense counsel through whose cooperative efforts actual examination of alternative methods of death qualification can take place. Such efforts could result in substantial benefits, both for defendants and for the State.

In this case, the discursive qualification, disqualification, and rehabilitation of death penalty jurors such as jurors M and S highlight the benefit that might be gained from death qualification after the guilt phase. As noted, Juror M, in response to the court's initial *voir dire*, clearly stated that he could in good conscience return a guilt verdict that would lead to death.

Defense counsel then undertook the desultory and eventually destructive examination of the juror about whether he thought death was the appropriate punishment "anytime a person has committed a murder." Quite naturally, Juror M hesitated, believing that if the act was done in self-defense it should not warrant death. The prosecutor then took up the questioning. The juror obviously sensing that he was in some sort of a cross-fire or test of wits, when asked by the court again about his position stated: "You're running a case like this, I truthfully could say I prefer not even to participate." Defendant argues that the effect of all the questioning was simply to

explain to the juror a way in which he could be excused from the trial.

It is difficult for us to place ourselves in the position of such jurors. Surely they must be bewildered by the trail of the questions. Notably, California has concluded that the process of death qualification itself conditions a jury to think in terms of guilt:

> In a typical death-qualifying voir dire, the judge and the attorneys repeatedly instruct the jurors about the steps leading to the penalty trial and question each prospective juror, oftentimes at considerable length, concerning his or her attitudes about capital punishment. These repeated displays of concern about the death penalty before any evidence of guilt has been presented may prompt the jurors to infer that the court and counsel assumes the penalty trial will occur.
>
> A penalty trial is contingent on a guilty verdict and a finding of special circumstances. Jurors undergoing death-qualification would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion. Only such an inference could serve to explain to the jurors why so much time and energy are devoted to an extensive discussion of penalty before trial. Provided with these cues from people who are not only experts in the courtroom but are also presumably acquainted with all the evidence in the case, the relevant law, and the "correct" application of the one to the other, death-qualified jurors may themselves become more inclined to believe that the accused is guilty as charged. [*Hovey v. Superior Court of Alameda County*, 28 *Cal.*3d 1, 70–71, 616 *P.*2d 1301, 1348, 168 *Cal.Rptr.* 128, 175 (1980).]

### III.

I believe that the Court should itself undertake to study the available alternatives to our current death qualification process and to test their reliability. We cannot absolve ourselves of responsibility for not examining the alternatives by reference to the act. The act is silent as to when and how death qualification shall occur. It is we who have chosen the present course. In this case and in our rules, we have interpreted the act to achieve fundamental fairness. We should make the same attempt here. If it proves that the cost, the delay, or the inefficiency of the alternative practices are grave burdens upon the administration of the criminal justice system, at least the effort would have been made.

I believe that pricing the expediency and efficiency of trials at the expense of a capital defendant's right to be tried before an impartial jury conflicts with our traditional sense of fairness and justice. I concur with the views of Justice Stevens, concurring and dissenting in *Spaziano v. Florida*, 468 *U.S.* 447, 470, 104 *S.Ct.* 3154, 3167, 82 *L.Ed.*2d 340, 359 (1984), that history amply demonstrates that the jury is central to the link between capital punishment and the standards of decency contained in the eighth amendment. In *State v. Gilmore*, 103 *N.J.* 508, 530 (1986), we recently restated our commitment to trial by a jury "as nearly impartial 'as the lot of humanity will admit.'" (citations omitted).

Ours is a civilization uniquely committed to the value of human life. Our nation does not view the lives of its citizens as easily expendable. We do not measure the value of human life in dollars. I realize that it is difficult for society to accept that those who stand to be convicted of the shocking and heinous acts demonstrated in capital murder convictions should ask society for fair treatment. Thus Arkansas says: "We may ask, why should the most cowardly and contemptible of criminals, merely by reason of the viciousness of their crimes, be favored in jury selection to a greater degree than any other accused person or any litigant in a civil case?" *Rector v. State*, 280 *Ark.* 385, 395, 659 *S.W.*2d 168, 173 (1983), *cert. denied*, 466 *U.S.* 988, 104 *S.Ct.* 2370, 80 *L.Ed.*2d 842 (1984). But capital defendants ask for no more than an unbiased jury. It is a premise of our system that the innocent and guilty alike deserve equal justice under law. So long as we adhere to that presumption of innocence, we must give it meaning. If we could but abstract ourselves as a people from our reaction to the shocking and heinous acts that have shattered innocent lives, I believe we would still choose a system that does not put a price upon the quality of justice.

The subject of capital punishment deeply divides our society. The subject of guilt or innocence does not. We should not, without the fullest examination of alternatives that might ac-

commodate fair trial with faithful observation of law, disqualify from participation in the most revered safeguard of a free society—the jury trial of guilt—those conscientious members of a society who do not share the majority's belief that the State may take a human life to advance the purposes of its criminal justice system. For these reasons, I would add to the decision made today that jurors with reservations about the death penalty not be excluded from the guilt phase of a capital trial.

HANDLER, J., dissenting.

In this case, and in the companion case of *State v. Biegenwald*, 106 *N.J.* 13 (1987), decided today, we are called upon to consider the constitutionality of the death penalty at a crucial moment in the history of our Constitution. The cases arise against a backdrop of renewed awareness of and heightened sensitivity to the integrity of our State Constitution. This deeper insight into the reach of the State Constitution is considered by many to be the most significant development in contemporary constitutional law. *See, e.g.,* Pollock, "State Constitutions As Separate Sources of Fundamental Rights," 35 *Rutgers L.Rev.* 707, 722 (1983). The constitutional questions presented by the capital murder-death penalty statute have been acknowledged to be as significant as they are complex. *See* Special Project: "The Constitutionality of the Death Penalty in New Jersey," 15 *Rutgers L.J.* 261 (1984). Further, we consider the role of the State Constitution in these singularly important cases against a strong tide of federal retrenchment from well-established protections of individual rights. These cases, therefore, present both a constitutional challenge and an opportunity.

The Court's response is disappointing. By yoking the State Constitution to the federal Constitution at this time and in these cases, this Court limits regrettably the scope of individual constitutional protections; further, it arrests the progress we have made in expounding our Constitution. The harm done by failing to give full effect to our State Constitution transcends,

therefore, that which flows from cases only incorrectly decided. With its decision today, the Court fails to meet the challenge to vindicate individual rights, and squanders the opportunity to deepen our understanding of the Constitution.

The Court upholds the constitutionality of the capital murder-death penalty statute, *L.* 1982, *c.* 111; *N.J.S.A.* 2C:11–3. It concludes that the legislative scheme satisfies both federal and State constitutional standards, including those implicating the respective constitutional doctrines prohibiting cruel and unusual punishments and mandating due process. The Court also concludes that the actual prosecution and conviction of the defendant for capital murder under this statute were, with one exception relating to an aspect of the jury charge on sentencing, free of reversible error. The Court determines, among many other matters, that the selection and qualification of both the grand and petit juries did not violate the constitutional protection assuring a criminal defendant a fair and impartial jury, and, further, that there was no constitutional infirmity in the statutory scheme by which a defendant's guilt is determined by a death-qualified jury. The Court, in addition, discounts a number of other claimed trial-level errors, regarding the use and effect of a prior *non vult* plea to murder, prosecutorial misconduct relating to critical defense testimony and an aspect of the court's charge on sentencing.

The Court reverses, however, the imposition of the death sentence. It finds irremediable prejudicial error in the trial court's instructions that had the effect of coercing the jury into reaching a unanimous verdict resulting in the death penalty.

I find myself in disagreement with many of the Court's determinations. I choose, however, to deal only with those matters I deem most serious and important. The most significant area of disagreement relates to the constitutionality of the capital murder-death penalty statute. I find it essential therefore to explain the role of the State Constitution in a case such

as this and to examine the principles that should govern our understanding and application of the State Constitution.

On the merits of the constitutional issues, I direct attention first to whether the statute's capital punishment scheme violates the state constitutional provisions relating to cruel and unusual punishment and due process as enhanced by the New Jersey doctrine of fundamental fairness. I then deal with those issues arising out of defendant's trial and sentencing whose resolution in this case warrant additional grounds for reversal. Certain of these issues relate to the composition, selection and qualification of the grand and petit juries, and the use of a death-qualified jury to determine criminal guilt. Other issues concern the relevance and effect of defendant's prior *non vult* plea to murder and the impact of prosecutorial misconduct upon defendant's murder conviction and death sentence and the effect of certain improper prosecutorial comments combined with certain aspects of the trial court's sentencing charge to the jury.[1]

Finally, I consider the issue of whether the trial court impermissibly coerced the jury to reach a decision mandating the death penalty and whether, as the Court determines, the death sentence must be reversed on this ground. I then address the proper grounds for vacation of the death sentence.

## I.

It is well-understood that this State has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the federal Constitution." *Prune-*

---

[1]There are a number of other questions—the validity of proceeding without a struck jury, the handling of defense testimony relating to defendant's psychiatric and mental condition, and the trial court's instructions relating to evidence, flight and other matters—that are addressed in the majority opinion. I do not necessarily agree with the Court's determination of these issues. However, in my opinion, many of these issues are not determinative. I therefore do not deal further or directly with such questions.

*yard Shopping Center v. Robins,* 447 *U.S.* 74, 81, 100 *S.Ct.* 2035, 2040, 64 *L.Ed.*2d 741, 752 (1980). Appreciation of their own sovereignity, and of the institutional constraints that the Supreme Court faces, impels states to consult their own constitutions as distinctive and independent sources of fundamental rights. *See* Pollock, *supra,* 35 *Rutgers L.Rev.* at 714–15; Williams, "In the Supreme Court's Shadow: Legitimacy of State Regulation of Supreme Court Reasoning and Result," 35 *S.C.L.Rev.* 353, 389–404 (1984); Sager, "State Courts and the Strategic Space Between Norms and Rules of Constitutional Law," 63 *Texas L.Rev.* 959 (1985).[2] This Court has not hesitated to find for its citizens greater protections than are afforded under the federal Constitution. *See, e.g., State v. Novembrino,* 105 *N.J.* 95 (1987); *State v. Gilmore,* 103 *N.J.* 508 (1986); *State v. Hunt,* 91 *N.J.* 338 (1982); *Right to Choose v. Byrne,* 91 *N.J.* 287 (1982); *State v. Alston,* 88 *N.J.* 211 (1981); *State v. Schmid,* 84 *N.J.* 535 (1980), *appeal dismissed sub nom. Princeton Univ. v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982); *State v. Bellucci,* 81 *N.J.* 531 (1980).

This imperative of constitutional interpretation is especially important in areas particularly suited to state action. As the majority acknowledges, *ante* at 167–168, capital punishment is such an area of special state concern. With respect to capital punishment, "it is elementary that States are free to provide

---

[2] As a lone court sitting atop the immense federal judicial pyramid, the Supreme Court has concerns that are more extreme than comparable problems within state judiciaries; and the management concerns interact unhappily with the diversity of settings in which the rules established by the Court must operate. Management concerns point to clarity, simplicity, and fact-independence, while diversity calls for nuance and fact-sensitivity.

 \* \* \* \* \* \* \* \*

State judges confront institutional environments and histories that vary dramatically from state to state, and that differ, in any one state, from the homogenized, abstracted, national vision from which the Supreme Court is forced to operate. It is natural and appropriate that in fashioning constitutional rules the state judges' instrumental impulses and judgments vary. [Sager, *supra,* at 974, 975–76 (footnote omitted).]

greater protections ... than the federal Constitution requires." *California v. Ramos,* 463 *U.S.* 992, 1013-14, 103 *S.Ct.* 3446, 3459-60, 77 *L.Ed.*2d 1171, 1188-89 (1983).[3]

The majority, however, persuaded particularly by the reasoning in *Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), *ante* at 183-184, only half-heartedly consults our State Constitution and declines to require greater protections in this State than are afforded under federal death-penalty jurisprudence. Because I believe that the federal decisional law has lost coherence and pursues fundamentally contradictory—perhaps unattainable—goals, I have no confidence in federal precedent as a guide in interpreting our Constitution. I am unpersuaded that *Gregg* and its progeny afford adequate assurance that the death penalty will not be "wantonly and freakishly imposed." *Furman v. Georgia,* 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). This substantial risk—approaching certainty—of arbitrary application is inconsistent both with the premises of *Furman* and *Gregg* and with this Court's state constitutional jurisprudence, and violates the principle of fundamental fairness underlying due process.

The challenge of state constitutional jurisprudence, as Justice Pollock has written, "is to develop ... a jurisprudence that will make more predictable the recourse to and the results of state constitutional law analysis." Pollock, *supra,* 35 *Rutgers L.Rev.* at 708. This Court has adopted structured analyses in which recourse is had first to the federal Constitution to assess the

---

[3]*See, e.g., Commonwealth v. Colon-Cruz,* 393 *Mass.* 150, 470 *N.E.*2d 116 (1984); *District Attorney v. Watson,* 381 *Mass.* 648, 411 *N.E.*2d 1274 (1980); *People v. Superior Court of Santa Clara County,* 647 *P.*2d 76, 31 *Cal.*3d 797, 183 *Cal.Rptr.* 860 (1982); *People v. Anderson,* 493 *P.*2d 880, 6 *Cal.*3d 628, 100 *Cal.Rptr.* 152, *cert.* denied 406 *U.S.* 958, 92 *S.Ct.* 2060, 32 *L.Ed.*2d 344 (1972); *State v. Payton,* 361 *So.*2d 866 (La.1978); *State v. Detter,* 298 *N.C.* 604, 260 *S.E.*2d 567 (1979); *State v. Quinn,* 290 *Or.* 383, 623 *P.*2d 630 (1981); *Miller v. State,* 584 *S.W.*2d 758 (Tenn.1979); *Petition for Writ of Mandamus,* 433 *A.*2d 375 (Del.1981); Special Project, *supra,* 15 *Rutgers L.J.* at 323-24.

minimal protections implicated. As Justice Garibaldi has observed, "We refer to federal constitutional law only as establishing the floor of minimum constitutional protection." *State v. Gilmore, supra,* 103 *N.J.* at 524. If the individual is unprotected or inadequately protected under the federal Constitution, the Court engages in a systematic inquiry into whether the State Constitution affords greater protection. In accordance with this general approach, I shall look first to federal precedent to assess the scope of the protection it affords, and then to independent state sources to determine whether State constitutional principles comport with the federal precedent or require different, enhanced protections.

## A.

Contemporary federal death penalty jurisprudence embraces conflicting goals that were anticipated in *McGautha v. California,* 402 *U.S.* 183, 207–08, 91 S.Ct. 1454, 1467, 28 *L.Ed.*2d 711, 726–27 (1971). Rejecting an argument that standardless discretion in capital sentencing violated due process, the Court asserted that "[any] attempt to catalog the appropriate factors [to guide discretion] ... could inhibit rather than expand the scope of consideration.... The infinite variety of cases ... would make general standards either meaningless 'boiler plate' or a statement of the obvious that no jury would need." The Court characterized as "beyond present human ability" the tasks of identifying a priori "those characteristics of criminal homicides and their perpetrators which call for the death penalty" and reducing those characteristics to understandable and uniformly applicable language. *Id.* at 204, 91 *S.Ct.* at 1465, 28 *L.Ed.*2d at 724. Any attempt to guide sentencing discretion, according to the *McGautha* Court, would prove at best ineffectual in guiding discretion, and inevitably arbitrary in distinguishing death-eligible offenses.

One year later, however, in *Furman v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 246, standardless sentenc-

ing discretion was held to violate the eighth amendment's proscription of cruel and unusual punishments (as extended to the states through the due process clause of the fourteenth amendment). It is impossible to distill a single rationale from the nine separate opinions issued in *Furman*. Writing for a plurality four years later in *Gregg v. Georgia, supra*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, however, Justice Stewart identified the abiding thrust of *Furman:* "While Furman did not hold that the infliction of the death penalty per se violates the ... ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment.... Because of the uniqueness of the death penalty, Furman held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Id.* at 188, 96 *S.Ct.* at 2932, 49 *L.Ed.*2d at 883. Thus, *Furman* is significant for merging eighth amendment analysis with the fundamental principle of fairness underlying due process; because the *penalty* is severe beyond rectification, its infliction under *procedures* risking arbitrary application cannot be countenanced.

Following *Furman*'s invalidation of all existing death penalty statutes, thirty-five states passed new death penalty statutes that purported to guide sentencing discretion. These statutes fell into two categories: those that guided discretion by effectively eliminating it, mandating the death penalty in certain cases; and those that guided discretion by attempting, the misgivings of *McGautha* notwithstanding, to enumerate for the sentencer deliberative factors in aggravation and/or mitigation of the offense. In 1976, in the complex of cases led by *Gregg v. Georgia, supra*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, the Court established the conceptual framework of contemporary federal death penalty jurisprudence by invalidating statutes in North Carolina and Louisiana that mandated the imposition of a death sentence in specified cases, while upholding the constitutionality of statutes in Georgia, Florida, and Texas that enumerated deliberative factors to guide sentencing discretion.

See *Jurek v. Texas*, 428 *U.S.* 262, 96 *S.Ct.* 2950, 49 *L.Ed.*2d 929 (1976); *Proffitt v. Florida*, 428 *U.S.* 242, 96 *S.Ct.* 2960, 49 *L.Ed.*2d 913 (1976); *Gregg v. Georgia, supra*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859; *cf. Roberts v. Louisiana*, 428 *U.S.* 325, 96 *S.Ct.* 3001, 49 *L.Ed.*2d 974 (1976); *Woodson v. North Carolina*, 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944 (1976) (rejecting mandatory death sentences as unconstitutional). In doing so, the Court seemingly fused the elements of cruel and unusual punishment analysis with due process principles:

> [W]e believe that in *capital* cases the fundamental respect for humanity underlying the *Eighth Amendment* ... requires consideration of the character and record of the individual offender and the circumstances of the offense as a constitutionally indispensable part of the *process* of inflicting the penalty of death. [*Woodson v. North Carolina, supra*, 428 *U.S.* at 304, 96 *S.Ct.* at 2991, 49 *L.Ed.*2d at 961 (plurality opinion) (emphasis added).]

Mandatory death sentences assure uniform application but are nonetheless unconstitutional, the Court held, because they deprive defendants of a "particularized consideration" of individual character and circumstances that might mitigate the offense. Statutes like Georgia's, by contrast, which enumerate circumstances of aggravation but allow for consideration of individualized mitigating circumstances, were held to strike the proper balance, assuring consistent application by guiding sentencing discretion, while allowing for consideration of individualized mitigating circumstances. The Court thus set the parameters of contemporary death penalty constitutionality under the federal Constitution: the death sentences resulting from application of the statute must be at once uniform and individualized.

In concluding that both mandatory and arbitrary death sentences are unconstitutional, however, the Court was driven to uphold the very schemes for guided discretion it had disparaged as either ineffective or beyond human capacity in *McGautha*. The unguided discretion struck down in *Furman* offered no assurance that capital defendants would be treated uniformly according to their crimes, while the mandatory sentencing invalidated in *Roberts* and *Woodson* offered no assurance that they would be treated individually according to their characters.

When life is at issue, the Court held, either extreme is unacceptable. The requirements of consistency and individualization identified by the Court, as reflected in contemporary schemes for guided discretion, are thus an acknowledgement of the heightened protections due a defendant when the penalty he or she faces is irreversibly severe. *See Gardner v. Florida,* 430 *U.S.* 349, 97 *S.Ct.* 1197, 51 *L.Ed.*2d 393, 405–06 (1977) (White, J., concurring) (eighth amendment analysis implicates the Due Process clause "as the vehicle by which the strictures of the Eighth Amendment are triggered").

Schemes for guided discretion, considered in the abstract, escape the mandatory and arbitrary extremes. I submit, however, that these extremes are avoided at a cost of doctrinal tension that has rendered unworkable the schemes embodying them.[4] Ultimately, such schemes are ineffectual in guiding sentencing discretion precisely because the unique severity of the penalty to be inflicted so escalates the contrary burdens of uniformity and individualization as to render them extraordinarily difficult, if not impossible, to reconcile. The progeny of *Gregg* reflects this current failure, if not ultimate futility. This experience argues strongly that the federal precedent not be used for guidance and that we look to our own constitutional resources. Because the majority ignores the lessons of this experience and insists that federal precedent be used to define our own Constitution, a more searching analysis and expose of the federal law is called for.

### B.

Despite great diversity in the specific issues it has addressed, and in the reasoning with which those issues have been addressed, the federal case law since *Gregg* is unified by the

---

[4]The majority, noting the reliance of sentencing policy generally on the concept of "guided discretion," rejects the notion that "doctrinal tension" *per se* "is a basis for depriving society of the ability to ordain what it believes to be the appropriate sanction for murder." *Ante* at 190. So do I.

attempt of the Supreme Court to manage the contrary impera-
tives of uniformity and individualization, to check, in other
words, the tendency of individualized sentencing to be arbitrary
while preventing uniform sentencing from becoming procruste-
an. *See generally* Special Project, *supra,* 15 *Rutgers L.J.* at
281–303 (describing developments in case law). In *Lockett v.
Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978), a
plurality of the Court emphasized the requirement of individual-
ized sentencing deliberations in reversing a death sentence
imposed under a statute that limited, in the interest of uniform-
ity, the number of mitigating circumstances a sentencer could
consider. Chief Justice Burger, writing for the plurality, was

> satisfied that [the] qualitative difference between death and other penalties
> calls for a greater degree of reliability when the death sentence is imposed.
> The mandatory death penalty statute in Woodson was held invalid because it
> permitted *no* consideration of "relevant facts of the character and record of the
> individual offender or the circumstances of the particular offense." ... We ...
> conclude that the Eighth and Fourteenth Amendments require that the sentenc-
> er ... not be precluded from considering *as a mitigating factor,* any aspect of
> a defendant's character or record and any of the circumstances of the offense
> that the defendant proffers as a basis for a sentence less than death. [*Id.* at
> 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 989–90 (emphasis supplied) (citation
> deleted).]

Justice Rehnquist dissented, accusing the Court of having
gone, in its death penalty rationales, "from pillar to post," *id.* at
629, 98 *S.Ct.* at 2973, 57 *L.Ed.*2d at 1005 (Rehnquist, J. dissent-
ing), and arguing that if defendants, in the interest of individu-
alized sentencing, are "permitted to offer as evidence in the
sentencing hearing any fact, however bizarre ... the new
constitutional doctrine will not eliminate arbitrariness or freak-
ishness ... but will codify and institutionalize it.... [I]t will
not guide sentencing discretion but will totally unleash it." *Id.*
at 631, 98 *S.Ct.* at 2974, 57 *L.Ed.*2d at 1006 (Rehnquist, J.
dissenting).[5]

---

[5]*See also Green v. Georgia,* 442 *U.S.* 95, 99 *S.Ct.* 2150, 60 *L.Ed.*2d 738 (1979)
(capital defendant's due process right to introduce mitigating penalty phase evi-
dence overrides state's rules of evidence); *Beck v. Alabama,* 447 *U.S.* 625, 100

This exaltation of individualized sentencing over uniformity continued in *Eddings v. Oklahoma*, 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982), in which the Court held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 113–14, 102 *S.Ct.* at 876, 71 *L.Ed.*2d at 10–11 (emphasis supplied).

The Court's emphasis on individualized sentencing has not been limited to the context of mitigating factors. In *Enmund v. Florida*, 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982), the Court overturned a death sentence imposed on a person who aided and abetted a homicide but did not kill or attempt to kill and who lacked the intent to kill. Justice White explained:

> The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence".... [*Id.* at 798, 102 *S.Ct.* at 3377, 73 *L.Ed.*2d at 1152 (citation omitted).] [6]

Given the Court's expansion of the requirement of individualization, and given the tendency of individualized sentencing toward arbitrariness, it is legitimate to question whether the Court has been able to vindicate the polar imperative of uniformity. In *Gregg v. Georgia, supra*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, the Court relied primarily upon two

---

*S.Ct.* 2382, 65 *L.Ed.*2d 392 (1980) (jury must be permitted to consider convicting of lesser-included offense).

[6] *Cf.* 458 *U.S.* at 828, 102 *S.Ct.* at 3392, 73 *L.Ed.*2d at 1171–72 (O'Connor, J. dissenting, but favoring remand because the trial judge's failure to consider defendant's "relative lack of mens rea and his peripheral participation in the murder" as mitigating factors denied the defendant the individualized sentence required in *Lockett*). *See also Cabana v. Bullock*, 474 *U.S.* 376, 106 *S.Ct.* 689, 88 *L.Ed.*2d 704 (1986) (finding of intent to murder under *Enmund* does not have to be made by trial jury, but can be made by federal appellate court after reviewing state trial and appellate findings).

aspects of the Georgia statute as guarantors of uniformity in capital sentencing: the requirements that the jury "find a *statutory* aggravating circumstance before recommending a sentence of death," *id.* at 197, 96 S.Ct. at 2936, 49 *L.Ed.*2d at 888,[7] and that "the Supreme Court of Georgia compare[] each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate." *Id.* at 198, 96 *S.Ct.* at 2937, 49 *L.Ed.*2d at 888.

As with mitigating factors, the Court's treatment of aggravating factors has emphasized individualized treatment of cases over uniform application of laws. In *Gregg* itself, the Court rejected facial challenges to several of Georgia's statutory aggravating factors. Petitioner argued that statutory provisions specifying as aggravating such factors as the "vileness" or "depravity" of the murder, the petitioner's "substantial history of serious assaultive criminal convictions," or the "great risk of death to more than one person" created by the petitioner were either "so broad that capital punishment could be imposed in any murder case" or "vague and therefore susceptible of widely differing interpretation, thus creating a substantial risk that the death penalty will be arbitrarily inflicted...." *Id.* at 201–02, 96 *S.Ct.* at 2938, 49 *L.Ed.*2d at 890–91. The Court acknowledged the possible force of these arguments, but relied on the Georgia Supreme Court to narrow the application of

---

[7]The aggravating circumstance requirement was seen as the linchpin of the process, assuring uniformity *through* individualization:

> These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do what Furman's jury did: reach a finding of ... guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime ... [and] focused on the characteristics of the person who committed the crime.... As a result, while some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce nondiscriminatory application." [428 *U.S.* at 197, 96 *S.Ct.* at 2936, 49 *L.Ed.*2d at 888 (citation omitted).]

these factors. *Id.* at 202, 96 *S.Ct.* at 2938, 49 *L.Ed.*2d at 890–91.

That the Georgia Court was failing to narrow the "vileness" factor became evident in *Godfrey v. Georgia,* 446 *U.S.* 420, 100 *S.Ct.* 1759, 64 *L.Ed.*2d 398 (1980), where the Court reversed a death sentence imposed after the trial court instructed the jury by merely reading the "vileness" language. Adverting to the statutory language—"outrageously or wantonly vile, horrible and inhuman"—the Court stated: "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.* at 428, 100 *S.Ct.* at 1764, 64 *L.Ed.*2d at 406. The Court stopped short, however, of invalidating the aggravating factor in the interest of uniformity, relying on the Georgia Court's narrowing construction in other cases (*see* detailed discussion of these developments, *infra* at 394–398). Justice Marshall concurred in the result, but challenged the Court's reliance on the Georgia Supreme Court to narrow the construction, arguing that the "Georgia court has made no substantial effort to limit the scope of [the "vileness"] factor, but has instead defined the provision so broadly that practically every murder can fit within its reach." *Id.* at 441, 100 *S.Ct.* at 1771, 64 *L.Ed.*2d at 414 (Marshall, J., concurring), citing Dix, "Appellate Review of the Decision to Impose Death," 68 *Geo.L.J.* 97, 110–123 (1979).[8]

If *Godfrey* did in fact re-emphasize channeling discretion in the interest of consistent sentencing, three 1983 decisions re-

---

[8]This failure was due not to "bad faith" on the Georgia Court's part, but to what Justice Marshall identified as a "deeper problem": "The task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system ... is unable to perform." 446 *U.S.* at 440, 100 *S.Ct.* at 1771, 64 *L.Ed.*2d at 413. All of the forebodings in *McGautha* as to the impossibility of "selecting in some objective way those persons who should be condemned to die" had, in Justice Marshall's view, been realized; the Georgia Court's failure to narrow its construction of the "vileness" factor was but a symptom of that impossibility.

treated from that goal, to the extent that they did not abandon it entirely. In *Zant v. Stephens,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235 (1983), the issue was whether the invalidity of one of the aggravating factors considered by a jury in imposing a death sentence required that sentence to be vacated. The Supreme Court affirmed the Georgia Supreme Court's determination that the sentence was valid despite the invalidity of the underlying aggravating circumstance. In doing so, it accepted the Georgia Court's characterization of its sentencing system as one in which statutory guidance of discretion ends once a single aggravating factor is found. *See id.* at 871–73, 103 *S.Ct.* 2733, 77 *L.Ed.*2d at 246–47. The unbridled discretion exercised by the jury at the "selection stage"—*i.e.,* once it has found a single aggravating factor—was held to be legitimate, because "[w]hat is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.... The Georgia scheme provides for categorized narrowing at the definition stage, and for individualized determination and appellate review at the selection stage." *Id.* at 879, 103 *S.Ct.* at 2743, 77 *L.Ed.*2d at 251 (emphasis added). Because there is no weighing process, discretion is unguided once a valid aggravating circumstance is found; because there were two other valid aggravating circumstances found, the invalid circumstance was held not to have infected the death sentence.

Thus, death penalty jurisprudence was brought full-circle. The Court again sacrificed the uniformity that might be gained by requiring that discretion be guided throughout sentencing in the interest of "an individualized determination"; the discretion it allowed at the sentencing stage was, moreover, like the discretion condemned in *Furman,* unguided. The latent instability of a system requiring individualized sentencing deci-

sions—its tendency toward arbitrary, unguided discretion—had become patent.[9]

The holding in *Zant* was, if anything, expanded in *Barclay v. Florida*, 463 *U.S.* 939, 103 *S.Ct.* 3418, 77 *L.Ed.*2d 1134 (1983), in which the Court upheld the validity of a death sentence despite the sentencer's consideration of (1) a nonstatutory and admittedly improper aggravating factor (the defendant's prior criminal record), and (2) the racial hatred motivating the murder as a reason for imposing the death penalty. Justice Rehnquist, writing for the plurality, held that the judge's reliance on his personal views as to racial hatred was not a nonstatutory aggravating circumstance, but instead "not an inappropriate way of weighing the 'especially heinous, atrocious, or cruel' statutory aggravating circumstance...." To the argument that allowing such reliance upon the sentencer's experience was tantamount to allowing arbitrary discretion, the Court responded: "Any sentencing decision calls for the exercise of judgment.... We have never suggested that the ... Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors. But to attempt to separate the sentencer's decision from his experiences would inevitably do precisely that." *Id.* at 950, 103 *S.Ct.* at 3425, 77 *L.Ed.* at 1144. Because the sentencer had found no mitigating circumstances to counterbalance the valid aggravating factors, the Court determined that the sentencer's finding of an invalid aggravating circumstance could not have affected the weighing process and was thus harmless error: "There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.... 'What is

_____

[9]Justice Marshall, in dissent, reviewed the emphasis upon uniformity in *Gregg* and *Godfrey*, then lamented: "Today we learn for the first time that the Court did not mean what it said in *Gregg*.... We now learn that the actual decision whether a defendant lives or dies may still be left to the unfettered discretion of the jury." 462 *U.S.* at 910, 103 *S.Ct.* at 2760, 77 *L.Ed.*2d at 271 (Marshall, J., dissenting).

important ... is an *individualized* determination....' " *Id.* at 958, 103 *S.Ct.* at 3429, 77 *L.Ed.*2d at 1149 (citation omitted).

Once again, therefore, the imperative of an individualized determination prevailed over the imperative of uniformity. Justice Stevens and Powell concurred in the judgment, but wrote separately because

> [t]he Court has never thought it sufficient *in a capital case* merely to ask whether the state court has been "so unprincipled or arbitrary as to somehow violate the United States Constitution." ... Nor does a majority of the Court today adopt that standard. A constant theme of our cases ... has been emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner. [*Id.* at 960, 103 *S.Ct.* at 3430, 77 *L.Ed.*2d at 1150 (emphasis added) (Stevens, J. concurring).]

For the first time, therefore, there was a recognition of some spill-over effect attributable to the exaggeration of "individualized" sentencing, an intimation that the Court's elevation of "individualized" sentencing determinations over uniform sentencing determinations was eroding the heightened standard of review in capital cases. In retrospect this is not surprising, for as the amount of discretion afforded the sentencer increases, the degree of scrutiny to which that discretion is subject necessarily decreases, if only because the decision-making process becomes opaque. Once discretion is in some degree unfettered, the question is no longer whether the decision to impose death is unprincipled or arbitrary but, as the plurality phrased it, whether it is "*so* unprincipled or arbitrary as to somehow violate the United States Constitution." *Id.* at 947, 103 *S.Ct.* at 3423, 77 *L.Ed.*2d at 1142.

The erosion of the requirement of consistency in *Zant* and *Barclay* continued in *California v. Ramos, supra,* 463 *U.S.* 992, 103 *S.Ct.* 3446, 77 *L.Ed.*2d 1171, where the Court upheld a death sentence in the deliberation of which the jury was instructed to consider the possibilities that the defendant's sentence, if less than death, might be commuted or that the defendant might be released on parole. To the argument that such an instruction introduces into death-penalty deliberations

an element of arbitrariness wholly unrelated to individualization because irrelevant to a defendant's character or the circumstances of the crime, the Court responded, relying on *Zant*:

Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty ... the jury is then free to consider a myriad of factors to determine whether death is the appropriate punishment. *In this sense, the jury's choice between life and death must be individualized.* "But the Constitution does not require the jury to ignore other possible ... factors in the process of selecting ... those defendants who will actually be sentenced to death." [*Id.* at 1008, 103 *S.Ct.* at 3457, 77 *L.Ed.*2d at 1185 (emphasis added, citation omitted).]

The sentencer, then, is not limited to the circumstances either in aggravation or in mitigation of the specific offense and the individual defendant, but is "free to consider a myriad of factors," among them the likelihood of the defendant's eventual release or sentence reduction.

With *Zant, Barclay,* and *Ramos,* the imperative of "individualized sentencing" identified in *Furman* and *Gregg* was substantially advanced, but only by substantially eroding the polar imperative of consistency. Indeed, the very notion of "individualized" sentencing, which in the original *Gregg-Woodson* cases had referred to the character and circumstances of the individual *defendant,* was transmuted in *Zant, Barclay,* and *Ramos* to refer to the amount of discretion afforded the individual *sentencer;* thus, the *Ramos* Court, following *Zant* and *Barclay,* found that once the jury has found one aggravating circumstance, it "then is free to consider a myriad of factors.... *In this sense,* the jury's choice ... must be individualized." *California v. Ramos, supra,* 463 *U.S.* at 1008, 103 *S.Ct.* at 3457, 77 *L.Ed.*2d at 1185, citing *Zant v. Stephens, supra,* 462 *U.S.* at 878, 103 *S.Ct.* at 2743, 77 *L.Ed.*2d at 251. The justification for this—presumably that the individual defendant can never have truly "individualized" sentencing unless the sentencer, at the selection stage, has unguided discretion—is equally a justification for the unguided discretion condemned in *Furman,* and

signals the collapse of any balance between individuality and uniformity.[10]

Aside from the aggravating factors that were to limit the grounds for imposing sentence, and thus to guide discretion, the other principal guarantor of uniformity identified by the Court in *Gregg* was the requirement of a state review generally, and proportionality review specifically; indeed, both *Zant* and *Barclay* relied on the requirement of proportionality review to ensure uniformity in Georgia and Florida, respectively, in light of the unguided discretion at the "selection" stage of sentencing approved by the Court. *Zant v. Stephens, supra,* 462 *U.S.* at 875, 103 *S.Ct.* at 2741, 77 *L.Ed.*2d at 248; *Barclay v. Florida, supra,* 463 *U.S.* at 953–54, 103 *S.Ct.* at 3426–27, 77 *L.Ed.*2d at 1146 (quoting *Proffitt v. Florida, supra,* 428 *U.S.* at 248–51, 96 *S.Ct.* at 2964–66, 49 *L.Ed.*2d at 920–22). In *Pulley v. Harris,* 465 *U.S.* 37, 104 *S.Ct.* at 871, 79 *L.Ed.*2d 29 (1984), however, the Court declined to require comparative proportionality review, acknowledging that "[a]ny capital sentencing scheme may occasionally produce aberrational outcomes" (*i.e.,* execute undeserving defendants) but holding that California's statute, requiring a jury finding of "special circumstances" beyond a reasonable doubt, and providing for sentence review by the trial judge and the State Supreme Court, "cannot be successfully challenged under Furman and our subsequent cases." *Id.* at 53, 104 *S.Ct.* at 880, 79 *L.Ed.*2d at 42. Justice

---

[10] *Cf. Caldwell v. Mississippi,* 472 *U.S.* 320, 105 *S.Ct.* 2633, 86 *L.Ed.*2d 231 (1985), in which a different plurality of the Court (led by Justices Marshall and Brennan) refused to extend *Ramos* to validate a prosecutor's closing argument in which the jury was assured that it did not have ultimate responsibility for the death sentence. Justices Rehnquist and White and the Chief Justice dissented, noting that the plurality's "string citations to our prior cases, many of which yielded only plurality opinions, which hold that capital sentencing juries must be allowed to consider all forms of mitigating evidence so as to facilitate individualized ... determinations ... simply highlight the lack of authority for the path the Court takes." *Id.* at 348–51, 105 *S.Ct.* at 2650–51, 86 *L.Ed.*2d at 252–53 (Rehnquist, J., dissenting). Justice O'Connor concurred, but only because the prosecutor's remarks had been misleading. *Id.* at 342, 105 *S.Ct.* at 2646, 86 *L.Ed.*2d at 248.

Brennan, in dissent, argued that the Court had betrayed the fundamental premise of *Furman:*

> Although we may tolerate ... irrationality in other sentencing contexts, the premise of Furman was that such arbitrary and capricious decisionmaking is simply invalid when applied to "a matter [as] grave as the determination of whether a human life should be taken or spared." ... As executions occur with more frequency, therefore, the time is fast approaching for the Court to reexamine the death penalty, not simply to ensure the existence of adequate procedural protections, but ... to reevaluate the imposition of the death penalty for the irrationality prohibited by our decision in *Furman. [Id.* at 64, 104 *S.Ct.* at 886, 79 *L.Ed.*2d at 49 (Brennan, J. dissenting) (citation omitted).]

The Court's decisions in *Zant, Barclay,* and *Ramos* to insulate a significant degree of discretion from appellate review, and its decision in *Pulley* not to require state courts to compare each death sentence to other homicide cases to ensure uniformity, are all the more significant in light of its approval of foreshortened appellate procedures in *Barefoot v. Estelle,* 463 *U.S.* 880, 103 *S.Ct.* 3383, 77 *L.Ed.*2d 1090 (1983). In *Barefoot,* the Court sustained a death sentence despite the fact that the two psychiatrists who were called at the penalty phase to testify that the defendant would constitute a "continuing threat" to society had never examined the defendant. The merits of petitioner's challenge in *Barefoot* were lost, however, in the argument over the propriety of the expedited procedures and standard of review used by the Fifth Circuit in rejecting the challenge.[11] The plurality acknowledged that "it is not

---

[11]Because the defendant's argument—that use of the psychiatrists' testimony was unconstitutional—had been heard and rejected by the state court and a federal district court—which had nonetheless certified probable cause to appeal—and because an execution date had been set and was imminent, the Fifth Circuit Court of Appeals gave little more than a day's notice for oral arguments, and heard argument without briefs; one of the judges was wholly unfamiliar with the record in the case. One day after argument, and four days before the scheduled execution, the Court of Appeals issued a 16–page opinion denying the petitioner's request for a stay of execution, on the ground that he could not show "some prospect of success on the merits...." 463 *U.S.* at 892, 103 *S.Ct.* at 2750, 77 *L.Ed.*2d at 1103. The court failed, however, to affirm the district court formally on the merits. *See generally* Note, 95 *Yale L.J.* 349, 349–52 (1985) (more detailed narration of the procedural facts).

clear whether the Fifth Circuit's recent practice of requiring a showing of some prospect of success on the merits before issuing a stay of execution" is valid. "Approving the execution of a defendant before his appeal is decided on the merits would clearly be improper...." *Id.* at 889, 103 *S.Ct.* at 2749, 77 *L.Ed.* 2d at 1102 (citations omitted). The Court held, however, that the Court of Appeals had addressed the question of probability of success on the merits and the merits themselves simultaneously. The Court then addressed the broader question of appellate review of habeas corpus petitions, approving the development of expedited procedures in capital cases. It acknowledged that "an increasing number of death-sentenced petitioners are entering the appellate stages" "but [held that] the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate [of probable cause]." It further concluded that the appellate court could "expedite" the review of death sentence cases so that their determination "is not delayed by the weight of other business." *Id.* at 892–95, 103 *S.Ct.* at 2750–52, 77 *L.Ed.*2d at 1103–06. The Court thus completely inverted the principle that the unique severity of death as a punishment required that it be treated differently from other punishments. Justice Marshall, in dissent, was mystified:

> [U]ntil today it had never been suggested, so far as I know, that *fewer* safeguards are required where life is at stake than where only liberty or property is at stake. This Court has always insisted that the need for procedural safeguards is particularly great where life is at stake.... By suggesting that special summary procedures might be adopted solely for capital cases, the majority turns this established approach on its head. [*Id.* at 913–14, 103 *S.Ct.* at 2761–62, 77 *L.Ed.*2d at 1117–18 (Marshall, J., dissenting) (citations omitted).]

The plurality's holding thus allowed an admittedly nonfrivolous appeal "to be singled out for summary treatment solely because the State has announced its intention to execute the appellant before the ordinary appellate procedure has run its course." *Id.* at 913, 103 *S.Ct.* at 2761, 77 *L.Ed.*2d at 1117 (Marshall, J., dissenting) (emphasis omitted).

*Barefoot* was decided the same day as *Barclay* and *Ramos,* which followed *Zant* in insulating much of the sentencer's discretion from appellate review. These cases were followed within a year by the decision not to require comparative proportionality review in *Pulley v. Harris.* Taken together, the cases signal the Court's "willingness to tolerate a significant degree of incoherence in capital sentencing procedures," and thus its abandonment of the imperatives identified in *Gregg.* "The Supreme Court—1982 Term," 97 *Harv.L.Rev.* 72, 118–27 (1984). There is, in other words, a causal connection between the decisions approving unguided discretion at the sentencing stage and the decisions truncating appellate review. To the extent that discretion is unguided, it is more likely to be arbitrary, and hence less likely to pass muster under an appellate review designed—because capital punishment is different in kind from all other forms of punishment—to ensure uniformity. To allow extra-statutory sentencing deliberations, as the Supreme Court has done, is to sanction arbitrary sentencing, and to make anything but perfunctory appellate review of sentencing impossible. The only way, therefore, to expand the scope of allowable discretion while maintaining a functional capital punishment system is to circumscribe the substance and procedure of appellate review. *See id.* at 127; Special Project, "Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency," 69 *Cornell L.Rev.* 1129, 1214–16 (1984).

The cases from *Zant* through *Barefoot* to *Pulley,* then, have in fact if not in doctrine vanquished the requirement of consistency that lies at the core of *Furman* and *Gregg,* and thus mark a departure from the principle underlying those cases that death sentences require heightened procedural scrutiny because death is different in kind from any other form of punishment. This retreat unifies the cases decided since *Barefoot.* In *Strickland v. Washington,* 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2061, 80 *L.Ed.*2d 674, 693 (1984), the Court held that "[f]or purposes of describing counsel's duties ... Florida's capital sentencing proceeding need not be distinguished from an ordi-

nary trial." Justice Marshall dissented on the grounds that the Court

has repeatedly acknowledged that the Constitution requires stricter adherence to procedural safeguards in a capital case than in other cases. . . . In my view, a person on death row, whose counsel's performance fell below constitutionally acceptable levels, should not be compelled to demonstrate a 'reasonable probability' that he would have been given a life sentence if his lawyer had been competent . . . [*Id.* at 716–17, 104 *S.Ct.* at 2079–80, 80 *L.Ed.*2d at 712 (Marshall, J., dissenting).]

*See id.* at 702–06, 104 *S.Ct.* at 2072–74, 80 *L.Ed.*2d at 702–06 (Brennan, J., concurring in the general principles but dissenting in their application in a capital sentencing context) ("the standards announced today can and should be applied with concern for the special considerations that must attend review of . . . a capital sentencing proceeding" because "counsel's general duty to investigate . . . takes on supreme importance . . . in the context of developing mitigating evidence to present to [a judge or jury considering the sentence of death]"); [12] *see also Lockhart v. McCree,* —— U.S. ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986) (upholding use of death-qualified juries during guilt-phase); *Poland v. Arizona,* —— U.S. ——, 106 *S.Ct.* 1749, 90 *L.Ed.*2d 123 (1986) (holding that resentencing hearing in capital case is not barred by Double Jeopardy when appeals court rejects sole aggravating factor found by sentencer; failure of sentencer to find other alleged aggravating factors is not an "acquittal" of these factors for Double Jeopardy purposes); *id.* at ——, 106 *S.Ct.* at 1758, 90 *L.Ed.*2d at 136 (Marshall, J., dissenting) ("In no other circumstance would the Double Jeopardy Clause countenance the offer of a second chance to the State and the trial judge to find a better theory upon which to base a conviction"); *Smith v. Murray,* —— U.S. ——, 106 *S.Ct.* 2661, 91 *L.Ed.*2d 434 (1986) (holding that petitioner had forfeited his right to object to psychiatric testimony by failing to raise the claim on initial appeal); *Cabana v. Bullock,* 474 *U.S.* 376,

---

[12]This Court adopted the general principles of *Strickland* in *State v. Fritz,* 105 *N.J.* 42 (1987). *Fritz* offered no occasion to decide, however, the applicability of those standards in the special context of capital punishment.

106 *S.Ct.* 689, 88 *L.Ed.*2d 704 (1986) (holding that the finding of intent to murder required under *Enmund* does *not* have to be made by the trial fact-finder, but can be made by federal appellate court after reviewing trial and appellate proceeding); *id.* at ——, 106 *S.Ct.* at 705, 88 *L.Ed.*2d at 727 (Blackmun, J., dissenting) ("The Court's conclusion that we should allow the State to adopt capital punishment schemes that depend on appellate factfinding because 'it is by no means apparent that appellate factfinding will *always* be inadequate' ... turns on its head the heightened concern with reliability ..." required in capital punishment cases); *Heath v. Alabama,* 474 *U.S.* 82, 106 *S.Ct.* 433, 88 *L.Ed.*2d 387 (1985) (holding that Double Jeopardy Clause does not prohibit imposition of death sentence in Alabama, despite life sentence in Georgia in murder-trial arising from same homicide); *id.* at ——, 106 *S.Ct.* at 444, 88 *L.Ed.*2d at 402–04 (Marshall, J., dissenting) ("the Court errs in refusing to consider the fundamental unfairness of the process by which petitioner stands condemned to die....").

No clearer signal of the Supreme Court's abandonment of the concern for heightened procedural safeguards in capital cases can be found than *Darden v. Wainwright,* —— *U.S.* ——, 106 *S.Ct.* 2464, 91 *L.Ed.*2d 144 (1986). In *Darden,* the trial court allowed a closing argument in which the prosecutor referred to the defendant as "an animal" and implied that a death sentence would be the only assurance against a future similar act. Applying conventional standards, the Supreme Court held that this allowance was harmless error. What Justice Blackmun wrote in dissent could have been written as easily in response to any of the above-cited post-*Barefoot* cases:

> Although the Constitution guarantees a criminal defendant only "a fair trial [and] not a perfect one" ... this Court has stressed repeatedly in the decade since *Gregg* ... that the Eighth Amendment requires a heightened degree of reliability in any case where a State seeks to take the defendant's life. Today's opinion, however, reveals a court willing to tolerate not only imperfection but a level of fairness and reliability so low it should make conscientious prosecutors cringe. [*Id.* at ——, 106 *S.Ct.* at 2476, 91 *L.Ed.*2d at 162 (Blackmun, J., dissenting) (footnote omitted) (citations omitted).]

Far from heightening the procedural integrity required because of the nature of the punishment, the Supreme Court in recent cases has, if anything, begun to *lower* appellate standards to make the punishment possible.

The cases from *Zant* to *Barefoot* thus set the trend in federal death penalty jurisprudence that continues to this day: "Despite the confusing plethora of concurrences and dissents in the death penalty cases ... the Court may indeed be setting a course: away from such cases." Paul Reidinger, "A Court Divided," *ABA Journal,* January 1, 1987, at 46, 50. Significantly, the breakdown of the system in *Zant-Barefoot* occurred just as the system was beginning to yield "results": roughly ninety percent of the executions since the first post-*Furman* execution in 1977 have occurred since the decisions in *Barefoot, Barclay,* and *Ramos. See* Note, *supra,* 95 *Yale L.J.* at 352.[13]

---

[13]Indeed, as important as the Supreme Court's substantive case law since 1983 has been the rancor on the Court evident in its denials of certiorari or of stays of executions. *See Woodard v. Hutchins,* 464 *U.S.* 377, 104 *S.Ct.* 752, 78 *L.Ed.*2d 541 (1984), in which five members of the Supreme Court—possessing neither the final draft of the lower court's decision nor the defendant's defense of the stay, but only the state attorney general's three-and-a-half page handwritten motion to vacate—vacated stay in order to beat the 6:00 p.m. expiration of the death warrant. Justices White and Stevens described the Court's *per curiam* vacation of the stay as "opaque"; Justice Brennan described as "indefensible" the Court's "rush to judgment." 464 *U.S.* at 383, 104 *S.Ct.* at 755, 78 *L.Ed.*2d at 546 (Justices White, Stevens & Brennan, dissenting). "In all candor," Justice Marshall wrote in dissent, "if there is an abuse of federal power in this matter, it is to be found in our own chambers." *Id.* at 384, 104 *S.Ct.* at 755, 78 *L.Ed.*2d at 547 (Marshall, J., dissenting). The issue that the petitioner had sought to preserve was eventually decided in 1986. *See Lockhart v. McCree, supra,* — U.S. ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137. *See generally* Note, *supra,* 95 *Yale L.J.* 349 (collecting cases). Other illustrative cases are: *Dobbert v. Wainwright,* 468 *U.S.* 1231, 105 *S.Ct.* 34, 82 *L.Ed.*2d 925 (1984) (a "frenzied rush to execution ... has become a common, if Kafkaesque, feature of the Court's capital cases") (Marshall, J., dissenting from denial of stay of execution); *Stephens v. Kemp,* 469 *U.S.* 1043, 105 *S.Ct.* 530, 83 *L.Ed.*2d 417 (1984) (court's denial of stay "result orientation carried to its most cynical extreme") (Brennan, J., dissenting from denial of stay); *Wainwright v. Adams,* 466 *U.S.* 964, 104 *S.Ct.* 2183, 80 *L.Ed.*2d 809 ("The haste and confusion surrounding this decision is degrading....") (Marshall, J., dissenting from vacation of stay);

The fundamental incoherence of federal death-penalty doctrine has never been more evident than in the Supreme Court's most recent disposition of the issue, *California v. Brown*, —— U.S. ——, 107 *S.Ct.* 837, 93 *L.Ed.*2d 934 (1987). Four Justices agreed that California's instruction prohibiting jurors from being swayed by "mere sympathy" was constitutional because by limiting "the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's 'need for reliability ...'" in sentencing *and* "ensures the availability of meaningful appellate review...." *Id.* at ——, 107 *S.Ct.* at 840, 93 *L.Ed.*2d at 940. Four other Justices, however, agreed that "[i]n forbidding the sentencer to take *sympathy* into account, this language on its face precludes precisely the response that a defendant's evidence of character and background is designed to elicit, thus effectively negating the intended effect of the Court's requirement that all *mitigating* evidence be considered." *Id.* at ——, 107 *S.Ct.* at 843, 93 *L.Ed.*2d at 944 (Brennan, J., dissenting). The deciding vote was cast by Justice O'Connor, who concurred in the result only because, in her opinion, "the individualized assessment ... is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence...." *Id.* at ——, 107 *S.Ct.* at 841, 93 *L.Ed.*2d at 942. Thus, the plurality result, emphasizing uniformity, was belied by the majority rationale, reempha-

---

*Wainwright v. Booker,* 473 *U.S.* 935, 106 *S.Ct.* 30, 87 *L.Ed.*2d 706 (1985) (Court has "moved with 'an impetuousness and arrogance that is truly astonishing'" in vacating stay granted to allow filing of petition for certiorari when Court had not seen the petition); *Skillern v. Procunier,* 469 *U.S.* 1182, 105 *S.Ct.* 945, 83 *L.Ed.*2d 956 (1985) (majority denied stay to one of eight named plaintiffs in a case challenging constitutionality of death by lethal injection, despite fact that certiorari had been *granted* in the case weeks earlier; Brennan, J. dissented: "The irony of the Court's ... action will not be lost on the public, when we ultimately issue a decision to a plaintiff no longer able to receive it"). *Cf. California v. Ramos, supra,* 463 *U.S.* at 1031, 103 *S.Ct.* at 3469, 77 *L.Ed.*2d at 1200 (1983) (Stevens, J., dissenting) ("Nothing more than an interest in facilitating the imposition of the death penalty in California justified this Court's exercise of its discretion to review the judgment of the California Supreme Court").

sizing individualized sentencing.[14] States with guided-discretion death-penalty statutes will be hard-pressed, to say the least, to identify and apply "the rule of *California v. Brown.*" As this exposition has demonstrated, moreover, *Brown* is not aberrational in this sense, but symptomatic. To paraphrase Chief Justice Rehnquist, the case law since *Gregg* has not eliminated arbitrariness or freakishness but has codified and institutionalized it; it has not guided sentencing discretion but has confused it. *Lockett v. Ohio, supra,* 438 *U.S.* at 631, 98 *S.Ct.* at 2974, 57 *L.Ed.*2d at 1006 (Rehnquist, J., dissenting).

This, then, is the federal capital punishment system in which this Court acquiesces. The Supreme Court, unable to harness the contending forces of individualization and consistency, has allowed death penalty prosecutions to run out of control. It has sanctioned arbitrary sentencing, and sacrificed the principle underlying *Furman* and *Gregg* that death is different in kind from other forms of punishment and thus demands heightened procedural safeguards in sentencing. Instead of balancing individualization and consistency, it has permitted these indispensable principles to cancel out one another. The reasons for this failure are self-evident: "It is naive to mandate individualized sentencing intending it to yield uniform results. The stronger the commitment to either standard—individuality or uniformity—the more difficult the other is to attain." Special Project, *supra,* 15 *Rutgers L.J.* at 300–03. Thus, when the Court has exalted individualization, it has crippled uniformity; when it has tried to rescue uniformity, it has become incoherent. The result is "legal doctrine-making in a state of nervous breakdown," "almost a bare aesthetic exhortation that the state

---

[14]The plurality opinion in *Brown* is also fundamentally incompatible with prior decisions such as Chief Justice Rehnquist's own opinion in *Barclay,* which emphasized the legitimacy of the *inability* of sentencers to detach themselves from feelings unrelated to the evidence (in that case, the sentencer's likening of the murder to his personal experience with Nazi concentration camps). *Barclay, supra,* 463 *U.S.* at 949–50, 103 *S.Ct.* at 3424–25, 77 *L.Ed.*2d at 1144. *See* discussion, *supra,* at 355–358.

just do something—anything—to give the death penalty a legal appearance." Weisberg, "Regulating Death," 1983 *Sup.Ct. Rev.* 305, 306. This experience at the federal level is disheartening. The federal precedent sets a poor example of constitutional jurisprudence and should not be considered as an interpretative model in giving meaning to our own Constitution or followed to set the outer limits of individual protection in this State.

### C.

The lessons of this ongoing federal odyssey compel us to search our own Constitution for the protections that must be applied in determining the validity of our capital murder-death penalty laws. That search must be thorough, conscientious and principled. We have in a variety of contexts emphasized those considerations that are germane to an understanding of our State Constitution. *State v. Williams,* 93 *N.J.* 39, 57–59 (1983); *State v. Hunt, supra,* 91 *N.J.* at 358–72 (Handler, J., concurring). Among these are the constitutional text and structure, constitutional history, pre-existing state law, state traditions, particular state governmental concerns, strong public policy, and cognizable public attitudes. *Id.; see* Linde, "E. Pluribus—Constitutional Theory and State Courts" in *Developments in State Constitutional Law,* 283–91 (deriving from P. Bobbitt, *Constitutional Fate* (1982), comparable factors to be considered: textual, historical, and structural factors to help define the range of possible meanings; doctrinal, prudential, and ethical factors to help define the desirable interpretation). Decisions based on "[t]he explication of standards such as these demonstrate that the discovery of unique individual rights in a state constitution does not spring from pure intuition but, rather, from a process that is reasonable and reasoned." *Hunt, supra,* 91 *N.J.* at 367 (Handler, J., concurring).

In the context of this case, the language and structure of the New Jersey Constitution, considered in light of the legal history

of capital punishment in this state, this Court's strong tradition of affording heightened protections to its citizens when important interests are at stake, and the special concern and interest of the State and its citizens in the administration of criminal justice, which are intensely concentrated in government-sanctioned capital punishment, create individual rights of exceptional strength. This informed understanding of the State Constitution reveals clearly that these individual rights and their corollary protections exceed those afforded under the federal Constitution. Our Constitution, so interpreted as a matter of both organic right and fundamental fairness, serves at a minimum to affirm the principles originally voiced in *Furman* and *Gregg.* Where a life is at stake, the procedures used to take that life must maximize both consistency and individual consideration in sentencing, and thus minimize arbitrariness and irrationality.

The Constitution itself is the first point of reference. The basic constitutional framework within which the validity of the capital murder-death penalty statute must be measured is the set of individual rights and corollary protections that are guaranteed by paragraphs 1, 5, and 12 of Article I of the New Jersey Constitution. Article I provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness. [*N.J. Const. of 1947 art.* I, para. 1]

No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin. [*Id.*, para. 5]

Excessive bail shall not be required, excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted. [*Id.*, para. 12]

Both the language and structure of these provisions affirm that the life of the individual—including a quality of life embodied in liberty, safety, security and happiness—is accorded the highest value and greatest protection possible under the State Constitution. Government cannot take life, or detract from the essence of life, or restrict the rights that are supportive of life,

based on arbitrary and unreasoned actions or invidious factors; even when sanctions must be imposed, the State may not impose any punishments that are cruel and unusual. It follows logically from these provisions and their obvious purport that when life itself is at stake government must be its most scrupulous to avoid any wrongful harm.

The history of New Jersey's experience in the application of the capital punishment reveals an evolving understanding of this meaning of our Constitution. This history discloses continuing changes in the perceptions of the scope and depth of the constitutional principles that prize individual life. The law has evolved historically in the direction of heightened protections for the individual, reflecting, perhaps tacitly, the need for the law and government to minimize the risk of injustice. This evolving societal awareness of the existence and evil of arbitrariness has in part paralleled increases in our knowledge of social and individual behavior. Over the generations, our understanding of social and individual injustice has become more acute. With greater insights into the existence and reality of such injustice, protections to eliminate undue risks of arbitrariness have also been heightened. This history of capital punishment in our State is most dramatically illustrated by the decreasing use of the capital murder sanction.

The change from lesser to greater protections is evidenced in several areas. Perhaps the most significant changes have been in the law itself. Between 1709 and 1877, the death penalty was apparently mandatory for all first degree murders. Defendants who pleaded guilty were subject to a degree of guilt hearing to determine if the murder was one of first degree. *See N.J. Revision* 1709–1877, Crimes, § 68, p. 239. Significantly, the death penalty statute enforced between 1906 and 1971 allowed very few murderers to face capital trials; the statute itself narrowly defined a class of capital murderers, *see N.J. S.A.* 2A:113–2. As pointed out in *State v. Genz,* 57 *N.J.L.* 459 (Sup.Ct.1895), however, from the earliest time, courts abhorred entering a death judgment on a defendant's admission, and

generally advised prisoners to retract the guilty plea and plead to the indictment to force the State to prove, to the jury's satisfaction, all elements of the crime charged. *Id.* at 462–63. Prompted by *Hallinger v. Davis*, 146 *U.S.* 314, 13 *S.Ct.* 105, 36 *L.Ed.* 986 (1892), in which a death sentence based on a guilty plea was upheld, the Legislature ended the practice. *See* Trenton Daily State Gazette, Feb. 14, 1893, at 5, cited in *State v. Forcella*, 52 *N.J.* 263, 277 (1968). The Legislature amended the statute in 1893 by abolishing the plea of guilty, thus eliminating "a ready and facile road to the gallows," *State v. Genz, supra,* 57 *N.J.L.* at 462, and authorizing a plea of *non vult.* If the *non vult* plea was accepted, the court was required to sentence the defendant to the same term of imprisonment as imposed upon a conviction of murder in the second degree. *See Forcella, supra,* 52 *N.J.* at 277. The *Forcella* Court noted that the *non vult* plea was intended to benefit murder defendants by permitting the court to bar the death penalty where the facts so warranted.

The Legislature in 1916 again added protections against the imposition of capital punishment. *L.* 1916, *c.* 270. That amendment modified the penalty for first degree murder to "death unless the jury at the time of rendering the verdict shall recommend imprisonment at hard labor for life." *L.* 1916, *c.* 170, p. 576. Another amendment increased the authorized maximum sentence on a *non vult* plea to life imprisonment. *L.* 1917, *c.* 238. While this amendment increased the maximum term, its purpose again was to improve the position of homicide defendants by encouraging courts to accept *non vult* pleas in circumstances in which a maximum term of years did not seem enough but the death penalty was too much. *See Forcella, supra,* 52 *N.J.* at 278.[15] Finally, in *In re Waiver of the Death*

---

[15] [A]fter 1916 life term prison sentences were meted out for murder with much greater frequency than death sentences would have been. But how much this is due primarily to the fact that juries availed themselves of the right to recommend mercy, and not to the fact that courts became more willing to accept

*Penalty,* 45 *N.J.* 501 (1965), this Court determined that a prosecutor has discretion to waive the death penalty in any case. "The result is that as to every murder indictment some official agency considers the fitness of the death penalty, the judge doing so on a plea of *non vult,* and either the prosecutor with the court's approval or the trial judge doing so when the defendant stands trial." *Forcella, supra,* 52 *N.J.* at 278–79.

These legal developments were reflected in empirical results. The combination of the 1893, 1916 and 1917 amendments had a major impact on New Jersey capital defendants. After 1916, life-term prison sentences were meted out for murder with greater frequency than death sentences would have been. Between 1916 and 1955, 497 persons were given life sentences for murder; 157 persons (or 3.8 per year) were sentenced to death. Between 1907 and 1916, however, 62 persons were sentenced to death while only 3 were given life sentences for murder. *See* Bedau, "Death Sentences in New Jersey, 1907–1960," 19 *Rutgers L. Rev.* 1, 30–31 (1961). Moreover, while New Jersey executed 160 defendants between 1907 (when accurate records began to be kept) and 1972—when the death penalty was declared unconstitutional—the figures declined toward the end of that period (approximately 127 executed between 1907 and 1940; 36 executed between 1941 and 1960; 3 between 1961 and 1963; none after). *See* New Jersey State Prison, *Historical Data on Death House* (Trenton, 1970). Clemency also played a role in the low number of eventual executions in New Jersey. Between 1916 and 1960, two persons' death sentences were commuted for every eleven persons executed. Before juries were given discretion to return a sentence of life imprisonment upon a conviction of first degree murder, two commutations occurred for every seven executions. *See* Bedau, *supra,* 19 *Rutgers L. Rev.* at 32.

---

pleas of *non vult* or *nolo contendere,* cannot be said. [Bedau, "Death Sentences in New Jersey, 1907–1960," 19 *Rutgers L.Rev.* 1, 30–31 (1961).]

In other respects the legal system moved to ameliorate the arbitrariness in the administration of capital punishment. Greater procedural protections were provided through the availability of appellate review.

> Under the 1948 Constitution, all appeals in capital causes are to be heard by the Supreme Court, and a writ of error with accompanying stay of execution is to issue automatically upon application.... New Jersey has moved from the position that appeal in capital cases is contingent on the pleasure of the court having authority to hear such appeals to the position that appeal is contingent only on the initiative of the defendant.... [*Id.* at 35–36.]

It was recognized that judicial review must be more scrupulous in capital cases than in others. *State v. Mount*, 30 *N.J.* 195 (1959).

The low number of criminals actually executed indicates, and is a consequence of, the strong procedural protections this State increasingly granted those facing the death penalty. Throughout that period the State developed a shared experience that, after prosecutors and juries and judges exercised their discretion, relatively few persons were sentenced to die. It is fair to conclude, in retrospect, that the history of our experience with capital punishment is the history of an evolving moral sense that the ultimate penalty should be inflicted in only the most egregious cases, under only the most rigorous procedural safeguards. *Cf. Trop v. Dulles*, 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958) (the phrase "cruel and unusual punishment" "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

Our history thus not only confirms that society places extraordinary value on individual life, but also teaches us society's moral judgment that the death penalty should not be applied unless it is right to do so, unless, in other words, substantive and procedural protections have been maximized so that the risk of arbitrariness is reduced and the possibility of the ultimate injustice is eliminated.

The import of the constitutional language and structure and the history of our experience with capital punishment must be

appreciated in the broader context of New Jersey's strong tradition of interpreting and applying its state Constitution to afford heightened protections for the individual, again reflecting our profound commitment to the worth of the individual.

> We have in important cases willingly resorted to our State Constitution as an independent source of individual rights. We have not hesitated to recognize and vindicate individual rights under the State Constitution where our own constitutional history, legal traditions, strong public policy and special state concerns warrant such action. [*State v. Williams, supra,* 93 *N.J.* at 52 (1983) (citations omitted).]

*See, e.g., State v. Novembrino, supra,* 105 *N.J.* 95; *State v. Gilmore, supra,* 103 *N.J.* 508; *State v. Hunt, supra,* 91 *N.J.* 338; *Right to Choose v. Byrne, supra,* 91 *N.J.* 287; *State v. Alston, supra,* 88 *N.J.* 211; *State v. Schmid, supra,* 84 *N.J.* 535; *State v. Johnson,* 68 *N.J.* 349 (1975); *Burlington Cty. NAACP v. Mt. Laurel,* 67 *N.J.* 151, *cert.* denied, 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975); *Cameron v. International Alliance Of Theatrical Stage Employees, Local 384,* 118 *N.J.Eq.* 11 (E. & A.1935). We have, in particular, endorsed an expansive reading of *Article* I, *paragraph* 1 of our Constitution, noting that "[t]he State Bill of Rights, which includes that provision, has been described as expressing 'the ... ideals of the present day in a broader way than ever before in American constitutional history.'" *Right to Choose, supra,* 91 *N.J.* at 303 (citation omitted).

Our decisions demonstrate that the State Constitution independently provides important guarantees of civil liberties in New Jersey. As recognized by Justice Pollock in *Right to Choose, supra,* 91 *N.J.* at 303, this Court "remain[s] obligated ... to evaluate [all statutes] in light of the Constitution of New Jersey." We carry out this task without granting any presumption that the Supreme Court's interpretation of the federal Constitution will determine the extent of state constitutional

rights. *See Hunt, supra,* 91 *N.J.* at 355 (Pashman, J., concurring); *id.* at 367 n. 3 (Handler, J., concurring).[16]

A consistent theme of our cases in the criminal law context has been this Court's unwillingness to follow the Supreme Court where its retrenchment of fundamental rights tolerates a significantly higher degree of arbitrary state action than would our own protections of these rights. Thus, in *State v. Novembrino, supra,* 105 *N.J.* at 850, Justice Stein, writing for the Court, understood that our State Constitution does not recognize the good-faith exception to the exclusionary rule, because the exception represents a Supreme Court retrenchment that failed to fully protect the underlying individual right to be free from unreasonable searches. The Court in an opinion written by Justice Garibaldi, *Matter of Guarino,* 104 *N.J.* 218 (1986), refused to follow the Supreme Court's reformulation of the fifth amendment privilege because it failed to fully protect the underlying individual privacy interests embodied in this State's common-law privilege. Justice Clifford, writing for the Court in *State v. Alston, supra,* 88 *N.J.* at 226, explained the Court's refusal to follow federal precedent in a search and seizure context: "Because we find that these recent decisions of the Supreme Court provide persons with inadequate protection against unreasonable searches and seizures, we respectfully part company with the Supreme Court's view of standing and construe Article I, paragraph 7 of our State Constitution to afford greater protection."

This Court has consistently seen the necessity for expanded protection when individual liberties are most vulnerable. We

---

[16]*See* Pollock, *supra,* 35 *Rutgers L.Rev.* at 722:

In the first half of this century, the most significant historic fact about New Jersey constitutional law was the adoption of a modernized constitution in 1947. During the balance of this century, the most significant fact may be the extent to which courts look to state constitutions as separate declarations of fundamental rights. If those declarations are to endure, courts must base their decisions on a principled theory justifying recourse to the constitutions.

have not hesitated to provide such protection when the Supreme Court, abandoning such protections, has opted to take a less protective route.

Protection of individuals involved in a criminal trial has also been enhanced by our recognition of the principle of fundamental fairness, a doctrine under New Jersey law that serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental *procedures* that tend to operate arbitrarily. The doctrine of fundamental fairness serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action. As we explained in *State v. Abbati*, 99 *N.J.* 418 (1985):

> Fundamental fairness can be viewed as an integral part of the right to due process.... It may also be considered a penumbral right reasonably extrapolated from other specific constitutional guarantees.... Regardless of its source, fundamental fairness is a settled repository of rights of the accused. [*Id.* at 429–30 (citations omitted).]

In this State, fundamental fairness is implicated at all stages of the administration of justice. In *State v. Kunz*, 55 *N.J.* 128 (1969), we held that a defendant had a right to disclosure of presentence reports and a right to be heard regarding any adverse matters within those reports. Our holding was

> taken [not] as a matter of constitutional compulsion for the Supreme Court holdings to date do not dictate it and we are not now prepared to find that it is of constitutional dimension under our State Constitution. It is being taken as a matter of rudimentary fairness.... [*Id.* at 144 (citations omitted).]

In *Rodriguez v. Rosenblatt*, 58 *N.J.* 281, 294 (1971), we observed that although there is no inflexible constitutional requirement that counsel be assigned without cost to indigents charged in the municipal courts with disorderly persons or other petty offenses, nonetheless "considerations of fairness dictate" that counsel be provided where necessary "to protect unrepresented indigent defendants against injustices which may result from their inability to cope fairly with municipal court charges against them."

Considerations of fundamental fairness are particularly heightened where the potential harm to the individual from arbitrary state action is greatest. Thus, in *State v. Tropea*, 78 *N.J.* 309 (1978), we held that a defendant could not be retried on a charge for which the defendant had been convicted, where the conviction had been reversed by the Appellate Division. We disallowed a retrial, because "constitutional compulsion aside, it is plain to us that considerations of fundamental fairness militate against any retrial in this case."

In *State v. Gaffey*, 92 *N.J.* 374 (1983), we said:

In fitting circumstances, [an incompetent whose indictment has been dismissed without prejudice] would doubtless, as a matter of elemental fairness and due process, be protected from any attempt to renew the prosecution against him, notwithstanding an earlier dismissal of the indictment without prejudice.

. . . .

[C]onstitutional considerations relating to speedy trial, due process and fundamental fairness will serve, when appropriate, to bar such future prosecutions [of those recently recovered from mental illness], even though not time-barred. [*Id.* at 388, 389.]

Fundamental fairness thus enhances or extends the scope of other constitutional protections. In *State v. Gregory*, 66 *N.J.* 510 (1975), we referred to the concept of fundamental fairness in requiring compulsory joinder of known offenses based on the same conduct or arising from the same criminal episode. We recognized that this protection went beyond the level of protection required by the constitutional guarantee against double jeopardy. The protection, instead, was intended "to satisfy the considerations of fairness and reasonable expectations." *Id.* at 521; *see also State v. Calvacca*, 199 *N.J.Super.* 434, 440 (App. Div.1985) (custodial sentence was "infringement of defendant's right to fundamental fairness in sentencing, a doctrine related to but somewhat broader in its application than the constitutional safeguard against double jeopardy"); *State v. Godfrey*, 139 *N.J.Super.* 135, 138 (App.Div.), *cert.* denied, 73 *N.J.* 40 (1976) (second prosecution of a defendant was barred, the court noting

that "the motion to dismiss should have been granted whether it be on grounds of double jeopardy or fundamental fairness").

Fundamental fairness constitutes an imperative that government minimize arbitrariness in its dealing with individual citizens. The imperative can be expressed in substantive as well as procedural laws. In *State v. Talbot*, 71 *N.J.* 160 (1976), we authorized an objective standard for an entrapment defense as a barrier against arbitrary police action. The holding was based on the constraints fundamental fairness places on state action.

> This ruling is bottomed on the principle of fundamental fairness.... [T]he methods employed by the State must measure up to commonly accepted standards of decency of conduct to which government must adhere. [*Id.* at 168.]

This Court has explained how "[i]t is universally recognized that, as an aspect of the courts' duty to ensure fundamental fairness, they will root out arbitrary government action." *State v. Leonardis*, 73 *N.J.* 360, 377 n. 7 (1977); *accord State v. Dalglish*, 86 *N.J.* 503, 513 (1981). At its heart, this injunction to avoid arbitrariness recognizes an equation between individual rights and government action. *Mathews v. Eldridge*, 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976); *Matter of Polk*, 90 *N.J.* 550, 562 (1982). As with due process, the two must balance: the greater and more important the individual interest, the greater and more sedulous must be the vigilance of the law in preventing the arbitrary invasion of that interest. Where the individual right at stake is the right to life, therefore, the safeguards of that right must be maximal, for "[t]he penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina, supra,* 428 *U.S.* at 304, 96 *S.Ct.* at 2989, 49 *L.Ed.*2d at 961. This Court's continued reaffirmation of the principle of fundamental fairness in the ordinary criminal context, moreover, stands in sharp contrast to the Supreme Court's retreat from the proposition that the death penalty requires heightened procedural safeguards.

In sum, an independent and separate analysis of our State Constitution demonstrates that individual life is accorded the greatest importance and vested with the highest value. This is fairly discerned from the grand and sweeping provisions of Article I, paragraphs 1, 5, and 12. A full examination of the Constitution also reveals that correlative governmental duties are expressly interposed to protect individual life, such as the prohibition against cruel and unusual punishment and invidious discrimination. The exaltation under the State Constitution of individual life, as well as liberty, safety, security and happiness, accounts in considerable measure for the development of both independent State constitutional interpretation and the ancillary doctrine of fundamental fairness. This has come to mean that government must accord those protections that are necessary and effective to vindicate and assure the individual interest at stake. It means, in the context of a capital murder-death penalty statute—given the unique importance of individual life and finality of death—that the maximum substantive and procedural protections possible must be used, protections that can realistically minimize the risk of arbitrary enforcement.

In assessing the constitutionality of New Jersey's capital punishment statute, we "can hardly ignore the ebb and flow" of the federal case law. *State v. Novembrino, supra,* 105 *N.J.* at 857. Further, though mindful of the undeniable popular support for capital punishment, at least in some forum, as reflected in opinion polls and in the passage of this statute, we cannot be swayed by it. As Justice Stein states in *Novembrino,* "[o]ur concern ... is with the Constitution and with the basic and fundamental guarantees that that document was intended to afford to all our citizens, particularly in times of public ferment.... In our tripartite system of separate governmental powers, the primary responsibility for [their] preservation is that of the judiciary." *Id.* at 857.

New Jersey, I believe, can benefit from the hard lessons of the federal experiment with guided discretion in capital cases. The record of that experiment makes "it quite possible that the

damage to the constitutional guarantee [in this case, of due process and against cruel and unusual punishment] may reach such a level as to cause the Court to reconsider its experiment" with guided discretion. *Id.* at 857. We need not abide such a result, for our state constitutional jurisprudence furnishes persuasive reasons not to follow federal precedent in this State. This is particularly so when "recent decisions of the Supreme Court provide persons with inadequate protection ...," *State v. Alston, supra,* 88 *N.J.* at 224–26; *State v. Novembrino, supra,* 105 *N.J.* 95; *Matter of Guarino, supra,* 104 *N.J.* 42, and when federal decisional law is perceived to be unsettled or unclear, *State v. Gilmore, supra,* 103 *N.J.* 508; *State v. Williams, supra,* 93 *N.J.* 39; *State v. Schmid, supra,* 84 *N.J.* 535. Here, the federal case law is unsettled, to say the least, for the standards adopted by the Court are radically indeterminate. The combination—unsettled case law and a trend toward retrenchment—counsels against following the federal precedent.

This Court's continued reaffirmation of the principle of fundamental fairness in the ordinary criminal context, moreover, stands in sharp contrast to the United States Supreme Court's retreat from the proposition that the death penalty requires heightened procedural safeguards. Justice Marshall highlighted the difference between the policies underlying recent federal decisions and the independent attitude of this State in his dissent in *Heath v. Alabama, supra,* 474 *U.S.* 82, 106 *S.Ct.* 433, 88 *L.Ed.*2d 387: "[T]he Court errs in refusing to consider the fundamental unfairness of the process by which petitioner stands condemned to die.... Whether viewed as a violation of the Double Jeopardy Clause or simply as an affront to the due process guarantee of fundamental fairness, Alabama's prosecution of petitioner cannot survive constitutional scrutiny." *Id.* at ——, 106 *S.Ct.* at 445, 88 *L.Ed.*2d at 402–04 (Marshall, J., dissenting). The federal cases, in short are irreconcilable with the principles we have established to inform capital punishment jurisprudence. By treating capital cases like any others they fail to make the bedrock distinction upon which the entire

edifice of capital punishment rests. The majority's acknowledgement of the infirmities of the federal precedent, moreover, and its assurance that it is "not obliged to follow the reasoning of all these [post-*Gregg*] United States Supreme Court decisions in interpreting our own state constitutional protections," *ante* at 190, have a rather hollow ring in light of its uncritical application in this case and in *State v. Biegenwald* of such post-*Gregg* cases as *Pulley v. Harris, ante* at 324–330, *Lockhart v. McCree, ante* at 248–261, *California v. Brown, ante* at 297, and *Poland v. Arizona, see State v. Biegenwald, supra,* 106 *N.J.* at 52.

We imperil more than lives, therefore, by following federal death-penalty precedent. To the extent that the majority's decision today is inconsistent with the approach of our prior state constitutional cases, we jeopardize our efforts to develop a principled recourse to the State Constitution. To the extent that the progeny of *Gregg* is contrary to the spirit of fundamental fairness underlying our State Constitution, we risk the integrity of our constitutional protections.

## II.

There should be consensus on the point that the Supreme Court is willing to tolerate in federal death-penalty jurisprudence an unacceptable level of arbitrariness. The question becomes whether death sentences issued under the New Jersey statute, *N.J.S.A.* 2C:11–3, are likely to be any less arbitrary. This question is fairly raised by defendant's challenge to the major aspects of the statute. He contends that the entire statutory scheme fails to provide a meaningful and effective basis for distinguishing those cases in which the death penalty is an appropriate penalty from those in which it is not, that it creates an intolerable risk that death will be inflicted in an arbitrary and capricious manner. Three major reasons are advanced to show that the statute fails to satisfy these constitutional standards: the death penalty is *per se* invalid; the capital

murder-death penalty statute is overly broad and inclusive; and the statute is too vague and imprecise. The Court rejects these contentions.

The majority contends (*ante* at 190) that I have made, in effect, a *per se* argument against all death penalty statutes by acknowledging the validity of the principles underlying death penalty jurisprudence while documenting the inability of courts to honor them. A *per se* invalidation of the death penalty is not, however, an ineluctable logical consequence of this argument; all that follows of necessity is that the protections afforded by federal death penalty jurisprudence in the name of these principles have been minimal, and that a New Jersey death penalty statute must provide, as a matter of independent state constitutional law, significantly greater protection than the minimum countenanced under federal precedent. I do note, however, my apprehension that time will settle the question. All of us will, I am certain, endure the frustrating and frenetic attempts to enforce capital punishment in a fair and sensible way that now plague our sister states. That experience will, I fear, yield grim confirmation of the fact that capital punishment in a civilized constitutional society is virtually impossible to administer in a principled manner. The *per se* invalidity of official capital punishment, in other words, may well be self-revealing. I therefore choose to concentrate on the statute itself.[17]

In assessing the constitutionality of our capital murder-death penalty statute under the standards relating to cruel and unusual punishment and due process of law, the major questions concern whether the law suffers from overbreadth and vague-

---

[17] I choose not to address defendant's related arguments based on federal constitutional grounds—that the death penalty is excessive; that a less severe penalty will serve the same deterrent and punishment process; that it serves no valid legislative purpose; and that retribution is not a legitimate state purpose. While I am not persuaded that these arguments lack merit under the State Constitution, disputation on these issues will prove at best inconclusive, problematic, and divisive, persuading few and settling nothing.

ness. These concerns bring us to examine (1) whether the law proceeds upon a definition of murder that itself is too broad and inclusive; (2) whether the aggravating factors enumerated in the statute to narrow this broad definition are themselves so vague as to be either meaningless or all-inclusive; and (3) whether the asserted deficiencies in terms of overbreadth and vagueness are exacerbated by (a) the fact that the jury determinations of death-eligibility and death-selection are made simultaneously, and (b) the failure in the statute to provide adequate standards in terms of who may be exposed initially to a capital-murder prosecution, *i.e.*, prosecutorial discretion, and who may ultimately have been unjustly subjected to the death penalty, *i.e.*, proportionality review.

### A.

The primary argument advanced by defendant is that our death penalty statute is violative of the cruel and unusual punishment prohibition, as well as due process standards, because the statute has failed both to sufficiently narrow the scope of the statute and to clearly define the crimes for which death can be a punishment.

There are two fundamental aspects to any death-penalty proceeding: a determination of death eligibility, in which the death-eligible class is first defined and then narrowed; and death selection, in which those in the death-eligible class whose crimes warrant the infliction of society's harshest sanction are selected for death. There is confusion, however, as to where one begins and the other ends. Thus, the majority rejects defendant's position that the aggravating factors "fail to define a narrow class of persons eligible for death," concluding instead that "aggravating factors ... are considered only after the death eligibility determination has been made." *Ante* at 188 n. 20.

Much, if not all, of the confusion is traceable to the United States Supreme Court's discussion of sentencing procedures in

*Gregg v. Georgia, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.* 2d 859, and *Zant v. Stephens, supra,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.* 2d 235.[18] The Court noted, in *Gregg,* that "[i]n the wake of Furman, Georgia amended its ... statute, but chose not to narrow the scope of its murder provisions.... Georgia did act, however, to narrow the class of murders subject to capital punishment by specifying ... aggravating circumstances...." *Id.* at 197–98, 96 *S.Ct.* at 2936, 49 *L.Ed.* 2d at 887–88. The emphasis in *Gregg* was on the role of the aggravating factors in guiding sentencing discretion; *Zant* made it clear, however, that the guiding of discretion during the sentencing *proceeding* did not extend to the sentencing *decision.* As we have seen, *supra* at 356, the Court in *Zant* upheld a death sentence based in part on consideration of an unconstitutional aggravating circumstance, but was forced in doing so to depart from the principles of *Gregg* by sanctioning unbridled juror discretion at the selection stage, the sentencing decision itself. The Court's holding was based in part on its acceptance of the Georgia Supreme Court's rather abstract depiction of Georgia's capital sentencing structure as a pyramid:

> The first plane of division above the base separates from all homicide cases those which fall into the category of murder. This plane is established by the legislature in statutes defining terms such as murder [and manslaughter]....
>
> The second plane separates from all murder cases those in which the penalty of death is a possible punishment. This plane is established by statutory definitions of aggravating circumstances.

* * * * * * * *

---

[18]The statute to which New Jersey's is most often likened is that of Georgia. *See* Special Project, *supra,* 15 *Rutgers L.J.* at 274–76 ("The similarity of the New Jersey statute to the Georgia version approved ... in *Gregg v. Georgia* is not accidental"); Capital Punishment Act: Hearings on S.112 Before the N.J. Senate Judiciary Comm., 200th Leg., 2nd Sess. 1 (1982) (Statement of Senator Russo: "Basically, the bill is drafted in accordance with the United States Supreme Court guidelines that render capital punishment constitutional in the Supreme Court case that so declared"). It is appropriate, therefore, to refer to the Supreme Court's analysis of the structure of the Georgia statute as a framework for discussing our own.

> The third plane separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed. There is an absolute discretion in the factfinder to place any given case below the plane and not impose death.... [*Zant, supra,* 462 *U.S.* at 871, 103 *S.Ct.* at 2739, 77 *L.Ed.* 2d at 246.]

Thus, under the Court's analysis "death-eligibility" is an equivocal term; while all statutory murders are "death-eligible," in the sense that conviction of murder exposes the defendant to the penalty proceeding, it is equally arguable that a defendant is not truly "death-eligible" until the jury has found one aggravating factor, for only then has the jury separated "from all murder cases those in which the penalty of death is a possible punishment." *Id.* As the Court noted, "statutory aggravating circumstances play a constitutionally necessary function at the stage of *legislative definition;* they circumscribe the class of persons eligible for the death penalty." *Id.* at 878, 103 *S.Ct.* at 2743, 77 *L.Ed.* 2d at 250–51. It is equally reasonable, in other words, to argue based on *Zant* that death-eligibility is defined by the aggravating factors, as to insist, as the majority does, that death-eligibility is defined before the aggravating factors are considered.

New Jersey's statute differs from the Georgia scheme described in *Zant,* however, in a decisive respect. Unlike Georgia, where statutory aggravating circumstances serve the sole function of narrowing "the class of persons eligible" for the penalty, and thus play no part in guiding the jury's death-selection discretion, in New Jersey aggravating circumstances guide the jury's death-selection discretion. That this distinction makes a difference can be seen in *Zant* itself, where the Court noted and distinguished cases in which consideration of improper aggravating factors required vacation of the sentence; the dispositive difference, the Court noted, was that those cases involved a statutory weighing process that would be corrupted by consideration of an invalid aggravating factor. *Id.* at 873 n. 12, 103 *S.Ct.* at 2741 n. 12, 77 *L.Ed.* 2d at 247 n. 12.

It is appropriate, therefore, to consider, independently of *Zant,* whether under New Jersey's statute the aggravating

factors properly play a role in defining the class of death-eligible murderers. There are two possibilities: (1) that they do not, in which case the class of death-eligible murderers is defined by *N.J.S.A.* 2C:11–3(a)(1) and (2), the statutory definition of murder; or (2) that the aggravating factors do define death-eligibility, in which case they serve both to narrow the class of death-eligible murderers and to guide the jury's discretion in the weighing process. In my opinion, either interpretation is constitutionally defective, the first because of the overbreadth of the statutory definition of murder, the second because of the inherent prejudice, from the defendant's point of view, of defining the offense as the sentence is imposed, and because of the inherent overbreadth and vagueness of the aggravating factors, most notably c(4)(c).

### 1.

We turn first then to the definitional provisions of the State capital murder-death penalty statute, *N.J.S.A.* 2C:11–3(c). This permits the infliction of the death penalty on anyone who commits a homicide by purposely or knowingly causing death or serious bodily injury if one of the statutory aggravating circumstances is found to exist and to outweigh any mitigating factors. In effect, the statute encompasses all murders, namely, all purposeful killings, all knowing killings, and all killings that result from a purposeful or knowing infliction of serious bodily harm. *N.J.S.A.* 2C:11–3(a).

The extraordinary breadth of the current class of murders initially eligible for the death penalty can be illustrated by a comparison to the class that was historically eligible for capital punishment throughout this century under our former death penalty statutes.[19] The former murder statute prescribed the

---

[19] I harbor no "preference" for one definition of murder over another. *Ante* at 195. To the extent that the prior definition of murder created a class of death-eligible murders so large that the arbitrary device of a *non vult* plea was required to narrow the class, even the prior definition may have been too

death penalty option only for first degree murder. This was defined to include "Murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which is committed in perpetrating or attempting to perpetrate certain felonies." *See* *L.* 1965, *c.* 212, § 1; *R.S.* 2:138–2; *L.* 1917, *c.* 238, § 1, p. 801 (1924 Supp. § 52–107); *L.* 1898, *c.* 235, § 107, p. 824 (C.S. p. 1780, § 107). This definition of first degree murder remained substantially unchanged (there were minor amendments) after 1898.

Under the former statute, with the exception of murders accomplished by poison or lying in wait, murders during the course of certain named felonies and the murder of a law enforcement officer, the State was required to prove three mental operations before a first-degree murder conviction could stand: premeditation, deliberation, and willful execution of the plan. *See State v. Anderson,* 35 *N.J.* 472, 496–97 (1961). All other murder was presumptively second degree murder—a non-capital offense—regardless of the circumstances of the murder. The element of deliberation was the crucial difference between first degree (capital) and second degree (non-capital) murder. Deliberation, followed by the homicide, is what was considered so outrageous about first degree murder, justifying societal punishment and retribution in the form of the death penalty. The current *mens rea* requirement of "purposely" committing the murder, *N.J.S.A.* 2C:2–2(b)(1), closely corresponds to the former requirement of premeditation, *i.e.,* intent to kill. The new statute, however, contains no requirement of deliberation.

The current statute also includes, as capital murder, death that results solely from the intentional infliction of serious bodily harm. It was clear under the former law that the intent only to do serious bodily harm was insufficient for a first

---

broad; it was nonetheless, I believe, more definite than the current definition. I am drawing a comparison here, not making a recommendation.

degree murder conviction. *See, e.g., State v. Thomas,* 76 *N.J.* 344 (1978); *State v. Madden,* 61 *N.J.* 377 (1972); *State v. Anderson, supra,* 35 *N.J.* at 497; *State v. Wynn,* 21 *N.J.* 264 (1956).

The inclusion of these murders and of "knowing" murders—a rough equivalent to the former second degree murder—expands the class of murderers who may be death-eligible as compared to the former statute. The majority acknowledges this, but insists that "[t]he comparison ... is irrelevant" because there is no requirement that the class at the guilt phase "be smaller than the class ultimately subject to the death penalty under a state's prior statute." *Ante* at 187. The majority further finds "no authority" imposing a " 'duty to limit' the *number* of individuals who are eligible for the death penalty." *Id.* Presumably, however, the limitation of the *class* of those eligible for the death penalty, a duty the majority does acknowledge, will result in a reduction in numbers, unless the class itself is meaninglessly large. I submit that the class here is so broad that the only meaningful definition of the class of death-eligible murderers can occur during the penalty phase. This state's homicide provision, standing alone, subjects to a possible death sentence defendants who under the prior statute would not even have been given a life sentence. Indeed, under our prior statute even most *first degree* murder defendants were not subjected to a death sentence, but could exercise a *non vult* plea; given a choice between excising the *non vult* plea provision and invalidating the death penalty statute, moreover, the Court in *State v. Funicello,* 60 *N.J.* 60 (1972), invalidated the statute, bridling at "the grisly [alternative] proposition that every defendant must risk death...." *Id.* at 82 (Weintraub, C.J., concurring); *cf. id.* at 100 (Francis, J., dissenting) ("The result of excision of the *non vult* provision is to require every first degree murder defendant to be put to trial before a jury, which will be called upon to decide guilt and death or life imprisonment. I agree this is a harsh result, but it follows inevitably from the United States Supreme Court

fiat. . . ."). Of course, under federal precedent there is no bar to determining death-eligibility during the penalty phase. It is clear, however, that to subject such a broad, nearly all-inclusive, class of defendants to a possible death sentence is to usurp the historical policy of this State, and of this Court, that capital punishment is an extreme sanction to be imposed in only the most egregious cases.[20] To the extent that the class is broadened, therefore, the comparison with the prior statute is entirely relevant, for any death sentences imposed upon defendants who would not have been death-eligible under this state's long-standing definition of first degree murder are, if nothing else, comparatively disproportionate. The likelihood, moreover, that juries will arrive at consistent results, given the variety of states-of-mind and circumstances contemplated by such a sweeping statutory definition of capital murder, is remote to say the least, as is the likelihood that this Court will be able to conduct a meaningful comparative appellate review.

New Jersey's statute can be "saved," in short, only if the aggravating factors applied in the penalty phase circumscribe substantially the class of death-eligible murderers. This Court's historical unwillingness to subject large numbers of first degree murder defendants under the old statute to a possible death sentence counsels in favor of requiring a narrower definition of death-eligible offenses at the guilt phase, and against the sweeping death-eligibility provisions of *N.J.S.A.* 2C:11–3(a)(1) and (2).

### 2.

If the broad definition of murder, standing alone, fails to distinguish adequately the capital offenses, it is arguable that

---

[20]The majority finds my reliance on the function of the *non vult* plea in this context "ironic given the dissent's overall purpose of demonstrating that the current Act will be arbitrarily applied." *Ante* at 195. I do not dispute the arbitrariness underlying the use of the *non vult* plea under the former statute; I do insist, however, upon the validity of the policy underlying its use as affirmed in *Funicello*—to subject only the most egregious first degree murderers to the death penalty.

the aggravating factors cure any overbreadth by narrowing the class of death-eligible offenses. This argument depends on two assumptions: (1) that no prejudice results from the fact that, unlike the Georgia scheme, aggravating factors in New Jersey serve both to narrow the class *and* to guide the jury in the discrete function of death selection; and most important (2) that the aggravating factors themselves are sufficiently clear and narrowly drawn to actually narrow the class. I reject both assumptions.

Our statute, as noted, provides a global definition of death-eligible murders. The overbreadth of this definition is "saved," as in Georgia's scheme, by interposing "aggravating factors" that must be found by the jury to determine which murderers qualify for capital punishment. In *Zant*, the Supreme Court approved this limited definitional use of aggravating factors, ruling that "in Georgia, the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons ... eligible for the death penalty." 462 *U.S.* at 871, 103 *S.Ct.* at 2739, 77 *L.Ed.*2d at 247. This structure differs dramatically, however, from the New Jersey statute, in which the finding of an aggravating factor does play a critical "role in guiding the sentencing body in the exercise of its discretion" by virtue of its function in the weighing process, *in addition to* "its function of narrowing the class of persons ... eligible for the death penalty." I have serious reservations as to whether the use of aggravating factors in a single proceeding both to define the murder as a capital offense and to determine the imposition of the death sentence is a fair way to administer the ultimate sanction of death.

This is not to deny that the weighing of aggravating and mitigating circumstances "provides the additional restraint on jury discretion that the petitioner in *Zant* argued was constitutionally necessary." *Ante* at 196. The constitutional infirmity is not in a weighing process. Rather, it inheres in the fact that weighing does double duty. It is used in the factfinding

necessary to determine whether a murder is capital in the same proceeding and deliberation that determines whether the murderer should be executed. Any distinction between finding an aggravating circumstance and weighing it when the tasks are performed in the same proceeding is at best, in my view, academic; the potential for jury misguidance and arbitrariness is simply too great.[21]

Other states, recognizing the absolute requirement that death penalty statutes be applied restrictively and clearly, have addressed this structural problem by defining with some particularity at the outset the specific kinds of murder considered "capital murder." *See* Cal. Penal Code § 190.2 (Supp.1986). Under these schemes, once a defendant is found guilty of capital murder according to pre-established criteria, the jury's discretion is then further guided by additional objective standards in sentencing defendants thus convicted of "capital murder"; *see Ala. Code* § 13A–5–40 to 52 (Supp.1984); *Ariz.Rev. Stat.Ann.* § 13–703, 13–1105 (1978 & Supp.1984); *Ill.Rev.Stat.* ch. 38, § 9–1 (Supp.1984); *La.Rev.Stat.Ann.* § 14:30, *La.Code Crim.Proc.*, arts. 905 to 905.9 (1984); *Miss.Code Ann.* § 97–3–19(2), 97–3–21 (Supp.1984); *N.H. Rev.Stat.Ann.* § 630:1, 630:5 (Supp.1984); *Texas Penal Code Ann.* § 19.03, *Texas Stat.Ann.* C.C.P. art. 37.071 (1981 & Supp.1984); *Utah Code Ann.* § 76–3–207, 76–5–202 (1978 & Supp.1984). In other words, death-qualifi-

---

[21]Consider, for instance, a circumstance in which a woman is raped before death, a circumstance arguably satisfying both c(4)(g) and c(4)(c). To the extent that the aggravating factors serve to define capital murder, the prosecution will insist that both factors be introduced, *see, e.g., People v. Harris, supra,* 679 *P*.2d at 448–50, 201 *Cal.Rptr.* at 797–99; however, the murder is not determined to be capital murder until the aggravating factors are weighed, and if they are weighed so as to render the murder capital, they will then automatically—without further deliberation—serve to call for the death sentence. *See, e.g., Wiley v. State,* 484 *So.*2d 339, 351–52 (Miss.), *cert.* denied, —— *U.S.* ——, 107 *S.Ct.* 304, 93 *L.Ed.*2d 278 (1986) (Marshall, J., dissenting from denial of certiorari); *Cook v. State,* 369 *So.*2d 1251, 1256 (Ala.1979); *State v. Rust,* 197 *Neb.* 528, 250 *N.W.*2d 867 (1977).

cation and death-selection are discrete, successive determinations, each to be made by the jury under appropriate standards.

Even though this Court decides that *N.J.S.A.* 2C:11–3 does rationally narrow the class of persons eligible for the death penalty under federal precedent, the uniqueness of our statute makes it appropriate as a matter of State constitutional doctrine to interpret Article I, paragraphs 1 and 12 to require a more reliable method of defining the class of murders subject to the death penalty. As noted, the jury's consideration of aggravating factors serves both to specify which defendants are in the class and, in the same process, to decide their punishment. The aggravating factors act as specifications of the class; they form, in effect, elements of the offense defendants must have committed to come within the class. *See ante* at 201 n. 27 ("It is clear to us . . . that functionally, the aggravating factors in the Act are indistinguishable ... from the elements of a crime") (citing *Arnold v. State*, 236 *Ga.* 534, 224 *S.E.*2d 386 (1976)); *State v. Silhan*, 302 *N.C.* 223, 269, 275 *S.E.*2d 450, 482 (1981). However, from the defendant's perspective, the sentence is imposed as and when the offense is defined. If the aggravating factors themselves are overbroad or capable of varying interpretation, therefore, the New Jersey process would not only fail to guide jury discretion in choosing the ultimate penalty once the jury has found the defendant to be within the death-eligible class, but it would fail to adequately narrow and define the class itself. The majority concedes, for instance, that "[i]t is true that any aggravating factor may alone lead to death, and that one aggravating factor—that the murder was committed in conjunction with a robbery, rape, burglary, arson, or kidnapping ...—includes a very substantial portion of all murders." *Ante* at 188–189. Thus, the overbreadth of the statutory definition of murder is carried through to the aggravating factors, which—however unambiguous in guiding death-selection discretion—necessarily fail to narrow a class they almost completely absorb. *See* discussion of factor c(4)(c), *infra* at 200–209. The State Constitution should

therefore be interpreted to require much greater narrowing of the death-eligible class *before* sentencing as a hedge against arbitrariness and to achieve greater reliability in sentence results.

### 3.

The intended definitional and discretion-guiding function of the aggravating factors is undermined by the vagueness of the principal factor implicated in this case, c(4)(c). Aggravating factor c(4)(c) permits a jury to consider whether "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." *N.J.S.A.* 2C:11–3c(4)(c). In *Gregg v. Georgia, supra,* 428 *U.S.* at 201, 96 *S.Ct.* at 2938, 49 *L.Ed.*2d at 890, the Supreme Court acknowledged that "it is, of course, arguable that any murder involves depravity of mind or an aggravated battery," but insisted that "there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction. . . ." The majority today similarly acknowledges that "[t]he provision is troublesome because of its obvious vagueness. Merely quoting it is the best proof of that fact." *Ante* at 198. The majority admits, moreover, that the results of attempts in other states to limit the application of their versions of factor c(4)(c) "often provide examples better not followed." *Ante* at 205.

The majority persists, nonetheless, in attempting a limiting construction of the factor, reading out of the statutory language both the "outrageously and wantonly vile, horrible or inhuman" phraseology and the legislature's recent amendment that would include "aggravated assault" as an aggravating factor. Sufficient clarity and narrowing can be achieved, the majority believes, by focusing on the defendant's state of mind; the standard that results encompasses (1) murders "in which the defendant intended to cause extreme physical or mental suffering" prior to death, but only where the victim actually felt pain or suffered, as well as (2) murders manifesting deprav-

ity of mind, where, in other words, "the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder and served no purpose for the defendant beyond his pleasure of killing. . . ." *Ante* at 207–209.

The majority's construction appears, at first blush, both novel and narrow. I submit, however, that when seen in the context of the efforts of other states to limit the application of the factor, the majority's effort is just one more attempt to salvage an incurably vague standard by rewriting it.

There can be no better illustration of the incurable vagueness of factor c(4)(c) than the attempts of other jurisdictions to limit its application. These attempts have been characterized by an initial assurance that the factor will be narrowed, a convincing-sounding statement of the narrowed standard, and a gradual temporizing expansion of the standard until it becomes unrecognizable. *See* Richard A. Rosen, "The 'Especially Heinous' Aggravating Circumstance in Capital Cases—The Standardless Standard," 64 *N.C.L.Rev.* 941 (1986). Indeed, every state whose construction of the "vileness" factor has paralleled the majority's in not limiting application of the factor to "serious physical abuse" before death has "proven . . . unable to provide any other identifiable, consistent, and meaningful limitations on the especially heinous circumstance." *Id.* at 968. What has emerged "is a pattern of ad hoc, standardless, and after-the-fact decision making—a pattern of judicial legislation." *Id.*

Thus, Georgia, in *Harris v. State*, 237 *Ga.* 718, 230 *S.E.*2d 1 (1976), *cert.* denied, 431 *U.S.* 933, 97 *S.Ct.* 2642, 53 *L.Ed.*2d 251 (1977), stated that it approved death penalties founded on this aggravating circumstance only when those cases are "at the core and not the periphery. . . ." *Id.* at 733, 230 *S.E.*2d at 11. Yet as Justice Marshall, concurring, noted four years later in *Godfrey*, Georgia had either abandoned that intention or "its understanding of the 'core' had become remarkably inclusive."

*Godfrey v. Georgia, supra,* 446 *U.S.* at 436, 100 *S.Ct.* at 1768, 64 *L.Ed.*2d at 411 (Marshall, J., concurring).

As the Supreme Court noted in *Godfrey,* by 1977 the Georgia Supreme Court had reached three separate conclusions respecting the (b)(7) aggravating factor as evidenced by the opinions in *Harris v. State, supra,* 237 *Ga.* 718, 230 *S.E.*2d 1 and *Blake v. State,* 239 *Ga.* 292, 236 *S.E.*2d 637, *cert.* denied, 434 *U.S.* 960, 98 *S.Ct.* 492, 54 *L.Ed.*2d 320 (1977). The *Godfrey* Court noted them approvingly:

> The first was that the evidence that the offense was "outrageously or wantonly vile, horrible or inhuman" had to demonstrate "torture, depravity of mind, or an aggravated battery to the victim." The second was that the phrase, "depravity of mind," comprehended only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim. The third, derived from *Blake* alone, was that the word, "torture," must be construed in pari materia with "aggravated battery" so as to require evidence of serious physical abuse of the victim before death. [446 *U.S.* at 431, 100 *S.Ct.* at 1766, 64 *L.Ed.*2d at 408 (footnotes omitted).]

Of course, the first conclusion of the Georgia courts—that torture, depravity of mind or aggravated battery demonstrates an outrageously or wantonly vile murder—is not a construction *of* the statutory language; it *is* the statutory language. *See Ga.Code Ann.* § 17–10–30(b)(7). The second and third constructions, however, taken alone, would have excluded *Harris* itself, since no physical abuse before death occurred in *Harris.*

In the wake of *Godfrey,* the Georgia court redefined the scope of this factor. In *Hance v. State,* 245 *Ga.* 856, 268 *S.E.* 2d 339, *cert.* denied, 449 *U.S.* 1067, 101 *S.Ct.* 796, 66 *L.Ed.*2d 611 (1980), the court rejected a contention that the factor had become a "catch-all" through varied applications. The court reestablished and refined the criteria required to uphold this factor in a capital case.

> This statutory aggravating circumstance consists of two major components, the second of which has three sub-parts, as follows: (I) The offense of murder was outrageously or wantonly vile, horrible or inhuman (II) in that it involved (A) aggravated battery to the victim, (B) torture to the victim, or (C) depravity of mind of the defendant. In determining "[w]hether * * * the evidence supports the jury's or judge's findings of [this] statutory aggravating circumstance * * *. (Code Ann. § 27–2537(c)(2)), the evidence must be sufficient to

satisfy the first major component of the statutory aggravating circumstance and at least one sub-part of the second component, as herein-after set forth. [*Id.* at 861, 268 *S.E.*2d at 345 (citation omitted).]

Both before *Godfrey* and after *Hance*, the Georgia Supreme Court has found torture supported whenever the victim anticipated the prospect of death. *See Rivers v. State*, 250 *Ga.* 303, 298 *S.E.*2d 1 (1982); *Harris v. State, supra*, 237 *Ga.* 718, 230 *S.E.*2d 1 (victim anticipated death). Thus, Georgia has strayed quite far from the conclusion approved in *Godfrey* that torture and aggravated battery should be construed in *pari materia* to require evidence of serious physical abuse before death.

The Georgia court has also strayed from its original conclusion that "depravity of mind" comprehended only that mental state that led the murderer to torture or batter his victim before death. That conclusion suggests that depravity could not exist independently of torture or battery. If it was ever seriously applied, that interpretation has been completely eroded. The Georgia court has found that physical harm to the victim after death will support a finding of depravity of mind. *See Fair v. State*, 245 *Ga.* 868, 268 *S.E.*2d 316, *cert.* denied, 449 *U.S.* 986, 101 *S.Ct.* 407, 66 *L.Ed.*2d 250 (1980) (defendant who mutilates or seriously disfigures the victim's body after death may be found to have a depraved mind). Moreover, in interpreting "depravity of mind," the Georgia court has found that age and physical characteristics of the victim may be considered, *see Thomas v. State*, 247 *Ga.* 233, 275 *S.E.*2d 318 (1980), *cert.* denied, 452 *U.S.* 973, 101 *S.Ct.* 3127, 69 *L.Ed.*2d 984 (1981), as well as the intent to inflict psychological distress on a witness. *Strickland v. State*, 247 *Ga.* 219, 275 *S.E.*2d 29, *cert.* denied, 454 *U.S.* 882, 102 *S.Ct.* 365, 70 *L.Ed.*2d 192 (1981). The Georgia Supreme Court has on occasion, moreover, simply recited the facts of cases in which no torture or battery occurred and concluded that *these* facts evidenced a depraved mind. *See Godfrey, supra*, 446 *U.S.* at 436, 100 *S.Ct.* at 1768, 64 *L.Ed.*2d at 411 (Marshall, J., concurring). This is especially true of instantaneous gunshot murders, which the Georgia

court labels "execution-style" by way of reaching its depravity conclusion. *See, e.g., Solomon v. State,* 247 *Ga.* 27, 277 *S.E.*2d 1 (1980), *cert.* denied, 451 *U.S.* 1011, 101 *S.Ct.* 2348, 68 *L.Ed.*2d 863 (1981) (execution-style murder of unarmed robbery victim); *Ruffin v. State,* 243 *Ga.* 95, 252 *S.E.*2d 472 (1979), *cert.* denied 444 *U.S.* 995, 100 *S.Ct.* 530, 62 *L.Ed.*2d 425 (1979) (shotgun murder of child showed depravity); *Banks v. State,* 237 *Ga.* 325, 227 *S.E.*2d 380 (1976), *cert.* denied, 430 *U.S.* 975, 97 *S.Ct.* 1667, 52 *L.Ed.*2d 370 (1977) (defendant's shooting of two non-offending defenseless persons execution-style was depraved). In still other cases, the Georgia Supreme Court has simply noted, in conclusory fashion, that "the evidence supported the jury's finding under § (b)(7)." *Godfrey v. Georgia, supra,* 446 *U.S.* at 440 n. 12, 100 *S.Ct.* at 1771 n. 12, 64 *L.Ed.*2d at 414 n. 12 (Marshall, J., concurring) (citing cases).

The application of similar versions of the "heinous" aggravating factor in other states has also been contradictory. Florida's application of "especially heinous, atrocious or cruel" has been especially erratic. Since that court infused a "conscienceless or pitiless" limitation, evidenced by "torture," into the meaning of this aggravating factor in *State v. Dixon,* 283 *So.*2d 1, 9 (Fla.1973), *cert.* denied, 416 *U.S.* 943, 94 *S.Ct.* 1950, 40 *L.Ed.*2d 295 (1974), applications of the factor appear to have strayed from any definite "core." *Compare Mason v. State,* 438 *So.*2d 374, 379 (Fla.1983), *cert.* denied, 465 *U.S.* 1071, 104 *S.Ct.* 1330, 79 *L.Ed.*2d 751 (1984) (heinousness supported by victim's painful death by stabbing; "[she] lingered, unable to breathe and aware of what was happening to her") *with Teffeteller v. State,* 439 *So.*2d 840, 846 (Fla.1983) ("[t]he fact that the victim lived for a couple of hours in undoubted pain and knew that he was facing imminent death ... does not set this senseless murder apart ..."), *cert.* denied, 465 *U.S.* 1074, 104 *S.Ct.* 1430, 79 *L.Ed.* 2d 754 (1984). While the court in some cases has adhered to the torture requirement set forth in *Dixon, see, e.g., Pope v. State,* 441 *So.*2d 1073, 1078 (Fla.1983) (at least three gunshot wounds and bludgeoning prior to causing death by drowning); *Wilson*

*v. State*, 436 *So.*2d 908, 912 (Fla.1983) (beating with hammer prior to killing by shotgun); *Bottoson v. State*, 443 *So.*2d 962, 966 (Fla.), *cert.* denied, 469 *U.S.* 873, 105 *S.Ct.* 223, 83 *L.Ed.*2d 153 (1984) (abduction, stabbing fourteen times, and run over with a car), the court has allowed factors distinct from this "torture" focus to enter into the analysis of whether a particular murder is heinous. *See, e.g., Breedlove v. State*, 413 *So.*2d 1, 9 (Fla.), *cert.* denied, 459 *U.S.* 882, 103 *S.Ct.* 184, 74 *L.Ed.*2d 149 (1982) (while pain suffered from a single stab wound alone might not make this murder heinous, atrocious, and cruel, the attack occurred while the victim lay asleep on his bed).

In *Magill v. State*, 428 *So.*2d 649 (Fla.), *cert.* denied, 464 *U.S.* 865, 104 *S.Ct.* 198, 78 *L.Ed.*2d 173 (1983), the Florida Supreme Court rejected a claim that the factor had become unconstitutionally vague because of the wide swings in meaning varied applications had created. The court's justification is classic temporizing:

> [t]here can be no mechanical, litmus test established for determining whether this or any aggravating factor is applicable. Instead, the facts must be considered in light of prior cases addressing the issue and must be compared and contrasted therewith and weighed in light thereof. [*Id.* 428 *So.*2d at 651.]

The *ad hoc* experience of the Georgia and Florida courts has been replicated in the other states employing aggravating factors akin to c(4)(c). Thus, Arizona, which, like the majority, takes the view that depravity refers to the defendant's state of mind, has upheld death sentences based on the factor "[w]henever *anything* about a murder has proved offensive to the court." Rosen, *supra*, 64 *N.C.L.Rev.* at 980–81. *See, e.g., State v. Ceja*, 126 *Ariz.* 35, 612 *P.*2d 491 (1980) (death after multiple shot wounds was not "cruel" because no pain was suffered, but was definitely depraved because multiple shots evidenced a " 'shockingly evil' state of mind 'marked by debasement' "). *See generally* Rosen, *supra*, 64 *N.C.L.Rev.* at 972–28 (surveying inability of state Supreme Courts of Florida, North Carolina, Nebraska, Alabama, Arizona, Georgia, Mississippi, Missouri, Oklahoma, and Virginia to limit the application of

their narrowing constructions when the constructions were, like the majority's, not limited to physical abuse before death). This most comprehensive state-by-state analysis of the case law concludes:

The legislature must provide a standard of sufficient definiteness to limit the discretion of juries and courts. Experience shows that the terms "heinous, atrocious or cruel," "depravity of mind," and "outrageously vile, wanton or inhuman" cannot perform this function. These terms, largely because they are so subjective and emotion laden, cannot, under the eighth amendment, limit the class of those eligible for the death penalty or provide a meaningful basis to distinguish the few who are to die from the many who are to live. They cannot, as required by the fourteenth amendment, adequately define and limit the elements that the prosecution must prove.... They cannot, as required by both the eighth and fourteenth amendment, sufficiently channel the sentencer's discretion to eliminate, or at least to minimize, the possibility of arbitrariness, capriciousness, and discrimination. [*Id.* at 990.]

I am persuaded by this decisional experience from other states that aggravating factor c(4)(c) is intractably vague. It cannot be sensibly clarified so as to overcome the intolerable risk that it will be vague in virtually all contexts and hence produce results unacceptably arbitrary and capricious. That this inherent vagueness infects the majority's attempt to limit the factor is best seen by exposing its construction to a real-world test. In *State v. Newlon,* 627 *S.W.*2d 606 (Mo.) (en banc), *cert.* denied, 459 *U.S.* 884, 103 *S.Ct.* 185, 74 *L.Ed.*2d 149 (1982), the Missouri court construed a version of c(4)(c) identical to New Jersey's in the following factual context: defendant entered a store and asked the clerk for cigarettes; when the clerk turned around the defendant shot him twice in the back with a shotgun; there was no conclusive evidence of suffering or of awareness of the gun. The Missouri court rejected the argument that the jury's depravity finding was unconstitutional under *Godfrey;* depravity, it held, had meaning independent of torture or aggravated battery. The murder was depraved, the court held, because the defendant had killed the victim without warning or provocation; the killing, as the court put it, was "senseless." *Id.* at 622. Similarly, under the majority's analysis a killing without warning or provocation, a "senseless" killing, satisfies the depravity standard. The manipulability of

this standard becomes clear, however, when the facts are varied. Suppose the murderer had threatened the victim, and the victim had threatened him in turn. In this event, the murder might no longer be "depraved," because it was committed not out of enjoyment but out of concern for personal safety; regardless of whether it was "depraved," however, the fact that a warning was issued brings the crime within the ambit of intentional infliction of psychological pain (awareness of impending death), thus still potentially satisfying the factor. Of course, the murder might still, at the court's discretion, be considered depraved, if the defendant had no "standard motive" for plotting the killing in the first instance. The point, however, is that motives are both innumerable and, ultimately, inscrutable; this is evidenced by the majority's own open-ended catalog of standard motives for murder ("greed, envy, revenge, or another of those emotions ordinarily associated with murder...." *ante* at 211). Indeed, to the extent that a given defendant is likely to fit within the majority's definition of depravity, *i.e.*, his motives are inexplicable in ordinary terms, he is also likely to verge on insanity. It is troubling that our society, which seeks to safeguard its citizens against arbitrary treatment by the state, responds to its most disturbed citizens by executing the depraved while acquitting the insane.

Nor are the objective factors unequivocal. In *Newlon*, the court "held that the jury's finding was supported by the evidence that defendant shot twice: if the victim still was alive after the first shot, the defendant must have suffered; if the victim died after the first shot, the second shot showed a purpose to mutilate the corpse." Rosen, *supra*, 64 *N.C.L.Rev.* at 985; *Newlon*, *supra*, 627 *S.W.*2d at 622. The majority's standard is no less malleable; in cases where there are multiple wounds, the jury can find either suffering or, if pain cannot be proved, mutilation. The majority's attempt to limit the application, in other words, by excluding murders where pain was intended but not felt is ineffectual; even where the absence of pain is provable, the defendant's intent to inflict pain in addition

to death makes the presence of mutilation (and thus depravity) likely. *Ante* at 209, n. 35.

The majority's insistence, finally, that "[t]he definition of this kind of murder is *not* vague," *ante* at 210, highlights once more the structural infirmities of the Act. It may be legitimate for society to be concerned, in capital murder, with "the complete absence—from society's point of view, of any of the recognizable motivations or emotions that ordinarily explain murder"; I believe, however, that this concern should be registered—from the defendant's point of view—earlier than when the sentence is imposed.

Aggravating circumstances are used in determining who among the class of all murderers is death-eligible. In this sense, these factors define the elements of capital murder. *See* discussion, *supra,* at 391–392. The factfinding necessary to determine if the murder is *capital* murder occurs in the sentencing rather than the guilt phase; moreover, the identical factfinding is necessary to determine if the murder is to be punishable by *death.* Thus, in the same process that the jury considers aggravating factors to determine if the murder is capital murder, it also must use the aggravating factors to determine if the sentence is death. In our statute, because the definition of capital murder is all-encompassing, and it is "narrowed" by resort to aggravating factors, the vagueness of c(4)(c) infects the very definition of the crime. *Cf. State v. Payton, supra,* 361 *So.*2d 866 ("vileness" aggravating factor sufficient for sentencing purposes but not as an element of an offense). In my opinion this is an impermissible way to narrow the class of death-eligible murders. I believe that a statute that in effect permits a jury to determine that *any* murder can be eligible for the death penalty without a prior, distinct and discrete determination that the murder is suitable for consideration as a death-penalty murder is intolerably arbitrary.

The reasoning of the California Supreme Court in *People v. Superior Court of Santa Clara Cty.,* 31 *Cal.*3d 797, 183

*Cal.Rptr.* 800, 647 *P.*2d 76 (1982) is persuasive on this point. In *Santa Clara,* the Court invalidated California's equivalent of factor c(4)(c). The court noted that terms such as depravity "address the emotions and subjective, idiosyncratic values. While they stimulate ... repugnance, they have no directive content." *Id.* 183 *Cal.Rptr.* at 802, 647 *P.*2d at 78. Such terms fail, the court concluded, to meet "the standards of precision and certainty required of statutes which render persons eligible for punishment, either as elements of a charged crime or as a charged special circumstance." *Id.* The conclusion that the aggravating factor was invalid took on added significance, moreover, because of the structure of the California statute:

> We must reject the People's argument that when the jury is determining the truth of the charged special circumstance, it is exercising a sentencing function and that, therefore, the requirements of due process for narrowness and clarity are lessened. Proceedings do not move into the penalty, or sentencing, phase until after a defendant is convicted of first degree murder *and* the special circumstance is found to be true.... The fact ... to be found in regard to the special circumstance is no less crucial to the potential for deprivation of liberty ... then are the elements of the underlying crime.... *[Id.]*

Although the structure of the New Jersey statute differs, as a matter of its basic definition of murder the statute effectively telescopes the definitional narrowing of the class of death-eligible murderers with the jury's finding of aggravating factors at sentencing. The vagueness of factor c(4)(c), in New Jersey no less than in California, infects both the death-selection and the death-eligibility determinations.[22]

Whether seen as elements of the offense of capital murder or as factors used to narrow the class at the sentencing stage, the aggravating circumstances must realistically act as a limit on

---

[22]In Virginia, by contrast, the elements of capital murder serve to narrow the class of death-eligible murderers significantly at the outset, such that the vileness factor is used only for sentencing, rather than as a defining element of the respective class. (For example, Mr. Ramseur's crime does not satisfy the elements of capital murder in Virginia. *See Va.Code Ann.* § 18.2–31 (1982).) In Tennessee and Georgia, the death-eligible class is limited to first degree or murderers, respectively, although both states construe this limitation rather broadly. *See Tenn.Code Ann.* 39–2–202 (1984); *Ga.Code* 16–5–1 (1982).

the otherwise over-inclusive category of murder. The structural vice of our statute, which merges the classification and sentencing functions—the defendant death-qualification and death-selection decisions—is compounded by its use of a critical aggravating factor that is itself inscrutable and overbroad.

B.

There are additional reasons for concluding that the state capital murder-death penalty statute is unconstitutional because it fails to eliminate the real risk of arbitrary enforcement. The statutory infirmities—the global definition of capital murder, the overbreadth and vagueness of the statute's most critical aggravating factor, and the merger of the defendant death-qualification and death-selection determinations—highlight another equally profound constitutional weakness in the capital murder-death penalty scheme.

Just as the statute fails to guide juries at its most critical points of application, it fails to channel prosecutorial or judicial discretion in ways that could reduce the threat of arbitrariness. On occasion we have acknowledged the possibility for abuse in the administration of criminal justice given the broad discretion that prosecutors are entitled to exercise in bringing prosecutions. We observed in *In re Ringwood Factfinding Comm.*, 65 *N.J.* 512, 516 (1974), that a prosecutor's discretion in selecting matters for prosecution is broad but it "is not unregulated or absolute and may, in appropriate circumstances be reviewed for arbitrariness or abuse." See *State v. Gledhill*, 67 *N.J.* 565 (1975).

There was a time when prosecutorial discretion to determine whether the death penalty should be pursued was recognized as a factor that benefited a defendant. *See In re Waiver of Death Penalty, supra*, 45 *N.J.* 501. This was, however, in the context of a statute that did not itself adequately regulate through careful substantive standards or proper procedures the decision to treat a particular murder as a capital crime for which the

death penalty is to be imposed. The current capital murder-death penalty statute provides no standards to guide a prosecutor's discretion in terms of who may be prosecuted for capital murder. In *State v. McCrary*, 97 *N.J.* 132 (1984), we required that a pretrial hearing in a capital murder prosecution be held to determine whether aggravating factors alleged by the prosecutor were adequately supported by evidence. Nevertheless, the Court permitted this to be done by a slight evidentiary showing, one no greater than that required to avoid the dismissal of an indictment. That evidentiary burden, in my view, is insufficient to assure a defendant that there is a reasonable, well-founded basis to prosecute him or her for capital murder. *Id.* at 147 (Handler, J., concurring). This is particularly so in light of the fact that in many murders the aggravating factor will be c(4)(c), which is hopelessly overbroad and vague. Not only is it insufficient to guide jury discretion, it is insufficient to guide prosecutorial discretion.

Thus, the standards that govern prosecutorial decisions leave the prosecutor virtually unfettered in terms of who should be prosecuted for capital murder. Any prosecutor is in a position to classify almost *any* murder as a capital offense. His decision, though conscientious, must necessarily be highly subjective and speculative. The decision, moreover, is virtually unchecked. While the prosecutor must notify defendant of the grounds for the decision, the evidentiary support that must be shown to sustain that decision is light. The inevitability of arbitrariness in a system in which prosecutorial discretion is unfettered is verified in the results—albeit preliminary—of the Public Defender's study *The Reimposition of Capital Punishment in New Jersey: Homicide Cases from 1982–1986*, which suggest that "there is an enormous discrepancy between the way in which prosecutorial discretion is exercised in each community. Every county prosecutor is politically autonomous, and the predilections and practices ... differ enormously.... As the preliminary data from these 568 cases demonstrate,

different methods of applying the statute have been institution-alized in each jurisdiction, and there are enormous discrepancies on both substantive and procedural matters." *Id.* at 3–4. Hence it becomes clear that prosecutorial decisions to prosecute for capital murder are basically standardless, and there is no procedure that will adequately provide a screen to intercept those defendants who should not be tried for capital murder.

A comparable infirmity exists at the other end of the death-penalty tunnel. The statute as enacted—and in effect when the defendants in this and the companion case were prosecuted—required proportionality review. In my opinion this is constitu-tionally essential. The statute with its serious flaws of over-breadth, vagueness, and the blurring of decision-making, to which may be added unchecked prosecutorial discretion, is grossly defective if it cannot provide an ultimate fail-safe that could otherwise rectify individual injustice and spare the life of a defendant improvidently sentenced to death.

It cannot be overstressed that at the time of his trial, defend-ant would have been entitled automatically to "proportionality review." Subsequently, the statute was amended to provide for proportionality review only when requested, presumably in response to *Pulley v. Harris, supra,* 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29. *L.*1985, *c.* 467. The absence of proportionality review, in my opinion, becomes a fatal constitutional flaw because there is no other way under the statute to correct an arbitrary or discriminatory death sentence.

Given the majority's assurance that it is "not obliged to follow the reasoning of all these [post-*Gregg*] United States Supreme Court decisions in interpreting our own state constitu-tional protections," *ante* at 190, it is difficult to comprehend its—and the legislature's—reliance on *Pulley v. Harris, supra,* 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29, which held that proportionality review is not necessarily mandated by the eighth amendment. This hardly answers the question whether

it is mandated as a matter of fundamental fairness under our State Constitution.

Proportionality review has a unique function in a capital murder prosecution. It seeks to determine whether the death penalty is "unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Id.* at 43, 104 *S.Ct.* at 875, 79 *L.Ed.*2d at 36. Proportionality review can act "as a check against the random and arbitrary imposition of the death penalty" by an aberrant jury. *Gregg v. Georgia, supra,* 428 *U.S.* at 206, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d at 893. Proportionality review tests the capital murder-death penalty scheme for fairness and consistency. It can measure whether " 'we have designed procedures which are appropriate to the decision between life and death and ... [that] we have followed those procedures.' " *Pulley v. Harris, supra,* 465 *U.S.* at 68–69, 104 *S.Ct.* at 888–89, 79 *L.Ed.* 2d at 52 (Brennan and Marshall, JJ., dissenting) (quoting Kaplan, "The Problem of Capital Punishment," 1983 *U.Ill.L.Rev.* 555, 576).

The majority itself observes that "proportionality review * * * is a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty," *ante* at 327, and, further, that it "is an important procedural mechanism to safeguard against the arbitrary and capricious imposition of the death penalty," *ante* at 330.

I am convinced that as a matter of fundamental fairness capital murder-death penalty convictions under our current statute must require proportionality review. It may well be that the paradox acknowledged by the majority—of attempting to assure uniformity at the end of a process that guarantees an individualized assessment of the defendant—will prove unresolvable; to the extent that our system seeks to assure *both* uniformity and individualization, however, proportionality review is indispensable in monitoring its efficacy. To the extent

that proportionality review is made optional, moreover, any case in which review is not exercised where review would have vacated the sentence irrevocably prejudices all future cases by lowering the threshold of properly imposed death sentences. The statute, I submit, is rife with substantive and procedural deficiencies that strongly demonstrate the real likelihood of arbitrary application. The Supreme Court in *Pulley* clearly recognized that proportionality review may be obviated only where the capital murder scheme provides substantive and other procedural safeguards against arbitrary or capricious sentencing. Our does not.

### D.

Thomas Ramseur was convicted and sentenced under a statute that violates our own constitutional standards relating to cruel and unusual punishment and due process of law. The statute fails markedly to clearly and strictly define the kind of murder that ought to be considered capital in nature. Its mechanisms for attempting to narrow and confine the definition of murder and this Court's attempts to give this definition clarity and certainty are inadequate. The fact that the aggravating factors are used in the same proceeding to define the offense and to determine the sentence compounds the high risks of arbitrariness stemming from inadequate standards. The absence in the scheme of any other measures that could ameliorate or rectify arbitrariness, such as guided prosecutorial discretion and appellate proportionality review of sentences, underscores the arbitrariness of the scheme.

### III.

Defendant raises several important issues involving his constitutional rights to indictment and trial by properly constituted juries. These issues concern the manner in which the juries, both grand and petit, were selected. Defendant asserts that the respective juries were neither fair and impartial nor a

representative cross-section of the community, and, further, that the trial court, in the selection of the petit jury, improperly limited *voir dire* examination into possible racial bias. In addition, defendant contends that the trial of the issue of criminal guilt before a jury that has been death-qualified, under the bifurcated trial scheme of the capital murder-death penalty statute, fails to satisfy constitutional requirements of a trial by a fair and impartial jury. Because these issues arise in the context of a criminal prosecution that can—and did—eventuate in the imposition of the death penalty, I disagree strongly with the Court's position that conventional standards and practices enable us to overlook the gravity of these jury-related errors. I therefore dissent from the Court's determination that none of the serious deficiencies attendant upon the selection and use of the juries in this case warrants a reversal of defendant's conviction and sentence.

## A.

Defendant challenges the composition of the grand and petit juries that were used respectively in his criminal indictment and trial conviction and sentence. He argues that the method used for jury selection resulted in underrepresentation of blacks in violation of his right to equal protection of the law and his right to be indicted and tried by a jury drawn from a representative cross-section of the community.[23] Specifically, defendant contends that the Essex County source list for grand and petit jurors was underrepresentative of blacks and, therefore, that the resulting pool of qualified jurors chosen from this list was unconstitutionally unrepresentative under the sixth amendment and the equal protection clause of the fourteenth amendment as well as Article I, paragraphs 5 and 9 of the State Constitution.

---

[23]Originally, defendant alleged that blacks, women, low-income groups, young people, students and Newark residents were unconstitutionally underrepresented. The Court focuses its attention only upon the alleged improper exclusion of blacks.

He also challenges the method by which grand jurors were selected and empaneled individually, as well as the procedures used to select grand jury forepersons.

In Essex County, grand and petit jurors are chosen from a list containing the names of all registered voters and licensed drivers of motor vehicles. *N.J.S.A.* 2A:70–4.[24] These lists, as acknowledged by the majority and demonstrated by the record, are clearly underrepresentative of blacks. *Ante* at 213–214; *infra* at 410–417. In addition, this underrepresentation is exacerbated by the individualized empaneling procedures used by the assignment judges in Essex County. As noted by the majority, these procedures were highly subjective and focused upon racial considerations.[25] Moreover, once each grand jury was selected, the assignment judges used a highly subjective method of selecting grand jury forepersons.[26]

Defendant's several challenges were tried and rejected by the court below. *See State v. Ramseur*, 197 *N.J.Super.* 565 (Law Div.1984). As noted, the majority does not dispute the fact that the jury-selection procedures used in this case resulted in the underrepresentation of blacks. Defendant and the State stipulated to the fact that blacks comprise 35.9% of the jury-eligible population in Essex County. *Ante* at 213. Because neither the sources from which the jury list is derived nor the questionnaires sent to those on the list classify jurors according to race, the defense used three surveys to determine the percentage composition of blacks on the jury list. Averaging the results of two telephone surveys and one survey based on a geographical-

---

[24]The procedures followed in selection of jurors are outlined by the majority. *Ante* at 212–213.

[25]The Court also summarizes this aspect of grand jury selection. *Ante* at 228–230.

[26] The majority has described this aspect of jury selection. *Ante* at 236. I am satisfied that the selection of grand jury forepersons was deficient but see no need to treat this claim as a basis for reversal.

ly-inferred method,[27] the defense concluded that, for the period between 1979 and September 1982, the percentage of blacks on the source list and the qualified list was 21.3 and 21.8 percent respectively. *Ante* at 214.

The trial court accepted this evidence, *State v. Ramseur, supra,* 197 *N.J.Super.* at 574, n. 4, and found that the absolute disparity between the percentage of blacks in Essex County and the percentage on the qualified and source lists was 14.1 and 14.6 percent respectively.[28] As noted, the majority does not quarrel with these figures. *Ante* at 214–215. In determining disparity the court did not utilize two other acceptable measurement techniques—the comparative disparity and statistical significance methods—because it felt that absolute disparity was the simplest measure and the one used by the United States Supreme Court in three precedents on this issue. *See State v. Ramseur, supra,* 197 *N.J.Super.* at 573 n. 3.

In order to resolve defendant's contentions, it is important first to explain the legal framework within which his constitutional rights must be analyzed. A defendant in state court may challenge the representativeness of the list from which jurors are chosen on two federal constitutional grounds. First, the equal protection clause of the fourteenth amendment protects a defendant from state action that invidiously discriminates against a distinctive class of people of which the defendant is a

---

[27]The geographically-inferred method determines a juror's race based on inferences drawn from the composition of the juror's neighborhood. This survey indicated that 17.9% of the source list was black. This total was the lowest of the three surveys. The defense claimed that even though this survey could have been given more weight because it used a much higher sample, the experts decided to use the more "conservative" methodology of giving the three samples equal weight.

[28]The court also found that the absolute disparity: between women in the population and the source and qualified lists was 6.0 and 6.7 percent respectively; with respect to low-income persons on the qualified list was 12.2 percent; and for Newark residents was 9.2 percent for the source list and 15.7 percent for the qualified list. *State v. Ramseur, supra,* 197 *N.J.Super.* at 573.

member. In the juror-selection context, an equal protection violation occurs when "the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group of which he belongs." *Castaneda v. Partida,* 430 *U.S.* 482, 494, 97 *S.Ct.* 1272, 1280, 51 *L.Ed.*2d 498, 510 (1977). Because the fourteenth amendment applies to all state action, the test developed to gauge discrimination applies equally to the selection of grand jurors and petit jurors.

The sixth amendment is the second federal constitutional ground that may be available to a state defendant. The sixth amendment right to trial by an impartial jury requires that petit juries be drawn from a "cross-section of the community." *Thiel v. Southern Pacific Co.,* 328 *U.S.* 217, 219–220, 66 *S.Ct.* 984, 985, 90 *L.Ed.* 1181, 1184 (1946). This requirement is based on the principle that a jury determination can be truly fair and impartial only if the beliefs, attitudes, and perspectives of the whole community are represented. *See Ballard v. United States,* 329 *U.S.* 187, 194, 67 *S.Ct.* 261, 264, 91 *L.Ed.* 181, 186 (1946) ("a flavor, a distinct quality is lost if either sex is excluded [from the jury.]"); *Taylor v. Louisiana,* 419 *U.S.* 522, 530, 95 *S.Ct.* 692, 698, 42 *L.Ed.*2d 690, 698 (1975) ("The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge."). The cross-section requirement, "fundamental to the jury trial guaranteed by the Sixth Amendment," *Taylor v. Louisiana, supra,* 419 *U.S.* at 530, 95 *S.Ct.* at 697, 42 *L.Ed.*2d at 698, has been applied to the states through the fourteenth amendment. *Alexander v. Louisiana,* 405 *U.S.* 625, 92 *S.Ct.* 1221, 31 *L.Ed.*2d 536 (1972); *Turner v. Fouche,* 396 *U.S.* 346, 90 *S.Ct.* 532, 24 *L.Ed.*2d 567 (1970).

The right to a jury drawn from a fair cross-section, cognizable under the sixth amendment, is violated when the operation of the system results in a non-representative jury list. It is settled that total exclusion is not required in order to make out

a constitutional violation. *Castaneda v. Partida, supra,* 430 *U.S.* 482, 97 *S.Ct.* 1272, 51 *L.Ed.*2d 498; *Turner v. Fouche, supra,* 396 *U.S.* 346, 90 *S.Ct.* 532, 24 *L.Ed.*2d 567; *Carter v. Jury Comm'n,* 396 *U.S.* 320, 90 *S.Ct.* 518, 24 *L.Ed.*2d 549 (1970); *Whitus v. Georgia,* 385 *U.S.* 545, 87 *S.Ct.* 643, 17 *L.Ed.* 2d 599 (1967); *Swain v. Alabama,* 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759 (1965), overruled on other grounds, *Batson v. Kentucky,* —— *U.S.* ——, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986); *Cassell v. Texas,* 339 *U.S.* 282, 70 *S.Ct.* 629, 94 *L.Ed.* 839 (1950). Unlike an equal protection challenge—which stresses impermissible discrimination—sixth amendment analysis is concerned with the *result* that members of a group have been excluded, not with the reasons for such exclusion or the motives of those implementing the system.

However, the sixth amendment's proscriptions apply only to juries chosen for trial and, therefore, do not limit the powers of the federal or state government to select grand jurors. It is the fifth amendment right to a "presentment or indictment of a Grand Jury" which requires that federal grand juries be selected from a cross-section of the community.[29] *Smith v. Texas,* 311 *U.S.* 128, 61 *S.Ct.* 164, 85 *L.Ed.* 84 (1940). This right to a representative grand jury "is similar to the right—applicable to state proceedings—to a representative petit jury under the Sixth Amendment." *Castaneda v. Partida, supra,* 430 *U.S.* at 510, 97 *S.Ct.* at 1288, 51 *L.Ed.*2d at 520 (Powell, J., dissenting). However, "[T]he [United States Supreme] Court has never held that federal concepts of a 'grand jury,' binding on the federal courts under the Fifth Amendment, are obligatory for the States." *Alexander v. Louisiana, supra,* 405 *U.S.* at 633, 92 *S.Ct.* at 1226, 31 *L.Ed.*2d at 544; *Hurtado v. California,* 110 *U.S.* 516, 538, 4 *S.Ct.* 111, 122, 28 *L.Ed.* 232 (1884).

---

[29]The Federal Jury Selection and Service Act of 1968, 28 *U.S.C.* § 1861 et seq. also requires that grand and petit juries be selected "from a fair cross section of the community in the district or division wherein the court convenes." 28 *U.S.C.* § 1861.

Although the Supreme Court has not held specifically that a state defendant is entitled to a grand jury chosen from a representative cross-section of the community, this right can be found in our State Constitution. Article I, paragraph 8 of the New Jersey Constitution extends to the citizens of this state the right of indictment. In *State v. Rochester*, 54 *N.J.* 85, 88 (1969), we interpreted this provision as requiring that grand jury selection "be so designed as to insure that juries are impartially drawn from community cross-sections." *See also State v. Porro*, 158 *N.J.Super.* 269, 272 (App.Div.), *cert.* denied, 439 *U.S.* 1047, 99 *S.Ct.* 724, 58 *L.Ed.*2d 706 (1978); *State v. Smith*, 102 *N.J.Super.* 325 (Law Div.1968), aff'd o.b., 55 *N.J.* 476 (1970), *cert.* denied, 400 *U.S.* 949, 91 *S.Ct.* 232, 27 *L.Ed.*2d 256 (1970). A majority of state courts have similarly decided that this right exists. *See, e.g., State v. Bowen*, 45 *Or.App.* 17, 607 *P.*2d 218 (1980); *Adler v. State*, 95 *Nev.* 339, 594 *P.*2d 725 (1979); *State v. Foster*, 196 *Neb.* 332, 242 *N.W.*2d 876 (1976); *State v. Nelson*, 603 *S.W.*2d 158 (Tenn.Cr.App.1980); *People v. Guzman*, 60 *N.Y.*2d 403, 469 *N.Y.S.*2d 916, 919 n. 3, 457 *N.E.*2d 1143, 1146 n. 3 (1983), *cert.* denied, 466 *U.S.* 951, 104 *S.Ct.* 2155, 80 *L.Ed.*2d 541 (1984); *State v. Castonguay*, 194 *Conn.* 416, 481 *A.*2d 56, 59 (1984); *State v. Jenison*, 122 *R.I.* 142, 405 *A.*2d 3 (1979). Therefore, although the federal fifth amendment right to indictment has not been applied to the states, *Hurtado v. California, supra*, 110 *U.S.* 516, 4 *S.Ct.* 111, 28 *L.Ed.* 232, state constitutional principles grant defendant the right to have an indictment returned by a grand jury whose members are drawn from a fair cross-section of the community. *See State v. Rochester, supra*, 54 *N.J.* at 88; *State v. Smith, supra*, 102 *N.J.Super.* 325.

Regardless of whether state or federal grounds are employed, federal analysis remains instructive in terms of understanding the constitutional right to a fair and impartial jury. Defendant has the right to demonstrate that the jury-selection system fails to provide adequate representation of cognizable groups, in which event his conviction must be considered invalid

regardless of whether actual prejudice was suffered. *See Vasquez v. Hillery,* 474 *U.S.* 254, ——--——, 106 *S.Ct.* 617, 622–24, 88 *L.Ed.*2d 598, 607–09 (1986). In *Duren v. Missouri,* 439 *U.S.* 357, 99 *S.Ct.* 664, 58 *L.Ed.*2d 579 (1979), the Supreme Court set forth the framework for evaluating fair cross-section claims under the federal constitutional entitlement to a fair and impartial jury.[30] First, the defendant must establish a *prima facie* case that the fair cross-section requirement has been violated, by showing:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Id.* at 364, 99 *S.Ct.* at 668, 58 *L.Ed.*2d at 587.]

Once the defendant has made this *prima facie* showing, the burden shifts to the state to justify this infringement of the defendant's right "by showing attainment of a fair cross-section to be incompatible with a significant state interest." *Id.* at 368, 99 *S.Ct.* at 670, 58 *L.Ed.*2d at 589–90. It is not sufficient that the exclusion rests on "rational grounds." Rather, those aspects of the selection process that result in the exclusion must "manifestly and primarily" advance the state interest. *Id.* at 367, 99 *S.Ct.* at 670, 58 *L.Ed.*2d at 589.

With respect to the first criterion—whether the excluded group is "distinctive"—the group must have been "singled out for different treatment under the laws." *Castaneda v. Partida, supra,* 430 *U.S.* at 494, 97 *S.Ct.* at 1280, 51 *L.Ed.*2d at 510. No discussion is needed to support the conclusion that blacks constitute a distinctive group for purposes of jury selection

---

[30]As noted, a challenge to the composition of state grand juries, unlike a challenge to the petit jury, involves only the equal protection clause rather than the sixth amendment. However, defendant contends that the source list and the qualified list, from which *both* petit and grand jurors are drawn, is substantially underrepresentative. Thus, defendant's sixth amendment claim may be considered in this context. Other state courts have followed this approach in similar situations.

challenges. *Rose v. Mitchell,* 443 *U.S.* 545, 565, 99 *S.Ct.* 2993, 3005, 61 *L.Ed.*2d 739, 756 (1979); *Swain v. Alabama, supra,* 300 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759; *Whitus v. Georgia, supra,* 385 *U.S.* 545, 87 *S.Ct.* 643, 17 *L.Ed.*2d 599; *Strauder v. West Virginia,* 100 *U.S.* (10 *Otto*) 303, 25 *L.Ed.* 664 (1879).

The defendant must next prove significant underrepresentation of the cognizable group. Such underrepresentation is shown by a comparison of the proportion of the group in the total population to the proportion called to serve as jurors. Under the equal protection clause, such underrepresentation must be substantial over a significant period of time. *See Castaneda v. Partida, supra,* 430 *U.S.* at 493, 97 *S.Ct.* at 1279, 51 *L.Ed.*2d at 509. Under the sixth amendment, the defendant must show that the representation of the group in venires from which juries are selected is not fair and reasonable. *See Duren v. Missouri, supra,* 439 *U.S.* at 364, 99 *S.Ct.* at 668, 58 *L.Ed.*2d at 587.

Defendant's claim of significant underrepresentation is based on the statistical disparity that results from using the Essex County voter's registration and licensed driver lists to create the source list. With respect to the grand jury, this claim is augmented by reference to the discriminatory practices of the assignment judges in selecting individual grand jurors.

In upholding the jury selection process, the trial court relied primarily on *Swain v. Alabama, supra,* 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759. In that case, blacks constituted 25 percent of the relevant population while the venire contained only 10–15 percent blacks. The Supreme Court ruled that underrepresentation on the venire of 10% did not show purposeful discrimination. The trial court also relied on *State v. Porro, supra,* 158 *N.J.Super.* 269, in which the Appellate Division ruled that disparities of 44% for Hispanics, 12% for blacks and 13% for blue collar workers were permissible because the disparities were generated by problems with the voter registration list, not as part of a systematic exclusion. *Id.* at 280–81.

Thus, the trial court ruled that an absolute disparity of 14.1% between the population and the qualified list (14.6 for the source list) was neither substantial nor unreasonable according to federal precedent. *State v. Ramseur, supra,* 197 *N.J.Super.* at 581. The trial court bolstered its conclusion by reasoning that any possible constitutional infirmity was cured by the "fact" that black representation in the grand juror selection process increased, rather than decreased, as blacks moved through that system: 21.3% representation on the source list to 21.8% representation on the qualified list. *Id.*[31]

In my opinion, the increase by one-half of one percent from the source list to the qualified list (21.3% to 21.8%) is insignificant where there is a disparity of 14 percent at the outset. In any event, the proofs used to demonstrate this ameliorative trend were problematic.[32]

---

[31]The trial court noted:

> This increase in representation as we move through the selection process is consistent with the results of the post summons surveys [headcount] of the race and sex of jurors reporting to the courthouse for jury service which was submitted by the state. [197 *N.J.Super.* at 581.]

The court then concluded that the disparities were permissible because: Of the 4450 petit jurors observed 47.64% were female and 32.20% were black; 52.74% of the 455 grand jurors were female and 24.61% were black. The significance of these figures is obvious. Not only is there an increase in the representation of blacks and women, but the increase occurs in the most significant stage of the selection process in terms of the defendant's right to a fair trial, among those jurors who report to the courthouse for jury service. *Id.*

[32]The prosecution's 12 week headcount showed that 24.61% of those who appeared for grand jury duty and 32.20% of those reporting for petit jury service were black. *State v. Ramseur, supra,* 197 *N.J.Super.* at 16. However, the defense experts, as well as Dr. Taylor testifying for the prosecutor, correctly pointed out that the prosecution's headcount was an unreliable and unacceptable survey from which to conclude the percentage of blacks who actually appeared for service. The most obvious and uncontrolled problem was surveyor bias—the very person who was in charge of the challenged jury system designed and executed the survey. This fact alone would render the results void in any ordinary scientific inquiry for statistically valid and reliable information. Another problem was the large number of people the three

There is ample support for defendant's contention that a 14% differential between the population and the source and qualified lists raises a presumption of discrimination. *See, e.g., Preston v. Mandeville,* 428 *F.*2d 1392 (5th Cir.1970) (29.3% of the relevant population, but only 15% of the master juror list, was black; 14.3% disparity sufficient to make out a *prima facie* case); *Stephens v. Cox,* 449 *F.*2d 657 (4th Cir.1971) (over the time period studied, black population was 36 and 34%, but only 14.64 and 15.74% of those actually drawn for service were black; court ruled that approximately 10% or 2 to 1 disparity established a *prima facie* case under the sixth amendment); *Barrows v. State,* 239 *Ga.* 162, 236 *S.E.*2d 257, 260 (1977) (black population was 37.3% but blacks comprised only 3% of the grand jury, while black representation on the traverse jury—from which the petit juries were chosen—increased from 11.3 to 22.9%, disclosing minimum disparity of 14.4%; the court focused on the historical pattern of discrimination and concluded that a significant disparity had been shown); *Villafane v. Manson,* 504 *F.Supp.* 78 (D.Conn.1980) (*prima facie* case established where 1.8% of the population was Puerto Rican, while .93% of the electorate eligible for grand jury duty was Puerto Rican, but only two out of 738 grand jurors empaneled were Puerto Rican). Moreover, in addition to the absolute

---

observor-clerks had to "check in" and record for their race and sex within an hour or hour and twenty minutes. Indeed, Dr. Lamberth pointed out a great deal of missing data throughout the weeks. An additional unexplained problem involved the wide swing in the percentage of blacks who appeared on Monday mornings and those who appeared later in the week. In general, mistakes seem inevitable in this type of survey. The prosecution witnesses vigorously contended that they would not skew results, not realizing that the defendant's complaint was based in the fixed and readily observed phenomenon, whether conscious or unconscious, of surveyor bias when the hope or intended goal is known to the surveyor, rather than an attack on their honesty and integrity. *See Jones v. Georgia,* 389 *U.S.* 24, 25, 88 *S.Ct.* 4, 5, 19 *L.Ed.*2d 25, 26 (1967) (Supreme Court was unpersuaded by lower court's finding that "public officers are presumed to have discharged their sworn official duties [including] eliminat[ing] prospective [black] jurors on the basis of their competency to serve, rather than because of racial discrimination.").

disparity of 14.1% (35.9 minus 21.8), the record in this case fairly reflects the following: (1) the comparative disparity was 35.3 (14.1 divided by 35.9)—indicating that a white person had approximately a 40% greater chance than did a black of being selected; and (2) the standard deviation from the expected outcome was 28.9.

The majority states that it will not "choose one test over the others as the best method for assessing the significance of statistical evidence." *Ante* at 222. However, in concluding that the underrepresentation of blacks on the jury list does not rise to the level of a constitutional violation, the Court totally ignores the results of the statistical decision theory (SDT) or statistical decision test.

As noted by the majority, "SDT provides a measure of the extent to which the actual percentage of minority jurors can be expected to differ from the percentage of the minority proportion in the general population if the selection process is completely random. SDT further indicates whether this figure is *so at variance with the expected outcome that the hypothesis of random selection ought to be rejected.*" *Ante* at 222 (emphasis added). As the Court concedes, *id.* at 221–222, a statistician would conclude that a result more than 2 or 3 standard deviations from the expected would be suspect. *See Castaneda v. Partida, supra,* 430 *U.S.* at 496 n. 17, 97 *S.Ct.* at 1281 n. 17, 51 *L.Ed.*2d at 512 n. 17. In this case, however, the difference between the expected and observed number of blacks on the jury list is 28.9 standard deviations. The majority's conclusion that this figure "straddle[s] the borderline of substantial underrepresentation" is inexplicable. *Ante* at 223–224. Moreover, in *Castaneda v. Partida, supra,* 430 *U.S.* 482, 97 *S.Ct.* 1272, 51 *L.Ed.*2d 498, the Court held that a figure of 29 standard deviations reflected substantial underrepresentation of Mexican-Americans in violation of the fourteenth amendment. In reaching this conclusion, the Court noted: "[T]he likelihood that such a substantial departure from the expected

value would occur by chance is less than 1 in 10 $^{140}$." *Id.* 430 *U.S.* at 496 n. 17, 97 *S.Ct.* at 1281 n. 17, 51 *L.Ed.*2d at 512 n. 17.

In light of the above figures, it is impossible to understand the majority's conclusion that "the statistical evidence .. is not so alarming as to compel a conclusion of substantial underrepresentation." *Ante* at 223.˙ Indeed, one has to wonder how severe the underrepresentation would have to be before the Court would be "sufficiently alarmed." The majority's conclusion flies in the face of the evidence and is bottomed on constitutionally irrelevant considerations. One is the claim that because the selection from the source list did not involve "subjectivity," "[a] higher disparity [higher than what?] is tolerable." *Id.* at 224. The asserted relevance of "subjectivity" is exaggerated. The Court itself rejects the argument that a jury-selection procedure based on voter or similar lists "can never amount to a 'systematic exclusion,' " noting that "the fair cross-section principle ... is designed to achieve *results* " and " 'compilers of jury lists may drift into discrimination by not taking affirmative action to prevent it.' " *Id.* at 226 (quoting *People v. Harris,* 36 *Cal.*3d 36, 58, 679 *P.*2d, 433, 446, 201 *Cal.Rptr.* 789 (1984) (quoting *People v. Superior Court,* 38 *Cal.App.*3d 966, 971–72, 113 *Cal.Rptr.* 732, 736 (1974)) (emphasis added).[33] Another irrelevant consideration is the proposition that there is no "history of exclusion." *Ante* at 225. Finally, and paradoxically, the Court depreciates the current defects in the system by finding some significance in the State's "efforts at reform." *Id.* at 226.

---

[33]In *Duren,* 54% of the relevant population but only 26.7% of those summoned and 14.5% of those who actually served were women. However, Missouri law granted women an automatic exemption from service at their request. Nevertheless, the exclusion was held to be systematic and the petitioner was granted relief. *See also Taylor v. Louisiana, supra,* 419 *U.S.* 522, 95 *S.Ct.* 692, 42 *L.Ed.*2d 690 (statutory exemption for women); *Thiel v. Southern Pac. Co., supra,* 328 *U.S.* 217, 66 *S.Ct.* 984, 90 *L.Ed.* 1181 (all daily wage earners excluded from jury list). Thus, the systematic nature of the exclusion of blacks is reflected not in the "objectivity vs. subjectivity" of the selection process but simply in its results.

The Court's reasoning is spurious. It finds—then disregards—the fact that defendant has clearly demonstrated the "systematic exclusion of the [cognizable] group in the jury-selection process." *Duren v. Missouri, supra,* 439 *U.S.* at 364, 99 *S.Ct.* at 668, 58 *L.Ed.*2d at 587. The Court's tacit and disingenuous recognition of the constitutional violation is suggested in its acknowledgement that "the results [*i.e.,* the disparity] are still far from optimal.... [and g]reater representativeness on the jury panels is obviously desirable." *Ante* at 226. I am therefore satisfied that the exclusion of blacks, as a distinctive group, from the jury list was significant and that blacks were substantially underrepresented.

The final prong of the *Duren* test requires an analysis of whether the underrepresentation came about as a result of volitional governmental action. Under the sixth amendment, the defendant must prove the systematic exclusion of blacks in the jury selection process. *See Duren v. Missouri, supra,* 439 *U.S.* at 366, 99 *S.Ct.* at 669, 58 *L.Ed.*2d at 588. The *Duren* Court's definition of systematic exclusion is whether the exclusion was "inherent in the particular jury selection process utilized." *Id.*

As noted, the jury selection system employed in Essex County utilized a merged list of registered voters and licensed drivers from which a source list was generated. Since blacks appear less frequently on these lists than in the general population, when names are chosen at random from the source list, blacks are substantially underrepresented. Thus, the resulting underrepresentation is "inherent in the selection process utilized" or "due to the system." However, many state courts that have dealt with similar systems—those based on voter registration lists—have held that such underrepresentation is not "systematic." Presented with the assertion that the system underrepresents a particular group that registers to vote with less frequency than the community as a whole, courts reply that this is not the fault of the system but of those who fail to register. *See, e.g., United States v. Brady,* 579 *F.*2d 1121 (9th

Cir.1978), *cert.* denied, 484 *U.S.* 1074, 99 *S.Ct.* 849, 54 *L.Ed.*2d 41 (1979); *United States v. Test, supra,* 550 *F.*2d 577, 586 (10th Cir.1976); *State v. Bowen, supra,* 45 *Or.App.* 17, 607 *P.*2d 218.

These cases totally misconstrue the right to a jury drawn from a representative cross-section of the community, and are hardly persuasive of what our own constitution reasonably requires in a death penalty trial. This right creates an affirmative duty on the part of the state to utilize a system that fairly represents all cognizable groups. If the chosen system fails adequately to represent a certain group, for whatever reason, this underrepresentation is "inherent in the selection process utilized."

Moreover, as the majority notes, *ante* at 230–232, the assignment judges' procedure for selecting each panel of grand jurors was anything but neutral. In fact, this procedure differs little from the "key man" juror selection system, utilized in many states, which has been attacked as "highly subjective" and "susceptible to abuse as applied." *Castaneda v. Partida, supra,* 430 *U.S.* at 491, 497, 97 *S.Ct.* at 1281, 51 *L.Ed.*2d at 508, 512.[34] Imperative to the integrity and legitimacy of the grand and petit jury system is the requirement that any biases from whatever source be minimized. In *Rose v. Mitchell, supra,* 443 *U.S.* at 555–56, 99 *S.Ct.* at 2999–3000, 61 *L.Ed.*2d at 749, the Supreme Court said:

Selection of members of a grand jury because they are one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service of Negroes, or any group qualified to serve, impairs the confidence of the public in the administration of justice ... 'The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to

---

[34]The Essex County system may even be worse because the assignment judges expressly included or excluded persons based on race, sex, occupation, and other variables. In contrast, many of the "key man" states require the jury commissioners to choose men "of sound mind and good moral character" who are literate. *Castaneda v. Partida, supra,* 430 *U.S.* at 485, 97 *S.Ct.* at 1275, 51 *L.Ed.*2d at 505.

the democratic ideal reflected in the processes of our courts.' [quoting *Ballard v. United States*, 329 *U.S.* 187, 195, 67 *S.Ct.* 261, 265, 91 *L.Ed.* 181, 187 (1946).]

The assignment judges' discretionary selection of the members of the grand jury is the epitome of a system subject to abuse. We should not hesitate to conclude, under our own Constitution, that this susceptibility, when combined with actual underrepresentation, is violative of the right to a properly constituted jury. *Accord Castaneda v. Partida, supra,* 430 *U.S.* at 494–95, 97 *S.Ct.* at 1280, 51 *L.Ed.*2d 510–11; *Whitus v. Georgia, supra,* 385 *U.S.* at 552, 87 *S.Ct.* at 647, 17 *L.Ed.*2d at 605.

Moreover, the assignment judges' exercise of discretion to obtain what was, in their subjective opinion, a fair cross-section of the county, violated equal protection standards. First, the judges admitted that race played a part in who was selected to sit on the grand juries. Undoubtedly, this practice was well-intentioned; however, it constituted a conscious effort to establish grand juries based on racial factors. This is as obnoxious as systemic exclusion. *See Cassell v. Texas*, 339 *U.S.* 282, 287, 70 *S.Ct.* 629, 631, 94 *L.Ed.* 839 (1950) (plurality opinion); *Ross v. Wyrick,* 581 *F.*2d 172, 175 (8th Cir.1978); *Harris v. Stephens,* 361 *F.*2d 888, 891 (8th Cir.1966), *cert.* denied, 386 *U.S.* 964, 87 *S.Ct.* 1040, 18 *L.Ed.*2d 113 (1967); *Villafane v. Manson, supra,* 504 *F.Supp.* at 88.[35] In addition, the judges' professed ignorance of the actual racial composition of Essex County casts doubt on their subjective determination of a fair cross-section. *See Barrow v. State, supra,* 236 *S.E.*2d at 261 (jury composition invalid where jury commissioners were not informed of the meaning of the term "fairly representative cross-section").

---

[35]The trial court did not mention that race was an overt factor in the selection of grand juries. It merely stated that "[a]fter a brief *voir dire,* [the assignment judge] taking into consideration all the information he has about the particular juror, will seat or excuse the juror in an effort to select those jurors who will represent a cross-section of the community and responsibly perform the functions of a grand juror." *See Ramseur,* 197 *N.J.Super.* at 591.

To the extent that motive or design is important in equal protection analysis, it may be inferred from the continued use of a system that results in underrepresentation. Thus, it is not enough for the State to claim that no one purposefully excluded blacks or that the system operates on a race-neutral basis. The lack of actual motive or intent to discriminate is irrelevant. The Supreme Court has consistently held that "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander v. Louisiana, supra*, 405 *U.S.* at 632, 92 *S.Ct.* at 1226, 31 *L.Ed.* 2d at 543; *see Turner v. Fouche, supra*, 396 *U.S.* at 361, 90 *S.Ct.* at 540, 24 *L.Ed.*2d at 579; *Whitus v. Georgia, supra*, 385 *U.S.* at 551, 87 *S.Ct. at* 647, 17 *L.Ed.*2d at 604; *Hernandez v. State of Texas*, 347 *U.S.* 475, 481, 74 *S.Ct.* 667, 98 *L.Ed.* 866, 872 (1954). Under our own Constitution, we have readily acknowledged the significance of discrimination under circumstances in which the purpose to discriminate can readily be imputed even though clear proof of actual discriminatory intent may be lacking.

In sum, defendant has amply demonstrated that the substantial underrepresentation of blacks on the jury source list constituted a violation of his constitutional rights to equal protection and a fair and impartial jury, both grand and petit. Thus, his conviction must be considered invalid regardless of whether actual prejudice was suffered. *See Vasquez v. Hillery, supra*, 474 *U.S.* at ——, 106 *S.Ct.* at 622–24, 88 *L.Ed.*2d at 607–09.

### B.

Related to the problem of non-representative grand and petit juries is whether the trial court erred by refusing defendant's request to ask prospective jurors certain questions designed to expose possible racial prejudice. The trial court limited defendant to the single question whether race would affect the juror's ability to reach a fair and impartial verdict, but did not allow any more specific or pointed inquiries as to racial bias. *See*

*ante* 243–245. The Court suggests that this refusal was a poor exercise of judgment by the trial court—not to be repeated in future cases—but one that does not rise to the level of trial error, let alone provide a basis for reversing defendant's conviction. I disagree.

The issue is whether there existed in this trial for capital murder a "reasonable possibility" that racial prejudice could influence the jury in its decision to convict and sentence to death, defendant—a black man. *Rosales-Lopez v. United States,* 451 *U.S.* 182, 191, 101 S.Ct. 1629, 1635, 68 *L.Ed.*2d 22, 30 (1981). The majority finds no error in the trial court's failure to recognize such a possibility because, in its view, race was not an issue in this case. This premise is mistaken.

The majority's position that racial issues were not implicated in this case is unsound. As has been shown, defendant was indicted, convicted and sentenced by juries drawn from lists that were clearly underrepresentative of blacks. *Ante* at 222–223. Indeed, the majority itself concedes that the underrepresentation of blacks on the jury list was "significant enough to alert us to a possible constitutional violation," *ante* at 224, and that "[g]reater representativeness is obviously desirable" in the future. *Id.* at 226. Moreover, the Court purports to be "sensitive to the reality of racial prejudice in American life," and to the danger—particularly in a capital case—"that jurors may prejudge a defendant because of his or her race." The Court notes that "[r]acial prejudice may operate, for instance, when the defendant is black simply because the defendant is black and regardless of the victim's color." *Id.* at 247.

In *State v. Long,* 137 *N.J.Super.* 124, 131 (App.Div.1975), certif. denied, 70 *N.J.* 143 (1976), the court held that whether the trial court abuses its discretion by failing to ask racial-prejudice questions depends on the facts of the case. In this case, blacks were improperly excluded from the source list from which both the grand and petit juries were drawn. When this fact is considered in conjunction with "the reality of racial

prejudice in American life", the possibility that racial bias could have an insidious and invidious influence in the trial is enhanced. These cumulative deficiencies—the invalid composition of the jury lists and the failure to permit searching inquiry as to individual racial bias—constitute reversible error.

Under our State Constitution, as a matter of fundamental fairness, defendant was entitled to have procedures invoked that would maximize his right to be tried by a fair and impartial jury. New Jersey has always evinced exceptional concern with the evils of racial prejudice, as exemplified by the State's many strong prohibitions against discrimination. *See, e.g., N.J. Const.* of 1947 art. I, para. 5; *N.J.S.A.* 10:5-3 (Law prohibiting discrimination); *N.J.S.A.* 2A:72-7 (establishing criminal penalties for disqualifying a person from jury service on account of race). Moreover, this Court has consistently confirmed the right of a criminal defendant to a fair and impartial jury as a matter of state constitutional jurisprudence. *E.g., State v. Ragland,* 105 *N.J.* 189 (1986); *State v. Ingenito,* 87 *N.J.* 204 (1981). We have given this constitutional right added force in terms of providing a criminal defendant with a trial free of racial bias. *E.g., State v. Gilmore, supra,* 103 *N.J.* 508.

The majority is satisfied in this case to tolerate a non-searching examination of potential jurors as a matter of state constitutional law because it interprets the federal Constitution as imposing no more heightened protections. However, the comparatively narrow federal protection against potential racial bias by individual jurors can be ascribed to concerns relating to federalism. As observed in *Ristaino v. Ross,* 424 *U.S.* 589, 597 n. 9, 96 *S.Ct.* at 1022 n. 9, 47 *L.Ed.*2d 258, 265 n. 9 (1976):

Although we hold that voir dire questioning directed to racial prejudice was not constitutionally required, the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant. Under our supervisory power *we would have required as much of a federal court* faced with the circumstances here. See *Aldridge v. United States, supra;* cf. *United States v. Walker,* 491 *F.*2d 236 (CA9), cert. denied, 416 *U.S.* 990, 40 *L.Ed.*2d 769, 94 *S.Ct.* 2399 (1974); *United States v. Booker,*

480 *F.*2d 1310 (CA 7 1973). The States also are free to allow or require questions not demanded by the Constitution. (Emphasis added.)

Several state courts have recognized the need for enhanced protections to assure a jury free from racial bias as a matter of strong local public policy and state constitutional concern. They have, therefore, required more extensive *voir dire* examination under state law than that mandated by the federal Constitution. *See, e.g., State v. Windsor,* 316 *N.W.*2d 684, 687 (Iowa Sup.Ct.1982) (inquiry required in any case "in which a reasonable possibility exists that the verdict might be affected by racial prejudice"); *Commonwealth v. Lumley,* 367 *Mass.* 213, 327 *N.E.*2d 683, 685–86 (1975) (inquiry mandated when a defendant is a "special target for prejudice"; in all other cases, the trial judge should grant a motion for such questioning); *State v. Taylor,* 423 *A.*2d 1174, 1175 (R.I.Sup.Ct.1980) (court rule gives right to inquire about prejudice).

A searching *voir dire* is especially critical in cases where the defendant is exposed to the death penalty. This is particularly so when the questioning is directed to potential racial bias. *See State v. Gilmore, supra,* 103 *N.J.* 508; *see also Commonwealth v. Holland,* 298 *Pa.Super.* 289, 444 *A.*2d 1179, 1181 (1982) (prohibition of such questioning is "[t]o sweep under the rug, figuratively, the reality of life and that racial prejudice exists [and] can prevent a defendant from obtaining a fair trial"). The Supreme Court itself has recognized the need for heightened questioning in capital cases. In *Turner v. Murray,* —— U.S. ——, 106 *S.Ct.* 1683, 90 *L.Ed.*2d 27 (1986), the Court held that a capital defendant was entitled to have potential jurors questioned on the issue of racial bias. *Id.* —— *U.S.* at ——, 106 *S.Ct.* at 1688, 90 *L.Ed.*2d at 37. The Court stated:

Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected....

The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence. "The Court ... has recognized that the qualitative difference of death from all other punishment requires a correspondingly greater degree of scrutiny of the capital

sentencing determination." [*Id.* — *U.S.* at ——, 106 *S.Ct.* at 1687–88, 90 *L.Ed.* 2d at 35–6 (citation omitted).]

This Court has also recognized the indispensable role of the *voir dire* in capital cases to expose juror prejudice:

Another important, indeed critical means for dealing with potential and latent bias is the voir dire. The court should consider the efficacy of more exhaustive and searching voir dire examinations. The court in conducting the voir dire should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias. The court could consider whether there should be a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause. Particularly, in capital cases, trial judges should exercise extraordinary care in the voir dire of potential jurors. [*State v. Williams,* 93 *N.J.* 39, 68–9 (1983) (footnotes omitted).]

When racial prejudice questions are excluded from the *voir dire,* the trial court's ability to remove prospective jurors is severely impaired as is the defendant's right to exercise intelligent challenges. *See Rosales-Lopez v. United States, supra,* 451 *U.S.* at 188, 101 *S.Ct.* at 1634, 68 *L.Ed.*2d at 28. Moreover, the actual costs of requiring the inquiry are slight. *Id.* at 190, 101 *S.Ct.* at 1635, 68 *L.Ed.*2d at 30.

The Court acknowledges that a more searching *voir dire* directed against racial bias could be permitted and, indeed, is the preferred course. *Ante* at 247–248. However, this concession deserves only the faintest praise. In this case, the Court has concluded that defendant suffered no constitutional violation and is not entitled to any redress. Admonitions to sensitize judges in the future and recommended measures to extirpate racial bias in capital murder trials cannot excuse the failure to have done so here. The trial court's refusal in this case to permit such questioning constitutes reversible error.

## C.

Defendant challenges the use of a death-qualified jury during the guilt phase of his bifurcated trial. Death-qualification involves the removal of veniremen

who ma[ke] unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude

toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* [*Witherspoon v. Illinois,* 391 *U.S.* 510, 522 n. 21, 88 *S.Ct.* 1770, 1777 n. 21, 20 *L.Ed.*2d 776, 785 n. 21 (1968).][36]

Defendant does not challenge the removal of the second group of veniremen (known as "nullifiers") from the guilt-phase jury, nor does he challenge the removal of the first group from the penalty phase of the trial. However, defendant claims that the removal of the first group from the guilt phase infringes his state constitutional right to trial by an impartial jury. He argues that the State should not be able to exclude at the guilt determination phase of the trial prospective jurors whose sole asserted disqualification consists of their inability to vote for the death penalty at the penalty phase of the trial. This claim should be upheld.

In *Witherspoon v. Illinois, supra,* the Supreme Court held that states could not exclude from a jury hearing a capital case all venirepersons expressing any scruples against capital punishment. The Court determined that using such a jury in the penalty phase of a bifurcated capital case would violate the defendant's rights under the sixth and fourteenth amendments. *Id.* at 518–23, 88 *S.Ct.* at 1775, 20 *L.Ed.*2d at 782–86. The Court noted that a narrower exclusion of venirepersons would be permissible in the limited context of a jury hearing the penalty phase of a bifurcated trial: "If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty." *Id.* at 520, 88 *S.Ct.* at 1776, 20 *L.Ed.*2d at 784 (footnote omitted).

---

[36]The standard for death-qualification was clarified and modified in *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), and *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985). The new standard is that "a juror may ... be challenged for cause based on his views about capital punishment [if] those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams, supra,* 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 581; *see Witt, supra,* 469 *U.S.* at 420–22, 105 *S.Ct.* at 850–51, 83 *L.Ed.*2d at 849–53.

The *Witherspoon* Court did not have enough evidence before it to conclude that states were constitutionally prohibited from removing venirepersons who might hesitate to return a verdict of death from the jury hearing the guilt phase of a bifurcated trial; the Court left this question open for future defendants to attempt to prove that such juries were less than neutral with respect to guilt. *Id.* at 517–18, 521 n. 18, 88 *S.Ct.* at 1774–75, 1776 n. 18, 20 *L.Ed.*2d at 782, 784 n. 18.

Eighteen years later, a defendant did bring to the Court extensive evidence and a full record showing

> that death-qualified juries are substantially more likely to convict or to convict on more serious charges than juries on which unalterable opponents of capital punishment[37] are permitted to serve.... [B]y systematically excluding a class of potential jurors less prone than the population at large to vote for conviction, the State gave itself an unconstitutional advantage at his trial. [*Lockhart v. McCree, supra,* —— *U.S.* at ——, ——, 106 *S.Ct.* 1758, 1770, 1775, 90 *L.Ed.*2d 137, 155, 161 (Marshall, J., dissenting).]

Inexplicably, the *Lockhart* majority rejected defendant's argument: "it is hard for us to understand the logic of the argument that a given jury is unconstitutionally partial when it results from a State-ordained process, yet impartial when exactly the same jury results from mere chance." *Id.* at ——, 106 *S.Ct.* at 1767, 90 *L.Ed.*2d at 151. As the dissent pointed out, it is just this kind of "logic"—rejecting as unconstitutional a process for selecting jurors when that process creates bias— "which carried the day in Witherspoon, and which never has been repudiated by this Court." *Id.* at ——, 106 *S.Ct.* at 1775, 90 *L.Ed.*2d at 161 (Marshall, J., dissenting).

Extensive social science research indicates that death-qualified jurors—i.e., jurors who are not in the two groups described in the earlier quote from *Witherspoon*—are

> more likely to believe that a defendant's failure to testify is indicative of his guilt, more hostile to the insanity defense, more mistrustful of defense attorneys, and less concerned about the danger of erroneous convictions.... [They

---

[37]"[P]rospective jurors uncommonly aware of an accused's constitutional rights," *Lockhart v. McCree,* —— *U.S.* ——, ——, 106 *S.Ct.* 1758, 1770, 90 *L.Ed.*2d 137, 155 (1986) (Marshall, J., dissenting).

have a] greater readiness to convict or to convict on more serious charges. And finally the very process of death qualification—which focuses attention on the death penalty before the trial has begun—has been found to predispose the jurors that survive it to believe that the defendant is guilty. [*Lockhart v. McCree, supra,* —— *U.S.* at ——, 106 *S.Ct.* at 1772, 90 *L.Ed.*2d at 157 (Marshall, J., dissenting) (citation omitted).] [38]

The evidence that death-qualification is a process that creates partiality in the juries it produces has been quite convincing.

The chief strength of [the sociological] evidence lies in the essential unanimity of the results using diverse subjects and varied methodologies.... Where studies have identified and corrected apparent flaws in prior investigations, the results of subsequent work have only corroborated the conclusions drawn in the earlier efforts.

\* \* \* \* \* \* \* \*

The true impact of death qualification on the fairness of a trial is likely even more devastating than the studies show [due to the use of peremptory challenges and lax judicial application of the *Witherspoon* standards.] [*Lockhart, supra,* —— *U.S.* ——, ——, 106 *S.Ct.* at 1773–74, 90 *L.Ed.*2d at 158, 159 (Marshall, J., dissenting).]

The social science research has consistently found that proponents of the death penalty are more punitive than opponents of the death penalty. Wilson, "Belief in Capital Punishment and Jury Performance" (unpublished, University of Texas 1964); Jurow, "New Data on the Effects of a 'Death-Qualified' Jury on the Guilt Determination Process", 84 *Harv.L.Rev.* 657 (1971); Fitzgerald and Ellsworth, "Due Process vs. Crime Control: Death-Qualification and Jury Attitudes", 8 *Law Hum.Behav.* 31 (1984). "Death-qualified respondents were more punitive than excludable respondents—less likely to consider mercy, more likely to favor harsh punishment as a means of reducing crime, and more likely to believe in the strict enforcement of all laws, no matter what the consequences. These differences are dra-

---

[38]The social science research is discussed and summarized in *Grigsby v. Mabry,* 569 *F.Supp.* 1273, 1291–1304 (E.D.Ark.1983), *aff'd,* 758 *F.*2d 266 (8th Cir.1985) (en banc), *rev'd sub nom. Lockhart v. McCree,* —— *U.S.* ——, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986); *see also Lockhart, supra,* —— *U.S.* at ——, 106 *S.Ct.* at 1771–74, 90 *L.Ed.*2d at 156–59 (Marshall, J., dissenting).

matic." Fitzgerald and Ellsworth, *supra*, 8 *Law Hum.Behav.* at 43–44.

Death-qualification as a *voir dire* process has its own effects, creating partiality among the jurors, even aside from the exclusion of veniremen.

> By focusing on the penalty before the trial actually begins the key participants, the judge, the prosecutor and the defense counsel convey the impression that they all believe the defendant is guilty, that the "real" issue is the appropriate penalty, and that the defendant really deserves the death penalty.
>
> The spectacle of the *defense attorney* being forced to lead and cajole a prospective juror who has expressed adamant opposition to the death penalty in order to prevent him from being "witherspooned" off the jury is striking: "Mr. A, don't you know that under some set of facts you could consider imposing the death penalty? Certainly if the evidence is bad enough you would be able to follow the law by considering imposing death?" [*Grigsby, supra*, 569 *F.Supp.* at 1303 & n. 8.]

The majority follows *Lockhart* because it finds itself in essential accord with the Supreme Court's resolution of this issue. *Ante* at 248–254. The majority does not construe the New Jersey Constitution as an independent source of protection in this area. Because I disagree with the majority on its interpretation of the State Constitution, I must dissent on this issue.

The decision in *Lockhart* was based in part on that Court's analysis that at least for the purposes of the federal constitution, Arkansas' interest in a unitary jury—having one jury hear both phases of a capital trial—outweighs the defendant's interest in not being tried by a jury that has been made less impartial by being death-qualified. *Lockhart, supra*, —— *U.S.* at ——, 106 *S.Ct.* at 1768–69, 90 *L.Ed.*2d at 152–54. The balance this Court makes under our Constitution must be different from that made by the United States Supreme Court under the federal constitution. First, the right to be tried by an impartial jury is given great protection under the our state standards and under our State Constitution. *See, e.g., State v. Ragland, supra*, 105 *N.J.* 189; *State v. Gilmore, supra*, 103 *N.J.* 508; *State v. Ingenito, supra*, 87 *N.J.* 204; *State v. Simon, supra*, 79 *N.J.* 191. Second, under the state doctrine of funda-

mental fairness, that right to an impartial jury must be applied even more strictly when life is at stake. Third, New Jersey's interest in a unitary jury is weaker than Arkansas' was in *Lockhart.* Arkansas' death penalty statute requires one jury to hear both the guilt phase and the penalty phase of the trial. *See* Ark.Stat.Ann. § 41-1303(3). New Jersey's death penalty statute makes a unitary jury discretionary. *See N.J.S.A.* 2C:11-3.

We have exhibited great concern and exceptional sensitivity to the subtle but real evils of jury bias. In *State v. Simon, supra,* 79 *N.J.* 191, we rejected a procedure in which a jury was "forced into a premature consideration of criminal guilt for which it was inadequately prepared." *Id.* at 201. The jury was required to answer special interrogatories which had a "subliminal suggestiveness" and created "conscious or subconscious feelings as to [defendant's] guilt." *Id.* The death-qualification process has an effect on prospective jurors as serious and as obvious as the effect created by special interrogatories. "The death-qualification process traps the participants into the necessity of communicating false cues to the jury": cues that the prosecutor, the judge, and even the defense attorney believe that the defendant is guilty, and the only *real* issue is what the penalty should be. *See Grigsby, supra,* 569 *F.Supp.* at 1303.

The right to trial by an impartial jury has always been highly valued by our state constitution.

In this State, the Constitution of 1776 expressly provided that "the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever," *N.J. Const.* (1776), Art. XXII. The right to "an impartial jury ... in all criminal prosecutions" was similarly guaranteed by the 1844 Constitution, *N.J. Const.* (1844), Art. I, ¶ 7-8, and the present constitution of course, reaffirms that "the right to trial by jury shall remain inviolate." *N.J. Const.* (1947), Art. I, ¶ 9. [*State v. Ingenito, supra,* 87 *N.J.* at 210.]

We have held that the right under our state constitution to trial by an impartial jury grants protections broader than those granted by the parallel federal right. *See State v. Gilmore, supra,* 103 *N.J.* at 524-29, 543-44.

The process of imposing a death sentence has three stages. The jury must determine that the defendant was guilty of murder, the jury must determine whether the murder the defendant committed was a kind for which the death penalty can be imposed, and the jury must decide whether this particular defendant should be given the death penalty. *See supra* at 379–382, 386–391. When not only the third decision (a decision of guided discretion), but also the first two decisions (in theory, matters not open to jury discretion) are decided by a death-qualified jury—a biased jury—a great injustice is done to the defendant.

The question, ultimately, is whether the state's putative interest in "neutrality" on the issue of penalty may be vindicated at the expense of the defendant's interest in a fair trial if both interests may be accommodated by using different procedures. If different and more protective procedures could be devised serving to guarantee defendant's right to be tried by a fair and impartial jury then, as a matter of fundamental fairness in a capital punishment prosecution, the State is enjoined to use such protective procedures.

I agree with Justice O'Hern in his concurring opinion, *Ante* at 334–341, that the inconvenience entailed in providing for a non death-qualified jury—one that is fair and impartial—in the trial of guilt is not too high a price to pay to vindicate defendant's constitutional interests. There can be no question that the use of completely separate juries would solve the problem because guilt would be determined by a normally composed jury but penalty would be determined by a death-qualified jury. A prohibition of death-qualifying the jury for the guilt phase of capital trials would impose relatively insubstantial burdens on the State. *See Grigsby, supra,* 569 *F.Supp.* at 1319:

> If such a bifurcated system were established, would it mean that in every case in which the State sought the death penalty two separate juries would have to be impaneled? The answer is, obviously, no. To require the impanelment of the second jury, the guilt phase jury would have to end with the

conviction of the defendant, in accordance with the statutory requirements, of capital murder (not a conviction on a lesser included offense, e.g., first degree murder); it would have to reject any insanity claim; and finally, the State would have to continue to seek the death penalty and to insist upon its consideration by a fully death-qualified jury.... [And] capital trials themselves comprise a miniscule percentage of all criminal trials.

Another procedure—death qualifying the jury after the guilt phase and replacing non-death-qualified jurors with alternate jurors—would also solve the problem. This approach is quite plausible, since *N.J.S.A.* 2A:74-2 authorizes the impaneling of more than the required number of jurors.

Either using two separate juries or using alternate jurors is more protective of the defendant's right to an impartial jury of the community than the current system. Using alternate jurors is less costly than using two separate juries but the actual cost in dollars and hours is unknown. Looking at the factors which influence that cost, however, suggests the costs are minimal.

I conclude, therefore, that the current system violates State constitutional guarantees of a fair and impartial jury as a matter of fundamental fairness.

### D.

In sum, defendant was deprived of his constitutional rights to indictment and trial by properly constituted juries. The source list, from which both the grand and petit juries were drawn, was substantially underrepresentative of blacks and resulted in non-representative juries. Moreover, this underrepresentation was exacerbated by the trial court's error in refusing defendant's request to ask prospective jurors questions directed toward possible racial bias. The use of a death-qualified jury at the guilt-phase of the trial was also reversible error, as it deprived defendant of his right under the state constitution to trial by an impartial jury.

. .

IV.

There were several particularly serious errors that affected the fairness of the guilt-phase trial or the penalty-phase trial or both. One involves the use of a prior *non vult* plea as an aggravating factor. There was also prosecutorial misconduct in the form of inappropriately aggressive cross-examination and the improper projection of testimonial commentary. Further, general comments by the prosecutor during summation coupled with the trial court's explanation to the jurv of mitigating factors and the question of sympathy served to mislead the jury. In my opinion these matters constitute additional grounds for reversal.

A.

Defendant raises the issue whether defendant's *non vult* plea to a 1966 murder indictment is an aggravating factor—a prior conviction of murder—for purposes of *N.J.S.A.* 2C:11–3(c)(4)(a). This poses two questions: the first is whether the *non vult* plea is a *conviction* for purposes of a subsequent criminal prosecution; the second question, assuming the plea is a conviction, is whether it is a conviction of *murder*.

Under the law as it stood in 1965, a plea of *non vult* was to the indictment, which charged murder generally. *N.J.S.A.* 2A:113–3 (repealed 1979). *See State v. Williams*, 39 *N.J.* 471, 479 (1963); *State v. Walker*, 33 *N.J.* 580, 588 (1960). New Jersey apparently used the same short form murder indictment from 1874 to 1979, which indictment encompassed the crime of manslaughter as well as first degree and second degree murder. *See State v. Zelichowski*, 52 *N.J.* 377, 382 (1968), *State v. Sullivan*, 43 *N.J.* 209, 241–42 (1964). Even though manslaughter was an offense distinct from, not a degree of, murder, it nevertheless was subsumed in the short form murder indictment. *See State v. Brown*, 22 *N.J.* 405 (1956). This factor takes on critical significance because under the current death penalty statute a prior conviction for manslaughter does not

constitute an aggravating factor. *N.J.S.A.* 2c:11–3(c)4(a). Thus there is no firm basis for concluding, as the majority does, that the Legislature intended to permit prior *non vult* pleas to be considered a prior conviction for the purpose of constituting a statutory aggravating factor. Given the gravity of capital punishment and the imperative that criminal statutes be strictly construed, absent the clearest expression of a contrary intent, it is fundamentally wrong to impute this conclusion to the Legislature.

At the outset of the *non vult* plea practice, judges accepting such pleas to short-form murder indictments were required to "proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly." *State v. Sullivan, supra,* 43 *N.J.* at 243 (describing requirements of *Rev. Stat.* 1874 § 68, p. 145). The degree-of-guilt hearing was necessary because if the judge found the crime was first degree murder, he or she could impose the death penalty. In 1893, the Legislature amended the murder statute so that defendants pleading *non vult* could not be sentenced to death, only imprisoned for life or a term of 30 years (the penalties for first and second degree murder, respectively). *See L.* 1893, *c.* 36 (precursor of *N.J.S.A.* 2A:113–3) (repealed 1979). This charge tended to obviate any factual inquiry relating to the degree of murder since the sentence would not likely be affected by such a determination. By accepting a *non vult* plea, the court generally did not decide the factual issue of the degree of defendant's guilt, for that issue was not before the court. *State v. Williams, supra,* 39 *N.J.* at 479; *State v. Walker, supra,* 33 *N.J.* at 588–89. Further, the statutory change appears to have created the notion that the crimes committed, and therefore the convictions, were presumed to be of second degree murder; the penalties imposed by the Legislature matched those crimes, even though the indictment continued to charge manslaughter. *See State v. Zelichowski, supra,* 52 *N.J.* at 382; *State v. Sullivan, supra,* 43 *N.J.* at 242–43.

*Degree* of guilt was never an issue because imposition of the death penalty did not depend on the use of prior murder convictions as an aggravating factor. Indeed, the State was prohibited from introducing evidence of defendant's prior convictions for the purpose of punishment at a capital trial. *See State v. Forcella, supra,* 52 *N.J.* at 288–89. Because no degree of guilt was determined upon the acceptance of *non vult* pleas since 1893, this Court should not automatically view a conviction based on a *non vult* plea to a short-form murder indictment as a conviction for second degree murder. A defendant who believed himself only guilty of manslaughter and innocent of murder, but who might have been found guilty of murder at trial, might well have accepted an offer to plead *non vult* to be sure of escaping the death penalty. *See State v. Corbitt,* 74 *N.J.* 379 (1977), *aff'd, Corbitt v. New Jersey,* 439 *U.S.* 212, 99 *S.Ct.* 492, 58 *L.Ed.*2d 466 (1978). In that situation, it would be illogical and unfair to assume that the "conviction" is for murder. Consequently, in the absence of a clear legislative expression that a prior *non vult* plea to murder could, under appropriate circumstances, be considered a prior conviction of murder, and therefore an aggravating factor under *N.J.S.A.* 2C:11–3(c)(4)(a), this Court must conclude that it was not intended to serve this purpose. It was therefore reversible error to have permitted the jury to consider it as an aggravating factor.

In addition, it would be improper to allow the use of such a prior *non vult* plea in the absence of an adequate factual record demonstrating that the underlying crime clearly constituted murder. Other states have resolved this degree-of-guilt problem through preliminary hearings. Under such a system, before a plea of *non vult* to general murder could be used as an aggravating factor, as in current New Jersey capital cases, trial courts would have to examine the record of the plea leading to the prior conviction to determine degree of guilt, at

least where there is some evidence that the crime committed was manslaughter.[39]

Even if there were facts from which a reasonable jury could infer that defendant had the requisite mental state for murder, the convictions should not be regarded as a murder conviction if that inference was not inescapable or if a jury would not be legally required to draw such an inference. *See Henderson v. Morgan,* 426 *U.S.* 637, 645–46 n. 17, 96 *S.Ct.* 2253, 2258 n. 17, 49 *L.Ed.*2d 108, 115 n. 17 (1976). The record in this case strongly suggests that it is equally possible for a reasonable jury to find manslaughter from the same circumstances.

Further, these proceedings occurred in 1965. Voluntary manslaughter at that time included slayings committed in a transport of passion induced by an adequate provocation (provided

---

[39]In this case the record of the prior conviction or *non-vult* plea contains evidence that would be insufficient to establish murder. The factual basis for the plea consisted of the following exchange at the 1966 plea hearing:

THE COURT: How was this killing done?

MR. RAMSEUR: You mean the way it happened?

THE COURT: Yes. Knife or gun or what?

MR. RAMSEUR: It was a gun.

THE COURT: With a gun?

MR. RAMSEUR: Yes.

THE COURT: In other words, you shot your wife causing her death; is that right?

MR. RAMSEUR: Correct.

THE COURT: And what were the circumstances?

MR. RAMSEUR: I gave her money for my kids Christmas which she had given to her boy friend, telling me she haven't saw him, and demanding her to go and find him. That is when she said she was not going, and she started to run away, and I shot her.

No other facts were adduced. At the sentencing hearing, Judge Glickenhaus referred to the facts contained within the presentence investigation report:

THE COURT: ... This man had no previous violations of the law. Against that, however, I considered the circumstances of the killing, a shooting of the deceased when she was prone to the ground, with a revolver which he had recently acquired.

Further, at sentencing under the prior conviction, defendant's counsel alleged that defendant's wife had been continuously unfaithful and neglected their children and that defendant had been attacked with a knife by one of her boyfriends. Defendant also indicated that he never intended to kill his wife.

the killing occurred before the passage of time sufficient for an ordinary person in like circumstances to "cool off"). *State v. Guido*, 40 *N.J.* 191, 209 (1963); *N.J.S.A.* 2A:113-5 (repealed). The difference between second degree murder and manslaughter was the element of malice. *State v. Brown, supra,* 22 *N.J.* 405. In *Guido*, for example, this Court held that a course of ill treatment, including continuous unfaithfulness, could induce a homicidal response in a person of ordinary firmness if the accused reasonably believed that it would continue. The Court permitted a finding of provocation where a wife intentionally emptied a gun into her sleeping husband who had abused her and threatened to kill her and their baby. *Guido, supra,* 40 *N.J.* at 195-96, 211. There was in the prior offense in the present case evidence of provocation, which might have brought the case within the *Guido* ruling had the defendant gone to trial. Further, defendant said, "I never intended this is happen." Thus, the record of defendant's plea and sentence in the 1965 conviction does not convincingly and clearly establish that he had the requisite intent for first or second degree murder.[40]

---

[40]This Court in *State v. Corbitt,* 74 *N.J.* 379 (1977), *aff'd, Corbitt v. New Jersey,* 439 *U.S.* 212, 99 *S.Ct.* 492, 58 *L.Ed.*2d 466 (1978) left open the possibility that the former statute unnecessarily coerced *non vult* pleas from defendants guilty only of manslaughter. In *Corbitt,* the petitioner unsuccessfully argued, on the basis of *Jackson,* 390 *U.S.* 570, 88 *S.Ct.* 1209, 20 *L.Ed.*2d 138 (1968), that any system under which the defendant received a lesser penalty in exchange for a guilty plea was unconstitutional. This Court noted that "[t]he criminal process . . . is replete with situations requiring 'the making of difficult judgments' as to which course to follow," *Corbitt, supra,* 74 *N.J.* at 398 *(quoting McGautha v. California,* 402 *U.S.* 183, 213, 91 *S.Ct.* 1454, 1470, 28 *L.Ed.*2d 711, 729 (1971)), and that such dilemmas were never thought to invade constitutional rights. However, significantly, the *Corbitt* Court was considerably less sanguine about the dilemma when one choice involved the death penalty. The Court concluded:

Finally, it is our considered view that *Jackson* today is authority only for a situation where a defendant faces the prospect of a possible death sentence if convicted as against the alternative of merely a prison term if he pleads guilty. We have hereinabove stressed the language of *Jackson* emphasizing the awful pressure exerted upon a defendant whose choice of a course of action may mean his death. At the time of *Jackson,* the Court

In criminal cases, particularly death penalty cases, any doubt or ambiguity should be resolved in favor of the accused. *See State v. Biegenwald,* 96 *N.J.* 630, 640 (1984); *State v. Maguire,* 84 *N.J.* 508, 514 n. 8 (1980). Defendant's *non vult* plea, therefore, should not have been considered a prior conviction of murder under *N.J.S.A.* 2C:11–3c(4)(a). It is perverse to use a procedural device available twenty years ago to enable defendants to avoid a possible death sentence as the vehicle for imposing one now.

In this case the jury erroneously determined that defendant's *non vult* plea was an aggravating factor. The death sentence should be vacated if, as here, the jury improperly found a non-statutory aggravating factor. While the Supreme Court in *Zant v. Stephens, supra,* 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.* 2d 235, did uphold a death sentence imposed under Georgia law which was based on three aggravating factors, one of which was found to be invalid, that holding does not apply due to differences in Georgia and New Jersey law. Under the New

---

was undoubtedly already sensitive to the considerations which were to lead to the later broad invalidation of death penalties in *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972). *Cf. Witherspoon v. Illinois, supra,* 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776. [*Id.* 74 *N.J.* at 399.]

It reasonably follows, then, that defendant's *non vult* plea in 1966 should not be considered voluntary at least for purposes of determining whether the plea is a valid prior conviction and an aggravating factor under the death penalty statute. Other courts have reached analogous conclusions. In *Commonwealth v. Colon-Cruz,* 393 *Mass.* 150, 470 *N.E.*2d 116, 124 (1984), the Massachusetts high court ruled that that state's newly-enacted death penalty law, which provided that the death penalty could only be imposed after a jury trial but permitted defendants to plead guilty to first degree murder to avoid any possibility of a death sentence, was unconstitutional because it impermissibly violated defendants' state constitutional rights to demand a jury trial and against self-incrimination. *See Spillers v. State,* 84 *Nev.* 23, 436 *P.*2d 18 (1968) (invalidating under the right to trial by jury a rape statute under which only a jury could impose the death penalty); *State v. Martin,* 94 *Wash.*2d 1, 614 *P.*2d 164 (1980) (invalidating a statute that authorized the imposition of the death penalty upon conviction following a plea of not guilty, but not following a plea of guilty).

Jersey statute the jury is expressly required to add together and then balance aggravating and mitigating factors. *See N.J.S.A.* 2C:11–3c(3). Under New Jersey's statute, therefore, the factors are not solely a threshold screening device to determine whether defendant is death-eligible. Rather the aggravating factors are also a device to determine whether the defendant is death-selected. A defendant becomes death-selected in this State when he becomes death-eligible; both determinations are made simultaneously. In a very real sense, therefore, the offense is defined when the punishment is fixed.

This difference means that the effect of introducing an invalid factor in New Jersey can differ from the effect of introducing an invalid factor in Georgia. Under New Jersey's statute, there is the real and inescapable possibility that introduction of an invalid factor would have an "ascertainable and 'dramatic' impact" on the jury by infecting the weighing process. *See Zant v. Stephens, supra,* 462 *U.S.* at 903, 103 *S.Ct.* at 2756, 77 *L.Ed.*2d at 267. Indeed, states whose death penalty statutes require the jury to balance aggravating and mitigating factors when deciding whether to impose the death penalty,[41] usually hold that a death penalty which is based on both valid and invalid aggravating factors must be set aside. *See, e.g., Williams v. State,* 274 *Ark.* 9, 621 *S.W.*2d 686, 687 (1981); *State v. Irwin,* 304 *N.C.* 93, 282 *S.E.*2d 439, 448–49 (1981); *State v. Moore,* 614 *S.W.*2d 348, 351–52 (Tenn.1981); *Hopkinson v. State,* 632 *P.*2d 79, 90 n. 1, 171–72 (Wyo.1981); *cf. Barclay v. Florida,* 463 *U.S.* 939, 103 *S.Ct.* 3418, 77 *L.Ed.*2d 1134 (1983) (judge's improper use under state law of defendant's criminal record as an aggravating factor did not require reversal of death sentence despite Florida's requirement that aggravating and

---

[41]*E.g.,* Ark.Stat.Ann. § 41–1302(1) (1977); N.C.Gen.Stat. § 15A–2000(b) (Supp.1979); Tenn.Code Ann. § 39–2–203(g) (Supp.1979); Wyo.Stat. § 6–4–102(d)(1) (1977).

mitigating factors be balanced since Florida court considered error harmless due to absence of mitigating factors).

Despite its conclusion that a *non vult* plea can be introduced as a prior conviction for the purposes of Section c(4)(a), the majority would allow defendants to present evidence to "cast some doubt about the conviction's reliability as proof that defendant committed murder." *Ante* at 278. That the majority needed to resort to elaborate procedures and a rebuttable presumption regarding *non vult* pleas, *see ante* at 277–279, only serves to reinforce the conclusion that the *non vult* plea should not be treated as a "prior conviction" aggravating factor.

Under prior case law and the relevant statutes, it is clear that the *non vult* plea cannot be considered as a conviction of murder. Thus to consider the prior *non vult* plea as an aggravating factor was improper for purposes of capital sentencing. Given the structure of the capital murder-death penalty statute, the use of an improper factor must be considered reversible error.

### B.

My assessment differs from the majority's of the prosecutorial misconduct that occurred in the course of this trial. In my opinion this misconduct in particular instances was egregious and highly prejudicial. As a result defendant was denied a fair trial, mandating reversal of his conviction.

With respect to this issue, it is important to understand the scope and focus of appellate review of capital murder-death penalty prosecutions. That review is especially scrupulous and exacting. The basic standard governing appellate review of claimed errors in criminal trials remains that expressed in *State v. Macon,* 57 *N.J.* 325, 335 (1971): "No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict."

The Court has demonstrated a reluctance to disregard errors that affect the jury's impartial deliberations upon the guilt of a criminal defendant. In *State v. Simon, supra,* 79 *N.J.* at 206, this Court stated:

> Errors impacting directly upon ... sensitive areas of a criminal trial are poor candidates for rehabilitation under the harmless error philosophy. The harmful effects of errors of this character cannot be readily measured by the empirical or objective assessment of the evidence bearing upon the defendant's guilt. For this reason, the rule of harmless error should be summoned only with great caution in dealing with the breach of fundamental procedural safeguards "designed to assure a fair trial." (citations omitted).

The Court reiterated this position in *State v. Czachor,* 82 *N.J.* 392 (1980). There, the issue was whether the repeated use of the *Allen* charge constituted reversible error. In refusing to apply the harmless error doctrine this Court stated:

> We have recognized that errors which impact substantially and directly on fundamental procedural safeguards, and particularly upon the sensitive process of jury deliberations, are not amenable to harmless error rehabilitation.... A defendant confronted with this kind of trial error need not demonstrate actual prejudice in order to reacquire his right to a fair trial. [*Id.* at 404.]

This Court was extremely reluctant to use the harmless error doctrine in its treatment of New Jersey's former death penalty statute. In *State v. Mount, supra,* 30 *N.J.* 195, the defendant was found guilty of murder in the first degree and was sentenced to death. On appeal, the defendant contended that the court's comments during the *voir dire* examination unfairly prejudiced his opportunity for a jury recommendation of life imprisonment which would have automatically voided his death sentence. The Court stated:

> "It is not enough that a trial goes through the forms of law. Especially where life is at stake it is requisite that the trial judge should so guide the jury that the jurors may be equipped to determine whether death should be the penalty for conduct. Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own standards against the misuse of capital punishment." [*Id.* at 206 (quoting *Fisher v. United States,* 328 *U.S.* 463, 66 *S.Ct.* 1318, 90 *L.Ed.* 1382, 1391 (1946) (Frankfurter, J., dissenting)).]

The Court recognized that the defendant voiced no objection to the trial court's remarks and made no motion for mistrial, but held that

> [w]here a life is at stake, this court does not hesitate in the interests of justice to invoke the plain error rule ... and to reverse when the trial errors were impregnated with the likelihood of having harmed the substantial rights of the defendant. [*Id.* 30 *N.J.* at 213.]

The Court concluded that the defendant's opportunity for a jury recommendation of life imprisonment had been adversely affected, and reversed the judgment of conviction.

I am satisfied that, as a matter of fundamental fairness, in a capital murder-death penalty case there must be a searching and strict standard of judicial review. The appellate court must be strongly persuaded and firmly convinced that there was no real possibility that an error influenced the jury to return a verdict of capital murder and the death sentence. It is this standard under which we must assess the prosecutor's conduct in this case.

The prosecutor's role is a special one in that his interest is not in winning a case but in seeing that justice is done. *See Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.*2d 1314, 1321 (1935); *State v. Spano,* 64 *N.J.* 566, 568–69 (1974); *State v. Farrell,* 61 *N.J.* 99, 104–05 (1972). Thus "[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States, supra,* 295 *U.S.* at 88, 55 *S.Ct.* at 633, 79 *L.Ed.*2d at 1321; *see State v. Spano, supra,* 64 *N.J.* at 568–69; *State v. Farrell, supra,* 61 *N.J.* at 104–05. When the prosecutor's conduct is so egregious as to deprive the defendant of a fair trial, then the defendant's constitutional rights have been violated.

A prosecutor may not in either specific or general terms express to the jury his personal belief that a defendant is guilty. *See State v. Farrell, supra,* 61 *N.J.* at 103; *State v. Hipplewith,* 33 *N.J.* 300, 311 (1960). An assertion of belief may be reversible error if the prosecutor insinuates that his or her opinion is based upon expertise or special training or is based on facts not in evidence. *See State v. Farrell, supra,* 61 *N.J.*

at 103; *State v. Hipplewith, supra,* 33 *N.J.* at 311. As this Court noted:

> The vice inherent in such insinuation is that it encourages the jury to base its decision on the undisclosed, superior knowledge of the prosecutor, who, in their eyes, represents the authority of the government and the people of the State. *See Berger v. United States,* 295 *U.S.* 78, 55 *S.Ct.* 629, 79 *L.Ed.* 1314 (1935); *State v. Johnson,* 31 *N.J.* 489, at p. 511 (1960). Additionally, the defense is deprived of the opportunity to cross-examine what is in effect unsworn and probably inadmissible testimony. Note, 54 *Colum.L.Rev.* 946, 955 (1954). [*Id.* at 311–12.]

The same considerations dictate that in summation a prosecutor, while otherwise entitled to wide latitude, must "stay" within the evidence. *See State v. Maybery,* 52 *N.J.* 413, 437 (1968); *State v. Hill,* 47 *N.J.* 490, 499 (1966).

In this case, defendant's primary defense consisted of expert testimony relating to "diminished capacity." [42] The evidential support for this defense was furnished mostly by Dr. Lewis, who testified that defendant suffered from psychomotor sei-

---

[42] "Diminished capacity" constituted defendant's main defense with respect to guilt, as well as being relevant in the penalty phase of the trial. In his summation in the penalty phase the defense attorney emphasized, as a mitigating factor, the testimony that Mr. Ramseur was a disturbed man and that he was not whole. He also pointed to the expert testimony that Mr. Ramseur was "literally losing his mind, but more importantly, he's losing that portion which controls or ... controlled his judgment and ability to control his own behavior." The prosecutor in his summation did not respond specifically to this approach.

"Diminished capacity" also was implicated in the issue of flight. Defense counsel objected to a charge on flight. The trial court gave a charge on flight because the defendant's own psychiatrists testified that flight would have a bearing on whether the defendant was suffering from a psychomotor seizure at the time of the murder, *i.e.,* was suffering from diminished capacity. However, these reasons were not explained or communicated to the jury. Rather, the instruction focused on "flight" only as evidence of "consciousness of guilt." Hence, defendant contends, the charge authorized consideration of a non-statutory aggravating factor, *i.e.,* consciousness of guilt, which prevented the jury from fully considering the defendant's mental problems in mitigation. The trial court's failure to make clear that "consciousness of guilt" with respect to flight from the scene was relevant only as it bore on the evidence of the mitigating factors concerning mental culpability, not as any independent aggravating factor, was arguably harmful error.

zures. The prosecutor both ridiculed Dr. Lewis and brought his personal opinion to bear against that of the witness. The prosecutor made comments which, in a non-evidentiary fashion, impermissibly demeaned and denigrated the witness and projected his own personal views and opinions with testimonial effect. On numerous occasions the prosecutor intimated that, according to his own personal belief and expertise, defendant had "hoodwinked" Dr. Lewis. The first such incident occurred when Dr. Lewis discussed defendant's conduct as a child. The witness testified that, according to defendant's mother, defendant's father was shot in a card game and defendant, who was then 11 years old, took his father's bloodstained clothes "[a]nd kept them in his room and sat with them and isolated himself with them." The prosecutor then testified in the form of a question:

> You know something about how a person who commits a crime behaves when you talked about Mr. Ramseur giving a statement. Don't you know that the police at the scene of a homicide would secure the clothing and keep them for evidence and hold them for a long period of time and they wouldn't turn them over to an 11-year-old kid? Do you believe that really happened?

The prosecutor clearly offfered his own personal belief in defendant's guilt to neutralize Dr. Lewis' expert testimony, and further, he insinuated that his belief was based on expertise.[43]

---

[43]This was compounded by at least two other incidents. At one point the following discussion occurred:

> Q Do you think you're any more qualified to say whether or not he would be in a position to knowingly make up a story or excuse than anybody else in this courtroom?
> A Yes, certainly I would hope so after many years.
> Q How about more than me?
> A Yes.
> Q Do you know anything about my background with how many cases of homicides I have handled? In my career?
> A However—
> Q How many murderers I've spoken to?
> A Yes, but you are not a physician and you are not a neurologist and you do not know what to look for in these particular areas to the best of my knowledge, that is your area of expertise.

The Supreme Court has vacated a death sentence where the prosecuting attorney injected into his argument at summation his own account of his record as a prosecutor to persuade the jury that he did not ask for the death penalty where it was not deserved. *See State v. Westbrook*, 408 *U.S.* 939, 92 *S.Ct.* 2873, 33 *L.Ed.*2d 761 (1978), *vacating* 279 *N.C.* 18, 181 *S.E.*2d 572 (1971). In this case, there was nothing inadvertent or acciden-

---

Q What do you know whether or not I have any training in the area of medicine and psychiatry.

A To the best of my knowledge you are not a psychiatrist.

Q Do you know?

A I'm not positive but I would have been introduced to you as a doctor had you been.

Q Well, you've never been introduced to me, have you? You're saying you're more qualified than I am to make a determination, given an opinion as to whether or not a man such as this under these circumstances would render such a story, right?

A That is why they called in psychiatrists as expert witnesses and not an attorney as an expert witness.

A Is that why?

Q Yes.

As did this discussion:

Q Doctor, using just common sense like anybody in this courtroom would you, like any of those kinds back there (indicating), like any of these men here, these women (indicating), whatever they may be in walks of life in this courtroom, use your common sense.

Isn't it the most logical, most reasonable explanation that this man after having done that act was fleeing the scene, after he just killed somebody?

A It is not logical. That's why you ask an expert witness. It is not my mind—

Q You have a different type of logic than anybody has. You have a different kind of common sense. Is your common sense and logic any better than anybody's in this courtroom?

A My logic is—

Q —is your logic and common sense in your opinion any better than anybody in this courtroom, including those young boys in the back, Doctor, who appear to be fourteen or fifteen years old?

A In regard to this, yes.

Q Do you think your common sense and logic in regard to this is better than the Prosecutor in the State of New Jersey who has tried maybe two hundred criminal jury cases and investigated a thousand? Do you think it is better than this unnamed person?

tal in what the prosecutor did.[44] That conduct clearly is prosecutorial misconduct, *see State v. Farrell, supra,* 61 *N.J.* at 103; *State v. Hipplewith, supra,* 33 *N.J.* at 311, and, in my estimation, was highly prejudicial.

## C.

Defendant also raises the claim that the trial court's charge that the jury consider the issue of penalty without "sympathy" constituted reversible error. At the close of the penalty phase, defendant requested that the jury be instructed to consider "fairness and mercy" and "compassion and sympathetic understanding" as mitigating factors.[45] The trial court rejected the

---

[44]Defense counsel also points to the prosecutor's extensive questioning about Dr. Lewis' failure to get defendant's old medical records. Dr. Lewis had testified that she believed that the more intensive a behavorial and medical history a doctor has, the better her opinion will be. She then stated that defendant's old medical records were unavailable, and explained how defense counsel and investigators had tried to locate this information and that some of it had been obtained from defendant's family. Apparently, the records were unavailable because of a fire. The prosecutor directed myriad questions at Dr. Lewis about what she personally had done to get records apart from what defense counsel and investigators had done. Eventually, defense counsel and the witness complained about prosecutorial harassment. The court ruled that the questions were proper but the prosecutor had made his point. Nevertheless, the prosecutor later continued to question Dr. Lewis concerning her own personal efforts to got the records.

Defense counsel contends that the prosecutor knew that Dr. Lewis' opinion was not invalid simply because she did not do her own legwork and that this line of questioning was "a cheap shot at the witness." The questioning was rude and abusive, as were other ridiculing and unnecessary comments made by the prosecutor to the witness, and they could very likely have caused an average juror to reject testimony which the juror would not otherwise reject.

[45]Defendant requested that the jurors be instructed as follows:

Ladies and gentlemen, it is now your duty to determine what punishment will be imposed upon Mr. Ramseur. . . . You must now decide whether extenuating circumstances exist which in fairness and mercy require that Mr. Ramseur be confined to prison with no possibility of parole for 30 years, or whether the Prosecutor has proven aggravating circumstances which you believe warrant Mr. Ramseur's execution.

request and instructed the jury that it "should decide the case on the evidence without any bias, prejudice or *sympathy* and, of course, without reference to conjecture" and with "cool, calm and dispassionate judgment." (Emphasis added). The trial court also explained the process by which the jury was to weigh the aggravating against the mitigating factors, including an instruction that the jury might consider as mitigating evidence "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense." Nevertheless, defendant contends, the court's charge effectively removed considerations of sympathy and compassion from the jury's deliberations and, further, prevented the jury from properly assessing the other mitigating circumstances. The majority rejects this position. It contends that the Supreme Court's decision in *California v. Brown,* —— *U.S.* ——, 107 *S.Ct.* 837, 93 *L.Ed.*2d 934 (1987), supports its determination.

There can be no genuine dispute that in determining whether or not to impose the death sentence, among the many factors the jury may rationally take into consideration is sympathy or compassion for the defendant. This has long been acknowledged by the Supreme Court, *e.g., Winston v. United States,* 172 *U.S.* 303, 312–13, 19 *S.Ct.* 212, 215, 43 *L.Ed.* 456 (1899). We also have firmly understood that juries must be allowed to consider "sympathy for the accused in deciding whether the punishment shall be death," *State v. Conyers,* 58 *N.J.* 123, 137 (1971); *State v. Mount, supra,* 30 *N.J.* 195. While jury discretion must be guided and confined by suitable standards, the ultimate decision as to whether a defendant deserves to die

---

Mitigating factors do not necessarily constitute a justification or excuse for the offense; rather they are circumstances which *in fairness and mercy,* may be considered as extenuating or reducing the degree of blame or moral culpability; circumstances which in your human experience warrant the exercise of *compassion and sympathetic understanding.*

Even if you find that one or more aggravating factors exist, you as the sentencing body may still determine that *in fairness and mercy* a sentence of death would be unjust. (Emphasis added)

cannot be totally scientific or objective. The jury in a criminal trial "serves as the conscience of the community, and the embodiment of the common sense and feelings reflective of society as a whole." *State v. Ingenito, supra,* 87 *N.J.* at 212; *United States v. Quarles,* 350 *U.S.* 11, 18–19, 76 *S.Ct.* 1, 5–6, 100 *L.Ed.* 8 (1955); *Duncan v. Louisiana,* 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.*2d 491 (1968).

The Supreme Court has invalidated death penalty statutes that have attempted in any way to limit the circumstances which the jurors could consider in mitigation at the penalty phase of capital trials. *Lockett v. Ohio, supra,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973; *Eddings v. Oklahoma, supra,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1.

> [The] Eighth and Fourteenth Amendments require that the sentencer … not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death. [*Lockett v. Ohio, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990 (footnote omitted).]

Indeed, *N.J.S.A.* 2C:11–3(c)(5)(h) requires that the jury consider in mitigation "any factor which is relevant to the defendant's character or record or to the circumstances of the offense." This statutory provision is accorded a liberal interpretation in order to assure complete fairness to the defendant. *State v. Davis,* 96 *N.J.* 611 (1984).

Here, the trial court not only refused to instruct the jurors that they could incorporate sympathetic and compassionate feelings into their analysis of the mitigating circumstance, he forbade them to do so. Clearly this constitutes an impermissible curtailing of the defendant's right to have the jury consider every possible mitigating circumstance. In *People v. Bandhauer,* 1 *Cal.*3d 609, 463 *P.*2d 408, 83 *Cal.Rptr.* 184 (1970), the defendant, charged with capital murder, presented evidence of an abused childhood, mental impairment and alcoholism in mitigation of penalty. The trial court charged the jury that "[t]he law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or pub-

lic feeling." 463 *P.*2d at 416, 83 *Cal.Rptr.* at 192. The Supreme Court of California held this charge to be reversible error:

> Thus, jurors who may have felt sympathy for defendant because of the evidence of his tragic childhood might also have felt compelled as "the law of the case" to disregard such sympathy even though the consequence was to impose a death penalty they otherwise would have deemed unwarranted. [*Id.*]

Further, the court ruled that the additional instruction to the jurors that they were "entirely free to act according to your own judgment, conscience and absolute discretion" was not sufficient to overcome the effect of the court's direction to ignore sympathy and sentiment. *Id.; see People v. Stanworth,* 71 *Cal.* 2d 820, 457 *P.*2d 889, 80 *Cal.Rptr.* 49 (1969); *People v. Polk,* 63 *Cal.*2d 443, 451, 406 *P.*2d 641, 47 *Cal.Rptr.* 1 (1965); *People v. Friend,* 47 *Cal.*2d 749, 767, 306 *P.*2d 463 (1957); *State v. Crawford,* 260 *N.C.* 548, 133 *S.E.*2d 232 (1963); *State v. Connor,* 244 *N.C.* 109, 92 *S.E.*2d 668 (1956).

The Supreme Court of Georgia came to the same conclusion in *Legare v. State,* 250 *Ga.* 875, 302 *S.E.*2d 351 (1983). While the case was reversed on another ground, for purposes of the retrial the court considered the defendant's challenge to a charge that instructed the jurors to render a penalty verdict "unaffected by either sympathy or prejudice." *Id.* at 354. Citing to *Lockett v. Ohio, supra,* the Georgia Supreme Court noted that no aspect of a defendant's background or character can be excluded from the jury's consideration. The court found that the trial judge's charge properly instructed the jury "to consider in mitigation all circumstances which in fairness and mercy offer a basis for not imposing the death penalty...." *Id.* Nevertheless, the court ruled:

> But the jury was also charged not to base their verdict on sympathy for the defendant. Since the evidence in mitigation might well evoke sympathy, we find these charges in irreconcilable conflict. Because the charge complained of might well confuse the jury and limit their constitutionally required consideration of evidence in mitigation, we hereby disapprove it. [*Id.*]

The Supreme Court of the State of Washington also found error when the trial court instructed the jury "not to be moved

by sympathy or influenced by prejudice" in coming to a verdict. *State v. Quinlivan*, 81 *Wash.*2d 124, 499 *P.*2d 1268, 1271 (1972). The court noted that "contrary to this implication in the instructions, sympathy is an appropriate factor in the jury's consideration of the penalty issue", *id.* 499 *P.*2d at 1272, and found this charge to be one of several errors requiring a reversal.

Our own understanding is in accord with these views. In *State v. Conyers, supra,* 58 *N.J.* 123, we considered a trial court instruction that "[s]ympathy should play no part in your deliberations." *Id.* at 136. Conceding that such an admonition would be appropriate with regard to the jury's determination of guilt or innocence, defendant argued that the jury might have misunderstood and applied this admonition to the penalty portion of its deliberations. We stated that "there is no dissent from the proposition that a jury should not be told to exclude sympathy for the accused in deciding whether the punishment shall be death." *Id.* at 137.

There should be no quarrel with the proposition that compassion and sympathy for the defendant are proper considerations for the jury in assessing penalty. The exclusion of these considerations from the jury's deliberations in a capital case should be considered highly prejudicial. In this case, the trial court's instruction to exclude sympathy was delivered at the close of the penalty phase, and could only have been understood by the jurors to be applied to their penalty deliberations.

The Court is misguided in treating *California v. Brown* as determinative. In *Brown,* the trial judge charged the jury that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" in making the penalty decision. *Brown,* —— *U.S.* at ——, 107 *S.Ct.* at 840, 93 *L.Ed.*2d at 940. In delivering the opinion of the Court, Chief Justice Rehnquist reaffirmed the established principles that a capital defendant must be allowed to introduce any relevant mitigating evidence regarding his character or record or the circumstances of the offense, and that consideration of

such evidence by the jury is constitutionally indispensible to the process of imposing a death sentence. *Id.* However, he went on to state that since the sentencer cannot be given "unbridled discretion" in determining who is to be sentenced to death, an instruction prohibiting a jury from considering "extraneous emotional factors," *i.e.*, sympathetic response not rooted in the mitigating evidence introduced during the penalty phase, would be constitutionally permissible. *Id.* —— *U.S.* ——–——, 107 *S.Ct.* at 840, 93 *L.Ed.*2d at 941.

In evaluating the instruction challenged in *Brown*, the Chief Justice concluded that because the jury was told "to avoid basing its decision on *mere* sympathy," no reasonable juror would have understood it as an admonition to ignore emotional responses emanating from the mitigating evidence presented. *Id.* —— *U.S.* at ——, 107 *S.Ct.* at 840, 93 *L.Ed.*2d at 940. The use of the word "mere" to modify "sympathy" would have been understood to apply to extraneous factors divorced from the evidence. *Id.* In this case, however, the instruction given by the trial court differed significantly. As noted, the trial court told the jurors that they should decide the penalty "on the evidence *without any* bias, prejudice or *sympathy* ..." (emphasis added). Because of the use of the word "any" in conjunction with a specific reference to "the evidence," the instruction at issue here could be reasonably understood as excluding even sympathy that might emanate from the mitigating testimony presented by the defense. Thus, even under the *Brown* ruling, this instruction is constitutionally defective.

Additionally, the impression given by the trial court here, that the jury should not be moved by considerations of sympathy, was intensified by several of the comments made by the prosecutor in his penalty-phase summation. The prosecutor denigrated the significance of sympathy or compassion.[46] He

---

[46]The prosecutor in summation made these comments:

invited the jury to believe that such feelings were improper—
"human weakness," "human frailty," inconsistent with the law,
and an abdication of responsibilities. Justice O'Connor grasped
this identical point in her concurrence in *California v. Brown,
supra.* She concluded that the "mere sympathy" instructions
considered together with remarks made by the prosecutor in
summation suggesting that the jurors should ignore mitigation
evidence about the defendant's background may have impaired
the jury's proper consideration of the mitigating factors. Ac-
cordingly, she recommended that on remand the California
Supreme Court consider whether the combination of instruction
and comments may have created an impermissible ambiguity in
the minds of the jurors as to their responsibility to consider all
of the mitigating evidence introduced by the defendant. *Id.*
—— *U.S.* at ——, 107 *S.Ct.* at 842, 93 *L.Ed.*2d at 943 (O'Connor,
J., concurring).

Who will decide, counsel asks you whether Mr. Ramseur lives or dies? Put
in a *very emotional and very sympathetic manner of which the defense tries
to get to your sympathy,* ladies and gentlemen, and to mine, tries to get to
the human weakness if you will, human frailty in all of us and that is to let
emotions overcome facts and reality ... Ask yourself, ladies and gentle-
men, whether or not *that play on emotion* should really play a role in your
deliberations.

\* \* \* \* \* \* \* \*

It's emotional but take ahold of your emotions and look at why you're
here. You're here representing everybody out there. You're here to say to
these people out in the streets working, living, playing that I will uphold
the laws as a juror. It's not easy, I don't like it, I don't want it but I will do
it and I will deal with it *not out of emotion or sympathy or bias* or
prejudice but I will render a decision consistent with the laws, consistent
with the laws that are here to protect us, all of us.

The most difficult things we do in our life are not the things we enjoy,
you know that. The things we enjoy in life are the easy things in life. It's
the difficult decisions, the ones which you anguish over which you lose
sleep over, which you may cry over and which you may die over. They're
the difficult ones but once we start abdicating those responsibilities, once
we start giving them up, ladies and gentlemen, *and getting emotional and
getting emotional and getting sympathetic,* where it shouldn't be, once we
start to get into that frame of mind the system is going to collapse.
(Emphasis supplied).

The Supreme Court in *Brown* disingenuously suggests that "the jury's ... reliance on extraneous emotional factors ... would be far more likely to turn the jury against a capital defendant than for him." *Id.* ―― *U.S.* at ――, 107 *S.Ct.* at 840, 93 *L.Ed.*2d at 941 (majority opinion). However, the decision really implies that the constitutional prohibitions against arbitrary imposition of the death penalty require the elimination of mercy, sympathy and compassion from the deliberations of a jury because these might result in the arbitrary sparing of life. In my opinion a condemned defendant's rights under both federal and State Constitutions do not imply such judicial neutrality, nor require the extirpation of such humane impulses from capital sentencing proceedings.

It must be presumed that jurors conscientiously follow the trial court's instructions; the jury here was admonished to and presumably did eliminate sympathy and compassion from its penalty phase deliberations. While prejudice under these circumstances should be presumed, in this case the erroneous instructions are likely to have actually affected the jury's deliberation. In this case the jurors first announced that they were deadlocked and then, following coercive instructions, found an equal number of aggravating and mitigating factors. It eventually weighed these factors to bring it to the ultimate sentence of death. To have allowed jurors to incorporate feelings of sympathy into their deliberations might well have altered the balance in defendant's favor.

### D.

I am firmly of the belief that reversible error occurred when the trial court permitted the jury to consider as an aggravating factor, under c(4)(a), defendant's prior *non vult* plea. In my view, such a plea does not constitute a prior conviction of murder and in this case does not clearly and convincingly demonstrate that the underlying crime constituted murder in the first degree under the former criminal statute. Under the

heightened standard of review applicable to capital murder-death penalty prosecutions, there was also serious prejudicial misconduct on the part of the prosecutor, who, through excessively aggressive cross-examination, improperly fostered and presented to the jury his own personal belief and expert view that a key defense witness was not credible or competent and that her opinion on critical defense issues was not to be given weight by the jury. The prosecutor further added prejudicial influence by insisting in summation, during the penalty phase of the trial, that it would be wrong for the jury to give any consideration to notions of sympathy. These comments combined with the trial court's specific instruction to the jury to remove considerations of sympathy not only had the capacity to confuse and mislead the jury but very likely contributed to their imposition of the death penalty. These several, seriously prejudicial errors furnish added grounds for reversal of defendant's conviction and sentence.

## V.

Irremediable prejudicial error occurred when the trial court coerced the jury to return a unanimous verdict for the death penalty. This error requires the vacation of defendant's death sentence, as the majority itself fully understands. *Ante* at 312. The Court also holds that where a trial court in a capital case has erroneously given coercive supplemental instructions, in violation of *State v. Czachor, supra,* 82 *N.J.* 392, to a jury that has expressed its inability to agree, the defendant may not be subjected to another capital sentencing proceeding. *Id.* at 312–313. However, the basis for the majority's ruling is not explained. The majority refuses to acknowledge the constitutional underpinnings of the result it reaches, positing, instead, a rule apparently limited to this particular situation. I agree with the Court's ruling that defendant may not, on retrial, be sentenced to death. However, I believe that this result is mandated by constitutional principles of double jeopardy and fundamental fairness.

When there is error in the penalty phase of a trial, resulting in the imposition of the death sentence, the Supreme Court has sanctioned the vacation of this sentence while leaving the conviction intact. *See, e.g., Eddings v. Oklahoma, supra,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1; *Adams v. Texas, supra,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581; *Roberts v. Louisiana, supra,* 431 *U.S.* 633, 97 *S.Ct.* 1993, 52 *L.Ed.*2d 637; *Gardner v. Florida, supra,* 430 *U.S.* 349, 97 *S.Ct.* 1197, 51 *L.Ed.*2d 393. We have on occasion done the same thing. *See, e.g., State v. Mount, supra,* 30 *N.J.* 195; *State v. White,* 27 *N.J.* 158 (1958). A retrial of the penalty phase has not been viewed as violating double jeopardy because the defendant was not previously acquitted of the death sentence nor on retrial would he be subjected to a more serious penalty than earlier imposed.

However, double jeopardy does bar resentencing if, in the earlier trial, the defendant was in fact sentenced only to life imprisonment. *See Bullington v. Missouri,* 451 *U.S.* 430, 101 *S.Ct.* 1852, 68 *L.Ed.*2d 270 (1981). This result is based upon the fact that a sentence of life imprisonment is tantamount to an acquittal of the death penalty. The law is settled that a judgment of acquittal bars further prosecution on any aspect of a criminal case. *Sanabria v. United States,* 437 *U.S.* 54, 98 *S.Ct.* 2170, 57 *L.Ed.*2d 43, 56 (1978); *Burks v. United States,* 437 *U.S.* 1, 98 *S.Ct.* 2141, 57 *L.Ed.*2d 1, 9 (1978); *State v. Tropea,* 78 *N.J.* 309 (1978); *State v. Lynch,* 79 *N.J.* 327, 343 (1979).

While this case may be distinguished from *Bullington* on the ground that defendant was not explicitly sentenced to life imprisonment, there are equally strong reasons militating against a second exposure to the death penalty. When the trial court rejected the jury's announcement that it could not agree and then coerced the jury into returning a unanimous verdict for the death penalty, it unfairly and improperly deprived defendant of the very real opportunity to have had the jury return a life sentence. Moreover, we can fairly infer from

these circumstances that the jury was otherwise unable to find sufficient evidence to return a unanimous verdict for a sentence of death. Consequently, exposure of the defendant to a second death penalty trial would, on state constitutional grounds, violate principles of double jeopardy and fundamental fairness.

Neither the United States Supreme Court nor this Court has ever expressly decided or discussed the exact question presented before us. However, in deciding whether to resentence capital murder defendants generally, two fundamental constitutional rights are implicated: the prohibition against double jeopardy and the due process guarantee, as well as the related principle of fundamental fairness.

It is settled that double jeopardy applies to sentencing as well as conviction. *See Ex Parte Lange,* 85 *U.S.* (18 *Wall.*) 163, 21 *L.Ed.* 872 (1873). As noted, the Supreme Court ruled in *Bullington v. Missouri, supra,* 451 *U.S.* 430, 101 *S.Ct.* 1852, 68 *L.Ed.* 2d 270, that a capital defendant who had earlier been sentenced to life imprisonment could not, on remand, be resentenced to the death penalty. The Court held that a sentencing hearing is, for double jeopardy purposes, a trial. Thus, resentencing was barred because the jury's first sentence was tantamount to a finding that the evidence was insufficient to support the death sentence—defendant had been acquitted of the death penalty. *See Sanabria v. United States, supra,* 437 *U.S.* at 69, 98 *S.Ct.* at 2181, 57 *L.Ed.*2d at 56 (a judgment of acquittal bars further prosecution on any aspect of a criminal trial.)

In pre-*Furman* cases arising from the state courts, the Supreme Court would frequently leave convictions of guilt standing but vacate the death penalty when trial error affected sentencing alone. *See Maxwell v. Bishop,* 398 *U.S.* 262, 90 *S.Ct.* 1578, 26 *L.Ed.*2d 221 (1970); *Boulden v. Holman,* 394 *U.S.* 478, 89 *S.Ct.* 1138, 22 *L.Ed.*2d 433 (1969); *Witherspoon v. Illinois,* 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1978). These cases apparently contemplate either resentencing or modification of the sentences to life imprisonment. Of course,

where the Court struck down entire death penalty provisions of state or federal laws, modification of the sentence to life was also permissible. In *Furman v. Georgia, supra,* for example, the Court reversed the consolidated state court decisions only insofar as they imposed the death penalty. There being no other valid penalty on remand, however, the defendants' sentences were modified to life imprisonment. *See Sullivan v. State,* 229 *Ga.* 731, 194 *S.E.*2d 410 (1972); *see also United States v. Jackson,* 390 *U.S.* 570, 88 *S.Ct.* 1209, 20 *L.Ed.*2d 138 (1968) (sentence modified to life imprisonment).

In post-*Furman* cases, the Supreme Court has continued to vacate defendants' death sentences while affirming their convictions. ' *See, e.g., Eddings v. Oklahoma, supra,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1; *Adams v. Texas, supra,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581; *Roberts v. Louisiana, supra,* 431 *U.S.* 633, 97 *S.Ct.* 1993, 52 *L.Ed.*2d 637; *Gardner v. Florida, supra,* 430 *U.S.* 349, 97 *S.Ct.* 1197, 51 *L.Ed.*2d 393; *S. Roberts v. Louisiana,* 428 *U.S.* 325, 96 *S.Ct.* 3001, 49 *L.Ed.*2d 974 (1976); *Davis v. Georgia,* 429 *U.S.* 122, 97 S.Ct. 399, 50 *L.Ed.*2d 339 (1976); *Woodson v. North Carolina, supra,* 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944. In effect, the Court has left to the individual states the decision as to the proper disposition of a capital murder case in which the prejudicial error affected only sentencing. There are, therefore, compelling reasons to examine our own constitutional jurisprudence to determine whether allowing defendant to be resentenced to death comports with our notions of double jeopardy and fundamental fairness.

We have recognized the interaction between principles of double jeopardy and fundamental fairness. When a defendant has been acquitted—for any reason—he may not again be prosecuted for the same crime. *State v. Tropea, supra,* 78 *N.J.* 309; *State v. Lynch, supra,* 79 *N.J.* 327. Moreover, it is settled that where there has been a determination that evidence is insufficient to support a conviction, a defendant may not be tried again—even when this determination is made on appeal.

See *State v. Lynch, supra*, 79 *N.J.* 327. We have also ruled, primarily on grounds of fundamental fairness, that a defendant may not be exposed to multiple trials involving the same or related crimes, particularly when the state has had an adequate and reasonable opportunity to prosecute the defendant. *See, e.g., State v. Abbati*, 99 *N.J.* 418 (1985); *State v. Gaffey*, 92 *N.J.* 374 (1983); *State v. Gregory*, 66 *N.J.* 510 (1975).

As noted, the issue of whether a capital defendant can be resentenced to death, under the circumstances presented by this case, has never been fully considered. It is fair to assume that the apparent dearth of cases in which the issue of retrial has arisen is due to the small number of capital cases prosecuted in New Jersey and death penalties returned by juries. However, in *State v. Laws*, 50 *N.J.* 159 (1967), reargued and sentences modified, 51 *N.J.* 494, *cert.* denied, 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968), we held, under the former death penalty statute, that errors affecting only the sentence should result in modification of the death penalty to life imprisonment. In that case, defendants were tried and convicted of murder in the course of a robbery. After deliberating for several hours, the jury asked if it could return a binding verdict of life imprisonment without possibility of parole. Although the trial judge replied in the negative, he failed to explain that, under *State v. White, supra*, 27 *N.J.* 158, a jury is prohibited from consideration of parole when deciding punishment. The jury then sentenced the defendants to death. On appeal, this Court ruled that the trial court's error was prejudicial but that the error related solely to the death sentences. On reargument, the Court held that a new trial on the issue of punishment alone would be inappropriate. *State v. Laws, supra*, 51 *N.J.* at 511. We based this decision primarily upon the impracticality of such a trial. The Court noted that the costs in terms of time and money to the State of either a partial or full retrial would most likely be very large. Moreover, the Court was

unable to conceive of the operation of a penalty trial. *Id.* at 511–12.[47]

In my opinion, these considerations remain relevant, if not dispositive, in deciding the correct disposition of this case. When the previous trial has been prolonged and complicated, it would be fundamentally unfair to subject defendant to the painful rigors of another death sentence trial. *See State v. Gregory, supra*, 66 *N.J.* 510; *cf. United States v. Scott*, 437 *U.S.* 82, 87, 98 S.Ct. 2187, 2191, 57 *L.Ed.*2d 65, 71–72 (1978) ("[T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby ... compelling him to live in a continuing state of anxiety and insecurity."). When it is practically impossible to rectify the issue of punishment on remand, considerations of fundamental fairness should preclude such a retrial.

In this case, although the proceedings were bifurcated, the guilt trial was prolonged and the record produced therein became the sole evidential record in the penalty phase of the trial. The end result was no different from a unitary trial on guilt and punishment. Thus, we should adopt the salutary resolution of *Laws* by modifying defendant's sentence to life imprisonment.

More importantly, other considerations also implicating notions of double jeopardy and fundamental fairness militate against the defendant once again being exposed to the death penalty. The capital murder-death penalty statute contem-

---

[47]The majority holds that defendant may not be resentenced to the death penalty because he has "irrevocably lost not merely a theoretical possibility but a substantial likelihood that, absent the [coercive *Allen* charge], the jury would have reached a verdict resulting in imprisonment rather than death." *Ante* at 314. In effect, the Court is saying that it would be impossible and fundamentally unfair to attempt to reconstruct the jury deliberations on remand: the course cannot be rerun. In this respect the majority tacitly adopts the rationale of *State v. Laws, supra,* 51 *N.J.* at 511–12, relating to the impracticality of a retrial on the sentencing issue alone.

63

plates three possible final penalty verdicts: a unanimous verdict that results in a sentence of death, a unanimous verdict that results in life imprisonment, and a non-unanimous verdict that results in a sentence of life imprisonment. In this case, defendant argues that the jury had in fact reached a non-unanimous verdict and, therefore, that a sentence of life imprisonment should have been imposed.

I believe that the trial court improperly refused to accept the jury's communication as a non-unanimous verdict. The jury had been instructed that it was permissible to reach a non-unanimous verdict and that the result would be life imprisonment. Moreover, it had deliberated a sufficient amount of time to have reached such a determination. While the intended effect of the jury's communication was not crystal clear, the trial court was derelict in not clarifying its meaning. If the court had allowed the jury to clarify further its communication, the jury might have indicated that the non-unanimous verdict was intended to be its final disposition. Not having done so, the communication should have been accepted at its face value—a determination by the jury that it could not agree. Thus, the trial court irrevocably deprived the defendant of the opportunity to have had this jury impose a sentence of life imprisonment rather than the penalty of death.

If the jury had reached such a disposition—a non-unanimous verdict for life imprisonment—double jeopardy would protect defendant from a retrial on the death sentence. *See Bullington v. Missouri, supra,* 451 *U.S.* 430, 101 *S.Ct.* 1852, 68 *L.Ed. 2d* 270. Unfortunately, the jury deliberations and determinations cannot be reconstructed, the course cannot be rerun. Under these circumstances—when the consequence of ambiguity may be death—defendant is entitled to the benefit of this important doubt.[48] Thus, the express announcement by the

---

[48]In *Commonwealth v. Aljoe,* 420 *Pa.* 198, 216 *A.2d* 50 (1966), the court found error in the imposition of a jury-determined death sentence, resulting from

jury of its inability to agree on a unanimous verdict should be deemed a non-unanimous verdict—which results in a sentence of life imprisonment. On grounds of double jeopardy and fundamental fairness, a death penalty retrial is barred.

In addition, the sentence of death in this case must be viewed as founded on insufficient evidence, thus triggering the double jeopardy bar. As clearly and emphatically recognized by the majority, the trial court coerced the jury into returning a unanimous verdict for the death sentence. *Ante* at 305. After the jury announced that it could not reach unanimity, the trial court gave three separate additional charges. At no time during these added instructions did the court remind the jury that the issue of penalty could be finally resolved by a non-unanimous verdict, resulting in a sentence of life imprisonment. Further, the court repeatedly, improperly and erroneously emphasized to the jurors the "importance of reaching a unanimous verdict." Indeed, the court indicated that by failing to reach unanimity, the members of the jury were betraying their oaths as jurors and shirking their responsibilities as citizens. The trial court emphasized more than once the amount of time and effort that went into the case, implying that the jurors would be responsible for wasting all of those resources if they failed to reach unanimity. Finally, the trial court remarked that the juror's task—whether or not defendant should be put to death—was "rather simple."

In *State v. Czachor, supra,* 82 *N.J.* at 402, we disapproved of the traditional *Allen* charge because it was unduly coercive. In this case, the supplementary instructions delivered by the trial court were rife with compulsion clearly offending the *Czachor*

---

prosecutorial misconduct, and remanded with directions to resentence the defendant to life imprisonment. The Court determined that the error was equivalent to disagreement of the jury and, consequently, that the death sentence should be reduced to life imprisonment since the statute, as does the New Jersey statute, authorized life imprisonment if jurors were unable to reach unanimity as to sentence.

strictures against charges that do not "permit jurors to deliberate objectively, freely, and with an untrammeled mind." *Id.* at 402. We noted in *Czachor* that a trial court's remarks to a jury that it should render a unanimous verdict so as to prevent a "waste" of time and resources and avoid additional expense are completely improper—even in the ordinary criminal prosecution, where a second trial may result because of a deadlock. *Id.* at 398. Such remarks are particularly misleading in a capital trial, where a non-unanimous verdict is not simply a deadlock that will result in a second trial, but constitutes a final resolution of the case.

The underlying problem caused by the coercive *Allen*-type charge, as recognized by the majority, *ante* at 312, is its purpose "to undo a jury deadlock." *Czachor, supra,* 82 *N.J.* at 398. In capital murder trials, however, a defendant has the right to a non-unanimous verdict. *See Lewis v. State,* 369 *So.* 2d 667, 670 (Fla.App.1979); *Kozakoff v. State,* 323 *So.*2d 28 (Fla.D.C.A.1975); *Bell v. State,* 311 *So.*2d 179 (Fla.D.C.A.1975) (cases holding that a defendant has a right to a hung jury). Thus, an *Allen* charge in a capital murder trial is especially intolerable. In an ordinary criminal case, the offending charge deprives the defendant of a mistrial; in a capital murder trial, it deprives him of his life.

In this case, it is clear that the *Allen*-type charges succeeded in "undoing the jury deadlock." Thus, the defendant was not simply deprived of a mistrial based on a hung jury, he was deprived of much more—an acquittal of the death penalty. Under these circumstances, double jeopardy and fundamental fairness principles preclude the retrial of defendant on the sentencing issue. *See State v. Lynch, supra,* 79 *N.J.* 327.

Further, in finding that the trial court's instructions were impermissibly coercive and constituted reversible error, the Court necessarily concludes that the jury was compelled to return the death sentence. What is particularly significant, however, is that the jury clearly demonstrated an inability or unwillingness to bring in an *uncoerced* unanimous verdict for

the death sentence. The conclusion is inescapable that, absent this compulsion, the jury would not have returned the death penalty, rather it would have sentenced defendant to life imprisonment. We are entitled to infer that before it was subjected to unwarranted compulsion, the jury had found the evidence legally insufficient to sustain a penalty of death. An acquittal based upon evidential insufficiency triggers double jeopardy and bars a retrial. See *State v. Lynch, supra,* 79 *N.J.* 327. The bar should apply under these circumstances.

Moreover, in *State v. Lynch, supra,* 79 *N.J.* at 340–41, this Court observed: "A defendant is generally entitled to have a trial proceed to its conclusion, to be free from the harassment of successive prosecutions, and to receive only one punishment for an offense." As already noted, in the ordinary criminal case a non-unanimous verdict will not terminate a criminal prosecution. A hung jury will signify a mistrial and the defendant will be tried again—although there may be cases where fundamental fairness will bar reprosecution following a mistrial. *See State v. Abbati, supra,* 99 *N.J.* 418. However, a capital murder trial can be concluded by a non-unanimous verdict. Hence, because a defendant is "entitled to have a trial proceed to its conclusion," defendant here was entitled to have his case fairly and finally ended by a non-unanimous verdict.

Finally, I believe the Court possesses the inherent power to modify the sentence in this case to life imprisonment. In *State v. Laws, supra,* 51 *N.J.* at 501, we carefully traced the history and development of the judicial power to review and modify sentences. The State Constitution also grants this Court the authority to reduce a jury-determined death sentence to life imprisonment.[49] The original jurisdiction clause and the appellate jurisdiction or "last resort" clause provide strong support

---

[49]The relevant constitutional provisions are: *N.J. Const.* of 1947 art. VI, § 2, para. 1 (Supreme Court exercises appellate jurisdiction in the last resort in all cases provided in the Constitution); art. VI, § 5, para. 3 (grants to Supreme Court such original jurisdiction as may be necessary to complete determination

for this position. The original jurisdiction authority empowers appellate courts to make independent findings of fact when the factual determinations of the trial court are incomplete or erroneous. *See State v. Johnson*, 42 *N.J.* 146 (1964); *State v. Taylor*, 38 *N.J.Super.* 6 (App.Div.1955); *State v. Richardson*, 4 *N.J.Super.* 503 (App.Div.1949). At the time of the *Laws* decision, the original jurisdiction clause had already been invoked by the Appellate Division to modify a trial court's sentence that was manifestly excessive, even though within statutory limits. *See State v. Johnson*, 67 *N.J.Super.* 414 (App.Div.1961).

Moreover, this Court is vested with "Such original jurisdiction as may be necessary to the complete determination of any cause on review." N.J. Const. of 1947 art. VI, § 5, para. 3. When read in conjunction with the grant that the Supreme Court exercise appellate jurisdiction in the last resort in all cases provided in the Constitution, art. VI, § 2, para. 1—capital cases being a clear subset, art. VI, § 5, para. 1,—the Court's power to modify a sentence from death to life imprisonment is obvious, particularly in exigent circumstances.[50] *See, e.g., Frady v. United States*, 348 *F.*2d 84 (D.C.Cir.), *cert.* denied, 382 *U.S.* 909, 86 *S.Ct.* 247, 15 *L.Ed.*2d 160 (1965); *Williams v. State*, 183 *Ark.* 870, 39 *S.W.*2d 295 (1931); *State v. Sorrentino*, 31 *Wyo.* 129, 224 *P.* 420 (1924).

In sum, "the state with all its resources and power should not be allowed to make repeated attempts" to impose the death

---

of any cause on review); art. VI, § 2, para. 3 (Supreme Court empowered to make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts); and art. VI, § 5, para. 1 (providing for appeals to the Supreme Court in capital causes).

[50]Arguably, the Legislature's prohibition on prosecutorial waiver of the death penalty, combined with the statutory provision for proportionality review—which creates in this Court the power to modify disproportionate sentences to life imprisonment—limits this Court's power to modify death sentences *only* in the proportionality review context. However, it would seem odd if the Legislature's recent authorization of this Court's review of sentences in the proportionality context was construed as limiting that authority to only that context.

penalty in this case. *United States v. Scott, supra,* 437 *U.S.* at 87, 98 *S.Ct.* at 2191, 57 *L.Ed.*2d at 71–72. State constitutional principles of double jeopardy and fundamental fairness prohibit exposing defendant once again to the onerous trevail of a death-penalty trial.

## VI.

A final thought. There is no more difficult constitutional issue, in a system that circumscribes state power to safeguard individual life, than the issue of capital punishment, for capital punishment is the exercise of ultimate state power against the individual, the denial of that life. In no other issue, moreover, does the gulf between arcane legalism and brute reality appear wider; it is futile to attempt to reconcile in one's mind the abstract justifications of death penalty jurisprudence with the pain and suffering of Asaline Stokes. Law cheats morality.

Because of the primacy our society reposes, as against the state, in individual life, however, no other issue so demands that legal doctrine be coherent and just. Society is entitled to express through its institutions the outrage felt when lives such as Asaline Stokes are taken so senselessly; if nothing else, this outrage expresses the value we place on individual life and reaffirms our commitment to the sanctity of individual life. As guardians of the Constitution that embodies that value and that commitment, however, the Court must never suffer state actions to replicate even remotely the irrationality of a Thomas Ramseur. Were the state to do so through the unreasoned imposition of death it would be traducing individual life, not honoring it. In a moral code of just deserts, Thomas Ramseur may deserve the same treatment he visited upon Asaline Stokes; under the Constitution, however, the refusal to allow the state to take life in an irrational or arbitrary manner affirms the value of all life including the life so cruelly taken. This Court's capital murder-death penalty decisions will define, by the degree of arbitrariness tolerated, the enormity of the

difference between the value the Constitution places upon individual life and the value the murderer placed upon the life of his victim. When the state takes life in an arbitrary manner, this difference begins to blur. We are all diminished by the violent taking of innocent life; an assurance that our constitutional values retain integrity, however, is our only abiding consolation.

O'HERN, J., concurring in the result.

*For affirmance in part, reversal in part and remandment* —Chief Justice WILENTZ and Justices POLLOCK, CLIFFORD, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—Justice HANDLER—1.